## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

.................................................................x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Barnes Bay Development Ltd., *et al.*[1] | : | Case No. 11-10792 (PJW) |
| | : | |
| Debtors. | : | |
| | : | **Hearing Date: TBD** |
| | x | **Objection Deadline: TBD** |

.................................................................x

## MOTION FOR AN ORDER (A) APPROVING PROCEDURES FOR THE AUCTION AND SALE OF THE DEBTORS' ASSETS AND THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (B) AUTHORIZING THE SALE OF SUCH ASSETS PURSUANT TO THE TERMS AND CONDITIONS OF SALE AND THE ASSUMPTION OF SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The above-captioned debtors and debtors in possession file this *Motion for an Order (a) Approving Procedures for the Auction and Sale of the Debtors' Assets and the Assumption of Certain Executory Contracts and Unexpired Leases and (B) Authorizing the Sale of Such Assets Pursuant to the Terms and Conditions of Sale and the Assumption of Such Executory Contracts and Unexpired Leases* (the "Motion"). The Debtors will subsequently seek approval of (i) the sale of such assets pursuant to the Terms and Conditions of Sale (as they may be modified, the "Terms and Conditions of Sale") attached hereto as Exhibit 1 and (ii) approval of the assumption and assignment of certain executory contracts and unexpired leases related thereto. In support of the Motion, the Debtors incorporate the statements contained in the *Declaration of Deborah Branch in Support of First Day Motions* filed on the Petition Date (the "First Day Declaration") and further respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of the employer identification number for each of the Debtors, are Kor Duo Investment Partners II, L.P. (xx-xxx9891), Kor Duo II, LLC (xx-xxx5207) and Barnes Bay Development Ltd. Barnes Bay Development, Ltd., is a company formed under the laws of Anguilla and, accordingly, does not have an employer identification number.

## I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are §§ 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[2] Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## II.
## BACKGROUND

### A.      The Chapter 11 Cases

3.      On March 16, 2011 (the "Petition Date"), Kor Duo Investment Partners II, LP ("KDIP"), a Delaware limited partnership, Kor Duo II, LLC ("Kor Duo"), a Delaware limited liability company, and Barnes Bay Development Ltd., a company duly incorporated in Anguilla and registered under the Companies Act, Company number 1007701 in the Register of Companies ("Barnes Bay" and, collectively, the "Debtors") filed petitions for relief in this Court under chapter 11 of title 11 of the Bankruptcy Code.

4.      The Debtors are operating their businesses as debtors in possession pursuant to §§ 1107(a) and 1108, and the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

5.      Contemporaneously with the filing of these cases, the Debtors have requested entry of an order authorizing them to obtain an additional $5,000,000 postpetition secured

---

[2]      Unless otherwise noted, section (§) and chapter references herein are to the Bankruptcy Code.

superpriority credit facility (the "DIP Loan") from SOF-VIII-Hotel II Anguilla Holdings, L.L.C. (in such capacity, the "DIP Lender"). As of the Petition Date, the Debtors owed approximately $370,000,000 to SOF-VIII-Hotel II Anguilla Holdings, L.L.C. (in such capacity, the "Prepetition Lender") under its prepetition secured credit facility.

## B. Corporate Structure

6. Kor Duo is managed by its managing member, Bradford Korzen, and is the general partner of KDIP. Barnes Bay, which is wholly-owned by KDIP, is the principal operating company of the Debtors. Barnes Bay owns the The Viceroy Anguilla Resort and Residences ("Viceroy Anguilla" or the "Property"), which comprises the principal assets of the Debtors. In addition, Barnes Bay holds several bank accounts in the United States and leases office space in Coral Gables, Florida to house its sales and marketing team.

## C. Viceroy Anguilla

7. The Viceroy Anguilla Resort and Residences is a luxury resort located on the Caribbean island of Anguilla in the British West Indies. The resort is situated on 35 acres, with more than 3,200 feet of beach frontage along both Barnes and Meads Bays. Viceroy Anguilla features 166 exclusive contemporary beachfront and blufftop villas, townhomes and resort residences. The resort opened on a limited basis in late 2009 when Viceroy introduced 31 free-standing oceanfront villas, 34 ocean view resort residences, guest reception area and the Sunset Lounge and pool. In 2010, the remaining 69 residences and 32 hotel rooms were completed along with the Viceroy Anguilla's 4 restaurants (Coba, Aleta, Bamboo Bar and Grill and The Half Shell), 2 additional community pools (Aleta and Bamboo), Sea Centre, 8,000 square foot oceanfront Spa, Wellness & Fitness Centre, boutique, Generation V Kid's Club and the Viceroy Anguilla Tennis Academy. Viceroy Anguilla also features a state of the art 250,000 gallon

EAST\44324275.11
RLF1 3916913v. 1

reverse osmosis water purification plant, on-site central energy plant and roof-top rainwater collection systems.

8.     Viceroy Anguilla's residences sell for $600,000 to $6,500,000. All residences are sold fully furnished and feature either private infinity or plunge pools. As of October 2010, buyers have agreed to purchase almost 70% of Viceroy's villas, townhomes and residences.

9.     The Property is managed by Viceroy International Holdings, Ltd, through its wholly-owned subsidiary Viceroy Hotel Anguilla Ltd, as agent for the Debtors in accordance with the management agreement executed by Barnes Bay and KHM Viceroy Anguilla LLC (a wholly-owned subsidiary of Kor Hotel Management LLC), and subsequently assigned by KHM Viceroy Anguilla LLC to Viceroy Hotel Anguilla Ltd, a wholly-owned subsidiary of Viceroy International Holdings, Ltd.

10.     As of December 31, 2010, the Debtors reported assets of approximately $530,993,428 and liabilities of $461,948,716 on their consolidated balance sheets. In 2010, the Property and related assets produced approximately $16,719,357 in consolidated revenues, and reported a consolidated net loss of $13,648,468 for the year ended December 31, 2010.

11.     Additional background information on the Debtors, their businesses and the relief requested in this pleading can be found in the First Day Declaration.

**D.     The Proposed Sale**

12.     As described in the First Day Declaration, the Debtors, in conjunction with the Prepetition Lender and the DIP Lender, have determined that the only viable path forward that will provide a benefit to all stakeholders is the sale of the Purchased Assets (as defined below), which includes substantially all the real and personal property of Barnes Bay, free and clear of

EAST\44324275.11
RLF1 3916913v. 1

liens and encumbrances.[3]  The proposed Sale forms one of the cornerstones of the Debtors'

proposed chapter 11 plan of reorganization (the "Plan"), which the Debtors anticipate filing (with

the support of the Prepetition Lender and the DIP Lender) within the first days of these chapter

11 cases.  The sale process in these cases is somewhat more complicated because the proposed

transfer of the Debtors' real property must also satisfy certain procedural requirements set forth

under the Registered Land Act of the Laws of Anguilla, Chapter R30 (the "Registered Land

Act").  Thus, in order to ensure that any sale of the Debtors' real property under §§ 363 and 1123

allows for the proper and legal transfer of title to the real property in Anguilla, the Debtors

believe that the contemplated sale must comply with both the Registered Land Act and the

Bankruptcy Code.  Fortunately, the Debtors believe that these procedural mandates are wholly

consistent with both the letter and the spirit of § 363.

13.    The most significant difference between § 363 and Section 75 of the Registered

Land Act is that the latter contemplates the sale being conducted *by the secured party* "by public

auction subject to such reserve price or other conditions of sale as the charge thinks fit."  *See*

Registered Land Act, § 75.  To constitute a "public auction" under the Registered Land Act, the

auction process must be entirely transparent, meaning that (a) bidders may not be required to

sign confidentiality agreements in order to participate in the auction, (b) there may not be

prequalification requirements for bidders and (c) in anticipation of the auction there must be

wide advertising announcing the auction to the public at large.  *See Credit Suisse AG and*

*Anguilla Masonry Prod. Co. Ltd., et. al.*, (Anguilla High Court of Justice, Nov. 30, 2010, claim

no. AXAHCV 0046/2010) (a copy of which is attached hereto as Exhibit 2).  Once the sale is

---

[3] The sale of the Purchased Assets is, of course, subject to the liens of the Prepetition Lender, which expressly reserves all of its rights under the Loan Agreement.  Thus, any sale of the Purchased Assets to a third party will require, among other consideration, the satisfaction of the Prepetition Lender's secured claim and the DIP Loan, absent the express consent of the Prepetition Lender to alternate treatment.

EAST\44324275.11
RLF1 3916913v. 1

completed, the seller and winning bidder are required to file a registered land transfer form with the Land Registry of Anguilla.  Once that document is registered, then the real property transfers from the seller to the winning bidder free and clear of all liens and charges.  As used herein, the "Seller" means the Debtors and, to the extent that they have statutory rights and authority over the Purchased Assets pursuant to Anguillan Law, the Prepetition Lender and the DIP Lender.

14.     Accordingly, to ensure that the sale of the Debtors' real property will comply both with § 363 and with Section 75 of the Registered Land Act, the Debtors, in conjunction with the Prepetition Lender, will conduct the sale process without either a "stalking horse" bidder or any of the customary bid protections typically associated with a § 363 sale.  Rather, consistent with Anguillan law, the sale will be conducted through a wide open auction process designed to garner the highest and otherwise best bid for the Purchased Assets.  By the attached Terms and Conditions of Sale, the Debtors and Lender have set forth the general terms of the sale of substantially all of their assets, including the real and personal property associated with the Property (all such assets, as described with more particularity in the Terms and Conditions of Sale, the "Purchased Assets"), subject to revisions pursuant to negotiations with interested third parties, and as set forth in the Bid Procedures detailed below.

15.     Finally, as further described in the First Day Declaration, the Debtors do not have sufficient liquidity to continue to operate except with the benefit of the postpetition financing provided by the DIP Lender.  While the DIP Lender is willing to continue to allow the Property to operate fully during the chapter 11 process, the DIP Lender has established a series of milestones to ensure the swift completion of the proposed Sale and emergence of the Debtors from chapter 11, while still allowing ample time to market the Purchased Assets and conduct a

EAST\44324275.11
RLF1 3916913v. 1

full and open sale process consistent with both § 363 and Section 75 of the Registered Land Act. Indeed, the sale of the Purchased Assets contemplated by this Motion not only complies with the postpetition financing agreement (the "DIP Credit Agreement"), but allows ample time to market the Property and conduct a full and open sale process.

## III.
## RELIEF REQUESTED

16.     The Debtors request entry of an order, substantially in the form attached hereto as Exhibit 3 (the "Bid Procedures Order"), (i) approving the procedures set forth on Exhibit 4 hereto (the "Bid Procedures") by which the Debtors propose to conduct an auction (the "Auction") of substantially all their assets, including the Purchased Assets; (ii) scheduling the Auction for May 24, 2011 at 10:00 a.m. (prevailing Eastern time) at the offices of Keithley Lake & Associates or at such other place, date and time as may be designated by the Debtors; (iii) approving procedures (the "Cure Procedures") for the assumption by the Debtors and assignment of certain executory contracts and unexpired leases (collectively the "Contracts") to the Prevailing Bidder; and (iv) approving (a) the form of notice of the Auction and Sale in substantially the form attached hereto as Exhibit 5 (the "Auction Notice") to be served on the Notice Parties (as defined below) and published in various newspapers (as described below) and (b) the form of notice to parties holding Contracts likely to be assumed and assigned in connection with the sale of Purchased Assets, in substantially the form attached hereto as Exhibit 6 (the "Cure Notice").

17.     In addition, the Debtors request that this Court approve the sale of the Purchased Assets to the Prevailing Bidder (as defined below) pursuant to § 1123(a)(5)(D) in connection with the confirmation of the Debtors' plan of reorganization at a date and time to be determined (the "Confirmation Hearing").

7

**IV.**
**PROPOSED BID AND SALE PROCEDURES**

**A.      Assets to Be Sold**

18.      Bids for the Purchased Assets shall be bids to acquire all of the Purchased Assets. Except as otherwise provided in the Terms and Conditions of Sale, all of the Seller's rights, title and interest in the Purchased Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with § 363.  The Seller proposes that any such liens, security interests, claims, charges or encumbrances shall attach to the amounts payable to the Seller resulting from the Sale, net of any transaction fees payable pursuant to the Sale (the "Sale Proceeds"), and held by the Seller, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

**V.**
**SUMMARY OF PROPOSED BID PROCEDURES**

**A.      Real and Personal Property.**

19.      As noted above, and as described in the Terms and Conditions of Sale, the Debtors seek to complete a sale of all or substantially all of the Purchased Assets as a going concern (the "Sale").

**B.      As Is, Where Is.**

20.      The sale of the Purchased Assets shall be on an "as is, where is" basis, without representations or warranties of any kind, nature or description by the Seller or Debtors' estates, except as specifically set forth in the Terms and Conditions of Sale.

**C.      Auction.**

21.      Anguillan law requires that the Auction be held in Anguilla and that no limitation be placed on who is allowed to attend and bid at the Auction.  In accordance with Anguillan law,

EAST\44324275.11
RLF1 3916913v. 1

the Seller shall conduct the Auction with respect to the Purchased Assets at the offices of Keithley Lake & Associates, on May 24, 2011, starting at 10:0 a.m. (prevailing Eastern time), or at such other place, date and time as may be designated in writing by the Seller.

22.    The Auction shall be governed by the following procedures:

(a)    Each bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

(b)    Each bidder shall appear at the Auction in person or through a duly authorized representative.

(c)    Each initial bid shall be equal to or greater than a reserve price established prior to the Auction by an appraiser hired by the Seller for this purpose.

(d)    All bidders shall have the right to submit additional bids in increments of no less than US$1 million and make modifications to the Terms and Conditions of Sale.

(e)    The Auction will be conducted by an approved auctioneer, will take place openly and each bidder will be informed of the principal terms of the previous bid.

(f)    The Auction shall continue until there is only one offer that the Seller determines, in its business judgment and subject to Court approval, is the highest and otherwise best offer from among the bids submitted at the Auction (the "Prevailing Bid"). In making this decision, the Seller may consider, among other things, the amount of the purchase price, the net benefit to the Debtors' estates, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof and the number, type and nature of any changes to the Terms and Conditions of Sale requested by each bidder. The bidder submitting the Prevailing Bid shall become the "Prevailing Bidder," and shall have such rights and responsibilities of the purchaser, as set forth in the Terms and Conditions of Sale.

(g)    Within one (1) day following the adjournment of the Auction, the Prevailing Bidder (unless such Prevailing Bidder is the Prepetition Lender) shall deposit cash in an amount equal to 20% of the purchase price (the "Purchase Price") in an escrow account controlled by the auctioneer (the "Escrow Account").

(h)    Within three (3) days after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made, including, without limitation, Form 4, which will be completed by the Prevailing Bidder promptly after conclusion of the Auction, all as Seller may reasonably request.

(i)    Absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding in the business judgment of the Seller, bids made after the close of the Auction shall not be considered by the Court.

(j)    The Auction proceeding shall be recorded by stenographer or other means as determined by the Seller.

**D.    Credit Bid.**

23.    The Prepetition Lender reserves its right to submit a credit bid at any time on or before the Auction in accordance with § 363(k) and Anguillan law.

**E.    Sale Approval**

24.    Pursuant to Anguillan law and promptly after conclusion of the Auction, the Prevailing Bidder will take those steps necessary to prepare for the transfer of the Purchased Assets free and clear of all liens and encumbrances.

25.    At the Confirmation Hearing, the Debtors will seek Court approval of the Sale to the Prevailing Bidder, free and clear of all liens, claims and encumbrances, pursuant to § 1123(a)(5)(D). All liens, claims and encumbrances will attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale, including the assumption by the Debtors and assignment to the Prevailing Bidder(s) of the assumed Contracts pursuant to § 365. The Debtors will submit and present additional evidence, as necessary, at the Confirmation Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtors' estates and all interested parties.

EAST\44324275.11
RLF1 3916913v. 1

26.     Upon confirmation of the Debtors' proposed chapter 11 plan of reorganization or liquidation (the "Plan") and consummation of the sale of the Purchased Assets, the Prevailing Bidder will complete the transfer of the Purchased Assets pursuant to Anguillan law.

**F.      Closing Conditions and Deadlines**

27.     Subject to the satisfaction of the conditions set forth in the Terms and Conditions of Sale (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (as defined in the Terms and Conditions of Sale) provided for in the Terms and Conditions of Sale (the "Closing") shall take place at the offices of Keithley Lake & Associates (or at such other place as the parties may designate in writing) no later than five (5) business days prior to the date established for the confirmation of the Plan.  At that time, the remaining 80% of the Purchase Price will be placed in the Escrow Account.  The entirety of the Purchase Price will be released from the Escrow Account to Seller upon confirmation of the Plan at the Confirmation Hearing.

**G.      Failure to Consummate Purchase**

28.     After the Auction, unless the Prepetition Lender is the prevailing party, the party with the next highest or otherwise best bid as determined by the Seller in the exercise of its business judgment at the Auction, shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern time) on (i) the first business day that is five (5) days following the entry of the Sale Order or (ii) the Closing.

29.     Following the Auction, if the Prevailing Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Prevailing Bidder, the Back-Up Bidder's bid will be deemed to be the new Prevailing Bid, and the Seller will be authorized, but not required, to consummate the sale with the Backup Bidder without further order of the Court

upon at least 24 hours notice to the Notice Parties (as defined below).  In such case, the Seller specifically reserves the right to seek all available damages from the defaulting Prevailing Bidder in accordance with the Terms and Conditions of Sale, including, but not limited to, retaining the 20% deposit held in escrow.  In the event that the Seller fails to consummate a transaction with the Back-Up Bidder, the Back-Up Bidder's deposit shall be dealt with in accordance with the Terms and Conditions of Sale and the Debtors specifically reserve the right to seek all available damages from the defaulting Back-Up Bidder in accordance with the Terms and Conditions of Sale.

**H.**     **Extension of Deadlines and Modification of Bid Procedures**

30.     The Seller reserves the right at or prior to the Auction to modify the Bid Procedures in a manner not inconsistent with the Terms and Conditions of Sale or impose additional customary terms and conditions on the sale of the Purchased Assets, including to extend the deadlines set forth in the Bid Procedures, modify the minimum bid increment, adjourn the Auction, withdraw from the Auction any or all of the Purchased Assets or cancel the Auction and the Sale, and reject all bids if, in the Debtors' business judgment, no such bid is for a fair and adequate price on terms.  The decision to undertake any such modifications, adjournments, extensions or otherwise remains within the sole discretion of the Debtors in the exercise of their business judgment.

**VI.**
**NOTICE OF AUCTION**

31.     As stated above, the Debtors request that this Court schedule the Auction for May 24, 2011.  The Debtors propose that any objections to the sale be filed on or before the date on which objections to the confirmation of the Plan must be filed.

EAST\44324275.11
RLF1 3916913v. 1

32.     The Debtors request that this Court approve the form of the Auction Notice, substantially in the form of <u>Exhibit 5</u> hereto.  In order to ensure that notice of the Auction is widely disseminated, the Seller will publish the Auction Notice once in *The Wall Street Journal* and twice in *The Financial Times*, and weekly in the Anguillan and St. Maarten newspapers until the date of the Auction.

33.     The Debtors propose to serve the Auction Notice within three (3) business days following entry of the Bid Procedures Order, by first-class mail, postage prepaid, on the following parties: (a) the U.S. Trustee for the District of Delaware, (b) counsel to any statutory committee, (c) counsel to the Prepetition Lender and the DIP Lender, (e) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, (f) all creditors or their counsel known to the Debtors to assert a lien (including a security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets and (g) all parties reasonably known by the Debtors to have an interest in or claim against the Purchased Assets (collectively, the "<u>Notice Parties</u>").

34.     The Auction Notice will provide that any party that has not received a copy of this Motion or the Bid Procedures Order that wishes to obtain a copy of this Motion or the Bid Procedures Order, including all exhibits thereto, may make such a request in writing to counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas  75201, Attention: Charles R. Gibbs, Esq., Telephone: (214) 969-2800, Facsimile: (214) 969-4343.

35.     The Debtors submit that the foregoing notice complies fully with Bankruptcy Rule 2002 and is reasonably calculated to provide timely and adequate notice of the Bid Procedures, Auction and Sale to the Debtors' creditors and other parties in interests and to those

EAST\44324275.11
RLF1 3916913v. 1

who have expressed an interest or are likely to express an interest in bidding on the Purchased Assets. Based on the foregoing, the Debtors respectfully request that this Court approve these proposed notice procedures.

## VII.
## PROCEDURES FOR THE ASSUMPTION AND
## ASSIGNMENT OF ASSUMED CONTRACTS

36.     As noted above, the Debtors will seek to assume certain Contracts to be identified on schedules to the Terms and Conditions of Sale, other than those agreements excluded by the Prevailing Bidder pursuant to the Terms and Conditions of Sale (collectively, the "Assumed Executory Contracts").

37.     At least initially, the Assumed Executory Contracts will be those Contracts that the Debtors believe may be assumed and assigned as part of the orderly transfer of the Assets. The Prevailing Bidder may choose to exclude (or to add) certain Contracts to the list of Assumed Executory Contracts, subject to further notice.

38.     In the interim, the Debtors will serve this Motion and the Cure Notice, substantially in the form of Exhibit 6 hereto, upon each counterparty to the Assumed Executory Contracts by no later than May 3, 2011. The Cure Notice will state the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (such amounts, the "Cure Amounts"). The Debtors also will serve upon all Notice Parties a complete list of Assumed Executory Contracts as set forth in the Terms and Conditions of Sale and the corresponding Cure Amounts by no later than May 5, 2011. If a Contract is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the

14

Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the Terms and Conditions of Sale. If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtors propose that such objection must identify all alleged defaults under such Contract and specify the proposed cure amount, if any, associated with such defaults that exceeds the amount, if any, specified by the Debtors in the Cure Notice. To the extent there is a contract to be assumed pursuant to the Terms and Conditions of Sale, this Motion constitutes a separate motion to assume and assign that contract to the Prevailing Bidder pursuant to § 365; each such contract will be listed on an exhibit to the Terms and Conditions of Sale and will be given a separate Cure Notice.

39.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (an "Assumption Objection"), the Debtors propose that the counterparty must file such objection by no later than (i) 4:00 p.m. (prevailing Eastern time) on May 13, 2011 or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction), *provided*, *however*, that any counterparty may raise at the Confirmation Hearing an objection to the assumption and assignment of an Assumed Executory Contract solely with respect to the Prevailing Bidder's ability to provide adequate assurance of future performance under such Assumed Executory Contract. After receipt of an Assumption Objection, the Debtors will attempt to reconcile any differences in the Cure Amount. In the event that the Debtors and the non-debtor party cannot resolve the Assumption Objection, and the Court does not otherwise make an applicable determination at the

EAST\44324275.11
RLF1 3916913v. 1

Confirmation Hearing, the Debtors may, in their discretion, segregate any disputed Cure Amounts pending the resolution of any such disputes by the Court or mutual agreement of the parties.

40.     The Prevailing Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under § 365(b) in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Prevailing Bidder from performance of any and all of its obligations pursuant to the Terms and Conditions of Sale.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to § 365(b) at the Confirmation Hearing.  Cure Amounts disputed by any counterparty will be resolved by the Court at the Confirmation Hearing.

41.     Except to the extent otherwise provided in the Terms and Conditions of Sale, the Debtors shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to § 365(k).

## VIII.
## APPLICABLE AUTHORITY

**A.      The Sale of the Purchased Assets is Authorized by § 363 as a Sound Exercise of the Debtors' Business Judgment**

42.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Purchased Assets by public auction will enable them to obtain the highest and best offer for these assets (thereby maximizing the value of estates) and is in the best interests of the Debtors, their estates and creditors.  The Sale, pursuant to the Terms and Conditions of Sale and the solicitation of higher or otherwise better offers at the Auction, will

EAST\44324275.11
RLF1 3916913v. 1

provide a greater recovery for the Debtors' estates than would be provided by any other existing alternative.

43.  Section 363(b) provides, in relevant part, that "the trustee, after notice and a hearing, may … sell … other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A court has the statutory authority to authorize a debtor to sell property of the estate pursuant to § 363(b)(1) when such sale is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith.  *See Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to § 363(b)(1)); *see also Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Ernst Home Center. Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

44.  Under § 363(b), a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business.  *See Lionel*, 722 F.2d at 1070-71.  Once a debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

EAST\44324275.11
RLF1 3916913v. 1

45.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See*, *e.g.*, *In re After Six, Inc.*, 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993) (noting that courts should defer to debtor's business judgment with respect to bidding on assets).

46.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).

47.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See*, *e.g.*, *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets. . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

48.     Procedures to dispose of assets, similar to the proposed Bid Procedures, have been approved in other large, complex chapter 11 cases. *See*, *e.g.*, *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive, Inc.*, Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006);

EAST\44324275.11
RLF1 3916913v. 1

*In re Kmart Corp.*, 02-B02474 (Bankr. N.D. Ill. Sept. 4, 2002); *In re Polaroid Corp.*, Case No. 01-10864 (Bankr. D. Del. Nov. 19, 2001).

**B.      The Bid Procedures Are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

49.      The Debtors have proposed the Sale of the Purchased Assets after thorough consideration of all viable alternatives and have concluded that such Sale is supported by a number of sound business reasons.  The Debtors believe that the value the Debtors will receive for the Sale of the Purchased Assets as a going concern exceeds any value the Debtors could get for the Purchased Assets if the Debtors were required to liquidate their assets piecemeal. Furthermore, the Debtors understand that the Prepetition Lender has the right under Anguillan law to exercise its power of sale and thereby force a sale of the Property.

50.      The Debtors also believe that the value of the consideration likely to be received for the Purchased Assets under the Terms and Conditions of Sale, which require that any bid submitted exceeds the Reserve Price established by the appraiser, is fair and reasonable.  As further assurance of value, however, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, Anguillan law and pursuant to the Bid Procedures approved by the Court.  Such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for their assets because they will ensure a competitive and fair bidding process.  Consequently, the fairness and reasonableness of the consideration to be paid by the Prevailing Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

51.      Without the sale of the Purchased Assets pursuant to the procedures outlined above and the Terms and Conditions of Sale, the Debtors' reorganization proceedings would be

EAST\44324275.11
RLF1 3916913v. 1

greatly protracted and potentially derailed, resulting in uncertainty as to the future of the Property and an increased risk of job loss for the Property's employees and independent contractors. It would almost certainly be followed by actions by the Prepetition Lender to seize control of the Property, with potentially no recovery to unsecured creditors. Indeed, such a consequence is almost assured because the failure to conduct the Sale of the Purchased Assets on the timeline contemplated herein will result in a breach of the DIP Credit Agreement.

52. The Debtors believe that the Bid Procedures also will allow the Debtors to undertake the Auction in as expeditious and efficient a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates and that the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtors' assets. In particular, the proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction and which will comply with Anguillan law.

53. In sum, the Debtors believe that the Bid Procedures will encourage bidding for their assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accordingly, the proposed Bid Procedures are reasonable and appropriate within the Debtors' sound business judgment under the circumstances.

**C.  The Sale of the Purchased Assets Free and Clear of Liens and Other Interests is Authorized by §§ 363(l) and 1123(a)(5)(D)**

54. The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to § 363(l), with any such liens attaching to the Sale Proceeds of the

EAST\44324275.11
RLF1 3916913v. 1

Debtors' assets to the extent applicable. Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

55.     This provision is supplemented by § 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

56.     Because § 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that § 363(f) is written in the disjunctive and holding that the court may approve the sale "free and clear" provided at least one of the subsections of § 363(f) is met.

57.     The Debtors believe that one or more of the tests of § 363(f) are satisfied with respect to the transfer of the Debtors' assets pursuant to the Terms and Conditions of Sale. In particular, the Debtors believe that at least § 363(f)(2) will be met in connection with the transactions proposed under the Terms and Conditions of Sale because each of the parties

21

holding liens on the Purchased Assets will consent or, absent any objection to this motion, will be deemed to have consented to the Sale. Any lienholder also will be adequately protected by having their liens, if any, against the Debtors or their estates, attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority and with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, § 363(f) authorizes the transfer and conveyance of the Debtors' assets free and clear of any such claims, interests, liabilities or liens.

58. Under the Terms and Conditions of Sale, the purchaser(s) assumes and agrees to pay, to perform and to discharge as and when they become due and payable, or are required to be performed, all liabilities that are to be performed on and after consummation of the Sale. The purchaser is not liable for any of the Debtors' liabilities in connection with the Sale of the Assets as successors to the Debtors' business or otherwise.

59. Courts have consistently held that a buyer of a debtor's assets pursuant to a § 363 sale takes such assets free from successor liability resulting from pre-existing claims. *See The Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under § 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor

license free and clear of any interest permissible even though the estate had unpaid taxes); *Am. Living Sys. v. Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *WBO P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBO P'ship)*, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in § 363(f)). The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct. Under § 363(f), the purchaser is entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Prevailing Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Purchased Assets.

60. The Debtors further submit that the same analysis is to be applied where, as here, the Sale is being approved pursuant to the confirmation of a chapter 11 plan under § 1123(a)(5)(D). *See, e.g., In re Ecoventure Wiggins Pass, Ltd.*, 419 B.R. 870 (Bankr. M.D.Fla. 2009); *In re Unbreakable Nation Co.*, Case No. 09-10131 (Bankr. E.D. Pa. Apr. 21, 2010) (Order Approving Confirmation and Sale [Docket No. 337]); *In re ILX Resorts Inc.*, Case No. 09-03594 (Bankr. D. Ariz. June 18, 2008) (Order Authorizing Sale [Docket No. 502]).

**D.      The Proposed Notice of Bid Procedures and Auction Is Appropriate**

61. Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and

Anguillan law and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Debtors' assets. The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should give interested purchasers ample time to participate in the Auction. The timeline contemplated by this Motion also conforms to the Debtors' prepetition agreements with the Prepetition Lender.

**E.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

62.    A debtor-in-possession "subject to the court's approval may assume or reject any executory contracts [or unexpired leases] of the debtor." 11 U.S.C. § 365(a). Upon finding that debtors have exercised their sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under § 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

63.    Section 365(b)(1) requires that a debtor in possession meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contact or lease, the trustee—
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default…;
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C)   provides adequate assurance of future performance under such contract or lease.

EAST\44324275.11
RLF1 3916913v. 1

11 U.S.C. § 365(b). Section 365(b)(2) goes on to clarify, however, that the foregoing cure

requirements do not apply to a default that is a breach of a provision relating to:

> (A) the insolvency or financial condition of the debtor at any time
> before the closing of the case;
> (B) the commencement of a case under this title;
> (C) the appointment of or taking possession by a trustee in a case
> under this title or a custodian before such commencement; or
> (D) the satisfaction of any penalty rate or provision relating to a
> default arising from any failure by the debtor to perform
> nonmonetary obligations under the executory contract or unexpired
> lease.

11 U.S.C. § 365(b)(2).

64. Pursuant to § 365(f)(2), a debtor-in-possession may assign an executory contract

or unexpired lease of nonresidential real property if:

> (A) the trustee assumes such contract or lease in accordance with
> the provisions of this section; and
> (B) adequate assurance of future performance by the assignee of
> such contract or lease is provided, whether or not there has been a
> default in such contract or lease.

11 U.S.C. § 365(f)(2).

65. The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." *See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and pay

rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").

EAST\44324275.11
RLF1 3916913v. 1

66. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

67. The Debtors will present evidence at the Confirmation Hearing to prove the financial credibility, willingness and ability of the Prevailing Bidder to perform under the Contracts. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Prevailing Bidder to provide adequate assurance of future performance under the Contracts, as required by § 365(b)(1)(C).

68. In addition, the Cure Procedures are appropriate and consistent with § 365. To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Terms and Conditions of Sale with the Prevailing Bidder. Any provision in each of the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to § 365(f)(1).

69. Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assigned Contracts as set forth herein are appropriate and should be approved.

**F.    The Prevailing Bidder should be Afforded the Protections of a Good Faith Purchaser Under § 363(m)**

70. Section 363(m) protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under § 363(b) is later reversed or modified on appeal. Specifically, § 363(m) states that:

> The reversal or modification on appeal of an authorization under [§ 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

71.     The selection of the Prevailing Bidder is anticipated to be the product of arm's-length, good faith negotiations in a competitive purchasing process. The Debtors intend to request at the Confirmation Hearing a finding that the Prevailing Bidder is a good faith purchaser entitled to the protections of § 363(m).

## IX.
## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

72.     The Debtors further seek a waiver of any stay of the effectiveness of the Order approving this Motion imposed by Bankruptcy Rules 6004(h) and 6006(d) so that the provisions of the Order may become effective immediately upon entry by the Court. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders

otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

73.     As set forth above, the Debtors' ability to enter into the Terms and Conditions of Sale and consummate the transactions described therein is key to the Debtors' successful emergence from chapter 11, and the ability to consummate such transactions immediately following their approval will help to preserve the value of such transactions and ensure the Debtors can move swiftly to conclude these transactions and allow the hotel to emerge from chapter 11. Accordingly, ample cause exists to justify a waiver of the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d).

## X.
## NOTICE

74.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for any statutory committee appointed in these chapter 11 cases, (iii) counsel to the Prepetition Lender and the DIP Lender, (iv) the Debtors' 30 largest unsecured creditors on a consolidated basis, (v) the Residence Purchasers (as defined in the First Day Declaration), (vi) the Securities and Exchange Commission, (vii) the Internal Revenue Service, (vii) the Notice Parties and (ix) all other parties requesting notice in these proceedings pursuant to Bankruptcy Rule 2002.

EAST\44324275.11
RLF1 3916913v. 1

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) granting the relief requested herein and (ii) granting such other and further relief as the Court may deem just and proper.

Dated: March 17, 2011
       Wilmington, Delaware

By: */s/ Chun I. Jang*                              
Paul N. Heath (No. 3704)
Chun I. Jang (No. 4790)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  302.651.7700
Facsimile  302.651.7701

**-and-**

Charles R. Gibbs (*pro hac vice motion pending*)
Michael P. Cooley (*pro hac vice motion pending*)
Sara J.L. Wahl (*pro hac vice motion pending*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  214.969.2800
Facsimile:  214.969.4343

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

EAST\44324275.11
RLF1 3916913v. 1