# EXHIBIT A

**Barnes Bay Development Limited**
**13 Week Cash Flow Forecast**

| | 1 Forecast WE 4/22/11 | 2 Forecast WE 4/29/11 | 3 Forecast WE 5/6/11 | 4 Forecast WE 5/13/11 | 5 Forecast WE 5/20/11 | 6 Forecast WE 5/27/11 | 7 Forecast WE 6/3/11 | 8 Forecast WE 6/10/11 | 9 Forecast WE 6/17/11 | 10 Forecast WE 6/24/11 | 11 Forecast WE 7/1/11 | 12 Forecast WE 7/8/11 | 13 Forecast WE 7/15/11 | 14 Forecast WE 7/22/11 | 15 Forecast WE 7/29/11 | Act 2011 | Bud 2011 | Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | | | |
| **Hotel Operations** | | | | | | | | | | | | | | | | | | |
| Room Revenue | 631,141 | 490,897 | 333,213 | 333,213 | 333,213 | 333,213 | 311,372 | 294,467 | 294,467 | 294,467 | 309,378 | 346,658 | 346,658 | 346,658 | 346,658 | 1,286,000 | 518,500 | 7,144,962 |
| Deposits applied, net of Transient receipts | 30,693 | 23,928 | 23,977 | 24,026 | 24,075 | 24,124 | 24,173 | 24,271 | 24,320 | 24,369 | 24,369 | 24,418 | 24,467 | 24,516 | 24,555 | (388,700) | 184,205 | 276,448 |
| Total Room Revenue (deposits and transient receipts) | 661,834 | 514,816 | 357,190 | 357,239 | 357,288 | 357,337 | 335,246 | 318,689 | 318,739 | 318,787 | 333,748 | 371,076 | 371,076 | 371,174 | 371,223 | 150,000 | 4,118,000 | 4,626,168 |
| Deposit Credits | 238,320 | (23,500) | (51,500) | (51,500) | (51,500) | (51,500) | | | | | | | | | | 1,947,250 | 4,820,705 | 2,898,802 |
| Food & Beverage Revenue | 36,148 | 189,360 | 195,314 | 195,314 | 163,641 | 139,536 | 139,536 | 139,536 | 139,536 | 134,991 | 123,278 | 123,278 | 123,278 | 123,278 | 1,001,000 | 395,216 | 178,793 | 2,167,370 |
| Spa Revenue | 29,551 | 19,362 | 29,483 | 29,483 | 25,467 | 23,100 | 23,100 | 23,100 | 23,100 | 23,121 | 23,175 | 23,175 | 23,175 | 23,175 | 86,625 | 42,500 | 512,336 | |
| Other revenue | 27,984 | 22,984 | 28,093 | 28,093 | 25,951 | 24,345 | 24,345 | 24,345 | 24,345 | 25,003 | 26,648 | 26,648 | 26,648 | 26,648 | 85,010 | 49,154 | 560,861 | |
| Credit Card Deductions | (18,664) | (17,274) | (13,902) | (13,902) | (21,034) | (19,587) | (19,569) | (19,569) | (19,569) | (20,208) | (21,246) | (21,746) | (21,751) | (21,753) | (65,411) | (235,516) | (584,948) | |
| Condo Assessments (1) | | | | | | | | | | | | | | | 198,300 | 184,303 | | |
| Service Charges Collected | 102,437 | 79,673 | 65,467 | 65,467 | 65,467 | 58,164 | 52,687 | 52,687 | 52,687 | 53,484 | 55,475 | 55,475 | 55,475 | 55,475 | 195,945 | 82,959 | 1,216,698 | |
| Government Taxes Collected | 63,114 | 49,089 | 33,321 | 33,321 | 33,321 | 31,107 | 29,447 | 29,447 | 30,938 | 34,666 | 34,666 | 34,666 | 34,666 | 34,666 | 128,800 | 51,850 | 745,488 | |
| Marketing Levies Collected | 3,162 | 2,516 | 3,387 | 3,387 | 3,387 | 3,118 | 2,917 | 2,917 | 2,917 | 2,990 | 2,823 | 2,823 | 2,823 | 2,823 | 15,000 | 15,000 | 78,374 | |
| **Total Cash Receipts for Hotel Operations** | 1,095,501 | 841,446 | 673,853 | 645,902 | 643,951 | 686,437 | 621,000 | 571,133 | 571,227 | 583,866 | 615,440 | 615,334 | 615,440 | 615,467 | 615,534 | 2,098,977 | 5,005,945 | 17,874,146 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | |
| **Hotel Operations** | | | | | | | | | | | | | | | | | | |
| Payroll | 292,527 | 405,750 | 234,000 | 234,000 | 234,000 | 332,500 | 289,750 | 289,750 | 332,500 | 289,750 | 289,750 | 289,750 | 289,750 | 665,750 | | 3,911,777 | | |
| Net Rental Income to Condo Owners | | | | | | | | | | | | | | | 68,354 | 68,354 | 68,354 | 273,416 |
| Social Security | 68,354 | 68,354 | 55,750 | 55,750 | 64,354 | 68,354 | | | | | | | | | | | | |
| Accounts Payable | | | | | | | | | | | | | | | | | | |
| Pre-opening critical | | | | | | | | | | | | | | | | 91,465 | | |
| Assumed contracts (hotels) | 138,998 | 160,000 | 172,617 | 172,617 | 172,617 | 545,862 | 225,465 | 225,465 | 225,465 | 83,900 | 83,900 | 83,900 | 83,900 | 83,900 | 81,838 | 23,084 | | |
| Post-petition | 19,382 | 19,382 | 15,864 | 14,453 | 14,453 | 14,453 | 15,315 | 17,469 | 17,469 | 17,469 | 16,672 | 16,672 | 199,948 | 13,866 | 199,948 | 426,267 | | |
| Sales & Marketing (inc TA commissions) | | | | | | | | | | | 289,534 | 225,602 | | | | 1,171,909 | | |
| Service Charge | | | | | | | | | | | | | | | 125,200 | 325,000 | | |
| Utility/Telephone | 19,926 | 200,000 | | | 200,000 | | | | | 225,000 | | | | | 120,854 | | | |
| Government Taxes | | 254,739 | | | 210,380 | | 310,918 | 325,000 | 325,000 | 147,566 | 12,500 | 125,200 | 125,200 | | 75,000 | 93,750 | 867,062 | |
| Marketing Levies | | | | | 15,000 | | | 15,000 | | | 36,109 | | | | | 156,316 | | |
| Management, Advisory & Group Servicing fees | | 71,985 | | 54,528 | | | | | 45,345 | | | | 87,500 | | 2,786,000 | | 6,132,805 | |
| Enemy accrual plus Diesel/LPG top-up | | | 70,000 | | | | | | 150,000 | | | | 2,661,685 | | | | | 78,448 |
| **Disbursements (out-months):** | | | | | | | | | | | | | | | | | | |
| **Total Hotel Operations Disbursements** | 469,915 | 1,430,220 | 522,451 | 638,904 | 1,057,253 | 1,065,372 | 598,864 | 242,934 | 1,124,249 | 1,068,000 | 459,473 | 100,572 | 734,732 | 735,046 | 811,870 | 2,392,339 | 2,057,632 | 15,999,479 |
| **Net Cash Flow for Hotel Operations** | 625,586 | (588,754) | 151,372 | 7,899 | (376,935) | (375,935) | 22,516 | 328,199 | (553,069) | (476,773) | 124,393 | 514,822 | (49,292) | (119,551) | (218,337) | (293,362) | 2,948,213 | 1,878,819 |
| **Development** | | | | | | | | | | | | | | | | | | |
| Staff costs | 67,652 | 21,826 | 21,826 | 21,826 | 45,426 | 21,826 | 21,826 | 28,826 | 45,426 | 21,826 | 28,826 | 21,826 | 23,003 | 66,957 | | 867,223 | | |
| Capital Expenditure | 506,625 | 160,333 | 442,109 | 272,015 | 879,299 | 134,021 | 95,918 | 311,973 | 152,485 | 89,311 | 141,688 | 316,530 | 371,282 | 1,202,782 | | 8,373,499 | | |
| Costs to Complete | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 125,031 | | | | | | 194,351 | | |
| Assumed Contracts (motion filed) | | | 1,597,897 | | | | | | | | | | | | | 310,418 | | |
| Assumed Contracts (motion to be filed) | | | | | | | | | | | | | | | | 53,524 | | |
| Sales & Marketing | 20,000 | 115,000 | 10,000 | 10,000 | 30,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 | | 355,000 | | |
| Other Costs | | | | | | | | | | | | | | | | | | |
| Legal & Professional fees | | | | | | | | | | | | | | | | | | |
| Business | | | | | | | | | | 87,500 | 75,000 | 93,750 | | 156,316 | | |
| Bankruptcy | | 28,560 | | | | | | | | | | 2,661,685 | 2,786,000 | | 6,132,805 | |
| Advertising | | | 70,000 | | | | | | | | | | | 78,448 | |
| Provision overall | | | | | | | | | | | | | | | | | | |
| **Total Development Disbursements** | 616,257 | 363,344 | 268,159 | 313,851 | 929,342 | 719,777 | 921,125 | 182,941 | 343,739 | 383,799 | 201,311 | 313,510 | 351,533 | 404,284 | 4,200,429 | 2,265,226 | 18,199,736 |
| **Net Cash Flow** | 9,430 | (711,997) | 2,521,601 | 1,749,604 | 1,531,817 | (742,716) | (1,522,568) | (2,233,334) | 142,353 | (860,372) | (4,846,894) | (4,657,158) | (7,619,149) | (6,890,244) | (8,710,856) | (4,493,801) | 682,958 | (19,823,265) |
| **Cash** | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 2,512,171 | 2,521,601 | 1,749,604 | 1,531,817 | (742,716) | (1,522,568) | (2,233,334) | (1,131,943) | (2,986,591) | (3,988,322) | (8,835,216) | (4,657,158) | (7,619,149) | (8,890,244) | (4,453,651) | (13,204,666) | (13,204,666) | 2,512,171 |
| Net Cash Flow | 9,430 | (771,997) | (217,786) | (2,274,533) | (779,843) | (710,766) | 1,101,392 | (1,854,648) | (1,001,731) | (860,531) | (4,670,640) | (2,961,991) | (1,271,096) | (436,593) | (8,751,015) | (4,670,680) | (13,204,666) | (19,823,768) |
| Ending Cash Balance | 2,521,601 | 1,749,604 | 1,531,817 | (742,716) | (1,522,568) | (2,233,334) | (1,131,943) | (2,986,591) | (3,988,322) | (4,848,894) | (4,670,640) | (7,619,149) | (8,890,244) | (4,453,651) | (13,204,666) | (12,521,709) | (12,521,709) | |

Notes:
(1) Net hotel receipts to condo purchasers. To be trued-up and disbursed in Dec 2010.

Total hotel receipts from Aug – Dec 2010: 1,804,500
Percentage paid: 9%
161,292
Percentage of hotel receipts to owners: 44%
70,881
Purchased condo assessments (monthly): 66,064
# of months (aug to dec): 3
330,338
Net hotel receipts to purchasers: (259,456)

$12,500,000.00
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
TERM LOAN AND SECURITY AGREEMENT AND
STIPULATION TO USE OF CASH COLLATERAL

Dated as of _____ __, 2011

Among

BARNES BAY DEVELOPMENT LTD., debtor and debtor-in-possession,
as Borrower,

KOR DUO INVESTMENT PARTNERS II, LP, debtor and debtor-in-possession, and
KOR DUO II LLC, debtor and debtor-in-possession,
as Accommodation Parties,

SOF-VIII-HOTEL II ANGUILLA HOLDINGS, LLC,
as DIP Lender, Administrative Agent and Collateral Agent,

and

SOF-VIII-HOTEL II ANGUILLA HOLDINGS, LLC,
as Pre-petition Lender

$12,500,000.00
# SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN AND SECURITY AGREEMENT AND STIPULATION TO USE OF CASH COLLATERAL

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN AND SECURITY AGREEMENT AND STIPULATION TO USE OF CASH COLLATERAL, is entered into as of _____ __, 2011 (as the same may be amended, supplemented or otherwise modified from time to time, this "Agreement"), by and among BARNES BAY DEVELOPMENT LTD., a company organized under the Companies Act, Revised Statutes of Anguilla, 2002, Chapter C65, as a debtor and debtor-in-possession ("Borrower"), KOR DUO INVESTMENT PARTNERS II, LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("KDIP"), KOR DUO II LLC, a Delaware limited liability company, as a debtor and debtor-in-possession ("Kor Duo" and, together with KDIP, the "Accommodation Parties"), and SOF-VIII-HOTEL II ANGUILLA HOLDINGS, LLC ("SOF Anguilla"), as DIP Lender (as defined herein), Administrative Agent (as defined herein) for DIP Lender, and Collateral Agent (as defined herein) for DIP Lender, and SOF Anguilla, as Pre-petition Lender (as defined herein).

## RECITALS:

WHEREAS, pursuant to that certain Second Amended and Restated Loan and Security Agreement dated as of July 17, 2009 (together with all "Loan Documents" as defined therein and all other agreements, documents, notes, instruments, and any other agreements delivered or recorded pursuant thereto or in connection therewith, and each as amended, supplemented or otherwise modified from time to time, the "Pre-petition Credit Agreement") among Borrower, Citicorp North America, Inc. ("Citicorp"), and Citigroup Global Markets Realty Corp. ("Citigroup"), Citicorp made loans and advances to, issued letters of credit for, and/or provided other financial accommodations to or for the benefit of Borrower thereunder from time to time;

WHEREAS, SOF Anguilla (in such capacity, "Pre-petition Lender") has acquired the loans made pursuant to the Pre-petition Credit Agreement (and all security securing the loans made thereunder) from Citicorp and Citigroup and, pursuant to the Pre-petition Credit Agreement, Borrower was, as of the Petition Date (as defined herein), indebted to Pre-petition Lender in the approximate principal amount of $358,000,000 plus accrued but unpaid interest, costs, fees and expenses (the "Pre-petition Secured Claim");

WHEREAS, the Pre-petition Secured Claim is secured by a valid, perfected, enforceable first priority lien ("Pre-petition Senior Lien") on the Pre-petition Collateral (as defined herein);

WHEREAS, Borrower, the Accommodation Parties, and SOF Anguilla entered into that certain Commitment Letter, dated as of March 16, 2011 (the "Commitment Letter"), confirming their understanding and agreement in connection with the initial proposed financing of a $5,000,000 delayed draw term senior secured super-priority debtor-in-possession financing facility (the "DIP Loan"), which DIP Loan on a final basis is in an aggregate principal amount of up to $12,500,000.00, to fund certain working capital and capex requirements for Debtors (as

defined herein) during a voluntary reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), pursuant to which SOF Anguilla, as DIP Lender, committed to make (i) that certain loan available to Borrower, for the benefit of the Borrower and the Accommodation Parties, upon entry of the Interim Order (as defined herein) in the maximum principal amount of $2,500,000.00 (the "Interim Order Commitment Amount") and (ii) that certain loan available to Borrower, for the benefit of the Borrower and the Accommodation Parties, upon entry of the Final Order (as defined herein) in the maximum principal amount of $10,000,000.00 (the "Final Order Commitment Amount"), which may be advanced in a series of future advances of not less than $1,000,000 each (each such advance a "Future Advance" and collectively the "Future Advances"), in each case subject to the terms and conditions set forth herein;

WHEREAS, Borrower owns good and insurable fee simple title to that certain real property and improvements known as The Viceroy Anguilla Resort and Residences located in Anguilla, British West Indies (the "Property");

WHEREAS, on March 17, 2011 (the "Petition Date"), Borrower, KDIP, and Kor Duo (collectively, "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, Case No. 11-10792 (PJW) (Jointly Administered) (collectively the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on the Petition Date, Debtors filed the Motion For Interim and Final Orders (A) Authorizing Debtors to Obtain Post-petition Financing and to Use Cash Collateral; (B) Granting Liens and Providing Super Priority Claims; (C) Granting Adequate Protection to Pre-petition Secured Parties; and (D) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing (the "DIP Financing Motion") and on March 21, 2011, the Bankruptcy Court entered the Interim Order (A) Authorizing Debtors (i) to Obtain Post-petition Financing and (ii) to Utilize Cash Collateral; (B) Granting Liens and Providing Super Priority Claims; (C) Granting Adequate Protection to Pre-petition Secured Parties; and (D) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing (the "Interim Order"); and

WHEREAS, subject to and in accordance with the applicable terms and conditions set forth in this Agreement, the Interim Order, the Final Order, and the other Loan Documents (as defined herein), DIP Lender agrees to provide the entire amount of the DIP Loan, and Borrower and DIP Lender desire to secure the DIP Obligations (as defined herein) by granting to the Administrative Agent, for the benefit of DIP Lender, a security interest in and lien upon substantially all of Borrower's property, as more fully set forth in this Agreement, the Interim Order, the Final Order, and the other Loan Documents.

NOW, THEREFORE, in consideration of the making of the DIP Loan by DIP Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

# I     DEFINITIONS; PRINCIPLES OF CONSTRUCTION.

1.1     <u>Definitions</u>.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"<u>Accommodation Parties</u>" means KDIP and KOR Duo, which have granted to the Collateral Agent a lien on all of their properties to secure the Borrower's DIP Obligations in consideration of a portion of the DIP Loan proceeds, pursuant to the DIP Budget, being made available to fund the costs of administration of the Accommodation Parties' bankruptcy estates.

"<u>Account Agreement</u>" means that certain Amended and Restated Collection Account Agreement among Administrative Agent, Borrower and Cash Management Bank, as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"<u>Account Collateral</u>" has the meaning set forth in <u>Section 5.1.2</u>.

"<u>Adequate Protection Super-Priority Claim</u>" has the meaning set forth in <u>Section 2.23.2</u>.

"<u>Administrative Agent</u>" means SOF Anguilla, in its capacity as Administrative Agent for Pre-petition Lender and DIP Lender, respectively, hereunder, and its successors and assigns in such capacity.

"<u>Advance Date</u>" means the date on which DIP Lender disburses any Advance to Borrower pursuant to this Agreement.

"<u>Advance</u>" means any advance of the DIP Loan.

"<u>Affiliate</u>" means, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under Common Control with such Person or is a director or officer (other than any independent directors) of such Person or of an Affiliate of such Person.

"<u>Affiliate Agreement</u>" has the meaning set forth in <u>Section 7.1.20(u)</u>.

"<u>Aggregate Commitment</u>" means the sum of the Interim Order Commitment Amount, the Final Order Commitment Amount, and the Additional Commitment Amount.

"<u>Agreement</u>" has the meaning set forth in the introductory first paragraph hereof.

"<u>Alteration</u>" has the meaning set forth in <u>Section 12.2</u>.

"<u>Approved Bank</u>" means a U.S. federal or state chartered depository institution or trust company whose (1) commercial paper, short-term debt obligations or other short-term deposits are rated by the Rating Agencies not less than "A-1"(or the equivalent), if the deposits are to be held in the account for thirty (30) days or less or (2) long-term unsecured debt obligations are rated at least "AA-" (or the equivalent), if the deposits are to be held in the account more than thirty (30) days.

"Assignment of Management Agreement" means any assignment of management agreement (or similarly titled document) entered into in accordance with this Agreement, as any of the same may be amended, replaced, supplemented or otherwise modified from time to time.

"Avoidance Actions" has the meaning set forth in Section 2.22.

"Bankruptcy Case" has the meaning set forth in the Recitals hereto.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bid Procedures Order" means the Order Approving Procedures for the Auction and Sale of the Debtors' Assets entered by the Bankruptcy Court on May 19, 2011 [D.I. 294].

"Borrower" has the meaning set forth in the introductory first paragraph hereof.

"Borrower's Account" means an account maintained by Borrower for its own account at such bank and with such account number as may be designated in writing by Borrower to Administrative Agent and Cash Management Bank from time to time.

"Borrower's Disbursement Account" means the account of Borrower with Cash Management Bank, into which the proceeds of the DIP Loan are to be disbursed as referred to in Section 4.2(b) or such other account as Borrower and Administrative Agent shall reasonably agree to be the account into which such DIP Loan proceeds are to be disbursed.

"Budget Costs" means any costs and expenses set forth in the DIP Budget.

"Business Day" means any day other than a Saturday, Sunday or any other day on which state or national banks in New York, New York are not open for business. When used with respect to an Interest Determination Date, Business Day shall mean any day on which dealings in deposits in U.S. Dollars are transacted in the London interbank market.

"Carve-Out" has the meaning set forth in Section 2.21.2.

"Cash" means Dollars, and any currency accepted as legal tender by the Property.

"Cash and Cash Equivalents" means any one or a combination of the following: (i) Cash, and (ii) U.S. Government Obligations.

"Cash Collateral" has the meaning set forth in the Final Order.

"Cash Management Bank" means Citibank, N.A., or any successor Approved Bank acting as Cash Management Bank under this Agreement or the Account Agreement, or other financial institution approved by Administrative Agent in its sole and absolute discretion.

"Casualty Amount" means One Hundred Thousand Dollars ($100,000).

"Chief Restructuring Officer" means Kevin Nystrom, an employee of Zolfo Cooper Management, LLC and a managing director of Zolfo Cooper, LLC, in his capacity as Chief Restructuring Officer of the Debtors.

"Citicorp" has the meaning set forth in the Recitals hereto.

"Citigroup" has the meaning set forth in the Recitals hereto.

"Closing Date" means the date hereof.

"Code" means the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral Accounts" means, collectively, the Lockbox Account, the Collection Account, Borrower's Disbursement Account and any other accounts now or hereafter pledged to Administrative Agent and/or Lender pursuant to this Agreement, or any of the other Loan Documents (including, without limitation, pursuant to any documents hereafter executed and delivered by Borrower in connection with the DIP Loan).

"Collateral Agent" means SOF Anguilla in its capacity as Collateral Agent for the Pre-petition Lender and DIP Lender, respectively, hereunder, and its successors and assigns in such capacity.

"Collection Account" has the meaning set forth in Section 5.1.1.

"Committee" shall mean the official committee of unsecured creditors appointed in the Debtors' Bankruptcy Case.

"Commitment" means the sum of (i) the Interim Order Commitment Amount (such amount, the "Interim Funding Commitment") and (ii) the obligation (stated as a maximum principal amount) to make Future Advances, together with the Interim Funding Commitment, up to the aggregate principal amount of $12,500,000.00 on or after the Closing Date pursuant to the terms and conditions of the Loan Documents (such amount, the "Future Funding Commitment"). The Commitment of the DIP Lender shall not, in the aggregate, exceed the Interim Funding Commitment and/or Future Funding Commitment, as the case may be (each stated as an original principal amount) set forth opposite the DIP Lender's name on the signature pages hereof, as modified from time to time pursuant to the terms and conditions of the Loan Documents.

"Commitment Letter" has the meaning set forth in the Recitals hereto and includes all exhibits thereto.

"Confirmation Hearing" has the meaning set forth in Section 7.9.1.

"Confirmation Order" has the meaning set forth in Section 7.9.1.

"Control" means (i) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting

securities, by contract or otherwise, and (ii) the ownership, direct or indirect, of no less than fifty-one percent (51%) of the voting securities of such Person, and the terms "Controlled", "Controlling" and "Common Control" shall have correlative meanings.

"Cut-Off Date" has the meaning set forth in Section 8.2.3.

"Debt" means, with respect to any Person at any time, (a) indebtedness or liability of such Person for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (excluding trade obligations); (b) obligations of such Person as lessee under leases which should have been or should be, in accordance with GAAP, recorded as capital leases; (c) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (d) obligations issued for, or liabilities incurred on the account of, such Person; (e) obligations or liabilities of such Person arising under letters of credit, credit facilities or other acceptance facilities; (f) obligations of such Person under any guarantees or other agreement to become secondarily liable for any obligation of any other Person, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (g) obligations of such Person secured by any Lien on any property of such Person, whether or not the obligations have been assumed by such Person; or (h) obligations of such Person under any interest rate or currency exchange agreement.

"Debt Service" means, with respect to any particular period of time, scheduled interest payments.

"Debtors" has the meaning set forth in the Recitals hereto.

"Default" means the occurrence of any event hereunder or under any other Loan Document or under the Interim Order or Final Order, which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" means the rate provided for under Section 2.6 plus two hundred basis points per annum.

"DIP Budget" has the meaning set forth in Section 2.1.4, a copy of which shall be appended to and incorporated into the Final Order.

"DIP Claims" has the meaning set forth in Section 2.22.

"DIP Collateral" means all of (i) Borrower's real and personal, tangible and intangible property and assets of any kind or nature whatsoever, including, without limitation, the Property, the Units, Leases and Rents, whether owned as of the Petition Date, now owned or hereafter acquired or arising and regardless of where located and all proceeds, issue, rents or profits thereof, and (ii) the Accommodation Parties' real and personal, tangible and intangible property and assets of any kind or nature whatsoever, whether owned as of the Petition Date, now owned or hereafter acquired or arising and regardless of where located and all proceeds, issue, rents or profits thereof; provided, that the DIP Collateral shall (x) exclude any assets or property of the Borrower upon which a security interest or lien may not be lawfully granted (collectively, the

"DIP Excluded Assets") but (y) include any and all proceeds of the DIP Excluded Assets. The DIP Collateral shall include the proceeds of Avoidance Actions.

"DIP Excluded Assets" has the meaning set forth in the definition of "DIP Collateral" herein.

"DIP Financing Motion" has the meaning set forth in the Recitals hereto.

"DIP Lender" means SOF Anguilla, and its successors and assigns.

"DIP Liens" has the meaning set forth in Section 2.21.1.

"DIP Loan" has the meaning set forth in the Recitals hereto.

"DIP Obligations" means the Indebtedness and all Loans, Advances, debts, liabilities, and obligations of every nature from time to time owed by Borrower in connection with the DIP Loan, including, without limitation, all obligations and liabilities of Borrower to DIP Lender, Administrative Agent and/or Collateral Agent, whether direct or indirect, absolute or contingent, liquidated or determinable, due or to become due, or now existing or hereafter incurred, whether or not evidenced by any note, agreement, or other instrument, which may arise under or out of or in connection with this Agreement, the Commitment Letter or any other Loan Documents and any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest (including, without limitation, all interest that accrued after the commencement of the Bankruptcy Case, whether or not allowed in the Bankruptcy Case), reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of advisors and counsel to DIP Lender, Administrative Agent and/or Collateral Agent that are required to be paid by Borrower pursuant to the terms of the Loan Documents) or any other sum chargeable to Borrower under this Agreement, the Commitment Letter, or any other Loan Documents, including, without limitation, fees, costs, disbursements, expenses, and charges arising under or in connection with paragraph 18 of the DIP Loan Term Sheet attached as exhibit A to the Commitment Letter.

"Disclosure Statement" has the meaning set forth in Section 7.9.1.

"Disclosure Statement Hearing" has the meaning set forth in Section 7.9.1.

"Disclosure Statement Order" has the meaning set forth in Section 7.9.1.

"Dollars" and "$" means legal tender of the United States of America.

"Domestic Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"Draw Request" has the meaning set forth in Section 4.4(a).

"Earnest Money Deposit" has the meaning set forth in Section 2.12(b)(i).

"Eligible Account" means a separate and identifiable account from all other funds held by the holding institution that is: (i) an account maintained with an Approved Bank or (ii) a segregated trust account maintained with the corporate trust department of a U.S. federal or state chartered depository institution or trust company subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations Section 9.10(b) which, in either case, has corporate trust powers, acting in its fiduciary capacity. An Eligible Account shall not be evidenced by a certificate of deposit, passbook, other instrument or any other physical indicia of ownership. Following written notice from Administrative Agent to Borrower of a downgrade, withdrawal, qualification or suspension of such institution's rating such that such institution is no longer an Approved Bank, each account must promptly (and in any case within not more than thirty (30) calendar days) be moved to a qualifying institution or to one or more segregated trust accounts in the trust department of such institution, if permitted.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"Escrow Agent" means such escrow agent for the Earnest Money Deposits or the proceeds from the sale of a Unit, or appointed in connection with any other transaction contemplated by the Bid Procedures Order and Plan, designated by Borrower and approved by Administrative Agent.

"Eurodollar Lending Office" means, as to DIP Lender, its office located within the European Union as such DIP Lender designates as its Eurodollar Lending Office by notice to Borrower and Administrative Agent.

"Event of Default" has the meaning set forth in Section 18.1(a).

"Exculpated Parties" has the meaning set forth in Section 19.1.

"Federal Funds Rate" means, for any day, the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the day next succeeding such day; provided that (i) if such day is not a Domestic Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Domestic Business Day as so published on the next succeeding Domestic Business Day, and (ii) if no such rate is so published on such next succeeding Domestic Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Administrative Agent on such day on such transactions as determined by Administrative Agent.

"Final DIP Budget" has the meaning set forth in Section 2.1.4.

"Final Order" means the final, non-appealable order of the Bankruptcy Court approving the DIP Loan.

"Final Order Commitment Amount" has the meaning set forth in the Recitals hereto.

"Future Advance" or "Future Advances" has the meaning set forth in the Recitals hereto.

"Future Funding Commitment" has the meaning set forth in the definition of "Commitment" herein.

"GAAP" means the generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, to the extent such principles are applicable to the facts and circumstances on the date of determination.

"Governmental Authority" means any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence, including, in the case of any provision herein relating to DIP Lender, non-U.S. Governmental Authorities.

"Gross Sales Proceeds" means, with respect to a sale of any individual Unit, the purchase price for such Unit under the applicable Sales Agreement.

"Impositions" means all taxes or payments-in-lieu of taxes (including all ad valorem, sales (including those imposed on lease rentals), use, single business, gross receipts, value added, intangible transaction, privilege or license or similar taxes), governmental assessments (including all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not commenced or completed within the term of this Agreement), water, sewer or other rents and charges, excises, levies, fees (including license, permit, inspection, authorization and similar fees), and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Property and/or any Rents (including all interest and penalties thereon), which at any time prior to, during or in respect of the term hereof may be assessed or imposed on or in respect of or be a Lien upon (a) Borrower (including all income, franchise, single business or other taxes imposed on Borrower for the privilege of doing business in the jurisdiction in which the Property is located), (b) the Property, or any other collateral delivered or pledged to Administrative Agent in connection with the DIP Loan, or any part thereof, or any Rents therefrom or any estate, right, title or interest therein, or (c) any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Property or the leasing or use of all or any part thereof. Nothing contained in this Agreement shall be construed to require Borrower to pay any tax, assessment, levy or charge imposed on (i) any tenant occupying any portion of the Property, or (ii) any third party manager of the Property, including any Manager.

"Indebtedness" means all indebtedness and amounts from time to time incurred by Borrower pursuant to this Agreement, the Security Documents or the other Loan Documents, including, without limitation, the Principal Amount and all unpaid accrued interest on the DIP Loan.

"Indemnified Parties" has the meaning set forth in Section 20.12(b).

"Independent" means, when used with respect to any Person, a Person who (i) does not have any direct financial interest or any material indirect financial interest in any Borrower or in any Affiliate of any Borrower, (ii) is not connected with any Borrower or any Affiliate of any Borrower, as an officer, employee, promoter, underwriter, trustee, partner, member, manager, creditor, director, supplier, customer or person performing similar functions, and (iii) is not a member of the immediate family of a Person defined in clauses (i) or (ii) above.

"Independent Accountant" means any so-called "big four" accounting firm or another firm of certified public accountants which is Independent and which is selected by Borrower and acceptable to Administrative Agent in its sole and absolute discretion.

"Independent Architect" means an architect, engineer or construction consultant selected by Borrower which is Independent, licensed to practice in Anguilla, if so required, has at least five (5) years of architectural experience and which is acceptable to Administrative Agent in its sole and absolute discretion.

"Insurance Premium" has the meaning set forth in Section 8.1.3.

"Insurance Requirements" means, collectively, (i) the requirements of Sections 8.1.2 and 8.1.3 together with all material terms of any insurance policy required thereunder, and (ii) all material regulations and then-current standards applicable to or affecting the Property or any part thereof or any use or condition thereof, which may, at any time, be recommended by the Board of Fire Underwriters, if any, having jurisdiction over the Property, or such other body exercising similar functions.

"Interest Determination Date" means, with respect to an Interest Period, the date which is the second Business Day preceding the first day of such Interest Period.

"Interest Period" means, a period commencing on and including a Payment Date to and excluding the next Payment Date; provided, however, that (x) the initial Interest Period shall commence on the date hereof and (y) if any Interest Period would otherwise end after the Maturity Date, such Interest Period shall end on the Maturity Date.

"Interim DIP Budget" has the meaning set forth in Section 2.1.4.

"Interim Funding Commitment" has the meaning set forth in the definition of "Commitment" herein.

"Interim Order" has the meaning set forth in the Recitals hereto.

"Interim Order Commitment Amount" has the meaning set forth in the Recitals hereto.

"KDIP" has the meaning set forth in the Recitals hereto.

"Kor Duo" has the meaning set forth in the Recitals hereto.

"Late Payment Charge" has the meaning set forth in Section 2.11.3.

"Lease" means any lease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, including any right of any duration to occupy any hotel room or Unit, sublease or similar agreement thereunder, and every modification, amendment or other agreement relating to such lease, or other agreement entered into in connection with such lease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Legal Requirements" means, collectively, all present and future laws, statutes, codes, ordinances, consents, approvals, certifications, orders, judgments, decrees, injunctions, rules, regulations and requirements, and irrespective of the nature of the work to be done, of every Governmental Authority which may be applicable to (i) Borrower or with respect to its obligations under the Loan Documents, (ii) all or any portion of the Property, including the improvements thereon, (iii) the performance and completion of the obligations and agreements of Borrower contained herein or in the other Loan Documents, (iv) the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of all or any portion of the Property including, without limitation, building and zoning codes and any required variances, and ordinances and laws relating to handicapped accessibility, and (v) all requirements of each Operating Permit.

"LIBOR" means, with respect to any Interest Determination Date, the rate (expressed as a percentage per annum rounded upwards, if necessary, to the nearest one one-thousandth (1/1000) of one percent (1%)) for deposits in U.S. Dollars for a one (1) month period that appears on Reuters Screen LIBOR01 (or the successor thereto) as of 11:00 a.m., London time, on such Interest Determination Date. If such rate does not appear on Reuters Screen LIBOR01 (or the successor thereto) as of 11:00 a.m., London time, on the applicable Interest Determination Date, Administrative Agent shall request the principal London office of any four (4) prime banks in the London interbank market selected by Administrative Agent to provide such banks' quotations of the rates at which deposits in U.S. Dollars are offered by such banks at approximately 11:00 a.m., London time, to prime banks in the London interbank market for a one (1) month period commencing on the first day of the related Interest Period and in a principal amount that is representative for a single transaction in the relevant market at the relevant time. If at least two (2) such offered quotations are so provided, LIBOR will be the arithmetic mean of such quotations (expressed as a percentage and rounded upwards, if necessary, to the nearest one one-thousandth (1/1000) of one percent (1%)). If fewer than two (2) such quotations are so provided, Administrative Agent will request major banks in New York City selected by Administrative Agent to quote such banks' rates for loans in U.S. Dollars to leading European banks as of approximately 11:00 a.m., New York City time, on the applicable Interest Determination Date for a one (1) month period commencing on the first day of the related Interest Period and in an amount that is representative for a single transaction in the relevant market at the relevant time. If at least two (2) such rates are so provided, LIBOR will be the arithmetic mean of such rates (expressed as a percentage and rounded upwards, if necessary, to the nearest one one-thousandth (1/1000) of one percent (1%)). If fewer than two (2) rates are so provided, then LIBOR will be LIBOR used to determine the LIBO Rate during the immediately preceding Interest Period.

"<u>LIBO Rate</u>" means, with respect to each Interest Period, an interest rate per annum equal to the greater of (i) LIBOR, determined as of the Interest Determination Date immediately preceding the commencement of such Interest Period or (ii) three hundred basis points (3.00%).

"<u>LIBOR Margin</u>" means one thousand basis points (10.00%).

"<u>Licenses</u>" has the meaning set forth in <u>Section 6.1.21</u>.

"<u>Lien</u>" means any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance or charge on or affecting Borrower, the Property, the DIP Collateral, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"<u>Line Item</u>" means a line item of cost or expense set forth in the DIP Budget as the same may be adjusted in compliance with <u>Section 4.6</u>.

"<u>Loans</u>" means the Advances of the DIP Loan made by DIP Lender pursuant to the terms hereof.

"<u>Loan Documents</u>" means, collectively, this Agreement, the Commitment Letter, the Interim Order, and the Final Order, together with all other agreements, certificates or other documents now or hereafter evidencing, guaranteeing, securing or otherwise executed in connection with the DIP Loan, as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"<u>Lockbox Account</u>" has the meaning set forth in <u>Section 5.1.1</u>.

"<u>Lockbox Agreement</u>" means, with respect to the Lockbox Account, the Lockbox Agreement (or similarly titled agreement), dated as of the applicable date and executed by Administrative Agent, Borrower and Lockbox Bank, as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"<u>Lockbox Bank</u>" means an Approved Bank or other financial institution approved by Administrative Agent in its sole and absolute discretion acting as Lockbox Bank under the Lockbox Agreement.

"<u>Management Agreement</u>" means collectively any of the various property management agreements for various portions of the Property with Manager to be approved by Administrative Agent in accordance with this Agreement, or, if the context requires, a replacement Management Agreement entered into in accordance with the terms hereof.

"<u>Manager</u>" means Viceroy Hotel Anguilla Ltd. or, if the context requires, a replacement manager engaged by Borrower with respect to all or any portion of the Property in accordance with the terms of this Agreement, which replacement manager shall be a Qualified Manager.

"<u>Marketing Prices</u>" has the meaning set forth in <u>Section 7.6</u>.

"Marketing Prices Schedule" means any schedule of Market Prices for the Units proposed by Borrower and agreed to by Administrative Agent.

"Material Adverse Effect" means any event or condition that has a material adverse effect on (i) the Property taken as a whole, (ii) the business, profits, operations or financial condition of Borrower, or (iii) the ability of Borrower to repay the principal and interest of the DIP Loan as it becomes due or to perform and satisfy when due or required any of Borrower's other obligations under any of the Loan Documents pursuant to the terms thereof.

"Maturity Date" means the earliest to occur of: (i) September 30, 2011, (ii) the effective date of the Plan of Liquidation of Debtors, (iii) the confirmation date of any plan of reorganization confirmed over the objection of the DIP Lender, (iv) the date of the appointment of an interim or permanent trustee in the Bankruptcy Case or the appointment of a receiver or examiner in the Bankruptcy Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Debtor (or any Debtor applies for, consents to, or acquiesces in, any such relief), (v) the date of the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code (or any Debtor applies for, consents to, or acquiesces in, any such relief), (vi) at the sole and absolute discretion of Administrative Agent, upon the occurrence and continuation of an Event of Default under the Loan Documents, and (vii) the date of payment in full in Cash in Dollars of all DIP Obligations under the Loan Documents.

"Maximum Aggregate Loan Amount" means $12,500,000.00.

"Maximum Legal Rate" means the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the DIP Loan.

"Milestones" has the meaning set forth in Section 7.9.1.

"Net Earnest Money Deposit" means with respect to any Unit, the Earnest Money Deposit payable in accordance with the Sales Agreement relating to such Unit less any Sales Commissions earned and paid to the Sales Agent at the time such Earnest Money Deposit is paid by Purchaser.

"Net Sale Proceeds" means as to any Unit subject to a Unit Sale Closing, the Gross Sale Proceeds for such Unit minus the Sales Commissions payable in connection with such Unit Sale Closing and the Sale Closing Costs incurred or payable in connection with such Unit Sale Closing.

"Offer" has the meaning set forth in Section 7.6.

"Offer Price" has the meaning set forth in Section 7.6.

"Officer's Certificate" means a certificate executed by the Chief Restructuring Officer of Borrower that is familiar with the financial condition of Borrower and the operation of the Property.

"Operating Permits" means, collectively, all authorizations, consents and approvals given by and licenses and permits issued by Governmental Authorities which are required for the ownership, use and occupancy of the Property in accordance with all Legal Requirements, and for the performance and observance of all obligations and agreements of Borrower contained herein or in the other Loan Documents that relate to the ownership, use and occupancy of the Property.

"Other Charges" means maintenance charges, impositions other than Impositions, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof by any Governmental Authority, other than those required to be paid by a tenant pursuant to its respective Lease.

"Partial Release" has the meaning set forth in Section 2.12.

"Partial Release Price" means, with respect to each Unit subject to a Unit Sale Closing, subject to Administrative Agent's prior written approval, an amount equal to the portion of the Net Sale Proceeds from the sale of the Unit payable by Purchaser to Borrower and by Borrower to Administrative Agent for the ratable benefit of the Pre-petition Lender and the DIP Lender at the Unit Sale Closing. as set forth on the Schedule of Partial Release Prices attached hereto.

"Partial Release Prices Schedule" means any schedule of Partial Release Prices for the Units proposed by Borrower and agreed to by Administrative Agent.

"Payment Date" shall be the first Business Day of each calendar month.

"Permitted Debt" means collectively, (a) the obligations, indebtedness and liabilities specifically provided for in any Loan Document and secured by this Agreement, the Security Documents and/or the other Loan Documents; (b) accrued obligations owing to professionals engaged by the Debtors or the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case not in excess of amount provided therefor in the DIP Budget; and (c) amounts not secured by Liens on the Property, not to exceed $100,000 at any one time outstanding, payable by or on behalf of Borrower for or in respect of the operation of the Property in the ordinary course of operating Borrower's business, provided that (but subject to the terms of the next sentence) each such amount shall be paid within sixty (60) days following the date on which each such amount is incurred. Nothing contained herein shall be deemed to require Borrower to pay any amount, so long as Borrower is in good faith, and by proper legal proceedings, diligently contesting the validity, amount or application thereof, provided that in each case, at the time of the commencement of any such action or proceeding, and during the pendency of such action or proceeding (i) no Event of Default shall exist and be continuing hereunder, (ii) adequate reserves with respect thereto are maintained on the books of Borrower (as determined by an Independent Accountant), and (iii) such contest operates to suspend collection or enforcement, as the case may be, of the contested amount and such contest is maintained and prosecuted continuously and

with diligence. Notwithstanding anything set forth herein, in no event shall Borrower be permitted under this provision to enter into a note or other instrument for borrowed money.

"Permitted Encumbrances" means collectively, (a) the Liens and security interests created or permitted by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Policy, (c) Liens, if any, for Impositions not yet delinquent, (d) Liens for Impositions which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted in accordance with Section 9.3 hereof, (e) statutory Liens of carriers, warehousemen, mechanics, materialmen and other similar Liens arising by operation of law, which are incurred in the ordinary course of business, (f) all easements, rights of way, restrictions and other similar non monetary encumbrances against Property which do not have a Material Adverse Effect and otherwise do not materially and adversely affect (i) the ability of Borrower to pay any of its obligations to any Person as and when due, (ii) the marketability of title to the Property and Units individually, (iii) the Strata Lot Plan, (iv) the fair market value of the Property, or (v) the use or operation of the Property.

"Permitted Investments" has the meaning set forth in the Account Agreement.

"Permitted Priority Liens" has the meaning set forth in Section 2.21.1.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county, municipal or other government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Petition Date Cash" has the meaning set forth in Section 5.2.1.

"Plan" has the meaning set forth in Section 7.1.20.

"Plan of Liquidation" has the meaning set forth in Section 7.9.1.

"Policy" has the meaning set forth in Section 8.1.3.

"Post-petition Cash" has the meaning set forth in Section 5.2.2.

"Post-petition Replacement Liens" has the meaning set forth in Section 2.23.1.

"Pre-petition Collateral" means all of Borrower's Petition Date real and personal, tangible and intangible property and assets of any kind or nature whatsoever, regardless of where located and all proceeds, issues, rents or profits thereof; provided, that the Pre-petition Collateral shall (x) exclude any assets or property of the Borrower upon which a security interest or lien may not be lawfully granted (collectively, the "Pre-petition Excluded Assets") but (y) include any and all proceeds of the Pre-petition Excluded Assets.

"Pre-petition Credit Agreement" has the meaning set forth in the Recitals hereto.

"Pre-petition Excluded Assets" has the meaning set forth in the definition of "Pre-petition Collateral" herein.

"Pre-petition Lender" has the meaning set forth in the Recitals hereto.

"Pre-petition Secured Claim" has the meaning set forth in the Recitals hereto.

"Pre-petition Senior Liens" has the meaning set forth in Section 2.21.1.

"Prime Rate" means the "Prime Rate" which Citicorp or any of its U.S. affiliates announces from time to time as its prime lending rate, in effect from time to time. The Prime Rate shall change as of the date of each change in the Prime Rate. If, during any period that any portion of the DIP Loans are outstanding, Citicorp or any of its U.S. affiliates no longer announces a "Prime Rate", the Prime Rate shall mean the rate reported by The Wall Street Journal (Eastern Edition) from time to time as the "Prime Rate". The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. DIP Lender may make commercial or other loans at rates of interest at, above or below the Prime Rate.

"Principal Amount" means the then outstanding aggregate principal amount of the DIP Loan, from time to time.

"Proceeds" has the meaning set forth in Section 8.2.2.

"Property" has the meaning set forth in the Recitals hereto.

"Public Sale" means the public auction and sale of the Property and related personalty as contemplated and as authorized by the Bid Procedures Order, which is currently scheduled to commence on July 27, 2011.

"Purchaser" has the meaning set forth in Section 2.12.

"Purchaser Deposit" has the meaning set forth in Section 2.12.

"Qualified Manager" means any reputable and experienced management organization having at least 5 years experience in the management of resort hotel properties similar to the Property, having managed for at least 5 years prior to the engagement as property manager at least 5 resort hotel properties similar to the Property and which together with its Affiliates has under management (excluding the Property), at the time of its engagement as manager of the Property, not fewer than 5 full service resort hotel properties containing not fewer than 5 times the number of hotel rooms as the Property in the aggregate. KOR Hotel Management, LLC, Viceroy Hotel Anguilla Ltd. and KHM Viceroy Anguilla, LLC, shall each be deemed to be a Qualified Manager.

"Qualifying Third Party Sales Agreement" has the meaning set forth in Section 2.12.

"Rents" means all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties

and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits (including, without limitation, amounts payable as a profit participation in connection with any sales agreements with Exclusive Resorts Real Estate Holdings II, LLC or any affiliate thereof or any other Unit Sales Agreement), charges for services rendered or goods sold and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property (but specifically excluding Net Sale Proceeds), and Proceeds, if any, from business interruption or other loss of income insurance, including (without limitation) all Lease proceeds, hotel receipts and revenues, credit card receipts, receipts, Cash and all payments received which relate to the rental of guest rooms or Units (under rental pool agreements or otherwise) or meeting rooms or banquet rooms or recreational facilities or bars, beverage or food sales, vending machines, mini-bars, room service, telephone, video and television systems, electronic mail, internet connections, guest laundry, bars, the provision or sale of other goods and services, and all other payments received from guests or visitors of the Property, license, Lease, sub-Lease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and all other items of revenue, receipts or income as identified in the Uniform System of Accounts.

"Restoration" has the meaning set forth in Section 8.2.4(a).

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Sale Closing Costs" means with respect to any Unit Sale Closing the actual and reasonable closing costs and expenses, including transfer taxes, legal fees, recording fees and other actual closing costs (but not Sales Commissions or marketing costs) incurred and paid by Borrower and approved by Administrative Agent in its sole and absolute discretion in connection with the Unit Sale Closing.

"Sales Agent" means Kor Marketing, LLC, a Delaware limited liability company, and any successor thereto which is approved by Administrative Agent that may hereafter be charged with the marketing and selling of Units at the Property pursuant to a Sales Agent Agreement.

"Sales Agent Agreement" means that certain Exclusive Sales & Marketing Agreement, dated as of January 1, 2007, between Borrower and the Sales Agent, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, or, if the context requires, a replacement Sales Agent Agreement approved by Administrative Agent in accordance with terms hereof.

"Sales Agreement" has the meaning set forth in Section 2.12.

"Sales Commissions" means the sales brokerage fees and commissions and other compensation that may be payable to the Sales Agent under the Sales Agent Agreement in connection with each Unit Sale Closing or the payment of an Earnest Money Deposit; provided, that aggregate Sales Commissions with respect to the sale of any Unit shall not exceed ten and

one-quarter percent (10.25%) of the Gross Sale Proceeds for such Unit without Administrative Agent's prior written approval in Administrative Agent's sole discretion.

"Security Documents" means, collectively, this Agreement, all other Loan Documents, the Interim Order and Final Order, which grant to, evidence or perfect in Administrative Agent or Collateral Agent (in each case, for the benefit of the Pre-petition Lender and DIP Lender) a security interest in any portion of the Pre-petition Collateral and/or DIP Collateral or any of Borrower's or the Accommodation Parties' rights or interests thereon or related thereto.

"SOF Anguilla" has the meaning set forth in the introductory first paragraph hereof.

"Strata Lot Plan" means the Amended and Restated Master Declaration, organizing a portion of the Property into a condominium under applicable Anguilla law, together with the Amended and Restated Condominium Declaration, Use Restriction Restrictive Agreement, Condominium Association Management Agreement, Villas Association Management Agreement, Unit Maintenance and Operation Agreement, Rental Program Agreement, and together with any and all other documents and instruments affecting or concerning that portion of the Property that is declared to be under the condominium regime and the operation thereof, the Condominium Association and the Villa Association, all as described more fully therein.

"Taking" means a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of compulsory acquisition, condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Term" has the meaning set forth in Section 2.5.

"Title Company" means Chicago Title Company.

"Title Continuation" means an endorsement to the Title Policy indicating that, since the last preceding Advance, there has been no change in the state of title to the Property and no Liens or survey exceptions not previously approved by Administrative Agent as provided herein, which notice or endorsements shall contain no exception for inchoate mechanic's liens and shall have the effect of continuing the Title Policy to the date of such Advance and increasing the coverage of the Title Policy by an amount equal to the Advance then being made if the Title Policy does not by its terms provide for such an increase.

"Title Policy" means a mortgagee title insurance policy substantially in the form approved by Administrative Agent, as the same may be substituted or supplemented by an owners policy insuring the Administrative Agent's interest in the Property upon the Transfer of title to the Property to Administrative Agent or its designee.

"Total Loss" means (i) a casualty, damage or destruction of the Property which, in the sole judgment of Administrative Agent, (A) involves an actual or constructive loss of more than thirty percent (30%) of the lesser of (x) the fair market value of the Property or (y) the Maximum Aggregate Loan Amount plus the amount of the Pre-petition Secured Claim, or (B) with respect to which Borrower is not required under the Leases to apply Proceeds to the restoration of the

Property or (ii) a permanent Taking which, in the sole judgment of Administrative Agent, involves an actual or constructive loss of more than fifteen percent (15%) of the lesser of (x) the fair market value of the Property or (y) Maximum Aggregate Loan Amount plus the amount of the Pre-petition Secured Claim, or (iii) a casualty, damage, destruction or Taking that affects so much of the Property such that it would be impracticable, in Administrative Agent's sole and absolute discretion, even after restoration, to operate the Property as an economically viable whole.

"Transfer" means any direct or indirect sale, assignment, conveyance, transfer, pledge or other disposition of any beneficial interest by any means whatsoever whether voluntary, involuntary, by operation of law or otherwise, or where used as a verb, means to directly or indirectly sell, assign, convey, mortgage, transfer, pledge, hypothecate, encumber, grant a security interest in, exchange or otherwise dispose of any beneficial interest or grant any option or warrant with respect thereto.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect in the State of New York or Delaware, as applicable.

"Unit" means each "Unit" as such term is used in the Strata Lot Plan, within the Property, designated as such pursuant to the Strata Lot Plan.

"Unit Sale Closing" has the meaning set forth in Section 2.12 hereof.

"United States" means the United States of America, including the States and the District of Columbia, but excluding its territories and possessions.

"Unused Commitments" means an amount equal to all unadvanced funds which DIP Lender is obligated, subject to the provisions of the Loan Documents, to advance to Borrower, pursuant to this Agreement.

"U.S. Government Obligations" means any direct obligations of, or obligations guaranteed as to principal and interest by, the United States Government or any agency or instrumentality thereof, provided that such obligations are backed by the full faith and credit of the United States. Any such obligation must be limited to instruments that have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change. If any such obligation is rated by S&P, it shall not have an "r" highlighter affixed to its rating. Interest must be fixed or tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with said index. In no event shall any such obligation have a maturity in excess of 365 days.

Any defined term used herein and not defined herein shall have the meaning ascribed to such term in the Pre-petition Credit Agreement.

1.2     Principles of Construction. All references to sections are to sections in this Agreement unless otherwise specified. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. Unless otherwise specified herein or therein, all terms defined in this Agreement shall have the definitions given them in this Agreement when used in any other Loan Document or in any certificate or other document made or delivered pursuant

thereto. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II    GENERAL TERMS.

### 2.1    Loan Amounts and Disbursement to Borrower.

#### 2.1.1    Loan Amounts.

(a)    DIP Loan. Subject to the conditions and upon the terms herein provided and as provided in the Interim Order and the Final Order, and subject specifically to the restrictions set forth in the remainder of this Section 2.1.1, DIP Lender hereby agrees to lend to Borrower, and Borrower agrees to borrow from DIP Lender, the DIP Loan in a maximum principal amount not to exceed the Maximum Aggregate Loan Amount or such lesser amount as shall then be available pursuant to the terms of this Agreement. The DIP Loan shall be repaid with interest, costs and charges as more particularly set forth in this Agreement and the other Loan Documents. Principal amounts of the DIP Loan which are repaid for any reason may not be reborrowed.

(b)    Maximum Aggregate Loan Amount. Notwithstanding anything contained herein or in any other Loan Document to the contrary, the aggregate principal amount of the DIP Loan shall not under any circumstances exceed (1) the Interim Funding Commitment under the Interim Order, and (2) the Maximum Aggregate Loan Amount under the Final Order.

#### 2.1.2    DIP Loan Advances.

(a)    Disbursement of DIP Loan. Borrower acknowledges and agrees that following the date of the Interim Order, DIP Lender made Advances of the DIP Loan to Borrower in the aggregate principal amount of $283,250.00, which Loans are secured by the Loan Documents, DIP Collateral (other than property of the Accommodation Parties) and Interim Order.

(b)    Future DIP Loan Advances.

(i)    In the event that Borrower shall have satisfied the applicable DIP Loan Advance conditions pursuant to and in accordance with the terms and conditions set forth in Articles III and IV of this Agreement, DIP Lender shall make Future Advances in an aggregate principal amount (including the Interim Order Commitment Amount) not to exceed the Maximum Aggregate Loan Amount.

(ii)    Upon the disbursement of any Future Advance, Borrower agrees to borrow such Future Advance from DIP Lender upon the terms of this Agreement and the other Loan Documents. Other than the disbursements of the DIP Loan by DIP Lender on the Advance Dates pursuant to this Agreement, DIP Lender shall have no obligation to

loan any additional funds or make any financial accommodations in respect of the DIP Loan.

2.1.3   The Security Documents and Loan Documents.

(a)   The DIP Loan shall be evidenced and secured by this Agreement, the Interim Order, Final Order, Security Documents and the other Loan Documents. The Security Documents respecting the Pre-petition Credit Agreement shall be deemed amended to grant a lien and security interest in the DIP Collateral to secure the DIP Loan, and perfect the DIP Loan and the DIP Liens in the DIP Collateral.

(b)   DIP Lender shall record the date, amount, type and maturity of each of the Loans made by it and the date and amount of each payment of principal made by Borrower with respect thereto; provided that the failure of DIP Lender to make such recordation shall not affect the obligations of Borrower hereunder.

2.1.4   Use of Proceeds.  Borrower acknowledges that it has used the proceeds of the DIP Loan disbursed prior to the date hereof, and shall use the proceeds of any Future Advances, in a manner consistent in all material respects with an interim budget provided to and approved by Administrative Agent prior to the Closing Date (the "Interim DIP Budget") and the then applicable rolling 13-week budget as provided to and approved by Administrative Agent as a final budget (as the same may be amended, supplemented or extended from time to time with the Administrative Agent's prior approval, the "Final DIP Budget" and together with the Interim DIP Budget, the "DIP Budget") for payment of (a) post-petition operating expenses and other working capital and financing requirements of Debtors subject to the DIP Budget, (b) certain transaction fees, costs, and expenses and (c) certain other costs and expenses incurred in the administration of the Bankruptcy Case.  Debtors and their estates shall not be permitted to use the DIP Loan Advances: (i) to finance or pay for in any way any direct or derivative action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Pre-petition Lender, Administrative Agent or DIP Lender or their rights and remedies under the Commitment Letter, the Interim Order, the Final Order, or the other Loan Documents, or the investigation or facilitation thereof by any other party, except, pursuant to the *Order Granting Debtors' Motion for an Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals* entered by the Bankruptcy Court on April 12, 2011 [D.I. 100], as to those allowed fees and expenses incurred by the Committee's attorneys and advisors prior to May 31, 2011; (ii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Administrative Agent; and (iii) to pay any fees, expenses or similar amounts to any Person who has proposed or may propose to purchase interests in the Borrower or the Property (including so-called "topping fees" and similar amounts) without the prior written consent of Administrative Agent.

2.2   Commitments to Lend.  DIP Lender agrees, on the terms and conditions set forth in this Agreement, to make the Advances to Borrower, pursuant to this Agreement in amounts such that the aggregate principal amount of the Loans at any one time outstanding shall not exceed the amount of its Commitment.  The term of the Commitments shall expire on the

Maturity Date and neither Administrative Agent nor DIP Lender shall have any further commitment to advance any additional funds after the Maturity Date.

2.3     Intentionally omitted.

2.4     Intentionally omitted.

2.5     Term.  The term (the "Term") of the DIP Loan shall terminate and expire on the Maturity Date.  If any Loans are outstanding on the Maturity Date, the same shall be due and payable (together with accrued interest thereon) in full on the Maturity Date, and Borrower shall repay the same in full.

2.6     Interest on Loans.

        (a)     The Loans shall each bear interest prior to maturity (whether by acceleration or otherwise), at a rate per annum equal to the LIBO Rate plus one thousand basis points for the applicable Interest Period.

        (b)     Interest on the Loans shall be payable at maturity (whether by acceleration or otherwise).

2.7     Intentionally omitted.

2.8     General Provisions as to Payments.

        (a)     Interest shall accrue and, absent an Event of Default, be due and payable in full on the Maturity Date.

        (b)     Borrower shall make each payment of principal of, and interest on, the Loans and fees hereunder, not later than 2:00 p.m. (New York City time) on the date when due, in Federal or other funds immediately available in New York City, to the account of Administrative Agent.

        (c)     All amounts due hereunder shall be payable, without any counterclaim, setoff or deduction whatsoever, at the office of Administrative Agent at the address set forth on the signature page of this Agreement or at such other place as Administrative Agent may from time to time designate in writing.

        (d)     In the absence of an Event of Default, the Principal Amount of all outstanding Advances under the DIP Loan shall be due at the Maturity Date.  The DIP Obligations, including, without limitation, the entire Principal Amount of the DIP Loan, all interest that would accrue on the Principal Amount through the Maturity Date, and all other fees and sums then payable hereunder or under the Loan Documents shall be due and payable in full on the Maturity Date.

        (e)     Administrative Agent shall distribute to DIP Lender each such payment received by Administrative Agent for the account of DIP Lender on the same day as received by Administrative Agent if received by Administrative Agent by 3:00 p.m. (New York City time),

or, if received by Administrative Agent after 3:00 p.m. (New York City time), on the immediately following Domestic Business Day. If the date for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended time. If and to the extent that Administrative Agent shall receive any such payment for the account of DIP Lender on or before 3:00 P.M. (New York City time) on any Business Day, and Administrative Agent shall not have distributed to DIP Lender such payment on such Business Day, Administrative Agent shall distribute such amount to DIP Lender together with interest thereon, for each day from the date such amount should have been distributed to DIP Lender until the date Administrative Agent distributes such amount to DIP Lender, at the Federal Funds Rate.

2.9     Intentionally omitted.

2.10     Computation of Interest and Fees. All interest and fees shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day). Interest for each Interest Period shall be calculated from and including the first day thereof to but excluding the last day thereof. Any change in the interest rate shall become and be effective for the entire day on which such change in rate shall become effective.

2.11     Default Interest; Application of Payments.

2.11.1   Default Interest. Upon the occurrence and during the continuance of an Event of Default, and from and after the Maturity Date if the entire Principal Amount is not repaid on the Maturity Date, interest on the outstanding principal balance of the DIP Loans and, to the extent permitted by law, overdue interest and other amounts due in respect of the DIP Loans, shall accrue at the Default Rate calculated from the date such payment was due without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Indebtedness (or that portion thereof that is then due). To the extent permitted by applicable law, interest at the Default Rate shall be added to the Indebtedness, shall itself accrue interest at the same rate as the DIP Loan, and shall be secured by the Loan Documents. This Section 2.11 shall not be construed as an agreement or privilege to extend the date of the payment of the Indebtedness, nor as a waiver of any other right or remedy accruing to Administrative Agent by reason of the occurrence of any Event of Default, and Administrative Agent retains its rights hereunder to accelerate and to continue to demand payment of the Indebtedness upon the happening of any Event of Default.

2.11.2   Application of Payments. All amounts advanced by Administrative Agent and/or DIP Lender pursuant to the applicable provisions of the Loan Documents together with any other charges as provided therein, shall be due and payable hereunder as provided in the Loan Documents. In the event any such advance or charge is not so repaid by Borrower, Administrative Agent may, at its option, first apply any payments received hereunder to repay such advances, together with any interest thereon, or other charges, fees, expenses and obligations as provided in the Loan Documents, and the balance, if any, shall be applied in payment of any installment interest or principal then due and payable.

2.11.3  Intentionally omitted.

2.11.4  Usury Savings.  This Agreement is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the DIP Loan at a rate which could subject Administrative Agent and/or DIP Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due under this Agreement at a rate in excess of the Maximum Legal Rate, then the applicable interest rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due.  All sums paid or agreed to be paid to Administrative Agent for the use, forbearance, or detention of the sums due under the DIP Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the DIP Loan until payment in full so that the rate or amount of interest on account of the DIP Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the DIP Loan for so long as the DIP Loan is outstanding.

2.12  Prepayments.

(a)  Intentionally omitted.

(b)  Unit Sales; Mandatory Prepayments.

(i)  Each Unit shall be sold under a sales agreement substantially in the form approved by Administrative Agent (each, a "Sales Agreement", the purchaser under any Sales Agreement is herein referred to as a "Purchaser"), subject to changes that in the aggregate would not render the final agreement materially different from the form approved by Administrative Agent, and in all material respects conforming to all Legal Requirements, including those requiring disclosures to prospective and actual Purchasers. Each Sales Agreement must require full payment of the purchase price in cash to Borrower at the closing in an amount equal to the Partial Release Price Schedule.  Each Sales Agreement hereafter entered into shall require non-refundable earnest money (subject to the rights of Purchasers under the Sales Agreement and subject to Legal Requirements) (an "Earnest Money Deposit") in an amount approved by Administrative Agent in its sole and absolute discretion and shall have no conditions or contingencies other than those contingencies set forth in the form of the Sales Agreement approved by Administrative Agent in its sole and absolute discretion.  Each Sales Agreement shall require the Purchaser thereunder to deliver the Earnest Money Deposit to the Escrow Agent in Dollars only in Cash, and such Earnest Money Deposit shall not be in the form of a letter of credit, security, instrument or any other form except as may be approved by Administrative Agent in its sole discretion.  No Unit may be leased, sold or conveyed under any Lease, conditional sales contract or other arrangement where Borrower retains a deferred portion of the purchase price or any residual or contingent interest in the Unit, including any purchase money security interest, without the express prior written consent of Administrative Agent in each instance.  Notwithstanding the foregoing to the contrary, Administrative Agent acknowledges and agrees that Sales Agreements entered into by

Borrower prior to the Petition Date, or post-Petition Date and prior to the date hereof, on forms previously approved by Administrative Agent (or on forms not materially different from forms previously approved by Administrative Agent) shall not be deemed to be a violation of this Section 2.12(b)(i).

(ii)     Borrower shall deposit (or cause to be deposited) with the Administrative Agent in cash or by wire transfer of immediately available funds or by certified or bank check payable to Administrative Agent all Earnest Money Deposits or other cash amounts hereafter deposited with Borrower (or any other person for the benefit of Borrower) relating to the sale of a Unit prior to the applicable Unit Closing Date (the "Purchaser Deposits").

(iii)     Borrower represents and warrants that (a) Borrower has provided to Administrative Agent prior hereto true, correct and complete copies of all Sales Agreements entered into with respect to any of the Units, including any amendments or modifications thereto, and such Sales Agreements are in full force and effect, and have not been terminated, modified or amended, and (b) neither applicable law nor the terms and conditions of any such Sales Agreement prohibits the application of each Purchaser Deposit as a mandatory prepayment of the DIP Loan in accordance with this Section 2.12(b).

(iv)     A sale of a Unit free and clear of the DIP Lien and Pre-petition Senior Lien shall occur only if a Sales Agreement is executed which meets the requirements of this Agreement.  Borrower may sell Units in the ordinary course of business with bona fide third party buyers (unrelated and not Affiliated with Borrower, any owner of any direct or indirect interest in Borrower, or any Affiliate of any of the foregoing) on bona fide arms-length terms and conditions provided that the following requirements are satisfied:

(A)     Borrower has complied with Section 7.6 with respect to the acceptance of the applicable Offer;

(B)     a Sales Agreement is executed with the Purchaser which conforms to the requirements of this Agreement;

(C)     Borrower, acting in good faith, believes (based on Borrower's review of the buyer's financial statements and credit reports and other document Borrower deems necessary) that the Purchaser is financially capable of performing all of its obligations under the Sales Agreement.

Any Sales Agreement meeting all of the conditions required by this Agreement is referred to as a "Qualifying Third Party Sales Agreement".

(v)     Borrower (a) shall perform its obligations under the Sales Agreements and shall enforce the Sales Agreements in full force and effect, and (b) except as required by law or a ruling of a court of competent jurisdiction, shall not

materially amend, modify, supplement or terminate, or permit any material amendment, modification, supplement or termination to occur under any of the Sales Agreements, without the prior written consent of the Administrative Agent in each instance.

(vi)     Intentionally omitted.

(vii)     Subject to the Committee's right to seek disgorgement pursuant to Paragraph 12(f) of the Final Order if the Plan of Liquidation is not confirmed, in connection with the closing of the sale of each Unit (a "Unit Sale Closing"), Borrower shall prepay without premium or penalty the loans under the Pre-petition Credit Agreement in the amount of the Partial Release Price for such Unit and Unit Sale Closing from the proceeds of such sale, and shall pay interest and other amounts due in accordance with the Pre-petition Credit Agreement, and Administrative Agent shall, at the sole expense of Borrower, release, or cause to be released the applicable Unit from the Pre-petition Senior Lien and DIP Lien securing the indebtedness (a "Partial Release") upon the satisfaction by Borrower of each of the following terms and conditions:

(A)     Administrative Agent shall have received not less than five (5) Business Days prior written notice of the proposed Unit Sale Closing accompanied by a pro forma settlement statement, in the form and substance acceptable to Administrative Agent in its sole discretion, signed by Borrower and reflecting the Gross Sales Proceeds, Sales Commissions, Sale Closing Costs, Net Sale Proceeds and Partial Release Price with respect to such Unit;

(B)     such Unit shall be sold under the Sales Agreement for such Unit provided to Administrative Agent, or Borrower shall have entered into a Qualifying Third Party Sales Agreement for the sale of such Unit;

(C)     Administrative Agent shall have received a copy of an executed Sales Agreement with reference to such Unit;

(D)     all Sales Commissions, Sale Closing Costs and all other fees, costs and expenses including costs related to any Unit upgrades shall be paid in full at the Unit Sale Closing and neither Borrower nor any other Person shall have any obligation to make post-closing payments on account thereof which are not held on deposit by the Escrow Agent under instructions for the disbursement of the same upon closing to the Persons to whom the same are owed pursuant to closing instructions satisfactory to Administrative Agent in its sole and absolute discretion and Escrow Agent;

(E)     Administrative Agent shall have received in Cash in Dollars, or Dollars by wire transfer of immediately

available funds or by certified or bank check payable to Administrative Agent in an amount equal to the Partial Release Price with respect to such Unit, to pay the principal amount of the Pre-petition Secured Claim in the amount of the Partial Release Price for such Unit and Unit Sale Closing;

(F)     the Unit to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property encumbered by the Pre-petition Senior Lien;

(G)     Borrower shall, at its sole expense, prepare any and all documents and instruments necessary to effect the Unit Sale Closing and Partial Release (including the form of partial release of mortgage, in the form and substance acceptable to Administrative Agent in its sole discretion), all of which shall be subject to the approval of Administrative Agent in its sole discretion, and Borrower shall pay all costs reasonably incurred by Administrative Agent or its servicer (including, but not limited to, reasonable attorneys' fees and disbursements, title search costs or endorsement premiums) in connection with Unit Sale Closing and the review, execution and delivery of the Partial Release;

(H)     no Event of Default shall have occurred and be continuing; and

(I)     the portion of the Property remaining subject to the Pre-petition Senior Lien and DIP Lien after a Partial Release will continue to be in compliance with the requirements of the Pre-petition Credit Agreement, this Agreement and remain in full compliance with all Legal Requirements (including, without limitation, applicable zoning and subdivision laws).

(c)     Intentionally omitted.

(d)     Prepayments after Event of Default.  Upon occurrence of an Event of Default beyond any applicable cure period, all unpaid principal and interest thereon and all other fees, charges, costs, assessments, reasonable advisors' and attorneys' fees and costs, and any other sums payable hereunder or under the Loan Documents, including without limitation, interest that has accrued, shall, upon written notice to Borrower from Administrative Agent acting at the discretion of DIP Lender, become accelerated and immediately due and owing.

(e) **No Right to Reborrow.** The Loans are not "revolving" loans and, therefore, Borrower may not borrow, repay and reborrow hereunder.

2.13 **Intentionally omitted.**

2.14 **Illegality.**

(a) If, after the date of this Agreement, the adoption of any applicable law, rule or regulation, or any change in any existing applicable law, rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by DIP Lender (or its Eurodollar Lending Office) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for DIP Lender (or its Eurodollar Lending Office) to make, maintain or fund its Loans based upon the LIBO Rate, and DIP Lender shall so notify Administrative Agent, Administrative Agent shall forthwith give notice thereof to Borrower, whereupon until DIP Lender notifies Borrower and Administrative Agent that the circumstances giving rise to such suspension no longer exist, (i) the obligation of DIP Lender to make Loans based upon the LIBO Rate shall be suspended, and (ii) each outstanding Loan made by DIP Lender shall be converted into a rate equal to the Prime Rate plus the LIBOR Margin on the last day of the then current Interest Period applicable thereto, except as provided below. Before giving any notice to Administrative Agent pursuant to this Section 2.14, DIP Lender shall designate a different Eurodollar Lending Office if such designation will avoid the need for giving such notice and will not, in the judgment of DIP Lender, be otherwise disadvantageous to DIP Lender. If DIP Lender shall determine in good faith that it or its parent may not lawfully continue to maintain and fund any of its outstanding Loans based upon the LIBO Rate to maturity and shall so specify in such notice, each Loan of DIP Lender then outstanding shall be converted to a rate equal to the Prime Rate plus the applicable LIBOR Margin either (i) on the last day of the then current Interest Period applicable to such Loan if DIP Lender may lawfully continue to maintain and fund such Loan to such day, or (ii) immediately if DIP Lender shall determine in good faith that it may not lawfully continue to maintain and fund such Loan to such day.

(b) DIP Lender shall promptly notify Borrower and Administrative Agent of any event of which it has knowledge, occurring after the date hereof, which will entitle DIP Lender to compensation pursuant to this Section 2.14 and will designate a different Eurodollar Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the judgment of DIP Lender, be otherwise disadvantageous to DIP Lender. A certificate of DIP Lender claiming compensation under this Section 2.14 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, DIP Lender may use any reasonable averaging and attribution methods.

2.15 **Intentionally omitted.**

2.16 **Intentionally omitted.**

2.17 **Intentionally omitted.**

2.18   Intentionally omitted.

2.19   Intentionally omitted.

2.20   Release of Property. If Borrower shall pay or cause to be paid, the principal of and interest on the DIP Loan in full at maturity or as permitted in accordance with the terms of the Loan Documents and satisfied all other DIP Obligations owed to Administrative Agent and DIP Lender under the Loan Documents by Borrower or secured by the Security Documents or by the other Loan Documents, then (a) Administrative Agent shall release the DIP Lien of this Agreement upon the DIP Collateral, and (b) with respect to the DIP Loan the Security Documents and all the other Loan Documents shall be discharged (unless such Loan Document by its terms is expressly intended to survive repayment of the DIP Loan) and satisfied of record. At the written request of Borrower, in connection with repayment of the Indebtedness and satisfaction of the DIP Obligations, Administrative Agent shall assign, or cause to be assigned, the Security Documents to Borrower or to any other Person at Borrower's direction and without representation or warranty by, or recourse to, Administrative Agent (except that Administrative Agent shall be deemed to have represented that such release and termination or reassignment has been duly authorized and that it has not assigned or encumbered the Security Documents or the other Loan Documents and Administrative Agent shall deliver a pay-off letter in customary form), all of the foregoing being at the sole cost, preparation and expense of Borrower. Concurrently with such release and satisfaction or assignment of the Security Documents and all the other Loan Documents, Administrative Agent will return to Borrower all insurance policies relating to the Property which may be held by Administrative Agent, any amounts held in escrow pursuant to this Agreement, or otherwise, and any part of the Property or other DIP Collateral that may be in its possession and, on the written request and at the expense of Borrower, will execute and deliver such instruments of conveyance, assignment and release (including appropriate UCC-3 termination statements) in recordable form prepared by Borrower and as may reasonably be requested by Borrower to evidence such release and satisfaction, or assignment and/or severance, and any such instrument, when duly executed by Administrative Agent and, if appropriate, duly recorded by Borrower in the places where the Security Documents and each other Loan Document are recorded, shall conclusively evidence the release and satisfaction or assignment of the Security Documents and the other Loan Documents.

2.21   DIP Liens; Carve-Out.

2.21.1 DIP Liens. As security for the full and punctual payment and performance of all DIP Obligations, Borrower and each of the Accommodation Parties hereby collaterally assigns, grants a security interest in, and pledges to, the Administrative Agent, to the extent not prohibited by applicable law, a valid and perfected first priority security interest in, and lien on, all DIP Collateral of the Borrower and each Accommodation Party, respectively, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code (the "DIP Liens"), (A) a first-priority lien and security interest, *pari passu* with the liens and security interests securing the pre-petition indebtedness of Borrower under the Pre-petition Credit Agreement (the "Pre-petition Senior Liens"), (B) a first priority Lien on the DIP Collateral that is not encumbered by a valid Lien as of the Petition Date, or as to which any Petition Date Lien is avoided or subordinated, and (C) subject and junior only to (i) any valid and enforceable Liens and security interests (other than the Pre-petition Senior Liens) in existence on the Petition Date in the Collateral that

are perfected and unavoidable on the Petition Date (or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code), (ii) Permitted Encumbrances, and (iii) the Carve-Out (together, the "Permitted Priority Liens"). The DIP Liens shall be senior to the Post-petition Replacement Liens and shall not be subject to any security interest or Lien that is avoided and preserved under section 551 of the Bankruptcy Code, and shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Bankruptcy Case. All Pre-petition Collateral held by either the Administrative Agent or the Pre-petition Lender or its agent is hereby transferred to Administrative Agent, as Collateral Agent, for the ratable benefit of the Pre-petition Lender and DIP Lender.

2.21.2 Carve-Out. The DIP Liens, and DIP Claims, granted to Administrative Agent with respect to the DIP Loan and the Pre-petition Senior Liens and Pre-petition Secured Claims shall be subject and subordinate to a carve-out in an amount not to exceed the sum of (a) the lesser of (i) the DIP Budget line items for Professional Fees of Debtors or Committee incurred prior to the earlier of (A) the occurrence of an Event of Default or (B) the Maturity Date, or (ii) the allowed fees and expenses of the respective retained professionals of Debtors and any statutory committee incurred prior to the earlier of (A) the occurrence of an Event of Default or (B) the Maturity Date, (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), and (c) any fees payable to the Clerk of the Bankruptcy Court and any agent thereof, (collectively, the "Carve-Out"), respecting the professional fees and expenses described in clause (a) above, subject to the rights of Administrative Agent and any other party in interest in the Bankruptcy Case to object to the award of any such fees and expenses. By way of explanation and not in limitation of the foregoing, the respective retained professionals of Debtors and any statutory committee may incur fees and expenses in excess of the Carve-Out and be paid on account of such excess from assets of Debtors' estates that are not Pre-petition Collateral or DIP Collateral or the proceeds thereof, and not the proceeds of the DIP Loan.

2.21.3 This Agreement shall create a continuing security interest in the DIP Collateral and shall remain in full force and effect until payment and performance in full of the DIP Obligations. Upon payment and performance in full of the DIP Obligations, the DIP Liens shall automatically terminate without further notice from any party. In addition to the rights and remedies herein set forth, Administrative Agent shall have all of the rights and remedies with respect to the DIP Collateral available to a secured party at law or in equity, including, without limitation, the rights of a secured party under the UCC and laws of Anguilla, as if such rights and remedies were fully set forth herein. This Agreement shall constitute a security agreement and agreement of similar effect for purposes of the UCC and other applicable law.

2.22    Super-Priority Nature of DIP Obligations and DIP Liens. The DIP Obligations arising under or in connection with the DIP Loan (the "DIP Claims") shall constitute allowed administrative expense claims that shall have priority over all other claims under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code, subject to the Carve-Out. The DIP Claims shall, subject to the Carve-Out, be payable from and have recourse to all DIP Collateral, including, subject to entry of the Final

Order, the proceeds of claims or causes of action belonging to Debtors and arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions").

2.23    Adequate Protection of Pre-petition Senior Liens. As adequate protection of the Pre-petition Senior Liens on account of the use of Cash Collateral by Debtors and any decline in the value of Pre-petition Lender's interest in the Pre-petition Collateral resulting from the imposition of the automatic stay or Debtors' use, sale or other disposition of Pre-petition Collateral, Pre-petition Lender shall receive the following:

2.23.1    Post-petition Replacement Liens. Borrower hereby grants, assigns, and pledges to Pre-petition Lender post-petition replacement security interests and Liens for, and equal in the amount to, the aggregate diminution in value of the Pre-petition Lender's interest in the Pre-petition Collateral (the "Post-petition Replacement Liens"), subject to the Carve-Out, on all of Debtors' and the Accommodation Parties' properties on which the Pre-petition Lender had a valid Lien as of the Petition Date. For the avoidance of doubt, the Pre-petition Senior Liens shall remain in full force and effect, and shall be *pari passu* with the DIP Liens on all Pre-Petition Collateral (provided, however, the DIP Liens shall be and remain first-priority Liens in the event and to the extent the Pre-petition Senior Liens shall be avoided or subordinated), and the Post-petition Replacement Liens shall be junior to the DIP Liens.

2.23.2    Super-Priority Claim. Pre-petition Lender shall have a super-priority claim for, and equal in amount to, the aggregate diminution in value of the Pre-petition Lender's interest in the Pre-petition Collateral (the "Adequate Protection Super-Priority Claim") that shall have priority over all other claims under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code, subject to the Carve-Out. The Adequate Protection Super-Priority Claim shall, subject to the Carve-Out, be payable from and have recourse to all Pre-petition Collateral and DIP Collateral, excluding the proceeds of Avoidance Actions. The Adequate Protection Super-Priority Claim shall be junior to the DIP Claims.

2.23.3    Right to Credit Bid. Subject to entry of the Final Order and to the extent permitted under applicable law (including Anguilla law), Pre-petition Lender and DIP Lender shall have the right to credit bid the amount of the Pre-petition Secured Claim and the DIP Obligations, respectively, in connection with any sale of all or substantially all of the Pre-petition Collateral and DIP Collateral, including any sale conducted pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization or liquidation subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code. Notwithstanding anything in the Final Order or the DIP Loan Agreement, pursuant to the Bid Procedures Order, the Committee has, and shall continue to have, the right to challenge the Pre-petition Lender's and DIP Lender's right to credit bid the Pre-petition Secured Claim and the DIP Loan, respectively, or any part thereof, with respect to any sale of all or any portion of the Pre-petition Collateral and DIP Collateral under sections 363(b) and 1123(b)(4); provided, however, that so

long as the Debtors and the Committee are pursuing confirmation of the Plan of Liquidation, the Pre-petition Lender and DIP Lender may credit bid at the Public Sale.

III    CONDITIONS TO EFFECTIVENESS.

The obligation of Administrative Agent and DIP Lender to enter into this Agreement, the obligation of DIP Lender to provide the DIP Loan pursuant to the Loan Documents and the Pre-petition Lender's consent to use of Cash Collateral are subject to the fulfillment by, or on behalf of, Borrower or waiver by Administrative Agent in its sole and absolute discretion of the following conditions precedent:

3.1    <u>Loan Documents</u>. Administrative Agent shall have received this Agreement and any other Loan Documents, duly executed (and to the extent required, acknowledged) and delivered on behalf of Borrower and any other parties thereto.

3.2    <u>Security Documents and Recordable Documents</u>. Administrative Agent shall have received evidence that the Security Documents and all amendments and modifications thereto, in proper form for recordation in Anguilla, have been recorded, so as effectively to create, in the judgment of Administrative Agent, valid and enforceable first priority Liens upon the Property, in favor of Administrative Agent or Collateral Agent as the case may be (or such other trustee as may be required or desired under local law), securing the DIP Obligations at least equal to the outstanding principal amount of the DIP Loan as of the Closing Date, subject only to the Permitted Encumbrances.

3.3    <u>Financing Statements</u>. Administrative Agent shall have received evidence that the financing statements relating to the Security Documents and this Agreement have been filed in all applicable jurisdictions, including Anguilla, and the Lockbox Account account control agreement among Citicorp, or its affiliate, Borrower and Administrative Agent in favor of Administrative Agent has been fully and duly executed.

3.4    <u>Strata Lot Plan</u>. Administrative Agent shall have received evidence that the Strata Lot Plan and all amendments and modifications thereto, in proper form for recordation in Anguilla, have been recorded, and are otherwise valid and enforceable under the laws of Anguilla, so as effectively to permit, in the judgment of Administrative Agent, the Transfer of good and marketable title to the Units.

3.5    <u>Intentionally omitted</u>.

3.6    <u>Representations, Warranties and Compliance</u>. The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, no Default or Event of Default shall have occurred and be continuing, and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

3.7    <u>Intentionally omitted</u>.

3.8    <u>Intentionally omitted</u>.

3.9 <u>Intentionally omitted</u>.

3.10 <u>Intentionally omitted</u>.

3.11 <u>Intentionally omitted</u>.

3.12 <u>Intentionally omitted</u>.

3.13 <u>Intentionally omitted</u>.

3.14 <u>Intentionally omitted</u>.

3.15 <u>Intentionally omitted</u>.

3.16 <u>Intentionally Omitted</u>.

3.17 <u>Transaction Costs</u>. Borrower shall have paid or reimbursed Administrative Agent for all fees, and reasonable out-of-pocket costs and expenses (including, without limitation, fees, costs and expenses of outside legal counsel) and all other third party out of pocket costs and expenses incurred in connection with the Commitment Letter, the entry of the Interim Order, the negotiation of this Agreement and the transactions contemplated herein, and all other costs incurred post-Petition Date by the Administrative Agent in connection with the Bankruptcy Case and diligence respecting the Property, of Administrative Agent.

3.18 <u>Other Payments and Fees</u>. All payments, deposits or escrows, if any, required to be made or established by Borrower under this Agreement and the other Loan Documents on or before the Closing Date shall have been paid.

3.19 <u>Material Adverse Effect</u>. No event or condition shall have occurred since the date of Borrower's most recent financial statements previously delivered to Administrative Agent which has or may have a Material Adverse Effect, other than the commencement of the Bankruptcy Case. No Bankruptcy Case shall have been converted, and no trustee or examiner with expanded powers shall have been appointed in any Bankruptcy Case.

3.20 <u>Intentionally omitted</u>.

3.21 <u>Financial Statements</u>. Administrative Agent shall have received certified copies of financial statements with respect to the Property and Borrower, as requested by Administrative Agent, each in form and substance satisfactory to Administrative Agent.

3.22 <u>Tax Lot; Subdivision</u>. Administrative Agent shall have received evidence that (i) the Property has been duly subdivided and (ii) the Property constitutes one (1) or more separate tax lots, which evidence shall be in form and substance satisfactory to Administrative Agent in its sole and absolute discretion.

3.23 <u>Intentionally omitted</u>.

3.24 <u>Intentionally omitted</u>.

3.25    Marketing Prices. Borrower shall have submitted, and Administrative Agent shall have approved, Marketing Prices for each Unit.

3.26    Intentionally omitted.

3.27    Intentionally omitted.

3.28    Intentionally omitted.

3.29    Intentionally omitted.

3.30    Intentionally omitted.

3.31    Insurance. Administrative Agent shall have received certified policies, valid certificates of insurance or other acceptable evidence with respect to the policies of insurance required hereunder, satisfactory to Administrative Agent in its sole discretion, and evidence of the payment of all insurance premiums currently due and payable for the existing policy period.

3.32    Intentionally omitted.

3.33    Miscellaneous. Administrative Agent or its counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or its counsel may have requested including the Loan Documents in form and substance satisfactory to Administrative Agent and its counsel, together with all reports, certificates, affidavits and other information, in form and substance reasonably satisfactory to Administrative Agent, as each reasonably may require to evidence compliance by Borrower with all of the provisions of this Agreement.

3.34    Intentionally omitted.

3.35    Consents and Approvals. After giving effect to the terms of the Interim Order and the Final Order, as applicable, Borrower and the Accommodation Parties shall have received all consents and authorizations required pursuant to any material contractual obligation with any other Person and shall have obtained all consents and authorizations of, and effected all notices to and filings with, any Governmental Authority, in each case, as may be necessary to allow Borrower and the Accommodation Parties lawfully (A) to execute, deliver, and perform, in all material respects, its obligations under the Commitment Letter, the Interim Order, the Final Order, and the Loan Documents and each other agreement or instrument to be executed and delivered by Borrower and the Accommodation Parties pursuant thereto or in connection therewith and (B) to create and perfect the DIP Liens on the DIP Collateral.

IV    CONDITIONS TO ALL ADVANCES.

4.1    Conditions Precedent to Advances. No DIP Lender shall be obligated to make any Advance after the Closing Date, unless in addition to the conditions set forth in Article III, the following conditions are satisfied in the sole and absolute discretion of Administrative Agent, except to the extent that Administrative Agent may elect (which election may be made without written or express notice of such election) to waive any such conditions:

(a)  Satisfaction of Conditions for Closing.  All conditions set forth in Article III shall continue to be satisfied as of the date of such Advance or waived in writing by Administrative Agent.

(b)  Representations and Warranties.  On the date of each Advance, the representations and warranties made by Borrower in Article VI and in any other Loan Documents shall be true and correct in all material respects on and as of the date of such Advance with the same effect as if made on such date.

(c)  Security Documents.  This Agreement and the Security Documents shall continue to constitute a valid and unavoidable Lien on the DIP Collateral which shall be free and clear of all Liens except for the Pre-petition Senior Liens, the DIP Liens, the Carve-Out, and Permitted Encumbrances.

(d)  No Defaults.  On the date of each Advance, and after giving effect to such Advance, no Default or Event of Default hereunder shall have occurred and be continuing.

(e)  Draw Request.  Administrative Agent shall have received a complete executed Draw Request in accordance with the requirements of Section 4.4, together with all required attachments and deliveries relating thereto.

(f)  Memorandum of Understanding.  The Memorandum of Understanding dated September 17, 2010, as amended March 16, 2011, between the Government of Anguilla and SOF Anguilla shall continue to be valid and enforceable in accordance with its terms, with no further modifications or amendments thereto without the agreement of Administrative Agent, in its sole and absolute discretion.

(g)  Intentionally omitted.

(h)  Intentionally omitted.

(i)  Intentionally omitted.

(j)  Impositions.  Administrative Agent shall have received (i) no notice of default with respect to the payment of Impositions and Other Charges, or (ii) evidence satisfactory to Administrative Agent that Borrower has paid all Impositions and Other Charges on the Property which are due and payable and for which any governmental entity delivers, provides or issues an invoice, bill or statement, if delinquent, all penalties and interest thereon.

(k)  Title Continuation; Survey Update.  Administrative Agent shall have received a notice of Title Continuation or an endorsement to the Title Policy (dated the date of the requested Advance) issued to Administrative Agent and DIP Lender in connection with the Advance, which Title Continuation or endorsement shall increase the amount of the insurance if necessary to insure the full amount of the lien of this Agreement and the Security Documents, state that since the last disbursement of the DIP Loan there have been no changes in the state of title to the Property and that there are no additional survey exceptions not previously approved by Administrative Agent.

(l)     Intentionally omitted.

(m)     Intentionally omitted.

(n)     <u>Updated DIP Budget</u>.   Administrative Agent shall have received an updated DIP Budget, in form and substance, approved by Administrative Agent in its sole and absolute discretion (including, without limitation, as with specificity as to Line Items and other levels of detail as Administrative Agent may require).

(o)     Intentionally omitted.

(p)     Intentionally omitted.

(q)     Intentionally omitted.

(r)     Intentionally omitted.

(s)     Intentionally omitted.

(t)     Intentionally omitted.

(u)     <u>Insurance</u>.   Administrative Agent shall have received certified policies, valid certificates of insurance or other acceptable evidence with respect to the policies of insurance required hereunder, satisfactory to Administrative Agent in its sole and absolute discretion, and evidence of the payment of all insurance premiums currently due and payable for the existing policy period.

(v)     Intentionally omitted.

(w)     <u>Sales Agreements</u>.   Administrative Agent shall have received a written report in form and substance acceptable to Administrative Agent in its sole and absolute discretion setting forth the status, and attaching a complete executed copy where applicable, of each Sales Agreement as of the Advance Date.

(x)     Intentionally omitted.

(y)     Intentionally omitted.

(z)     Intentionally omitted.

(aa)     Intentionally omitted.

(bb)     Intentionally omitted.

(cc)     Intentionally omitted.

(dd)     <u>Miscellaneous</u>.   Administrative Agent shall have received all documents, reports, certificates, affidavits and other information, in form and substance satisfactory to

Administrative Agent, as each reasonably may require to evidence compliance by Borrower with all of the provisions of this Agreement.

(ee) Compliance. On the date of each Advance, and after giving effect to such Advance, no violation of any Legal Requirement, order, writ, injunction, decree or demand of any Governmental Authority shall have occurred and be continuing.

(ff) Final Order. In the case of any Advance in excess of the Interim Order Commitment Amount, the Final Order (i) shall have been entered by the Bankruptcy Court and shall be in form and substance satisfactory to Administrative Agent and its counsel, (i) shall be effective and not have been terminated, expired, vacated, reversed, stayed, amended, supplemented or otherwise modified without the consent of Administrative Agent, and (iii) shall not be the subject of any motion for reconsideration pending or appeal pending or stay pending appeal or motion for stay pending appeal.

4.2 DIP Budget Costs and Advances.

(a) Subject to the provisions of Section 4.2(b), Borrower shall pay all Budget Costs as set forth in Section 4.3 from Rents or Future Advances made by DIP Lender pursuant to this Agreement.

(b) Subject to the other provisions of this Agreement, any Advances shall be made in accordance with Draw Requests submitted by Borrower and approved by Administrative Agent in accordance with the provisions of Section 4.4 of this Agreement. The proceeds of the DIP Loan shall be advanced from time to time on Advance Dates by transfer of such funds to Borrower's Disbursement Account or in such other manner as Administrative Agent and Borrower may agree. Borrower shall not deposit any funds into Borrower's Disbursement Account other than sums sufficient to pay the administrative costs of such account.

(c) Intentionally omitted.

(d) Advances shall be made upon satisfaction of the conditions set forth in Articles III and IV (as applicable), except to the extent that Administrative Agent may elect to waive any such conditions precedent in its sole and absolute discretion. All conditions precedent to the obligation of DIP Lender to make Advances are imposed solely for the benefit of Administrative Agent and DIP Lender and no other party may require satisfaction of any such condition precedent or be entitled to assume that DIP Lender will refuse to make the Loans or any Advance in the absence of strict compliance with such conditions precedent.

4.3 Use of Advances. Each Advance made to Borrower shall be received, held and used by Borrower to pay for (or reimburse Borrower for the payment of) Budget Costs, which were specified on the Draw Request for such Advance and in accordance with the DIP Budget.

4.4 Loan Borrowing Procedures.

(a) Draw Requests. Borrower shall submit to Administrative Agent a draw request (a "Draw Request") substantially in the form required pursuant to Section 4.4(b) not less than two (2) Business Days prior to the Advance Date, no more frequently than once in each

calendar week and not within fifteen (15) days or less of the Maturity Date. Each Draw Request shall be in an amount equal to or in excess of $1,000,000. All Draw Requests shall have been approved by Administrative Agent, in its sole and absolute discretion.

(b)     Required Documentation. Each Draw Request submitted hereunder shall include an executed borrowing certificate in form and substance acceptable to Administrative Agent in its sole and absolute discretion.

(c)     Conditions Precedent. Administrative Agent and DIP Lender shall not be obligated to make any Advance of the DIP Loan unless Administrative Agent is satisfied, in its sole and absolute discretion, that the applicable conditions precedent to the making of such Advance, as set forth in Articles III and IV, as applicable, of this Agreement, have been satisfied by Borrower (or waived in writing by Administrative Agent in its sole discretion).

(d)     Intentionally omitted.

(e)     Advances to Pay Fees and Expenses. Proceeds of the DIP Loan may be used to pay any sums due and payable with respect to the Loan or pursuant to any Loan Documents, subject to the terms and conditions of this Agreement, including, without limitation, the availability in the DIP Budget of DIP Loan proceeds. Borrower hereby irrevocably requests that Administrative Agent and DIP Lender make an Advance on each Advance Date to pay expenses and other reimbursable expenses under the Loan Documents that are then due and payable. Administrative Agent will give Borrower notice of any such advance promptly following the date of such Advance and any Advance so made shall be deemed to be a Loan made to and received by Borrower. Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent and DIP Lender shall have no obligation to make any Advances with respect to such fees and expenses if an Event of Default exists. No such Advance shall be deemed to cure or waive any Default or Event of Default that may then exist. The authorization hereby granted shall be irrevocable, and no further direction or authorization from Borrower shall be necessary for Administrative Agent and/or DIP Lender to make any such disbursements. However, the provisions of this Section shall neither require Administrative Agent and/or DIP Lender to make such disbursements, nor prevent Borrower from paying fees and expenses from its own funds.

4.5     Intentionally omitted.

4.6     DIP Budget Reallocations.

(a)     Line Items. Unless Borrower receives the prior written approval of Administrative Agent, which approval may be withheld in Administrative Agent's sole and absolute discretion, Borrower may not revise any component of the DIP Budget at any time.

(b)     New Line Items. Borrower shall not be permitted to create any new Line Items without Administrative Agent's prior written consent, which consent may be withheld in Administrative Agent's sole and absolute discretion.

4.7     Intentionally omitted.

4.8    Intentionally omitted.

4.9    Intentionally omitted.

4.10   Intentionally omitted.

4.11   Intentionally omitted.

4.12   Intentionally omitted.

## V    CASH MANAGEMENT.

5.1    Cash Management.

(a)    The Accounts.  Borrower has entered into a Lockbox Agreement with a Lockbox Bank and has caused to be established with the Lockbox Bank, in the name of Borrower for the benefit of Administrative Agent, as secured party, a Lockbox Account (the "Lockbox Account"), which is an interest-bearing deposit account.  Borrower has or has caused Manager to (i) instruct in writing (1) each respective credit card company or credit card clearing bank with which Borrower or Manager has entered into merchant's agreements to make all payments due in connection with goods or services furnished at or in connection with the Property directly to the Lockbox Account (and shall deliver the same instruction to any credit card company with whom Borrower or Manager commences doing business) and (2) any tenant under a Lease to pay all Rents under Leases and other proceeds derived from the Property directly to the Lockbox Account (and shall deliver the same instruction to any new tenant under a new Lease entered into prior to the commencement of such Lease) and (ii) immediately deposit or cause the Manager to deposit in the Lockbox Account, all Rents and any other money received in connection with the operations of the Property (to the extent not directly deposited as provide in (i) above).  Pursuant to the Account Agreement, Borrower has established with the Cash Management Bank, the Collection Account (the "Collection Account"), which has been established as a securities account.  Both the Lockbox Account and the Collection Account and each sub-account of either such account and the funds deposited therein and securities and other assets credited thereto shall serve as additional security for the DIP Loan.  Pursuant to the Lockbox Agreement and the Account Agreement, Borrower shall irrevocably instruct and authorize Lockbox Bank and Cash Management Bank, respectively, to disregard any and all orders for withdrawal from the Lockbox Account or the Collection Account made by, or at the direction of, Borrower other than to transfer all amounts on deposit in the Lockbox Account on a daily basis to the Collection Account.  Pursuant to the Lockbox Agreement, Lockbox Bank on a daily basis shall transfer all collected and available funds as determined by Lockbox Bank's then current funds availability schedule received in the Lockbox Account to the Collection Account.  Borrower agrees that, prior to the payment in full of the Indebtedness and satisfaction of all other DIP Obligations, the terms and conditions of the Account Agreement and the Lockbox Agreement shall not be amended or modified without the prior written consent of Administrative Agent (which consent Administrative Agent may grant or withhold in its sole discretion).  In recognition of Administrative Agent's security interest in the funds deposited into the Lockbox Account and the Collection Account, Borrower shall identify both the Lockbox Account and the Collection Account with the name of Administrative Agent, as secured party.

5.1.2    Pledge of Account Collateral.  To secure the full and punctual payment and performance of the DIP Obligations, Borrower hereby collaterally assigns, grants a security interest in and pledges to Administrative Agent, to the extent not prohibited by applicable law, a first priority continuing security interest, *pari passu* with the Pre-petition Senior Liens, in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same, collectively, the "Account Collateral"):

(a)    the Collateral Accounts and all cash, checks, drafts, securities entitlements, certificates, instruments and other property, including, without limitation, all deposits and/or wire transfers from time to time deposited or held in, credited to or made to Collateral Accounts;

(b)    any and all amounts invested in Permitted Investments;

(c)    all interest, dividends, cash, instruments, securities entitlements and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing or purchased with funds from the Collateral Accounts; and

(d)    to the extent not covered by clauses (a), (b) or (c) above, all proceeds (as defined under the UCC) of any or all of the foregoing.

In addition to the rights and remedies herein set forth, Administrative Agent shall have all of the rights and remedies with respect to the Account Collateral available to a secured party at law or in equity, including, without limitation, the rights of a secured party under the UCC, as if such rights and remedies were fully set forth herein.

This Agreement shall constitute a security agreement for purposes of the Uniform Commercial Code and other applicable law.

5.1.3    Maintenance of Collateral Accounts.

(a)    Borrower agrees that the Lockbox Account shall be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Administrative Agent shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Lockbox Account and (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Lockbox Account and, except as provided herein, no Account Collateral shall be released to Borrower or Manager from the Lockbox Account. Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only maintain the Lockbox Account with a financial institution that has executed a Lockbox Agreement in a form acceptable to Administrative Agent in its sole discretion.

(b)    Borrower agrees that each of the Collection Account and any sub-account is and shall be maintained (i) as a "securities account" (as such term is defined in Section 8-501(a) of the UCC), (ii) in such a manner that Administrative Agent shall have control (within the meaning of Section 8-106(d)(2) of the UCC) over the Collection Account and any sub-account, (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Collection Account or the sub-accounts and, except as provided herein, no Account

Collateral shall be released to Borrower from the Collection Account or the sub-accounts, (iv) in such a manner that the Cash Management Bank shall agree to treat all property credited to the Collection Account or the sub-accounts as "financial assets" and (v) such that all securities or other property underlying any financial assets credited to the Collateral Accounts shall be registered in the name of Cash Management Bank, endorsed to Cash Management Bank or in blank or credited to another securities account maintained in the name of Cash Management Bank and in no case will any financial asset credited to any of the Collateral Accounts be registered in the name of Borrower, payable to the order of Borrower or specially endorsed to Borrower except to the extent the foregoing have been specially endorsed to Cash Management Bank or in blank. Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Collection Account with a financial institution that has executed an agreement substantially in the form of the Account Agreement or in such other form acceptable to Administrative Agent in its sole discretion.

5.1.4    _Eligible Accounts_.  The Collateral Accounts shall be Eligible Accounts.  The Collateral Accounts shall be subject to such applicable laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or governmental authority, as may now or hereafter be in effect.  Income and interest accruing on the Collateral Accounts or any investments held in such accounts shall be periodically added to the principal amount of such account and shall be held, disbursed and applied in accordance with the provisions of this Agreement, the Lockbox Agreement and the Account Agreement. Borrower shall be the beneficial owner of the Collateral Accounts for federal income tax purposes and shall report all income on the Collateral Accounts.

5.1.5    _Intentionally omitted_.

5.1.6    _Intentionally omitted_.

5.1.7    _Intentionally omitted_.

5.1.8    _Intentionally omitted_.

5.1.9    _Cash Management Bank; Lockbox Bank_.

(a)    Administrative Agent shall have the right at Borrower's sole cost and expense to replace the Cash Management Bank and/or the Lockbox Bank, as the case may be, with a financial institution reasonably satisfactory to Borrower in the event that (i) the Cash Management Bank and/or the Lockbox Bank, as the case may be, fails, in any material respect, to comply with the Account Agreement and/or the Lockbox Agreement, as applicable, (ii) the initial Cash Management Bank and/or the Lockbox Bank, as the case may be, is no longer the Cash Management Bank and/or the Lockbox Bank, as the case may be, or (iii) the Cash Management Bank and/or the Lockbox Bank, as the case may be, is no longer an Approved Bank.  Upon the occurrence and during the continuance of an Event of Default, Administrative Agent shall have the right at Borrower's sole cost and expense to replace Cash Management Bank and/or the Lockbox Bank with any Approved Bank at any time, without notice to Borrower.  Borrower shall cooperate with Administrative Agent in connection with the appointment of any replacement Cash Management Bank and/or the Lockbox Bank, as the case

may be, and the execution by the Cash Management Bank and Borrower of an Account Agreement or the Lockbox Bank and the Borrower of a Lockbox Agreement and, in each case, delivery of the same to Administrative Agent.

(b)     So long as no Event of Default shall have occurred and be continuing, Borrower shall have the right at its sole cost and expense to replace the Lockbox Bank with a financial institution that is an Approved Bank <u>provided</u> that such financial institution and Borrower shall execute and deliver to Administrative Agent a Lockbox Agreement substantially similar to the Lockbox Agreement in effect prior to such replacement.

5.1.10  <u>Borrower's Account Representations, Warranties and Covenants</u>.

(a)     Intentionally omitted.

(b)     Borrower represents, warrants and covenants that Borrower shall direct in each Sales Agreement and deliver a letter in form and substance acceptable to Administrative Agent to Purchasers under all Sales Agreements entered into after the date hereof requiring each such Purchaser to pay all amounts due under its Sales Agreement directly into the Lockbox Account.

(c)     Borrower further represents, warrants and covenants that (i) Borrower shall cause Manager to deposit all amounts payable to Borrower pursuant to the Management Agreement directly into the Lockbox Account, (ii) Borrower shall pay or cause to be paid all Rents, Cash and Cash Equivalents or other items of operating income not covered by the preceding subsection (a) within one Business Day after receipt thereof by Borrower or its Affiliates directly into the Lockbox Account and, until so deposited, any such amounts held by Borrower or Manager shall be deemed to be Account Collateral and shall be held in trust by it for the benefit, and as the property, of Administrative Agent and shall not be commingled with any other funds or property of Borrower or Manager, (iii) there are no accounts other than the Collateral Accounts maintained by Borrower or any other Person with respect to the Property or the collection of Rents other the accounts listed in Exhibit A of the Debtors' Motion for (A) Authority to (I) Continue Using Existing Centralized Cash Management System, as Modified, (II) Honor Certain Pre-Petition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; and (B) An Extension of Time to Comply with § 345(b) [D.I. 6, 3/17/2011], as approved by the order entered by the Bankruptcy Court [D.I. 30, 3/21/2011] and (iv) so long as the DIP Loan shall be outstanding, neither Borrower nor any other Person shall open any other operating accounts with respect to the Property or the collection of Rents, except for the Collateral Accounts.

5.1.11  <u>Account Collateral and Remedies</u>.

(a)     Upon the occurrence and during the continuance of an Event of Default, without prior notice from Administrative Agent to Borrower, (i) Administrative Agent may, in addition to and not in limitation of Administrative Agent's other rights, make any and all withdrawals from, and transfers between and among, the Collateral Accounts as Administrative Agent shall determine in its sole and absolute discretion to set-off or pay any Indebtedness or Budget Costs for the Property; and (ii) Administrative Agent may liquidate and transfer any

amounts then invested in Permitted Investments to the Collateral Accounts to which they relate or reinvest such amounts in other Permitted Investments as Administrative Agent may determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Administrative Agent to exercise and enforce Administrative Agent's rights and remedies hereunder with respect to any Account Collateral or to preserve the value of the Account Collateral. The Final Order shall modify the automatic stay of § 362 to permit the foregoing without further order of the Bankruptcy Court.

(b)     Upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably constitutes and appoints Administrative Agent as Borrower's true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do and which Administrative Agent may deem necessary or desirable to more fully vest in Administrative Agent the rights and remedies provided for herein and to accomplish the purposes of this Agreement. The foregoing powers of attorney are irrevocable and coupled with an interest. Upon the occurrence and during the continuance of an Event of Default, Administrative Agent may perform or cause performance of any such agreement, and any reasonable expenses of Administrative Agent incurred in connection therewith shall be paid by Borrower. The Final Order shall modify the automatic stay of § 362 to permit the foregoing without further order of the Bankruptcy Court.

(c)     Borrower hereby expressly waives, to the fullest extent permitted by law, presentment, demand, protest or any notice of any kind (except as expressly set forth in this Section 5.1.11(c)) in connection with the Account Collateral. Borrower acknowledges and agrees that ten (10) days' prior written notice of the time and place of any public sale of the Account Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to Borrower within the meaning of the UCC. The Final Order shall modify the automatic stay of § 362 to permit the foregoing without further order of the Bankruptcy Court. Administrative Agent shall notify Borrower as soon as reasonably practicable after taking any action pursuant to this Section 5.1.11.

5.1.12  Transfers and Other Liens. Borrower agrees that it will not (i) Transfer any of the Account Collateral except to pay the Carve-Out, or (ii) create or permit to exist any Lien upon or with respect to all or any of the Account Collateral, except for the DIP Lien granted to Administrative Agent under this Agreement.

5.1.13  Reasonable Care. Beyond the exercise of reasonable care in the custody thereof, Administrative Agent shall have no duty as to any Account Collateral in its possession or control as agent therefor or bailee thereof or any income thereon or the preservation of rights against any person or otherwise with respect thereto. Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Account Collateral in its possession if the Account Collateral is accorded treatment substantially equal to that which Administrative Agent accords its own property, it being understood that Administrative Agent shall not be liable or responsible for any loss or damage to any of the Account Collateral, or for any diminution in value thereof, by reason of the act or omission of Administrative Agent, its

Affiliates, agents, employees or bailees, except to the extent that such loss or damage results from Administrative Agent's gross negligence or willful misconduct. In no event shall Administrative Agent be liable either directly or indirectly for losses or delays resulting from any strikes, stays, judgments, orders, decrees, labor disputes, governmental restrictions, acts of God, the elements, enemy action, civil commotion, fire, casualty, accidents, shortages of, or inability to obtain, utilities or materials, computer malfunctions, interruption of communication facilities, labor difficulties or other causes beyond Administrative Agent's reasonable control or for indirect, special or consequential damages except to the extent of Administrative Agent's gross negligence or willful misconduct. Notwithstanding the foregoing, Borrower acknowledges and agrees that (i) Administrative Agent does not have custody of the Account Collateral, (ii) Cash Management Bank and/or the Lockbox Bank, as the case may be, has custody of the Account Collateral, (iii) subject to Section 5.1.9(a), the Cash Management Bank and the Lockbox Bank were each chosen by Borrower and (iv) Administrative Agent has no obligation or duty to supervise Cash Management Bank and/or the Lockbox Bank, as the case may be, or to see to the safe custody of the Account Collateral.

5.1.14 <u>Administrative Agent's Liability</u>.

(a)     Administrative Agent shall be responsible for the performance only of such duties with respect to the Account Collateral as are specifically set forth in this <u>Section 5.1</u> or elsewhere in the Loan Documents, and no other duty shall be implied from any provision hereof. Administrative Agent shall not be under any obligation or duty to perform any act with respect to the Account Collateral which would cause it to incur any expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies. Borrower shall indemnify and hold Administrative Agent, its employees and officers harmless from and against any loss, cost or damage (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Administrative Agent in connection with the transactions contemplated hereby with respect to the Account Collateral except as such may be caused by the gross negligence or willful misconduct of Administrative Agent, its employees, officers or agents.

(b)     Administrative Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper, document or signature believed by it in good faith to be genuine, and, in so acting, it may be assumed that any person purporting to give any of the foregoing in connection with the provisions hereof has been duly authorized to do so. Administrative Agent may consult with counsel, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder and in good faith in accordance therewith.

5.1.15 <u>Continuing Security Interest</u>. This Agreement shall create a continuing security interest in the Account Collateral and shall remain in full force and effect until payment and performance in full of the DIP Obligations. Upon payment and performance in full of the DIP Obligations, this security interest shall automatically terminate without further notice from any party and Borrower shall be entitled to the return, upon its request, of such of the Account Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof and Administrative Agent shall execute such instruments and documents as may be reasonably requested by Borrower to evidence such termination and the release of the Account Collateral.

5.2     Use of Cash Collateral.

5.2.1    Pre-petition Lender Consent.  Upon entry of the Interim Order, to the extent Borrower had Cash Collateral on hand as of the Petition Date (the "Petition Date Cash"), Pre-petition Lender hereby consents to Debtors' use of such Cash Collateral up to the amount of the Petition Date Cash for the operation of their businesses in accordance with this Agreement, the DIP Budget, the Commitment Letter, the Interim Order and the Final Order.

5.2.2    DIP Lender Consent.  Upon entry of the Interim Order, to the extent Borrower has Cash Collateral on hand subsequent to the Petition Date, other than Petition Date Cash (the "Post-petition Cash"), DIP Lender hereby consents to Debtors' use of such Cash Collateral up to the amount of the Post-petition Cash for the operation of their businesses in accordance with this Agreement, the DIP Budget, the Commitment Letter, and the Interim Order and the Final Order.

5.2.3    Final Order Consent.  Upon entry of the Final Order, provided there is no Default and no Event of Default has occurred and is continuing, Pre-petition Lender, Administrative Agent and DIP Lender consent to Borrower's use of Cash Collateral and Post-petition Cash on terms and conditions set forth in sections 5.2.1 and 5.2.2 hereof.

VI     REPRESENTATIONS AND WARRANTIES.

6.1     Borrower General Representations.

Borrower represents and warrants as of the Closing Date that:

6.1.1    Organization.  Borrower is a Non-Public/Ordinary Company formed under the laws of Anguilla has been duly organized and is validly existing and in good standing pursuant to the laws of Anguilla, as applicable with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, subject to approval of the Bankruptcy Court.  Borrower has duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership, development, construction, management and operation of the Property.  Borrower shall not change its name, identity, corporate structure or jurisdiction of organization unless it shall have given Administrative Agent thirty (30) days prior written notice of any such change and shall have taken all steps reasonably requested by Administrative Agent to grant, perfect, protect and/or preserve the security interest granted hereunder to Administrative Agent.

6.1.2    Proceedings.  Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents, subject to approval of the Bankruptcy Court.  This Agreement and the other Loan Documents have been duly executed and delivered by, or on behalf of, Borrower, as applicable, and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, subject to approval of the Bankruptcy Court, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  Debtors have properly served copies of the Interim Order as entered by the

Bankruptcy Court on all parties to which notice and service is required under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any local or other rules applicable in the Bankruptcy Court.

6.1.3 <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject (unless consents from all applicable parties thereto have been obtained) which will have a material adverse effect on the transactions contemplated hereunder, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such regulatory authority or other governmental agency or body required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

6.1.4 <u>Litigation</u>. Except as set forth on <u>Schedule VI</u> attached hereto, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower, Manager, or the Property. Other than as described on <u>Schedule VI</u>, the actions, suits or proceedings identified on <u>Schedule VI</u>, if determined against Borrower, Manager, or the Property, would not have a Material Adverse Effect or materially and adversely affect the condition (financial or otherwise) or business of Borrower, Manager, or the Property.

6.1.5 <u>Agreements</u>. Except as set forth in Schedule VII attached hereto, Borrower is not a party to any agreement or instrument or subject to any restriction which is reasonably likely to materially and adversely affect Borrower or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound and which would have a Material Adverse Effect. Borrower has no financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (i) obligations incurred in the ordinary course of the construction and operation of the Property and (ii) obligations under the Pre-petition Credit Agreement and the Loan Documents.

6.1.6 <u>Property</u>. Borrower has good, marketable and insurable fee simple absolute title to the land and the improvements of the Property, free and clear of all Liens whatsoever subject to the Pre-petition Senior Liens, DIP Liens, Permitted Encumbrances and the Carve-Out and Borrower has good and marketable title to the remainder of the Property, free and clear of all Liens whatsoever subject to Pre-petition Senior Liens, DIP Liens, Permitted Encumbrances and the Carve-Out. Unless covered by title insurance, to the best of Borrower's knowledge, there are

no claims for payment for work, labor or materials affecting the Property which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents. Borrower represents and warrants that none of the Permitted Encumbrances will materially and adversely affect (i) the ability of Borrower to pay any of its obligations to any Person as and when due, (ii) the fair market value of the Property, (iii) the marketability of title to the Property, or (iv) the use or operation of the Property as of the Closing Date and thereafter. Borrower will preserve its right, title and interest in and to the Property for so long as the DIP Loan remains outstanding and will warrant and defend same and the validity and priority of the Lien hereof from and against any and all claims whatsoever other than the Permitted Encumbrances.

6.1.7   Strata Lot Plan.   The Strata Lot Plan and all amendments and modifications thereto, in proper form for recordation in Anguilla, have been recorded, and are otherwise valid and enforceable under the laws of Anguilla, so as effectively to permit the Transfer of good and marketable title to the Units.

6.1.8   Full and Accurate Disclosure.   No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.   There is no fact since the commencement of the Bankruptcy Case presently known to Borrower which has not been disclosed which would have a Material Adverse Effect.

6.1.9   All Property.   The Property constitutes all of the real property, personal property, equipment and fixtures currently owned or leased by Borrower.

6.1.10   Intentionally omitted.

6.1.11   Compliance.   Borrower and the Property shall comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes.   To the best of Borrower's knowledge, Borrower is not in default or in violation of any order, writ, injunction, decree or demand of any Governmental Authority.   To the best of Borrower's knowledge, there has not been committed by Borrower any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

6.1.12   Financial Information.   All financial data including, without limitation, the statements of cash flow and income and operating expense, that have been delivered by or on behalf of Borrower to Administrative Agent in respect of the Property (i) are true, complete and correct in all material respects as of the date thereof, (ii) fairly represent the financial condition of the Property as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with applicable Governmental Authority income tax standards throughout the periods covered, except as disclosed therein.   Except as disclosed to Administrative Agent in writing, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and likely to have a Material Adverse Effect.   Since the date of the most recent of such financial statements, there has been no materially adverse change in the financial condition, operations or

business of Borrower from that set forth in said financial statements, other than the commencement of the Bankruptcy Case.

6.1.13 <u>Intentionally omitted</u>.

6.1.14 <u>Federal Reserve Regulations</u>.  None of the proceeds of the DIP Loan will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U, Regulation X or Regulation T or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry "margin stock" or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of Regulation U or Regulation X.  As of the Closing Date, Borrower does not own any "margin stock."

6.1.15 <u>Intentionally omitted</u>.

6.1.16 <u>Intentionally omitted</u>.

6.1.17 <u>Intentionally omitted</u>.

6.1.18 <u>Intentionally omitted</u>.

6.1.19 <u>Intentionally omitted</u>.

6.1.20 <u>Insurance</u>.  Borrower has obtained and has delivered to Administrative Agent full and accurate copies of all insurance policies or certificates of insurance reflecting the insurance coverages, amounts and other requirements required to be maintained pursuant to this Agreement.  Borrower has not, and to the best of Borrower's knowledge no person has, done by act or omission anything which would impair the coverage of any such policy.

6.1.21 <u>Permits; Licenses</u>.  To the best of Borrower's knowledge, all certifications, permits, licenses and approvals required to own and operate the Property as of the Closing Date (collectively, the "<u>Licenses</u>"), have been obtained and are in full force and effect.

6.1.22 <u>Intentionally omitted</u>.

6.1.23 <u>Intentionally omitted</u>.

6.1.24 <u>Intentionally omitted</u>.

6.1.25 <u>Intentionally omitted</u>.

6.1.26 <u>Intentionally omitted</u>.

6.1.27 <u>Intentionally omitted</u>.

6.1.28 <u>Intentionally omitted</u>.

6.1.29 <u>No Change in Facts or Circumstances; Disclosure</u>.  All financial statements and rent rolls submitted by Borrower in connection with the DIP Loan are accurate, complete and correct in all material respects as of the time made.  All other written information, reports,

certificates and other documents submitted by Borrower to Administrative Agent in connection with the DIP Loan are, to the best of Borrower's knowledge, accurate, complete and correct in all material respects as of the time made. Except with respect to such representations and warranties contained in this Agreement or in any other Loan Document which are qualified as being made to the best of Borrower's knowledge, all representations and warranties made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects. There has been no material adverse change known to Borrower in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the Property or the business operations or the financial condition of Borrower, other than the commencement of the Bankruptcy Case. Borrower has disclosed to Administrative Agent all material facts known to Borrower and has not failed to disclose any material fact known to Borrower that is likely to cause any representation or warranty made herein to be materially misleading.

6.1.30 <u>Tax Filings</u>. Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed (including, without limitation, any such returns required to be filed in Anguilla) and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.

6.1.31 <u>Intentionally omitted.</u>

6.1.32 <u>Intentionally omitted.</u>

6.1.33 <u>Intentionally omitted.</u>

6.1.34 <u>Labor</u>. No organized work stoppage or labor strike is pending or threatened by any Governmental Authority, employees and other laborers at the Property. Neither Borrower nor Manager (i) is involved in or threatened with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including, without limitation, violation of any federal, state or local labor, safety or employment laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (ii) has engaged in any unfair labor practices within the meaning of the applicable Legal Requirements; or (iii) is a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property and no such agreement or contract is currently being negotiated by Borrower, Manager or any of its Affiliates in connection with the Property.

6.1.35 <u>Intentionally omitted.</u>

6.1.36 <u>Intentionally omitted.</u>

6.1.37 <u>Intentionally omitted.</u>

6.1.38 <u>Principal Place of Business</u>. Borrower's principal place of business and chief executive office is c/o KOR Realty Group, L.L.C., 1212 South Flower Street, Suite 100, Los Angeles, California 90015.

6.1.39 <u>Intentionally omitted</u>.

6.1.40 <u>Intentionally omitted</u>.

6.1.41 <u>Intentionally omitted</u>.

6.1.42 <u>Intentionally omitted</u>.

6.2 <u>Intentionally omitted</u>.

6.3 <u>Survival of Representations</u>. Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 6.1</u> and elsewhere in this Agreement and in the other Loan Documents shall be deemed given and made as of the date of the funding of the DIP Loan and survive for so long as any amount remains owing to Administrative Agent or DIP Lender under this Agreement or any of the other Loan Documents by Borrower unless a longer survival period is expressly stated in a Loan Document with respect to a specific representation or warranty, in which case, for such longer period. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Administrative Agent and DIP Lender notwithstanding any investigation heretofore or hereafter made by Administrative Agent or on its behalf.

## VII BORROWER COVENANTS.

7.1 <u>Affirmative Covenants; Negative Covenants</u>. From the Closing Date and until payment and performance in full of all DIP Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Administrative Agent that:

7.1.1 <u>Performance by Borrower</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower, as applicable, without the prior written consent of Administrative Agent.

7.1.2 <u>Existence; Compliance with Legal Requirements</u>. Subject to Borrower's right of contest pursuant to <u>Section 9.3</u>, Borrower shall at all times comply with and cause the Property to be in material compliance with all Legal Requirements applicable to Borrower and the Property and the uses permitted upon the Property. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect their existence, rights, licenses, permits and franchises necessary to comply in all material respects with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower, and Borrower shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit or knowingly permit to exist any act or omission affording such right of forfeiture.