# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Barnes Bay Development, Ltd., *et al.* | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Case No. 11-10792 |
| | ) |
| | ) Dkt. Ref. No. 380 |
| | ) |
| | ) **Objections Due: June 23, 2011 at 4:00 pm** |
| | ) **Hearing Date: June 30, 2011 at 10:30 am** |

## OBJECTION OF RJR VICEROY, LTD. TO DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

RJR Viceroy, Ltd. ("RJR"), files this Objection to the Disclosure Statement in Support of the Joint Plan of Liquidation [D.I. 380] filed on June 13, 2011.

**I.     INTRODUCTION**

On May 21, 2005, RJR and Barnes Bay Development, Ltd. entered into a Purchase and Sale Agreement ("PSA") for the purchase of a Bluff Top Villa #14 (the "Unit") located in what is commonly known as the "Viceroy Anguilla Resort." The Purchase and Sale Agreement was expressly to be governed by the laws of Anguilla without regard to conflicts of laws. RJR paid two deposits pursuant to the terms of the Purchase and Sale Agreement totaling $1,998,000.00 (the "Deposit"). Under the terms of an Addendum to the PSA dated May 21, 2005, RJR had the right to terminate the PSA if the Unit was not completed for any reason by December 31, 2008

The Unit was not completed by December 31, 2008. RJR terminated the PSA according to its terms and filed a Claim in the High Court of Anguilla against Barnes Bay for repayment of the Deposit. On January 26, 2010, RJR and Barnes Bay entered into a Consent Judgment (the "Consent Judgment") that entitled RJR to cause a Caution to be registered against the Unit at the Lands and Survey Department and stated that the Caution so registered against the Unit by RJR

3437667/1

Viceroy will state that Unit 14 cannot be sold by Barnes Bay with RJR Viceroy's prior written consent, until repayment of the full payment of the amount awarded under that Consent Judgment.

On March 17, 2011, Barnes Bay, and its owner, Kor Duo Investment Partners II, LP ("KDIP"), and the general partner of KDIP, Kor Duo II, LLC ("Kor Duo", collectively with Barnes Bay and KDIP, the "Debtors") filed petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

On that same date, the Debtors filed a motion asking this Court to authorize the sale of real and personal property located in Anguilla free and clear of any liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code [D.I. 61] ("Sale Motion"). RJR and other similarly situated creditors (the "Sale Objectors"), objected to the Sale Motion on several grounds. As a result, the Court entered an Order Granting Relief from Stay on May 24, 2011 [D.I. 314] ("Lift Stay Order"), which allowed the Sale Objectors to pursue their rights in their respective units in the Anguillan courts. In reliance of the Lift Stay Order, the Sale Objectors filed a Statement of Claim in the High Court of Anguilla ("Anguillan Action") on June 10, 2011. As a result of the Debtor's motion to reconsider the Lift Stay Order, the Court entered a subsequent Order on June 14, 2011 [D.I. 392], to clarify that the relief granted in the Lift Stay Order was intended to be limited to the right of the Sale Objectors to have the Anguillan courts determine the validity and enforceability of their rights in their respective units. In response to this Order, on June 17, 2011, the Sale Objectors amended their Statement of Claim in the Anguillan Action to ensure that the relief sought in the Anguillan Action is entirely consistent with the relief intended by the Court in its June 14, 2011 Order.

RJR filed its Proof of Claim on May 16, 2011, asserting a secured claim in the amount of $1,998,000, plus interest, based upon its Consent Judgment [Claim No. 151]. The Second Amended Joint Chapter 11 Plan of Liquidation ("Plan") places RJR's claim in Class 6. That Class is to receive a distribution of 50% of their allowed claim, but each holder of a claim may elect to purchase their unit under the "Purchase Option" or to elect the "Enforcement Option" thereby waiving any distributions under the Plan. As discussed below, this construct, as applied to RJR and the other Sale Objectors, renders the Plan unconfirmable. In addition, the Disclosure Statement does not contain adequate information concerning crucial aspects of the Plan that are necessary for creditors to make an informed decision about the Plan.

## II. OBJECTION

### A. The Disclosure Statement Should not be Approved Because the Plan as Currently Proposed Unconfirmable

It is well settled that a disclosure statement should not be approved where the plan that it accompanies is unconfirmable on its face. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001)(Where plan is not confirmable, it is appropriate to consider such issues at the hearing on disclosure statement); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). The Plan is unconfirmable for several reasons, including its unfair discrimination between creditors, its provisions that purport to grant relief to the Buyer that this Court is unable to grant, and its improper classification of claims. These objections have been raised by other creditors in prior objections, *see, e.g. Anguilla Re, LLC's Objection to Debtor's Motion for Approval of Disclosure Statement* [D.I. 267], *Objection of Exclusive Resorts Real Estate Holdings II, LLC to Debtor's Disclosure Statement* [D.I. 247], and *Objection of IMI Resort Sales, LLC, et al. to Adequacy of Disclosure Statement* [D.I. 246]. RJR adopts those arguments to the extent not inconsistent with RJR's arguments in this Objection, but will not

restate them here. While the Court may, in its discretion, defer the consideration of such issues until the confirmation hearing, there is one issue that that renders the Plan in its current form unconfirmable that can and should be addressed at this stage.

As stated above, RJR filed a proof of a secured claim. Notwithstanding RJR's assertion of a secured claim, the Debtors have classified RJR's claim as a Class 6 PSA Claim (Tier 1) for purposes of the Plan. Holders of a Class 6 Claim are entitled to receive a distribution of 50% of their allowed amount. In the alternative, the holder may elect either the Purchase Option or the Enforcement Option. The Enforcement Option permits the holder of a PSA Claim to commence a PSA Enforcement Action (i.e. to determine and enforce the rights of the PSA Creditor in the Property or any Residence Property).

Section 4.12(c) of the Plan provides that the election by a PSA Creditor of the Purchase Option or Enforcement Option "shall be deemed to constitute a waiver by such PSA Creditor of any right to see to receive a Distribution under the Plan or otherwise seek payment of such Claim from the Debtors or their Estates." Thus, even if the PSA Creditor prevails in a PSA Enforcement Action, proving that it has a valid, enforceable senior lien on its Unit, and therefore would be an "Other Secured Creditor" in Class 3, it will be deemed to have waived the right to be treated as such in order to even bring the Enforcement Action, and will receive no recovery under the Plan. This Court authorized the Sale Objectors to resort to the Anguillan courts in order to have their status as secured creditors determined, and they filed the Anguillan Action for this purpose. Now the proposed Plan provides that because RJR and the other Sale Objectors filed the Anguillan Action to determine their secured status, even if they prevail, they will not receive the treatment as Class 3 Other Secured Creditors to which they would be entitled. This construct, which essentially prevents a secured creditor from proving its secured claim and

receiving treatment that other secured creditors receive, cannot be confirmed because it denies to RJR the treatment provided to Other Secured Creditor in Class 3. 11 U.S.C. § 1123(a)(4)(plan must provide the same treatment for each claim of a particular class); *In re Combustion Engineering, Inc.*, 391 F.3d 190, 241, 248 (3d Cir. 2004) (vacating confirmation order based on apparent disparate treatment of creditors within a class).

### B. The Disclosure Statement does not Provide Adequate Disclosure on Material Issues that May Impact the Decision of Creditors to Vote for the Plan

Disclosure is "the pivotal concept in reorganization of a Chapter 11 Debtor." *In re Krystal Cadillac-Oldsmobile GMC v. General Motors Corp.*, 337 F.3d. 314, 322 (3d. Cir. 2003). Therefore, the Code requires a debtor to provide full and fair disclosure so that a hypothetical investor can make an informed judgment about the plan and the treatment proposed for its claims. *See*, 11 U.S.C. § 1125(b); *see also, Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d. 414, 417 (3d. Cir. 1988) ("The importance of full disclosure is underlaid by the reliance upon the disclosure statement by creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d. 355, 362 (3d. Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

Section 1125(b) of the Code provides that acceptances or rejections of a plan may not be solicited unless the disclosure statement that accompanies that plan contains "adequate information." 11 U.S.C. § 1125(b). Adequate information is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical

investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a).

Whether a disclosure statement contains adequate information is "determined by the facts and circumstances of each case." *Oneida*, 848 F.2d at 417. Although the Code does not provide a standard for defining "adequate information," numerous courts have prescribed a list of material information that should be included in a disclosure statement. For example, in *In re Oxford Homes, Inc.*, 204 B.R. 264 (Bankr. D. Me. 1997), the court adopted the following 18-point, non-exhaustive list of material information that should be found in a disclosure statement:

> (1) the circumstances that gave rise to the filing of the bankruptcy petition; (2) a complete description of the available assets and their value; (3) the anticipated future of the debtor with a company financial projections; (4) the source of the information provided in the disclosure statement; (5) the condition and performance of the debtor while in chapter 11; (6) information regarding claims against the estate; (7) a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7; (8) the accounting and valuation methods used to produce the financial information in the disclosure statement; (9) information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors and/or officers of the debtor; (10) a summary of the plan of reorganization; (11) an estimate of all administrative expenses, including attorneys' fees and accountants' fees; (12) the collectability of any accounts receivable; (13) any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; (14) information relevant to the risks being taken by the creditors and interest holders; (15) the actual or projected value that can be obtained from avoidable transfers; (16) the existence, likelihood and possible success of non-bankruptcy litigation; (17) the tax consequences of the plan; and (18) the relationship of the debtor with affiliates.

*In re Oxford Homes, Inc.*, 204 B.R. at 269, n.17. While not all of the categories of information are relevant to this case, there are several matters on which there is inadequate disclosure.

### 1. Releases of Debtor's Claims against Non-Debtors

Section 524(e) of the Bankruptcy Code provides that the discharge of the debt of the debtor "does not affect the liability of any other entity on or the property of any other entity for,

3437667/1

such debt". 11 USC § 524(e). The joint plan contains extensive releases, including reported releases of creditors direct claims against insiders of the debtor. While the Third Circuit has recognized the propriety, in certain circumstances, the release of claims against officers, directors and professionals relating to their post petition conduct in connection with the Chapter 11 case (*See, e.g., In re P.W.S. Holding Corp.*, 28 F.3d 224 (3rd Circuit 2002)), the broad releases given to non-debtors under the Plan goes well beyond the type of release approved in the P.W.S. case, and yet there is no meaningful disclosure of the nature of any of the claims that are being released. Debtors must disclose all of their legal and equitable interests in property in a disclosure statement, including any cause of action that the Debtor may have. *In re Krystal Cadillac-Oldsmobile GMC*, 337 F.3d. at 321. The Disclosure Statement provides no information whatsoever as to what these released claims are, what value they may have, and why it is in the best interest of creditors that they be released for no consideration.

2. **Releases of Creditors' Claims against Non-Debtors**

In addition, the Disclosure Statement and Plan are ambiguous as to the extent and scope of releases applicable to PSA creditors who elect the "Enforcement Option." Section VIII.G. of the Disclosure Statement describes broad releases that every holder of a claim is deemed to give to "Released Parties" (which includes the Debtor's affiliates). That Section suggests that the releases contained therein do not apply to "any PSA Creditor that elects the Enforcement Option." However, Section IV.E.3 of the Disclosure Statement and Section 4.12(b) of the Plan appear to contemplate that a PSA Creditor that elects the Enforcement Option may commence only a "PSA Enforcement Action." A PSA Enforcement Action is limited to "an action or proceeding commenced . . . to determine or enforcement the rights, if any, of a PSA Creditor in the Property or any Residence Property arising on account of any caution, charge or other interest arising under Anguillan law and claimed by such PSA Creditor". If the PSA Creditor

who elects the enforcement option is limited only to pursuing a PSA Enforcement Action, then it is, in fact, precluded from pursuing an independent claim against a released party, contrary to what is stated in Section IX.E.3 of the Disclosure Statement.

The Disclosure Statement and Plan should both be amended to make it clear that a PSA Creditor that elects the PSA Enforcement Option is not limited by any of the releases or injunctions provided in the Plan from asserting its own direct claims against any non-debtor party under Anguillan, or any other applicable law.

3. **Lender Collateral Deficiencies**

Section II.I.3 of the Disclosure Statement states that the Unsecured Credit Committee, conducted an "extensive investigation" of the liens of SOF-VIII-Hotel II Anguilla Holdings, LLC, the Debtor's prepetition lender ("Lender'), and concluded that the Lender had valid and perfected liens on "substantially all the debtor's assets, with limited exceptions". Creditors are entitled to additional disclosure as to what gaps or deficiencies the committee found in the prepetition lenders collateral. Unsecured assets that are not subject to the Lender's security interest would be available for distribution to unsecured creditors. This statement by the Committee begs for additional disclosure as to the deficiencies in the Lenders collateral and the value of the assets that maybe available to unsecured creditors as a result of the gap in the Lender's collateral package.

4. **Lender's Payments to Insiders**

Section IX.I.6 of the Disclosure Statement provides that the effectiveness of the Plan is conditioned upon the Lender having "paid to the PSA Guarantors $1,296,000.00 on account of the Hirsch and Mazzei Settlement". The PSA Guarantors are affiliates of the debtor. There is no disclosure in the Disclosure Statement or the Plan as to what this substantial payoff to affiliates of the Debtor relates to, or why is it necessary for this payment to be made in order for the Plan

3437667/1

to become effective. Disclosure of this information at the very least is critical for the creditors' analysis of the fairness of treatment provided to them under the Plan.

5. **Other Transactions Between the Lender and Affiliates of the Debtors**

The Plan provides that after it becomes effective the Debtors will dissolve. However, at the hearing on the Committee's motion for the appointment of a chapter 11 trustee, it was revealed that an affiliate of the Debtors and/or Brad Korzen will be engaged by the Lender to operate the Debtor's business assets that the Lender expects to acquire at the foreclosure sale the Lender will conduct in Anguilla, and there is an indemnification arrangement between Lender and the Debtor and its affiliates. None of these deals is even mentioned in the Disclosure Statement. Creditors are entitled to know all of the details of the deals have been made between the Debtor and its Lender that have lead to the current Plan.

6. **Distributions to be Paid on Insiders' Claims**

The proposed Plan provides for the payment in full, without interest, of all claims in Class 5--General Unsecured Claims. General Unsecured Claims are defined broadly, so as to include any amounts owing by the Debtors to any of their insiders. The Debtors' Schedules indicate that there are substantial sums owing to individuals and entities that are known insiders.[1] These claims appear to fall into Class 5 and would be paid in full, while other creditors receive 15-50% of their claims. When the proposed Plan provides that insiders claims are to be paid in full, fundamental fairness requires that the Debtor fully disclose to its creditors the identities of and the amounts that will be paid to its insiders under the Plan, so that those creditors can factor this treatment into their analysis of whether to vote for the Plan.

---

[1] For example, the schedules of Barnes Bay Development indicate that Kor International Holdings Ltd. holds a claim of $327,662.57, Kor Realty Group holds a claim of $87,000.00 and Brad Korzen holds a claim for $15,000.00.

## III. CONCLUSION

For all of the foregoing reasons, the Disclosure Statement in Support of Joint Chapter 11 Plan of Liquidation [D.I.380] should be denied.

Dated: June 23, 2011

**MORRIS JAMES LLP**

/s/ *signature*

Carl N. Kunz, III (DE Bar No. 3201)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com

- and -

Robert G. Sanker (0039040)
Jason V. Stitt (0078513)
Keating Muething & Klekamp PLL
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202
Telephone: (513) 579-6587
Facsimile: (513) 579-6457
Email: rsanker@kmklaw.com
  jstitt@kmklaw.com

*Counsel for RJR Viceroy, Ltd.*