**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| BARNES BAY DEVELOPMENT LTD., | : | Case No. 11-10792 (PJW) |
| *et al.*[1] | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : | **Re: Docket No. 380** |

**OBJECTION OF GRANT GIBSON, KIM EVANS AND MARK FREDERICKSON**
**TO THE DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**

Grant Gibson, Kim Evans, and Mark Frederickson (collectively, the "Lien

Holders"), by and through their undersigned attorneys, submit this objection (the

"Objection") to the above-captioned debtors (collectively, the "Debtors") and Official

Committee of Unsecured Creditors' (the "Committee") Joint Disclosure Statement in

Support of Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 380] (the

"Second Amended Disclosure Statement"). In support of this Objection, the Lien

Holders respectfully represent as follows:

**RELEVANT BACKGROUND**

1.       On March 17, 2011 (the "Petition Date"), the Debtors filed voluntary

petitions for relief in this Court under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").

2.       The primary purpose of these cases appears to be to "sell" to the

replacement prepetition lender, SOF-VIII-Hotel II Anguilla Holdings ("Starwood"),

substantially all of the Debtors' assets, including The Viceroy Anguilla Resort and

---

[1] The Debtors in these cases, along with the last four digits of the employer identification number for each
of the Debtors, are Kor Duo Investment Partners II, L.P. (9891), Kor Duo II, LLC (5207) and Barnes Bay
Development Ltd. Barnes Bay Development Ltd. is a company formed under the laws of Anguilla and,
accordingly, does not have an employer identification number.

Residences (the "Property"), by a credit bid pursuant to the Registered Land Act of the Laws of Anguilla (the "Registered Land Act") and purportedly Section 363 of the Bankruptcy Code.

3.      The Lien Holders were counterparties to three purchase and sale agreements (each a "PSA") with the Debtors for units located on the Property.  In accordance with their contracts, the Lien Holders deposited a certain percentage of their respective sale prices with the Debtors (each a "Purchase Deposit").  Grant Gibson's Purchase Deposit was in the sum of $423,000.00.  Grant Gibson and Kim Evans' Purchase Deposit was in the sum of $999,000.00.  Mark Frederickson's Purchase Deposit was in the sum of $1,012,000.00.

4.      Prior to the Petition Date, the Debtors failed to deliver the units by their respective closing dates, prompting each of the Lien Holders to terminate their respective PSA's and commence litigation in Anguilla seeking repayment of their Purchase Deposits (the "Anguillan Litigation").

5.      As a consequence of the Anguillan Litigation, prior to the Petition Date, each of the Lien Holders entered into Consent Judgments with Barnes Bay Development Ltd. which, *inter alia*, provided for repayment of the Purchase Deposits and a charge under the Registered Land Act against their respective units.  Also prior to the Petition Date, the Lien Holders duly recorded their charges in the Anguillan Land Registry.

6.      On the Petition Date, the Debtors filed the Motion of the Debtors for an Order (a) Approving Procedures for the Auction and Sale of the Debtor's Assets and the Assumption of Certain Executory Contracts and Unexpired Lease and (B) Authorizing the Sale of Such Assets Pursuant to the Terms and Conditions of Sale and the Assumption of Such Executory Contracts and Unexpired Leases [D.I. 15] (the "Sale

Procedures Motion"). The Sales Procedures Motion was originally scheduled to be heard on April 12, 2011, but was continued until May 18, 2011, to permit the Committee to first proceed with hearings on its motion for the appointment of a Chapter 11 Trustee [D.I. 107] (the "Trustee Motion"), filed on April 13, 2011.

7. Hearings on the Trustee Motion were conducted on May 6, 2011 and again on May 13, 2011 (the "Appointment Hearings"). During the Appointment Hearings, the Committee presented testimony and documentary evidence which, among other things, disclosed that: (1) immediately prior to the Petition Date, Starwood had contemplated an agreement with certain third parties, who had guaranteed repayment of the purchase deposits, to indemnify them up to $52 million for any claims against them by purchasers on account of the purchase deposits; (2) Starwood had agreed to pay Lubert-Adler, an affiliate of the Debtors, the sum of $1.2 million; and (3) affiliates of the Debtors would be retained to manage the Property if Starwood was the successful purchaser. See Transcript of Appointment Hearings, at 209, 213-18, 222, 227-28, & 237-38, relevant portions of transcript attached hereto as Exhibit A.

8. The Appointment Hearings were suspended, on information and belief, to allow the Debtors, the Committee, and Starwood the opportunity to negotiate a resolution of their disputes in these cases, including issues involving treatment of claims in the Joint Chapter 11 Plan of Liquidation, filed by the Debtors on April 1, 2011 [D.I. 61].

9. On May 13, 2011, the Court conducted a hearing on the Sale Procedures Motion (the "Sale Procedures Hearing"). The Lien Holders, who had reserved their rights and joined in an objection by RJR Viceroy Ltd. ("RJR") to the Sale Procedures Motion, appeared at the Sale Procedures Hearing.

10.     During the Sale Procedures Hearing, the Lien Holders argued that the proposed procedures included a foreclosure auction by Starwood under Anguillan law which was inconsistent with Section 363 of the Bankruptcy Code and amounted to relief from the automatic stay for one party claiming rights in the Property but not for others who likewise claimed to be secured by portions of the Property.

11.     At the conclusion of the Sale Procedures Hearing, the Court approved the Sale Procedures Motion, although not pursuant to Section 363.  The Court also granted relief from the automatic stay to permit the Lien Holders to institute declaratory judgment actions in Anguilla for the purpose of determining that their liens on their units were prior in right to Starwood's liens.

12.     On June 10, 2011, the Lien Holders commenced an action in Anguilla against the Debtors and Starwood seeking, *inter alia*, declaratory relief regarding the priority of their liens (the "Anguillan Action").  In the Anguillan Action, the Lien Holders maintain that they understood that before agreeing to the Consent Judgments, the Debtors needed the consent of Starwood or its predecessor as secured lenders.

13.     On June 13, 2011, the Debtors and Committee filed the Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 378] (the "Second Amended Plan") and corresponding Second Amended Disclosure Statement.  The Second Amended Plan provides for the rejection and termination of all PSAs and classifies claims arising from purchase deposits into 3 separate classes: Class 6 PSA Claims (Tier 1); Class 7 PSA Claims (Tier 2); and Class 8  PSA Claims (Tier 3).  The Second Amended Plan provides for a significantly different distribution to members of each of the three classes.  The Lien Holders are listed as holding Class 7 PSA Claims (Tier 2).

4

14.     A hearing to consider, *inter alia*, approval of the Second Amended Disclosure Statement is scheduled for June 30, 2011 (the "Disclosure Statement Hearing").

## OBJECTION

**A.     The Second Amended Disclosure Statement Does Not Contain Adequate Information As Required By Section 1125 Of The Bankruptcy Code.**

15.     Section 1125(b) of the Bankruptcy Code provides that an acceptance or rejection of a plan of reorganization may not be solicited until after a disclosure statement approved by the Bankruptcy Court as containing "adequate information" has been prepared and distributed to creditors.  11 U.S.C. § 1125(b).

16.     The term "adequate information" is defined in Section 1125 as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1).

17.     A disclosure statement represents the primary source of information for creditors to determine whether to vote to accept or reject a proposed plan and is commonly recognized as "a pivotal concept of Chapter 11 reorganization." Kunica v. St. Jean Fin. Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999); see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v Gen. Motors Corp., 337 F.3d 314, 322 (3d Cir. 2003) ("The

importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.") (citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d 414, 417 (3d Cir. 1988).

18.    Where, as here, a disclosure statement omits information material to the proposed plan, courts will deny approval. In re New Haven Radio, Inc., 18 B.R. 977 (Bankr. D. Conn. 1982) (denying approval of disclosure statement for lack of adequate information); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (same).

19.    The Second Amended Disclosure Statement does not contain adequate information sufficient to justify this Court's approval because it fails to describe a myriad of critical facts concerning the Second Amended Plan. As currently drafted, the Second Amended Disclosure should not be approved by this Court for the reasons that follow. [2]

20.    First, the Second Amended Disclosure Statement indicates at several points that the Second Amended Plan contemplates a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code. See e.g., Second Amended Disclosure Statement § I. D. It fails however to advise that several parties—including the Lien Holders—have taken the position that Starwood's foreclosure on the Property by auction under Anguillan law, cannot satisfy the requirements of or be approved pursuant

---

[2] At the outset, the Lien Holders note that the Debtors' and Committee's attempt to characterize the Second Amended Disclosure Statement as settlement communication subject to Federal Rule of Evidence 408 and prevent its use in other proceedings (See Second Amended Disclosure Statement, p. ii) is wholly inconsistent with the purpose and nature of disclosure statements and the Federal Rules of Evidence. Disclosure Statements are designed to provide parties in interest with adequate public and presumably accurate information on which to rely in making a decision on the proposed plan. In a similar vein, the Federal Rules of Evidence permit publicly filed pleadings or papers to be used in a variety of circumstances in the same or other proceedings. The provisions on page ii of the Second Amended Disclosure Statement should be removed from any disclosure statement approved by this Court in these cases.

to Section 363 of the Bankruptcy Code, or by extension, Section 1123 (a)(5)(D). This information should be provided to creditors so that they can properly evaluate the feasibility of the Second Amended Plan.

21.     Second, the Second Amended Disclosure Statement briefly describes several prepetition lawsuits against the Debtors and advises that, although no judgments have been rendered, "the reader should be aware that any such judgments or liabilities could affect the Distributions anticipated under the Plan." Second Amended Disclosure Statement, § II. J. 3. The Second Amended Plan provides for distributions to various classes of creditors in specified amounts but such distributions do not appear to be a function of the assets and liabilities of the Debtors or the buyer. Thus the implication that judgments in the prepetition actions could impact potential distributions, if accurate, should be described in more detail to permit creditors to evaluate their likely impact on distributions under the Second Amended Plan or, if inaccurate, should be removed. See In re Radco Properties, Inc., 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.").

22.     Third, the Second Amended Disclosure Statement only partially describes the stay relief issues litigated in this Court by the Debtors, RJR, and the Lien Holders. Second Amended Disclosure Statement, § III. L. 2. The description, however, stops at the Debtors Motion to Amend [D.I. 326] the Court's May 24, 2011 stay relief Order [D.I. 314]. Id. This is an  incomplete description of the circumstances, as the Debtors' Motion to Amend has been resolved and the Lien Holders and RJR have commenced the Anguillan Action  More detailed information concerning this development is warranted

7

where, as here, certain creditors are being offered the opportunity to elect the Enforcement Option (as defined in the Second Amended Plan).

23.     Fourth, the Second Amended Disclosure Statement provides that as a condition precedent to the Second Amended Plan going effective, Starwood shall have paid the PSA Guarantors $1,296,000 "on account of the Hirsch and Mazzei settlement." Second Amended Disclosure Statement, § IX. I. 6.  Neither the Second Amended Disclosure Statement nor the Second Amended Plan provide any description of: (i) the "Hirsch and Mazzei settlement;" (ii) the purpose of the payment to the PSA Guarantors by Starwood; and (iii) why the payment is a condition precedent to effectiveness of the Second Amended Plan.  This information should be provided to creditors so they can evaluate both the feasibility of the Second Amended Plan and the good faith of the proponents thereof.  To the extent the settlement implicates the Debtors and/or property of the estate, this information is important to creditors in evaluating the reasonableness of the settlement.  See e.g., In re Washington Mut., 442 B.R. 314, 328 (Bankr. D. Del. 2011) (finding that plan supporters must establish settlement is within range of reasonableness).

24.     Fifth, the Second Amended Disclosure Statement wholly fails to describe the contemplated management of the Property post effective date.  Evidence presented during the Appointment Hearings established that Starwood, as the intended buyer, plans to leave present management (or an affiliate thereof) in place following the effective date of the Second Amended Plan.  See Transcript of Appointment Hearings, at 209 & 227-28.  Present management is an affiliate of the Debtors.  If Starwood and present management have such an understanding or agreement, this information should be provided to creditors so they can evaluate the good faith of a sale, if any, approved pursuant to Section 363 of the Bankruptcy Code, the good faith of any sale pursuant to

Section 1123(a)(5)(d), and whether they wish to elect the Purchase Option (as defined in the Second Amended Plan).

25.     Sixth, the Second Amended Disclosure Statement fails to provide any detailed information regarding the terms on which the Debtors and/or Starwood intend to sell the units pursuant to the Purchase Option, applicable taxes, and/or homeowner association fees going forward. By way of example, the Second Amended Disclosure Statement describes the Purchase Option as including an option to " trade down," which would permit a former party to a PSA to buy a less expensive unit and apply 100 percent of its purchase deposit to the price. On information and belief, this is inaccurate as it applies to certain transactions. More detailed information regarding the pricing of units, the treatment of purchase deposits, applicable taxes, and homeowner fees should be provided to provide a complete picture of the Purchase Option under the Second Amended Plan. This information should further be provided so creditors can evaluate the Purchase Option and contrast it with the distribution they are described as receiving under the Second Amended Plan.[3]

26.     Seventh, the Second Amended Disclosure Statement fails to disclose what, if any, other arrangements were made between the Debtors, the Debtors' affiliates, and Starwood related to the Property and the Purchase Deposits. Evidence presented at the hearing on the Trustee Motion disclosed that prior to the Petition Date, Starwood contemplated providing the Debtors and/or the Debtors' affiliates with up to $53 million of indemnity protection for possible third-party claims concerning purchase deposits. See

_____

[3] The Debtors and Committee attempt to characterize the purchase price for units on the Property as "confidential, proprietary information that will be disclosed only to the purchaser of a given [unit.]" Second Amended Disclosure Statement, § IV. E. 1. This provision should be stricken from the Second Amended Disclosure Statement and information concerning the purchase price of units should be freely available to creditors. This is not proprietary information of the sort protected by the confidentiality provisions of the Bankruptcy Code and restricting access to this information will prevent parties from determining if creditors are receiving more favorable treatment than others in their respective class.

Transcript of Appointment Hearings, at 213-19. If this arrangement is in place or intended, it should be disclosed and explained, as it will permit creditors to evaluate, among other things, the good faith of the Debtors in proposing the plan and the fairness of the distributions to them. If this agreement is no longer in place, its abandonment should be explained as well to avoid any confusion based the record in these cases.

27.     Eighth, the Second Amended Disclosure Statement does not estimate the amount of General Unsecured Claims in proposed Class 5 of the Second Amended Plan. The Second Amended Plan provides that Class 5 is impaired and entitled to vote because, although it members are intended to receive a 100 percent payout, they will not receive interest while, proposed Classes 6, 7, and 8, which also consist of unsecured claims, are intended to receive only 50, 25, and 15 percent respectively. This information should be provided to creditors so they can evaluate what the total distribution to Class 5 is likely to be, what the interest would be, and whether the Debtors are seeking to create an impaired accepting class by the treatment afforded to Class 5.

28.     Finally, the Second Amended Disclosure Statement does not explain why Class 9, which consists of Starwood's pre-petition deficiency claim is entitled to vote. Pursuant to the Second Amended Plan, Starwood is waiving any distribution on account of its deficiency claim. Starwood is therefore impaired and pursuant to Section 1127(g) is deemed to reject the plan. Yet, the Second Amended Disclosure Statement indicates Starwood is entitled to vote its Class 9 Claim. This information should be provided to creditors so they can evaluate whether to accept the rationale or whether the Debtors are attempting to create an alternative impaired accepting class.

29.     The above-detailed infirmities prevent creditors from making an informed decision about accepting or rejecting the Second Amended Plan.  Therefore, as currently submitted, the Second Amended Disclosure Statement should not be approved.

**B.      The Disclosure Statement Should Not Be Approved Because The Plan Is Facially Unconfirmable.**

30.     It is well established that a court should not approve a disclosure statement where the corresponding plan is patently unconfirmable on its face.  In re La Guardia Associates, L.P., 2006 WL 6601650, at *60 (Bankr. E.D. Pa. Sept. 13, 2006); see also In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (recognizing the principle that approval of a disclosure statement is not warranted where it describes a plan that is so fatally flawed confirmation would not be possible).  "The purpose for this rule of law is to eliminate the wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a proposed plan, which cannot be confirmed."  In re La Guardia, 2006 WL 6601650 at *60; see also In re Am. Capital Equip., Inc., 405 B.R. 415, 421 (Bankr. W.D. Pa. 2009)(denying approval of a disclosure statement of a facially unconfirmable plan).

31.     Although the issue of whether a plan satisfies the requirements of the Bankruptcy Code is usually decided at the confirmation stage, where the proposed plan's inadequacies are so great, they may and should be addressed in connection with the disclosure statement.  In re Phoenix Petroleum, 278 B.R. at 394.  A disclosure statement may be denied where its corresponding plan was not proposed in good faith.  Id.; see also 11 U.S.C. § 1129(a)(3) (requiring that a plan be proposed in good faith and not by any means forbidden by law).

32.     The Second Amended Plan contemplates a three-tiered classification for Purchase Deposit creditors, each tier receiving substantially different treatment.  <u>See</u> Second Amended Plan, § IV. D. 6-8.  Class 6 is described as consisting solely of all Purchase Deposit creditors holding claims arising from PSAs that were purportedly terminated prior to the Petition Date.  Class 7 is described as consisting of Purchase Deposit creditors holding claims arising from pending or threatened prepetition litigation relating to a PSA that either (i) resulted in the entry of a Consent Judgment or out-of-court settlement agreed to by Barnes Bay and the corresponding PSA Creditor, or (ii) was subjected to a standstill agreement executed by the Debtors and such PSA Creditor prior to the Petition Date.  As to each of Class 6 and Class 7, the Second Amended Plan provides "[f]or the avoidance of doubt, on the Effective Date, all PSAs shall be deemed rejected or terminated, as applicable, and of no further force and effect."  Second Amended Plan, § IV. D. 6 & 7.

33.     The Lien Holders are apparently listed in Class 7 because they initiated litigation in Anguilla and obtained Consent Judgments obligating the Debtors to repay the Purchase Deposits and providing them with charges on their units.  But prior to undertaking the time and expense of the litigation in Anguilla, the Lien Holders also terminated their PSAs.  In addition, by entering into Consent Judgments the Debtors agreed to repay the Purchase Deposit, essentially terminating the PSAs to the extent they were not terminated previously, which the Lien Holders maintain they were.

34.     There is no reasonable or justifiable basis on which the Lien Holders have been classified differently from Class 6 PSA Creditors (nor have the Debtors provided one in the Second Amended Disclosure Statement) unless the Debtors and Committee were seeking to create an accepting impaired class of PSA Creditors in Class 6,  as Class

6 originally consisted of three members  two of whom were Committee members  who could control class voting.[4]

35.     The Second Amended Plan is also facially unconfirmable because it does not provide for the same treatment of each claim in a particular class as required by Section 1123.  See 11 U.S.C. 1123(a)(4).  Specifically, the provisions providing a purchase deposit creditor with an option to elect the Purchase Option or Enforcement Option (only if the purchase deposit creditor has a charge or caution on its unit in the Property) in place of a distribution all but guarantee differing treatment, even within the specific classes.

36.      Although the Bankruptcy Code does not precisely define what is meant by the phrase "equal treatment," Section 1123(a)(4) at the very least prohibits different percentage settlements to members of the same class.  Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.), 407 B.R. 576, 592 (D. Del. 2009) (recognizing that "if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable"); see also In re Washington Mut., 442 B.R. 314, 360-61 (Bankr. D. Del. 2011) (holding that the proposed plan must be modified to permit equal participation rights in a rights offering).

37.     The Second Amended Plan places the Lien Holders in the Class 7 PSA Claims (Tier 2) which would entitle them to a distribution equal to 25 percent of their claims unless they elect the Purchase Option (which purports to provide a 100% recovery on the Purchase Deposits) or the Enforcement Option (which could likewise lead to a 100

---

[4] Class 6 PSA Claims (Tier 1) current consists of Exclusive Resorts Real Estate Holdings II, LLC (a Committee member with a claim in excess of $7 million), Joel Greenberg and Marcy Gringlas (a Committee member with a claim in excess of $2 million), RJR, and Lee Zoeller.  Upon information and belief, the proponents did not originally intend to include RJR in this class.

percent recovery). These elections are not consents to less favorable treatment and the ability of one or more of the Class 7 claimants to elect them violates the bar against disparate treatment in Section 1123(a)(4) of the Bankruptcy Code.

38.     The Second Amended Plan also provides disparate treatment for the Lien Holders to the extent that it seeks to bar them from either receiving a distribution as a PSA creditor or electing the Purchase Option. Although the Second Amended Plan classifies the Lien Holders' claims as Class 7 PSA Claims (Tier 2), it also provides that with respect to the Enforcement Option (defined as an option to bring an action or proceeding to determine rights in the Property based on a caution or charge arising under Anguillan law) PSA Creditors have until the Voting Deadline to elect to choose it, except "that any PSA Creditor that commences a PSA Enforcement Action on or prior to the Voting Deadline shall be deemed conclusively to have affirmatively elected the Enforcement Option." Second Amended Disclosure Statement, § IV. E. 3.

39.     In May 2011, the Court granted the Lien Holders relief from the automatic stay in order to seek declaratory relief with respect to their charges on their units in the Anguillan courts. Following entry of the stay relief order [D.I. 314] and in reliance thereon, on June 10, 2011, the Lien Holders filed the Anguillan Action seeking declaratory relief regarding their charges. Three days later, on June 13, 2011, the Debtors and the Committee filed the Second Amended Plan which by its express terms would prevent the Lien Holders from making the same choice as other PSA Creditors because of the previously filed Anguillan Action. This is disparate treatment that violates Section 1123(a)(4) of the Bankruptcy Code. See In re Washington Mut., 442 at 362 (Bankr. D. Del. 2011) (holding that certain general unsecured creditors who were involved in litigation regarding their claims could not be denied the same option under a plan that

14

other general unsecured creditors were afforded because the disparate treatment was impermissible under Section 1123(a)(4) of the Bankruptcy Code.).

40.     Finally, the releases provided for in the Second Amended Plan are far too broad. See Second Amended Disclosure Statement, § VIII. G. They are also ambiguous and too difficult for a hypothetical investor to understand. The apparent release of Starwood and third parties from any claims relating to any involvement they ever had with the Debtors is simply not justified under the circumstances of these cases and runs afoul of this Court's decision in In re Washington Mutual.[5] Third party releases of non-debtors are the exception, not the rule, in this Circuit and only granted in "extraordinary cases." In re Washington Mut., 442 B.R. at 351-52; see also Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212 (3d. Cir. 2000) (recognizing that non-consensual third party releases of non-debtors are to be granted only in "extraordinary cases"). The proponents of the Second Amended Plan have wholly failed to address why such broad releases are warranted in these cases.

## RESERVATION OF RIGHTS

41.     The Lien Holders hereby reserve the right to raise additional arguments supporting their above-detailed objections at the Disclosure Statement Hearing. The Lien Holders also expressly adopt and incorporate herein by reference all other objections to the Second Amended Disclosure Statement filed by other parties in interest to the extent

---

[5] It is not clear from the Second Amended Disclosure Statement whether an opt-in election will be used on the ballots. Even if such an option is provided, the Second Amended Plan proponents should include detailed instructions on how and why to make the election. As drafted, the Second Amended Disclosure Statement is wholly devoid of any guidance on the proposed releases. Moreover, the Second Amended Plan and corresponding disclosure statement may be read to bind those creditors who do not return their ballots. As this Court has held before, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release." In re Washington Mut., 442 B.R. at 355; see also In re Zenith Elec. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999).

such objections impact the Lien Holders and bear on this Court's consideration of the Second Amended Disclosure Statement.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the Lien Holders respectfully request that the Court enter an order denying approval of the Second Amended Disclosure Statement, or in the alternative, require the Debtors and Committee to amend the Second Amended Disclosure Statement to provide additional and adequate information as is required by the Bankruptcy Code.

Dated:  June 23, 2011
Wilmington, Delaware

BAYARD, P.A.

*/s/ Justin R. Alberto*
Charlene D. Davis (No. 2336)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: cdavis@bayardlaw.com
jalberto@bayardlaw.com

*Attorneys for Grant Gibson,*
*Kim Evans, and Mark Frederickson*