IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Barnes Bay Development Ltd., et al[1], | ) | Case No. 11-10792 (PJW) |
| | ) | |
| Debtor. | ) | **Re: D.I. Nos. 378, 380** |
| | ) | |

**OBJECTION OF JONATHAN SIMON AND W.O. VICEROY I LTD. TO THE DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION**

Jonathan Simon ("Mr. Simon") and W.O. Viceroy I Ltd. ("Viceroy"), by and through their undersigned counsel, Pepper Hamilton LLP, hereby object, pursuant to Fed. R. Bankr. P. 3017(a), to the Disclosure Statement in Support of Second Amended Joint Chapter 11 Plan of Liquidation [Docket No. 380], and in support hereof, respectfully state as follows:

**PROCEDURAL POSTURE OF CASE**

1. On March 17, 2011 (the "Petition Date"), Barnes Bay Development Ltd., Kor Duo Investment Partners II, LP and Kor Duo II, LLC (collectively the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. Since the Petition Date, the Debtors have continued to operate as Debtors in Possession pursuant to §§ 1107 and 1108 of the Code. The Debtors' cases have been

---

[1] The Debtors in these cases, along with the last four digits of the employer identification number for each of the Debtors are Kor Duo Investment Partners II, LP (xx-xxx9891), Kor Duo II, LLC (xx-xxx5207) and Barnes Bay Development, Ltd. Barnes Bay Development, Ltd. is a company formed under the laws of Anguilla and, accordingly, does not have an employer identification number.

administratively consolidated for procedural purposes and no trustee or examiner has been appointed.

3. On June 13, 2011, the Debtors, along with the Official Committee of Unsecured Creditors appointed in these bankruptcy cases (the "Committee"), filed the Disclosure Statement In Support Of Second Amended Joint Chapter 11 Plan of Liquidation (the "Disclosure Statement" [Docket No. **380**] and proposed Second Amended Joint Chapter 11 Plan of Liquidation (the "Joint Plan") [Docket No. **378**].

4. This is Mr. Simon's and Viceroy's Objection to the Disclosure Statement (the "Objection").

## MR. SIMON'S CLAIM AGAINST THE DEBTORS

5. On May 21, 2005, Mr. Simon entered into two (2) separate Purchase and Sale Agreements (the "Simon Purchase and Sale Agreements") with the Debtors for the purchase of two (2) condominium units at the Resort Residences at Anguilla, Condominium Unit No. E-201 and Condominium Unit C-204 (the "Simon Units"). Mr. Simon delivered a $207,000 buyer's deposit to the Debtors in connection with the first Simon Purchase and Sale Agreement and a $319,500 buyer's deposit to the Debtors in connection with the second Simon Purchase and Sale Agreement.

6. As a condition of closing, the Debtors were required to deliver the Simon Units to Mr. Simon in May, 2007. The Debtors failed to do so and the parties executed addendums (the "Addendums") to the Sale Agreements that, among other things, extended the delivery deadline to December 31, 2008.

7.     The Debtors failed to deliver the Simon Units to Mr. Simon in accordance with the Addendums and breached the terms of the Purchase and Sale Agreements. Consequently, approximately eighteen (18) months prior to the Petition Date, by letters dated September 8, 2009 and September 16, 2009, Mr. Simon (i) advised the Debtors that they were in material default, (ii) terminated the Simon Purchase and Sale Agreements and (iii) demanded the return of the deposits paid to the Debtors.

8.     The Debtors failed to return the deposits to Mr. Simon. Consequently, on or about September 18, 2009, Mr. Simon filed a complaint against the Debtors in the Eastern Caribbean Supreme Court in the High Court of Justice (Anguilla Circuit) seeking the return of his deposits. The complaint also seeks damages related to the Debtors' breach of the Simon Purchase and Sale Agreements. Mr. Simon has also filed a proof of claim in the bankruptcy cases asserting a claim against the Debtors.

9.     It is undisputed that Mr. Simon terminated the Simon Purchase and Sale Agreements prior to commencement of the Debtors' bankruptcy cases.

## VICEROY'S CLAIM AGAINST THE DEBTORS

10.    On or about May 21, 2005, Viceroy entered into a Purchase and Sale Agreement (the "Viceroy Purchase and Sale agreement") with the Debtors for the purchase of a condominium unit at the Resort Residences at Anguilla, Condominium Unit No. B-304 (the "Viceroy Unit"). Viceroy delivered a buyer's deposit in the amount of $359,100 to the Debtors in connection with the Viceroy Purchase and Sale Agreement.

11.    As a condition of closing, the Debtors were required to deliver the Viceroy Unit to Viceroy in May, 2007. The Debtors failed to do so and breached the terms of the Viceroy

Purchase and Sale Agreement. By letter dated January 13, 2009, Viceroy: (i) advised the Debtors they were in material default, (ii) terminated the Purchase and Sale Agreement, and (iii) demanded the return of the deposit paid to the Debtors.

12. The Debtors failed to return the deposit to Viceroy. Consequently, on or about July 31, 2009, Viceroy filed a complaint against the Debtors in the Eastern Caribbean Supreme Court in the High Court of Justice (Anguilla Circuit) seeking the return of Viceroy's deposit. The complaint filed by Viceroy also seeks damages related to the Debtors' breach of the Purchase and Sale Agreement. Viceroy has also filed three (3) separate proofs of claims in the bankruptcy cases against the Debtors.

13. Like Mr. Simon's Purchase and Sale Agreements, it is undisputed that Viceroy terminated the Viceroy Purchase and Sale Agreement prior to commencement of these bankruptcy cases. Mr. Simon's and Viceroy's claims have been classified in the Joint Plan as PSA Claims (Tier II).

## SUMMARY OF OBJECTION TO DISCLOSURE STATEMENT

14. The Disclosure Statement should not be approved because it (i) fails to contain "adequate information" and (ii) describes a plan of liquidation that is patently unconfirmable. More specifically, the Joint Plan separates similarly situated unsecured creditors into artificial classes for the purposes of gerrymandering plan voting and distributing the Debtors' assets unequally among unsecured creditors of equal priority and rank. Because the Disclosure Statement fails to contain adequate information and describes a plan that is unconfirmable on its face, the request for an order approving the Disclosure Statement should be denied.

-4-
#14457321 v3

**OBJECTION**

**I.    The Disclosure Statement Is Patently Unconfirmable**

15.    When a plan is not confirmable on its face, the Courts will not approve the disclosure statement. *In re M.J.H. Leasing,* 328 B.R. 363, 369 (Bankr. D. Mass. 2005) (observing that it is appropriate to consider an objection related to confirmation at a disclosure statement hearing) (citations omitted); *In re Felicity Associates*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("it has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face") (quotations and citations omitted).

16.    Such a situation exists with respect to the proposed Joint Plan. First, the Joint Plan seeks to classify unsecured creditors into four separate classes, each of which is to receive a widely varied distribution from the Debtors' estates:

| UNSECURED CREDITOR CLASS | DISTRIBUTION |
| --- | --- |
| Class 5 General Unsecured Claims | 100% |
| Class 6 PSA Claims (Tier I) | 50% |
| Class 7 PSA Claims (Tier 2) | 25% |
| Class 8 PSA Claims (Tier 3) | 15% |

17.    The Code requires similar classification and treatment of substantially similar claims. *See* 11 U.S.C. §1124. Substantially similar claims may be separately classified only where the plan proponent(s) "articulate legitimate differences among otherwise substantially similar claims **and** if separate classification is in the best interest of creditors and will foster reorganization." *In re* Simon, 2008 Bankr. Lexis 2787 (Bankr. E.D. Va. 2008) (emphasis

-5-

added); see also *In re Armstrong World Indus., Inc.* 344 B.R. 136, 159 (Bankr. D. Del. 2006) (separate classification permitted where a "reasonable basis exists for the classification…."). However, claims may not be classified separately solely in order to gerrymander an affirmative vote on reorganization. *In re Wabash Valley Power Association*, 72 F.3d 1305, 1321 (8th Cir. 1995).

18. Neither the Disclosure Statement nor Joint Plan offer any reasonable explanation, let alone basis, for the separate classification of the Debtors' unsecured creditors. Further, they fail to provide any explanation or basis for the varied distributions proposed for unsecured claims having equal rank and priority.

## II. The Joint Plan Violates The Codes Prohibition On Unfair Discrimination.

19. In order to confirm a plan of reorganization over a nonconsenting impaired class, the debtor must show that the "plan does not discriminate unfairly … with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Indeed, courts have consistently rejected "grossly disparate" discrepancies in the treatment of equal classes. *See, e.g., In the Matter of Great Bay Hotel & Casino, Inc.,* 251 B.R. 213, 231 (Bankr. D. N.J. 2000) (citing cases). Whether a proposed plan unfairly discriminates against a dissenting class centers on "whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In the Matter of Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003); *In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003). More recently, the United States District Court for the District of Delaware applied a rebuttable presumption test when analyzing the issue of unfair discrimination. *See In re Armstrong World*

*Indus.*, 348 B.R. 111, 121 (D. Del. 2006). Under this test, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Armstrong*, 348 B.R. at 121 (D. Del. 2006). Thus, the burden is on the debtor to prove that the plan does not discriminate unfairly. *Id.* Such burden remains with the debtor, even if the debtor is able to demonstrate that the classification of the dissenting class is proper. This rule is designed to ensure that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. *Id.*

20. The Joint Plan is discriminatory and provides, without any explanation or basis, for unequal treatment among the Debtors' unsecured creditors. Class 5 is to receive a 100% distribution, Class 6 a 50% distribution, Class 7 a 25% distribution, and Class 8 a 15% distribution. However, the creditors in all four of these classes hold claims of equal rank and priority.

21. How the Debtors distinguish among the PSA creditors is also not adequately explained in the Disclosure Statement. For example, both Mr. Simon and Viceroy terminated their Purchase and Sale Agreements prior to the Petition Date, yet they are not identified as Class 6 PSA Claim (Tier I) creditors. Even more troubling is the lack of disclosure regarding the impact of the proposed classification scheme will have on a creditor's rights and ultimate distribution. For example, it does not appear that a PSA Creditor will be entitled to move up in class (Tier), as the class designation (and distribution) appears set in stone. No disclosure is

-7-

made as to whether a PSA Creditor could move up in class (Tier). More importantly, no disclosure is made as to the potential impact such move may have on the feasibility of the Joint Plan. To this end, the Disclosure Statement identifies PSA Claims in the following amounts:

| | |
|---|---|
| Class 6 PSA Claim (Tier I) | $11,488,500 |
| Class 7 PSA Claim (Tier 2) | $ 7,514,400 |
| Class 8 PSA Claim (Tier 3) | $33,811,912 |

22.     Assuming the PSA Claims are entitled to equal treatment at Tier I, the claims at Tier I (the "Tier I claims") would approximate $54 million. The proposed distribution to such creditors would be 50%, or approximately $27 million. It is not clear that the Debtor have sufficient assets to pay this amount to the allowed Tier I Claims. It is likewise unclear whether the Buyer (as defined in the Joint Plan) will fund the difference between the current estimated distribution to the Tier I Claims (approximately $5.75 million) and the potential distribution to the PSA Creditors if their claims are determined to be entitled to a 50% distribution under the Joint Plan.

23.     In short, the classification scheme set forth in the Joint Plan discriminates against creditors of equal priority by proposing completely different distribution schemes among creditors of the same class. Because this renders the Joint Plan unconfirmable on its face, the Court should deny approval of the Disclosure Statement and solicitation process.

### III.     The Second Amended Plan Fails The Fair And Equitable Test

24.     The U.S. Supreme Court held, in *Bank of America Nat. Trust and Sav. Ass'n. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 460 (1999):

> Section 1129(b) requires that, to be confirmed over the objections of an impaired class of creditors, a reorganization plan [must] be fair and equitable. With respect to an impaired class of unsecured creditors, a plan can be fair and equitable only if, at a minimum, it provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*Id.* at 460 (quotations and citations omitted); *See also FSLIC v. D & F Const., Inc. (In re D & F Const., Inc.* 865 F.2d 673, 675 (5th Cir. 1989):

> Section 1129(b)(2) sets minimal standards [that] plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is fair and equitable.

*Id.* at 675 (emphasis added); *See also In re Lowenschuss,* 170 F.3d 923, 932-933 (9th Cir. 1999) (excluding over sixty percent of an $8 million asset "made plan confirmation impossible" under section 1129(b)).

25. The Joint Plan is not fair and equitable because it proposes to distribute more assets to certain classes of unsecured creditors than to others. Because the Joint Plan is not fair and equitable (and therefore not confirmable) the Disclosure Statement and solicitation procedures should be denied.

## IV. The Second Amended Plan Is Not Proposed In Good Faith

26. The Bankruptcy Code requires that a plan be proposed in good faith. 11 U.S.C. § 1129(a)(3). "The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Coram Healthcare Corp.,* 271

B.R. 228, 234 (Bankr. D. Del. 2001) (quotations and citations omitted). "A good faith determination must be a fact-intensive, case by case inquiry. *Solow* v. *PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),* 324 F.3d 197, 211 (3d Cir. 2003); *In re Corey,* 892 F.2d 829, 835 (9th Cir. 1989). The objectives of Chapter 11 are: (1) to permit successful rehabilitation of the debtor and (2) to maximize the value of the bankruptcy estate. *In re Capital West Investors,* 186 B.R. 497, 499 (N.D. Cal. 1995).

27. The Joint Plan ignores this second objective – "maximizing value for creditors." If approved, the Joint Plan would disburse the majority of the Debtors' cash assets to a few, while leaving other unsecured creditors with little. The Joint Plan would also release valuable claims against third-parties while simultaneously extinguishing the creditors' claims against the proposed third-party releasee. Such self-serving actions should not be countenanced or condoned by the Court. *Computer Task Group, Inc. v. Brotby (In re Brotby),* 303 B.R. 177, 197-98 (BAP 9th Cir. 2003) (stating that a plan can fail the good-faith requirements of § 1129(a)(3) when the debtor files a chapter 11 petition solely as a litigation tactic).

## V. The Joint Plan Contains Impermissible Releases

28. Section VIII (G) of the Joint Plan provides for a broad release of claims in favor of the Debtors and the "Released Parties." While a chapter 11 plan may include a third party release, the releases proposed in the Joint Plan "[do] not pass muster under even the most flexible tests for the judicial approval of non-debtor releases." *Gillman v. Continental Airlines* (*In re Continental Airlines*), 203 F.3d 203, 214 (3d. Cir. 2000). The "most flexible" test for non-debtor releases was articulated recently in *In re South Canaan Cellular Investments, Inc.,* 427 B.R. 44 (Bankr. E.D. Pa. 2010). Pursuant to such test, the court will consider the following factors:

-10-

> (1) whether the third party who will be protected by the injunction or release has made an important contribution to the reorganization; (2) whether the requested injunctive relief or release is "essential" to the confirmation of the plan; (3) whether a large majority of the creditors in the case have approved the plan; (4) whether there is a close connection between the case against the third party and the case against the debtor; and (5) whether the plan provides for payment of substantially all of the claims affected by the injunction or release.

*Id.* at 72; *see also In re Exide Technologies,* 303 B.R. 48, 71-74 (Bankr. D. Del. 2003); *In re Zenith Electronics Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999) (presenting the same factors in different order). These factors are neither exclusive nor conjunctive. *Exide,* 303 B.R. at 72 (Bankr. D. Del. 2003). "Instead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* Nonconsensual releases by a non-debtor of other non-debtor third parties are to be granted only in "extraordinary cases." *Matter of Genesis Health Ventures,* 266 B.R. 591, 608 (Bankr. D. Del. 2001) (citing *Continental Airlines,* 203 F.3d at 212).

29. The Court in *Genesis Health Ventures* added that non-consensual releases may be approved only if all of the following four additional factors are met: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors. *Genesis Health Ventures,* 266 B.R. at 607-08. "Fair," in the context of this last factor, means that the non-consenting creditors received "reasonable compensation in exchange for the release." *Exide,* 303 B.R. at 75.

30. The releases proposed in the Joint Plan fail to satisfy any of these factors.

## RESERVATION OF RIGHTS

31. Mr. Simon and Viceroy reserve the right to supplement this Objection or raise further objections at the hearing on the Disclosure Statement and/or at the hearing on confirmation of the proposed Joint Plan.

## CONCLUSION

WHEREFORE, Jonathan Simon and W.O. Viceroy I, Ltd. respectfully request that the Court deny approval of the Disclosure Statement, and grant them any and all further relief the Court deems just and appropriate.

Dated: June 23, 2011
Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP

*/s/ James C. Carignan*
Donald J. Detweiler (DE No. 3087)
James C. Carignan (DE No. 4230)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
*Counsel for W.O. Viceroy I Ltd.
and Co- counsel Jonathan Simon*

and

Susan Seflin, Esquire
Admitted Pro Hac Vice in these cases
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Blvd., 9th Floor
Los Angeles, California 90064

*Co- counsel Jonathan Simon*

# CERTIFICATE OF SERVICE

I, James C. Carignan, hereby certify that, on June 23, 2011, I caused to be served the Objection Of Jonathan Simon And W.O. Viceroy I Ltd. To The Disclosure Statement in Support Of Second Amended Joint Chapter 11 Plan Of Liquidation, upon the following entities via electronic mail and first-class mail.

Charles R. Gibbs, Esq.
Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
cgibbs@akingump.com
mcooley@akingump.com

Paul N. Heath, Esq.
Chun I. Jang, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801
heath@rlf.com
jang@rlf.com

Richard L. Schepacarter, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801
richard.schepacarter@usdoj.gov

Andrew Dash, Esq.
Brown Rudnick LLP
7 Times Square
New York, NY 10036
adash@brownrudnick.com

Richard A. Chesley, Esq.
DLA Piper LLP
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601
richard.chesley@dlapiper.com

Dated: June 23, 2011
Wilmington, DE

*/s/ James C. Carignan*
James C. Carignan (DE No. 4230)