# EXHIBIT B

(Blackline of Disclosure Statement)

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| Barnes Bay Development Ltd., *et al.*[1] | : | Case No. 11-10792 (PJW) |
| | : | |
| Debtors. | : | |
| | x | |

## DISCLOSURE STATEMENT IN SUPPORT OF
## SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION

June 28, 2011

**Akin Gump Strauss Hauer & Feld LLP**
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
(214) 969-2800

**Brown Rudnick LLP**
Seven Times Square
New York, NY 10036
(212) 209-4800

and

and

**Richards Layton & Finger, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

**Womble Carlyle Sandridge & Rice, PLLC**
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4320

Attorneys for Debtors
and Debtors in Possession

Attorneys for Official
Committee of Unsecured Creditors

- Voting Record Date: _____, 2011.
- Voting Deadline: ~~_____~~ August 10, 2011 at 5:00 p.m. prevailing ~~Eastern~~ Pacific Time.

---

[1] The Debtors in these cases, along with the last four digits of the employer identification number for each of the Debtors, are Kor Duo Investment Partners II, LP (xx-xxx9891), Kor Duo II, LLC (xx-xxx5207) and Barnes Bay Development, Ltd. Barnes Bay Development, Ltd., is a company formed under the laws of Anguilla and, accordingly, does not have an employer identification number.

- Deadline to file and serve objections to plan confirmation: ~~~~~~~ August 10, 2011 at 5:00 p.m. prevailing Eastern Time.
- Hearing on confirmation of Plan: ~~~~~~~ August 17, 2011 at ~~~~~~~ 11:00 a.m. prevailing Eastern Time.

Kor Duo Investment Partners II, L.P. ("*KDIP*"), Kor Duo II, L.L.C. ("*Kor Duo*") and Barnes Bay Development Ltd. ("*Barnes Bay*" and, collectively, the "*Debtors*"), as debtors in possession under chapter 11 of the Bankruptcy Code, and the Official Committee of Unsecured Creditors (the "*Committee*") hereby jointly file this *Disclosure Statement in Support of Second Amended Joint Chapter 11 Plan of Liquidation* (the "*Disclosure Statement*"). The Disclosure Statement describes the *Second Amended Joint Chapter 11 Plan of Liquidation* (the "*Plan*"), filed on April 18, 2011 and jointly proposed by both the Debtors and the Committee. The Plan provides for the liquidation of the Debtors and the treatment of all Claims against and Interests in the Debtors. The Plan and Disclosure Statement have been filed in the Debtors' jointly-administered Chapter 11 Case, which is currently pending in the United States Bankruptcy Court for the District of Delaware. Pursuant to § 1121(a), each Debtor is deemed to have filed the Plan as its individual, separate plan of liquidation.

If you have a Claim against or Interest in any Debtor, you should read the Disclosure Statement and Plan carefully. **The Debtors and the Committee urge all holders of Claims in Impaired Classes receiving Ballots to accept the Plan.**

This Disclosure Statement (and the other appendices hereto), the Plan, the accompanying forms of Ballot, if any, and the related materials delivered together herewith are being furnished by the Debtors to their respective holders of Impaired Claims and Impaired Interests pursuant to § 1125, in connection with the solicitation by the Debtors of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

This Disclosure Statement is designed to provide adequate information to enable holders of Claims against and Interests in the Debtors to make an informed judgment on the Plan. All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. Be advised that under the Plan all holders of Interests are deemed to reject the Plan. The Plan summary and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan of even date herewith, other Appendices annexed hereto and other documents referenced as filed with the Bankruptcy Court before or concurrently with the filing of this Disclosure Statement. Furthermore, the projected financial information contained herein has not been the subject of an audit. Subsequent to the date hereof, there can be no assurance that: (a) the information and representations contained herein will continue to be materially accurate; or (b) this Disclosure Statement contains all material information.

All holders of Impaired Claims who are entitled to vote on the Plan should read and consider carefully the matters described in this Disclosure Statement as a whole, including the Section entitled "RISK FACTORS," prior to voting on the Plan. In making a decision to accept or reject the Plan, each holder of a Claim must rely on its own examination of the Debtors as described in this Disclosure Statement and the terms of the Plan, including the merits and risks involved. In addition, Confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that each of these conditions will be satisfied or waived (as provided in the Plan) or that the Plan will be consummated. Even after the Effective Date, distributions under the Plan may be subject to substantial delays for holders of Claims that are Disputed.

RLF1 3966053v. 1
EAST\44424685.9

This Disclosure Statement has been approved by order of the Bankruptcy Court as containing adequate information of a kind and in sufficient detail to enable holders of Claims to make an informed judgment with respect to voting to accept or reject the Plan. However, the Bankruptcy Court's approval of this Disclosure Statement does not constitute a recommendation or determination by the Bankruptcy Court with respect to the merits of the Plan.

With the exception of historical information, some matters discussed herein, including the projections and valuation analysis described herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially from future results expressed or implied by such forward looking statements.

No party is authorized by the Debtors to give any information or make any representations with respect to the Plan or the Reorganization Securities other than that which is contained in this Disclosure Statement. No representations or information concerning the Debtors, their future business operations or the value of their properties have been authorized by the Debtors, other than as set forth herein. Any information or representations given to obtain your acceptance or rejection of the Plan which are different from or inconsistent with the information or representations contained herein and in the Plan should not be relied upon by any holders of Claims and Interests in voting on the Plan.

This Disclosure Statement has been prepared in accordance with § 1125 and not in accordance with federal or state securities laws or other applicable nonbankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtors should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "***Commission***") or by any state securities commission or similar public, governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

~~With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.~~

~~This Disclosure Statement shall neither be admissible in any other proceeding involving the Debtors or any other party nor be construed to be providing any legal, business, financial or tax advice.~~ Each holder of a Claim should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan or the transactions contemplated thereby.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summaries thereof contained in this Disclosure Statement.

RLF1 3966053v. 1
EAST\44424685.9

This Disclosure Statement, the Plan (and the other appendices hereto), the accompanying forms of Ballot, if any, and the related materials delivered together herewith are being furnished by the Debtors to their respective holders of Impaired Claims and Impaired Interests pursuant to § 1125, in connection with the solicitation by the Debtors of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

**The Bankruptcy Court has scheduled the Confirmation Hearing to commence on ~~————————~~ August 17, 2011, at ~~————~~ 11:00 a.m. (prevailing Eastern Time) before the Honorable Peter Walsh in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 5th Floor~~, Courtroom #————~~, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment of such hearing.**

**Objections to Confirmation of the Plan must be filed and served on or before ~~————————~~ August 10, 2011, at 5:00 p.m. Prevailing eastern time. Objections that are not timely filed and served may not be considered by the Bankruptcy Court.**

**To be counted, Ballots must be received by the Debtors' Claims Agent, Kurtzman Carson Consulting LLC, no later than 5:00 p.m. (prevailing ~~Eastern~~ Pacific Time) on ~~————~~ August 10, 2011.**

## INCORPORATION OF DOCUMENTS BY REFERENCE

This Disclosure Statement incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith.

The following documents are incorporated by reference herein in their entirety:

Each Debtor's *Schedules of Assets and Liabilities* filed in the Chapter 11 Case, including all amendments thereto filed through the date of the approval of this Disclosure Statement.

Each Debtor's *Statement of Financial Affairs* filed in the Chapter 11 Case, including all amendments thereto filed through the date of the approval of this Disclosure Statement.

The Debtors' Monthly Operating Reports, including all amendments thereto filed through the date of the approval of this Disclosure Statement.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein modifies or supersedes such statement.

## AVAILABLE INFORMATION

Certain documents filed in the Chapter 11 Cases are available through the Bankruptcy Court at the following website: http://www.deb.uscourts.gov/ and through the Debtors' Claims Agent at the following website: http://www.kccllc.net/BarnesBay.

RLF1 3966053v. 1
EAST\44424685.9

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY ................................................................. 1
   A.     Overview of Chapter 11 ............................................................... 1
   B.     The Solicitation .......................................................................... 1
   C.     Recommendation. ....................................................................... 2
   D.     Summary of the Plan. .................................................................. 2
   E.     Voting Eligibility and Procedures ................................................ 6
   F.     Votes Required for Acceptance; Confirmation ............................... 6
   G.     Effective Date of the Plan. ........................................................... 7
   H.     Sources of Information ................................................................ 8

II. BACKGROUND .......................................................................................... 8
   I.     General Information Regarding the Debtors.................................... 8
       1.     Corporate Structure ............................................................ 8
       2.     Viceroy Anguilla................................................................ 9
       3.     Prepetition Long Term Debt Structure .................................. 9
   J.     Events Leading to Chapter 11 filing ............................................ 10
       1.     The Construction Process .................................................... 10
       2.     PSA Creditors ................................................................... 11
       3.     PSA Creditor Lawsuits ....................................................... 11

III. THE CHAPTER 11 CASE ............................................................................ 12
   K.     Continuation of Business; Stay of Litigation................................. 12
   L.     Significant Events During the Chapter 11 Case ............................. 12
       1.     First Day Motions. ............................................................. 12
       2.     Bid Procedures Order; Stay Relief........................................ 15
       3.     Appointment of Committee. ................................................ 16
       4.     Chief Restructuring Officer. ................................................ 16
       5.     Trustee Motion .................................................................. 16
       6.     Certain Prepetition Litigation .............................................. 16
       7.     341 Meeting. ..................................................................... 17
       8.     Claims Process and Bar Date. .............................................. 17
       9.     Operation of the Debtors..................................................... 18

IV. THE PLAN ................................................................................................ 18
   A.     Overall Structure of the Plan. ...................................................... 18
   B.     Administrative and Priority Tax Claims Against All of the Debtors.... 18
       1.     Administrative Claims ........................................................ 18
       2.     Priority Tax Claims............................................................ 20
   C.     Classification and Treatment of Claims and Interests Against Debtors ............ 20
   D.     Treatment Of Claims And Interests .............................................. 20
       1.     Class 1 - DIP Claims.......................................................... 20
       2.     Class 2 - Prepetition Lender Claims ..................................... 21
       3.     Class 3 - Other Secured Claims ........................................... 22

4.     Class 4 – Priority Claims .............................................................. 22
5.     Class 5 - General Unsecured Claims ............................................. 22
6.     Class 6 - PSA Claims (Tier 1) ....................................................... 23
7.     Class 7 - PSA Claims (Tier 2) ....................................................... 23
8.     Class 8 - PSA Claims (Tier 3) ....................................................... 24
9.     Class 9 – Prepetition Lender Deficiency Claims ......................... 25
10.    Class 10 – Intercompany Indemnity Claims ................................ 25
11.    Class 11 – Interests and Interest Related Claims ...................... 26
E.    Election of Alternative Treatments by PSA Creditors ........................ 26
1.     Purchase Option ........................................................................... 26
2.     Enforcement Option ..................................................................... 28
3.     Form and Manner of Election. ..................................................... 28

V.    MEANS FOR IMPLEMENTATION ....................................................... 28
A.    Implementation of Plan ...................................................................... 28
B.    The Asset Sale ...................................................................................... 29
C.    Funding of the Plan ............................................................................. 29
D.    Other Issues ......................................................................................... 29
E.    Causes of Action ................................................................................. 30
F.    Appointment and Term of the Responsible Person ........................... 31
G.    Duties of the Responsible Person ....................................................... 31
H.    Omitted ................................................................................................ 33
I.    Discharge of Debtors' Professionals ................................................. 33
J.    Dissolution of the Committee ............................................................. 33
K.    Employee Matters ............................................................................... 33
L.    Corporate and Limited Liability Company Action ............................ 34
M.    Dissolution of the Debtors .................................................................. 34
N.    Saturday, Sunday or Legal Holiday ................................................... 34

VI.    TREATMENT OF EXECUTORY CONTRACTS .................................. 34
A.    Rejection of Remaining Executory Contracts .................................... 34
B.    Assumption and Cure of Executory Contracts ................................... 35
C.    Cure of Defaults of Assumed Executory Contracts ........................... 35
D.    Effect of Assumption and Assignment ............................................... 36
E.    Rejection Damages Bar Date .............................................................. 36
F.    Insurance Policies ............................................................................... 36
G.    PSAs .................................................................................................... 37

VII.    DISTRIBUTIONS ................................................................................... 37
A.    General Provisions Concerning Distributions .................................... 37
B.    Disbursing Agent ................................................................................. 38
C.    Time and Manner of Distributions ..................................................... 38
D.    Delivery of Distributions .................................................................... 38
E.    Undeliverable Distributions ................................................................ 38
F.    Procedures for Treating Disputed Claims .......................................... 39
1.     Reservation of Rights to Object to Claims .................................. 39
2.     Objections to Claims .................................................................... 39
G.    Filing of Objections ............................................................................ 39
H.    Determination of Claims .................................................................... 39

| | | | |
|---|---|---|---|
| | I. | Procedures for Treating and Resolving Disputed and Contingent Claims | 40 |
| | | 1. No Distributions Pending Allowance | 40 |
| | | 2. Claim Estimation | 40 |
| | J. | Setoffs and Recoupment | 40 |
| | K. | Allowance and Disallowance of Claims | 40 |
| | L. | Cancellation of Instruments and Agreements | 40 |
| | M. | No Interest on Claims | 41 |
| | N. | Withholding Taxes | 41 |
| | O. | Reports | 41 |
| VIII. | | EFFECT OF CONFIRMATION | 41 |
| | A. | Vesting of Assets | 41 |
| | B. | Binding Effect | 42 |
| | C. | Discharge of Claims and Termination of Interests | 42 |
| | D. | Injunction | 42 |
| | E. | Term of Injunctions or Stays | 43 |
| | F. | Exculpation and Releases | 43 |
| | G. | Releases by Holders of Claims and Interests | 43 |
| | H. | Reservation of Causes of Action/Reservation of Rights | 44 |
| IX. | | CONDITIONS PRECEDENT | 44 |
| | I. | Conditions Precedent to Effective Date | 44 |
| | J. | Revocation, Withdrawal or Non-Consummation of Plan | 45 |
| X. | | ADMINISTRATIVE PROVISIONS | 45 |
| | A. | Retention of Jurisdiction by the Bankruptcy Court | 45 |
| | B. | Payment of Statutory Fees | 47 |
| | C. | Headings | 47 |
| | D. | Binding Effect of Plan | 47 |
| | E. | Final Order | 47 |
| | F. | Withholding and Reporting Requirements | 47 |
| | G. | Tax Exemption and Expedited Tax Determination | 48 |
| | H. | Governing Law | 48 |
| | I. | Plan Supplement | 48 |
| | J. | Severability | 48 |
| | K. | Revocation | 49 |
| | L. | Substantial Consummation | 49 |
| | M. | Conflict | 49 |
| | N. | Amendments and Modifications | 49 |
| | O. | Notices | 49 |
| | | 1. To the Debtors: | 50 |
| | | 2. To the Prepetition Lender: | 50 |
| | | 3. To the Committee: | 50 |
| | P. | Filing of Additional Documents | 51 |
| | Q. | Direction to a Party | 51 |
| | R. | Successors and Assigns | 51 |
| | S. | Waiver of Subrogation | 51 |
| XI. | | CONFIRMATION OF THE PLAN | 51 |
| | A. | Voting Procedures and Requirements | 51 |

B.     Acceptance. ................................................................................. 54

C.     Confirmation of the Plan. ............................................................ 54

     1.     The Best Interests Test. .................................................... 55

     2.     Feasibility. ......................................................................... 55

D.     Non-Acceptance and Cramdown. ................................................ 56

     1.     The Plan Is Fair and Equitable ......................................... 56

     2.     No Unfair Discrimination. ................................................. 57

E.     Confirmation Hearing ................................................................ 57

XII.     RISK FACTORS ...................................................................................... 57

A.     Bankruptcy Risks ........................................................................ 57

     1.     Objection to Classifications .............................................. 57

     2.     Risk of Nonconfirmation of the Plan. ............................... 58

     3.     Nonoccurrence of Effective Date of the Plan. .................. 58

     4.     Potential Effect of Bankruptcy on Certain Relationships. ..................... 58

     5.     The Status and Priority of certain Claims May Be Disputed. ................. 58

B.     Business Risks ............................................................................ 59

     1.     Risks and Uncertainties Associated with the Chapter 11 Cases. ............. 59

     2.     Risks and Uncertainties Associated with Current Economic Conditions ............................................. 59

XIII.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES ..................... 59

C.     Federal Income Tax Consequences to Creditors. ..................... 60

D.     Federal Income Tax Consequences to Interest holders ............. 61

E.     Federal Income Tax Consequences to Debtors ......................... 61

F.     Withholding and Reporting ......................................................... 61

G.     Importance of Obtaining Professional Tax Assistance. ............. 61

XIV.     MISCELLANEOUS PROVISIONS ........................................................ 62

A.     Additional Documents ................................................................ 62

B.     Payment of Statutory Fees ......................................................... 62

C.     Reservation of Rights ................................................................. 62

D.     Successors and Assigns .............................................................. 63

XV.     RECOMMENDATION AND CONCLUSION ......................................... 63

**Schedule 1**     PSA Creditor Lawsuits

**Appendix 1**     Liquidation Analysis

**Appendix 2**     Prepetition Agreements

# I.  INTRODUCTION AND SUMMARY

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement.  References herein to a "fiscal" year refer to the fiscal year of the Debtors ending the last day of December in the calendar year indicated.  Capitalized terms used but not defined in the Disclosure Statement have the meanings assigned to them in the Plan.  Unless otherwise noted, section (§) references are to title 11 of the United States Code (the "***Bankruptcy Code***").

## A.  Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to chapter 11, a debtor in possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other parties in interest.  Formulation of a plan of reorganization is the principal purpose of a chapter 11 case.  The chapter 11 plan sets forth the means for satisfying the Claims of creditors against and interests of equity security holders in the debtor.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, a chapter 11 debtor may continue to operate its business and control the assets of its estate as a debtor in possession.  The Debtors have so operated since the Petition Date.

The filing of a chapter 11 petition also triggers the automatic stay, which is set forth in § 362.  The automatic stay essentially halts all attempts to collect pre-petition Claims from the debtor or to otherwise interfere with the debtor's business or its estate.

## B.  The Solicitation.

On June _____, 2011, the Debtors and the Committee filed the Plan with the United States Bankruptcy Court for the District of Delaware.  The Debtors and the Committee filed this Disclosure Statement with the Bankruptcy Court pursuant to § 1125 and in connection with the solicitation with respect to the Plan.

On _____, 2011, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" in accordance with § 1125.  Pursuant to § 1125(a)(1), "adequate information" is defined as information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records, that would enable a hypothetical reasonable investor typical of holders of Claims or interests of the relevant class to make an informed judgment about the Plan.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan before the Honorable Peter J. Walsh, United States Bankruptcy Judge on ——————August 17, 2011 at ——————11:00 a.m. prevailing Eastern Time.  The hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  Any objections to Confirmation of the Plan must be in

writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel listed below to ensure receipt by them on or before ~~——————~~August 10, 2011 at ~~——————~~5:00 prevailing Eastern Time.  Bankruptcy Rule 3007 governs the form of any such objection.  Counsel on whom objections must be served are:

Counsel for the Debtors:
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 1700
Dallas, Texas  75201
Telephone:  (214) 969-2800
Attention:  Charles R. Gibbs

Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Attention:  Paul Heath

Office of the U.S. Trustee:
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Telephone:  (302) 573-6540
Attention:  Richard Schepacarter

Counsel for the Committee:
Brown Rudnick LLP
Seven Times Square
New York, New York  10036
Telephone:  (212) 209-4800
Attention:  Gordon Z. Novod

Womble Carlyle Sandridge & Rice PLLC
222 Delaware Avenue
Wilmington, Delaware  19801
Telephone:  (302 252-4320
Attention:  Steven K. Kortanek

**C.      Recommendation.**

THE DEBTORS AND THE COMMITTEE RECOMMEND THAT EACH PERSON ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

With respect to the Plan, the Debtors and the Committee believe that: (i) the Plan provides the best possible result for the holders of Impaired Claims; (ii) with respect to each Impaired Class of Claims, the distributions under the Plan are greater than the amounts that would be received if the Debtors were to liquidate under Chapter 7 of the Bankruptcy Code; and (iii) acceptance of the Plan is in the best interest of holders of Impaired Claims.

In arriving at their conclusions, the Debtors and the Committee considered (i) the limited alternatives available to the Debtors to restructure their respective debts, (ii) the Debtors' estimated liquidation value, and (iii) the rights, in both payment and security position, of all Creditors.

**D.      Summary of the Plan.**

The Plan is the product of extensive negotiations among the Debtors, the Prepetition Lender and the Committee.  The Plan contemplates the public auction and sale of substantially all the Debtors' assets conducted in compliance with both §§ 363 and 1123(a)(5)(D) and the

applicable provisions of Anguillan law, including Section 75 of the Registered Land Act of Anguilla. The proceeds will be used to satisfy the Debtors prepetition and postpetition secured obligations and make Distributions under the Plan.

The Debtors and the Committee believe that the Plan provides a substantially better recovery for certain Classes of Creditors than the original plan of liquidation filed by the Debtors on April 1, 2011 and amended April 18, 2011. Among other changes, *the Plan provides for the payment in full of all holders of Allowed Class 5 General Unsecured Creditors, including all trade vendors holding Allowed General Unsecured Claims, and improved recoveries for PSA Creditors*.

In addition, the Plan now offers each PSA Creditor the option to either (i) accept a Cash Distribution on account of its PSA Claim, (ii) close on the purchase of a Residence Property with full credit for any deposit already paid by such PSA Creditor or (iii) seek to enforce whatever rights the PSA Creditor believes it may have in the Property or any Residence Property arising on account of any Caution, Charge or other interest arising under Anguillian law and claimed by such PSA Creditor. In this fashion, PSA Creditors are afforded the option to either close on the originally-contemplated transaction, receive a cash recovery, or pursue such other remedies as they believe may exist under Anguillian law.

**The Debtors and the Committee believe the Plan treats all Classes of Creditors and Interest holders fairly and equitably, in observance of the absolute priority rule of § 1129(b)(2). The Debtors and the Committee believe the Plan provides all Creditors and Interest holders with at least as much as they would receive in a Chapter 7 liquidation of the Debtors and provides all General Unsecured Creditors substantially more than they would receive in a Chapter 7 liquidation. Because, among other things, certain contemplated settlements and objections to Claims have not been resolved, neither the Debtors nor the Committee are certain what the total amount of Allowed General Unsecured Claims will be.**

Set forth in detail elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims and Interests, the relative allocations of property to holders of such Claims and Interests, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the reorganization of the Debtors. The Plan is complex and is the product of lengthy discussions between the Debtors, the Committee, certain of their senior secured lenders and other parties in interest and is based upon the Debtors' and the Committee's analysis of all Claims asserted or known as of the date hereof, an evaluation of the relative merits of potential conflicting Claims and a compromise between such Claims consistent with the goals of the Bankruptcy Code. The Debtors and the Committee believe that the following broad overview of what Creditors and Interest holders will receive under the Plan will be helpful in your consideration of whether you wish to accept or reject the Plan. This summary does not purport to be complete and should only be relied upon for voting purposes when read in conjunction with the Plan and the Disclosure Statement in their entirety. In the event of any inconsistency between the Plan and the Plan Documents, on the one hand, and this Disclosure Statement, on the other hand, the Plan and the Plan Documents shall control and take precedence with respect to such inconsistency.

The following Table 1 sets forth a quick reference guide to the classification and treatment of Allowed Claims against and Allowed Interests in the Debtors. Table 1 is a summary only and is subject in all respects to the specific provisions of the Plan.

| Class | Claim or Interest | Estimated Amount of Allowed Claims[2] | General Description |
|---|---|---|---|
| 1 | DIP Claims | $[~~~~~~~~~~]$10,000,000[3] | Claims of the DIP Lender against any Debtor or its Estate arising from or relating to the DIP Loan Agreement. |
| 2 | Prepetition Lender Claim | Unknown[34] | Claims of the Prepetition Lender arising under the Prepetition Facility, but only to the extent that such Claims are "secured claims" or successfully bid by the Prepetition Lender at the Public Sale as a credit bid that results in the designation and approval by the Court of the Prepetition Lender as the Buyer. |
| 3 | Other Secured Claims | $0 | Secured Claims other than those falling in Classes 2-3. |
| 4 | Priority Claims | $205,400 | Claims entitled to priority under § 507(a) that are not Administrative Expenses or Priority Tax Claims. |
| 5 | General Unsecured Claim | $[8.5-9.5 million] | Claims that is neither secured by collateral nor entitled to priority under §§ 503 or 507, and does not fall into one of the other Classes. |
| 6 | PSA Claims (Tier 1) | $[11,488,500] | PSA Claims (identified on Exhibit A, Schedule 1 to the Plan) arising from a PSA that was terminated prior to the Petition Date and identified on Exhibit A. |
| 7 | PSA Claims (Tier 2) | $[7,514,400] | Claims (identified on Exhibit A, Schedule 2 to the Plan) arising from prepetition litigation relating to a PSA that either (i) resulted in the entry of a consent judgment or out-of-court settlement or (ii) was subjected to a standstill prior to the Petition Date. |
| 8 | PSA Claims (Tier 3) | $[33,811,912] | Claims (identified on Exhibit A, Schedule 3 to the Plan) arising from a PSA that are not a PSA Claim (Tier 1) or a PSA Claim (Tier 2). |
| 9 | Prepetition Lender Deficiency Claim | Unknown[3] | Claims of the Prepetition Lender arising under the Prepetition Facility, but excluding the Prepetition Lender Claims, and (ii) all Claims by the Prepetition Lender for advancements made by the Prepetition Lender to the Debtors to protect the collateral securing the Prepetition Facility. |
| 10 | Intercompany Indemnity Claims | Unknown | Claims of any Debtor against any other Debtor, any Affiliate of any Debtor, any member of a Debtor, any partner of a Debtor or any direct or indirect holder of an |

---

[2] ~~The~~Unless otherwise indicated, the total amounts of Allowed Claims are estimated as of the Petition Date.
[3] Estimated as of the Effective Date, excluding any unpaid interest, fees or other costs outstanding under the DIP Facility.
[34] The Prepetition Lender Claim totals approximately $392,100,000, of which that portion up to the value of the collateral securing such Claims will be treated as a Class 2 Claim. The remaining balance of the Prepetition Lender Claim, together with $14,100,000 in unsecured overadvances made by the Prepetition Lender, will be treated in Class 9.

| Class | Claim or Interest | Estimated Amount of Allowed Claims[2] | General Description |
|---|---|---|---|
| | | | interest in any Debtor or its Affiliate. |
| 11 | Interests and Interest Related Claims | n/a | All issued and outstanding Interests in the Debtors as of the Petition Date, and any Claims subordinated to the level of Interests. |

The above is the continuation of:

**Table 1**
**Summary of Claims Against and Interests in the Debtor**

Table 2 is a summary of estimated recoveries for the different Classes under the Plan and is subject in all respects to the Plan.

**Table 2**
**Projected Treatment of Claims Against and Interests in the Debtor**

| If you have an Allowed Claim in this Class: | You are expected to receive this treatment: |
|---|---|
| Class 1<br>DIP Claims | If the DIP Lender is the Buyer, at the exclusive election of the DIP Lender, either (A) payment in full or (B) conversion of DIP Claims to debt of Newco or (C) discharge of DIP Claims in whole or in part. If the DIP Lender is not the Buyer, payment in full. |
| Class 2<br>Prepetition Lender Claim | Payment in full, or in the event the Prepetition Lender is the Buyer, satisfaction in whole or in part or inclusion in the debt of Newco, at the exclusive option of the Prepetition Lender. |
| Class 3<br>Other Secured Claims | Either payment in full or the return of the property securing such Allowed Other Secured Claim as the indubitable equivalent of your interest in such property. |
| Class 4<br>Priority Claims | Payment in full. |
| Class 5<br>General Unsecured Claims | Payment in full, without interest. |
| Class 6<br>PSA Claims (Tier 1) | A Distribution equal to 50.00% of the amount of such Allowed Claim; *provided*, *however*, that pursuant to Section 4.12 of the Plan, any PSA Creditor may affirmatively elect to either purchase a Residence Property or commence one or more PSA Enforcement Actions in lieu of receiving any such Distribution. |
| Class 7<br>PSA Claims (Tier 2) | A Distribution equal to 25.00% of the amount of such Allowed Claim; *provided*, *however*, that pursuant to Section 4.12 of the Plan, any PSA Creditor may affirmatively elect to either purchase a Residence Property or commence one or more PSA Enforcement Actions in lieu of receiving any such Distribution. |
| Class 8<br>PSA Claims (Tier 3) | A Distribution equal to 15.00% of the amount of such Allowed Claim; *provided*, *however*, that pursuant to Section 4.12 of the Plan, any PSA Creditor may affirmatively elect to either purchase a Residence Property or commence one or more PSA Enforcement Actions in lieu of receiving any such Distribution. |
| Class 9<br>Prepetition Lender Deficiency Claims | On the Effective Date, the Prepetition Lender shall waive any right to Distribution on account of its Prepetition Lender Deficiency Claims. |
| Class 10<br>Intercompany Indemnity Claims | No Distribution. Intercompany Indemnity Claims shall be waived, released and discharged on the Effective Date. |

| Table 2 | |
|---|---|
| **Projected Treatment of Claims Against and Interests in the Debtor** | |
| **If you have an Allowed Claim in this Class:** | **You are expected to receive this treatment:** |
| Class 11<br>Interest and Interest Related Claims | No Distribution.  Interests shall be canceled on the Effective Date. |

The Debtors and the Committee believe that the Plan treats the respective Classes of Creditors and Interest holders of each Debtor fairly and equitably in observance of the absolute priority rule of § 1129(b)(2).  The Debtors and the Committee believe that the Plan provides each Creditor and Interest holder of each Debtor with at least as much as it would receive if the corresponding Debtor were liquidated under Chapter 7 of the Bankruptcy Code, and provides each General Unsecured Creditor substantially more than it would receive if the corresponding Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

**E.      Voting Eligibility and Procedures.**

Table 3 provides a summary of the voting eligibility of Creditors and Interest holders in each Class under the Plan, based on whether or not those Claims and Interests are Impaired or not Impaired.

| Table 3 | | | |
|---|---|---|---|
| **Voting Eligibility Under the Plan** | | | |
| **Class** | **Description** | **Impairment** | **Entitled to vote?** |
| Class 1 | DIP Claims | Not Impaired | NO   (deemed to accept) |
| Class 2 | Prepetition Lender Claim | Not Impaired | NO   (deemed to accept) |
| Class 3 | Other Secured Claims | Impaired | YES |
| Class 4 | Priority Claims | Not Impaired | NO   (deemed to accept) |
| Class 5 | General Unsecured Claim | Impaired | YES |
| Class 6 | PSA Claims (Tier 1) | Impaired | YES |
| Class 7 | PSA Claims (Tier 2) | Impaired | YES |
| Class 8 | PSA Claims (Tier 3) | Impaired | YES |
| Class 9 | Prepetition Lender Deficiency Claims | Impaired | YES |
| Class 10 | Intercompany Indemnity Claims | Impaired | NO   (deemed to reject) |
| Class 11 | Interest and Interest Related Claims | Impaired | NO   (deemed to reject) |

Some Creditors might hold Impaired Claims in more than one Class and must vote separately for each Class.  If you hold Claims in more than one Class, or Claims against more than one Debtor, you must cast a separate vote based on each individual Claim against each individual Debtor.

Please do not return any other documentation with your Ballot.  For further information on casting a Ballot to vote on the Plan, please see Section XI.A. of this Disclosure Statement.

**F.      Votes Required for Acceptance; Confirmation.**

The Bankruptcy Code defines acceptance of a plan by an Impaired Class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the Claims of that Class which actually cast ballots.  The vote of a holder of a Claim may be

disregarded if the Bankruptcy Court determines, after notice and hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition to this voting requirement, § 1129 requires that the Plan be accepted by each holder of a Claim in an Impaired class or that the Plan be found by the Bankruptcy Court to provide the holder with at least as much value on account of its Claim as it would receive on a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. If the Plan is not accepted by one or more Classes of Impaired Claims, the Debtors may nevertheless ask the Court to confirm the Plan despite such lack of acceptance if the Court finds that the Plan does not discriminate unfairly and is "fair and equitable" with respect to any such non-accepting Impaired Class. Refer to Section XI.D. of the Disclosure Statement for a detailed discussion of the procedures by which the Plan may be confirmed based upon the votes of Impaired Creditors.

Section 1129(b) provides that upon request of the proponent of the Plan, the Bankruptcy Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (c) at least one Impaired Class has accepted the Plan (without counting acceptances by insiders) and (d) the Plan satisfies the requirements set forth in § 1129(a) other than § 1129(a)(8). In general, § 1129(b) permits Confirmation notwithstanding non-acceptance by an Impaired Class if that Class and all more junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under a Plan.

Confirmation of the Plan will make the Plan binding upon the Debtors and all holders of Claims against and Interests in the Debtors and other parties in interest regardless of whether they have accepted the Plan, and such holders of Claims and Interests will be prohibited from receiving payment from, or seeking recourse against, any assets that are distributed to other holders of Claims or Interests under the confirmed Plan. In addition, Confirmation of the Plan will enjoin Creditors and Interest holders from taking a wide variety of actions on account of a debt, Claim, liability, interest or right that arose prior to the Confirmation Date. As of the Effective Date of the Plan, Confirmation will also operate as a discharge of all Claims against and Interests in the Debtors to the full extent authorized by § 1141(d). Section 1141(d) provides generally that, except as otherwise provided in the Plan or order confirming the Plan, Confirmation of the Plan (i) discharges the Debtors from any debt that arose before the date of such confirmation, including a debt of a kind specified under specified sections of the Bankruptcy Code (such as rejection damages Claims), whether or not a proof of Claim based on such debt is filed or deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has accepted the Plan, and (ii) terminates all rights and interests of Interest holders as provided for in the Plan.

## G.    Effective Date of the Plan.

The Plan will not be consummated immediately upon Confirmation, but only upon the Effective Date. The Effective Date will not occur unless various conditions to the occurrence of the Effective Date are satisfied (or waived to the extent permitted by, and in accordance with the terms of, the Plan). Certain of the conditions to the occurrence of the Effective Date may be

waited by the Debtors.  There is no assurance, however, that the Debtors would waive any such conditions.  The Confirmation Order may be vacated if the conditions to the Effective Date are not timely met or waived.

Because of the conditions to the occurrence of the Effective Date provided in the Plan, a delay will occur between Confirmation of the Plan and the Effective Date.  There is no assurance that the conditions to the Effective Date will be fulfilled, or that any waivable condition, which is not fulfilled will in fact be waived.  The Plan provides that it is a condition to the occurrence of the Effective Date of the Plan that each of the conditions set forth in Section 10.1 of the Plan has been satisfied or waived.  **In the event any conditions to the Effective Date cannot be fulfilled or waived, the Effective Date will not occur.**

The implementation of the Plan involves certain risks.  For a discussion of these risks, see Article XI, entitled "RISK FACTORS."

The Debtors and the Committee currently believe that all conditions to the occurrence of the Effective Date of the Plan will be satisfied, and that the Effective Date of the Plan is likely to occur by ~~————————~~August 31, 2011.

## H.    Sources of Information

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their business, properties and management, and the Plan have been prepared from information furnished by the Debtors.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied on other than as set forth in this Disclosure Statement.  In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement.  Any such additional representations or inducements should be reported immediately to counsel for the Debtors, Charles R. Gibbs, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 1700, Dallas, Texas  75201, Telephone: (214) 969-2800, Facsimile: (214) 969-4343, and counsel for the Committee, Gordon Z. Novod, Brown Rudnick LLP, 7 Times Square, New York, NY 10036, Telephone:  (212) 209-4800, Facsimile: (212) 209-4801.

# II. BACKGROUND

**1A.** **General Information Regarding the Debtors**

### 1. *Corporate Structure*

Kor Duo is managed by its managing member, Bradford Korzen, and is the general partner of KDIP. Barnes Bay, which is wholly-owned by KDIP, is the principal operating company of the Debtors. Barnes Bay owns the The Viceroy Anguilla Resort and Residences (the "***Property***"), which comprises the principal assets of the Debtors.

### 2. *Viceroy Anguilla*

The Viceroy Anguilla Resort and Residences is a luxury resort located on the Caribbean island of Anguilla in the British West Indies. The resort is situated on 35 acres, with more than 3,200 feet of beach frontage along both Barnes and Meads Bays. Viceroy Anguilla features 166 exclusive contemporary beachfront and blufftop villas, townhomes and resort residences. The resort opened on a limited basis in late 2009 when Viceroy introduced 31 free-standing oceanfront villas, 34 ocean view resort residences, guest reception area and the Sunset Lounge and pool. In 2010, the remaining 69 residences and 32 hotel rooms were completed along with the Viceroy Anguilla's 4 restaurants (Coba, Aleta, Bamboo Bar and Grill and The Half Shell), 2 additional community pools (Aleta and Bamboo), Sea Centre, 8,000 square foot oceanfront Spa, Wellness & Fitness Centre, boutique, Generation V Kid's Club and the Viceroy Anguilla Tennis Academy. Viceroy Anguilla also features a state of the art 250,000 gallon reverse osmosis water purification plant, on-site central energy plant and roof-top rainwater collection systems.

Viceroy Anguilla's residences sell for $600,000 to $6,500,000. All residences are sold fully furnished and feature either private infinity or plunge pools. As of October 2010, buyers have agreed to purchase almost 70% of Viceroy's villas, townhomes and residences.

The Property is managed by Viceroy International Holdings, Ltd, through its wholly-owned subsidiary Viceroy Hotels Anguilla Ltd. ("***VHA***"), as agent for the Debtors in accordance with the management agreement executed by Barnes Bay and KHM Viceroy Anguilla LLC (a wholly-owned subsidiary of Kor Hotel Management LLC), and subsequently assigned by KHM Viceroy Anguilla LLC to VHA.

As of December 31, 2010, the Debtors reported assets of approximately $531,000,000 and liabilities of $461,900,000 on their consolidated balance sheets. In 2010, the Property and related assets produced approximately $16,700,000 in consolidated revenues, and reported a consolidated net loss of $13,700,000 for the year ended December 31, 2010.

### 3. *Prepetition Long Term Debt Structure*

Barnes Bay, as borrower, entered into that certain Loan and Security Agreement, dated as of June 13, 2006 (as amended from time to time thereafter, the "***2006 Loan Agreement***") with Citigroup Global Markets Realty Corp. ("***CGMRC***"), as initial lender, administrative agent and collateral agent thereunder. The 2006 Loan Agreement was subsequently amended and restated pursuant to an Amended and Restated Loan and Security Agreement, dated as of July 30, 2008

(the "***2008 Loan Agreement***" and, together with the 2006 Loan Agreement, the "***Original Loan Agreement***").  Pursuant to the Original Loan Agreement, CGMRC provided Barnes Bay with a $250,000,000 "Tranche A Loan" and a $46,000,000 "Tranche B Loan," each of which was subsequently fully funded.  The obligations under the Original Loan Agreement were secured by substantially all the assets of Barnes Bay, including the Property.  Thereafter, CGMRC made two protective advances of $9,300,000 and $3,200,000 on June 9, 2009 and June 26, 2009, respectively.  On June 26, 2009, CGMRC subsequently assigned the outstanding Tranche A and Tranche B Loans to Citicorp North America, Inc. and other designated assignees, which replaced CGMRC as Tranche A Lender and Tranche B Lender, respectively, under the two facilities.

Barnes Bay thereafter entered into that certain Second Amended and Restated Loan and Security Agreement, dated as of July 17, 2009 (as amended, the "***2009 Loan Agreement***").  The 2009 Loan Agreement amended and restated the 2008 Loan Agreement, and increased the maximum Tranche B Loan amount from $46,000,000 to $128,500,000 (the "***Tranche B Maximum Loan Amount***"), thus providing Barnes Bay with an additional $70,000,000 in funding after giving effect to the 2009 protective advances.

Barnes Bay's obligations under the 2009 Loan Agreement were secured by liens on and security interests in substantially all the assets of Barnes Bay, including the Property, and portions of such obligations were guaranteed by Bradford Korzen pursuant to certain guaranties executed contemporaneously with the 2009 Loan Agreement.

Shortly thereafter, Barnes Bay defaulted under certain of its obligations under the 2009 Loan Agreement, including the obligation to convert the Property to a condominium form of ownership prior to September 15, 2009.  Nevertheless, the Tranche B Lender continued to advance Tranche B Loans to fund certain budget costs and operating shortfalls up to the Tranche B Maximum Loan Amount.  On May 19, 2010, Barnes Bay and the Tranche A and Tranche B Lenders entered into a first amendment to the 2009 Loan Agreement, pursuant to which the aggregate Tranche B loan commitment was increased by an additional $10,000,000.

On or about October 13, 2010, the outstanding loans under the 2009 Loan Agreement were acquired by SOF-VIII-Hotel II Anguilla Holdings, LLC (the "***Prepetition Lender***"), an affiliate of Starwood Capital Group.  Since that time, the Prepetition Lender has provided approximately $14,100,000 in *unsecured* overadvances.  As of the Petition Date, the total outstanding balance owed by Barnes Bay to the Prepetition Lender under the 2009 Loan Agreement was approximately $392,100,000.

The Committee conducted an extensive investigation of the Prepetition Lender's liens and the perfection of such liens. After completing this investigation, the Committee determined that the Prepetition Lender has valid and perfected liens on substantially all of the Debtors' assets.  The Committee believes some question may exist as to whether the Prepetition Lender held valid and perfected liens on certain deposit accounts prior to the Petition Date; however, those deposit accounts—which are believed to hold less than $1,000,000 in funds—are pledged as collateral to secure the DIP Facility.  Accordingly, the Committee has concluded that all or substantially all the Debtors' assets are encumbered by valid and perfected liens in favor of either the Prepetition Lender or the DIP Lender.

**B.**      **Events Leading to Chapter 11 filing**

     *1.*      *The Construction Process*

The Property was constructed on the site of the old Cocoloba Beach Resort, situated on a promontory between Meads Bay and Barnes Bay. Despite the spectacular location, previous attempts to develop the location had ended unsuccessfully. When Barnes Bay took over the property in 2004 and sought to redevelop the property, it approached the problem from a new perspective. In 2005, Viceroy razed the old Cocoloba property to the ground, starting again from scratch.

When construction began on the Property in 2005, the project was expected to take two years to complete at a budgeted cost of approximately $144,000,000. Construction of the Property, however, was difficult almost from the beginning, and by May 2005 a final *pro forma* put the projected cost at approximately $238,000,000, which swelled to $327,000,000 by January 2007. Given Anguilla's small size and population, a sufficient construction work force was not available on-island. Accordingly, laborers were recruited from India to relocate to Anguilla on a temporary basis to construct the hotel property. Worker complaints of low pay and insufficient benefits ultimately led to a series of labor strikes that slowed the pace of construction further. Barnes Bay ultimately settled with workers in November 2007, agreeing to higher wages and reducing the number of employees per housing trailer. In addition, Barnes Bay launched its own investigation into the workers' Claims to ensure that its contractors adhered to "best employment practices."

In March 2008, Barnes Bay unveiled its model villa, but the project suffered another setback in October 2008 when Hurricane Omar struck Anguilla. Construction on the Property was delayed further in the wake of the hurricane, and storm damage repairs further added to the overall construction budget for the project. Although a Claim was submitted to the insurer, it has yet to be resolved. It is contemplated that Buyer will acquire the rights to any recoveries on this insurance Claim and will be responsible for all costs associated therewith.

Barnes Bay finally had a soft opening in August 2009, and officially opened in October 2010. Ultimately, it took almost five years to complete the project, and has cost substantially more than was originally forecast. As a result, Barnes Bay has been unprofitable from the outset, plagued by construction delays and cost overruns that have left the Property overleveraged and unable to service its existing debt obligations.

     *2.*      *PSA Creditors*

During the construction process Barnes Bay actively marketed and sold the private villas and oceanfront residences. As of the Petition Date, Barnes Bay had signed Purchase and Sale Agreements ("***PSAs***") with buyers (the "***PSA Creditors***") for 25 villas and 72 of the other private residences, collecting almost $52,900,000 in deposits (the "***PSA Deposits***") against purchase prices aggregating approximately $220,000,000. As these funds were collected by Barnes Bay, they were used to fund ongoing construction and operating expenses. Under Anguillan law and as explicitly set forth in the PSAs, none of the deposits are secured by liens against the corresponding properties; however, some of the PSA Creditors obtained guaranties of their PSA

Deposits from various third party affiliates of the Debtors. Proceeds from the deposits were used to fund construction. In total, these affiliates guaranteed approximately $6,400,000 in PSA Deposits. Under the Plan, the right of PSA Creditors (other than PSA Creditors electing the Purchase Option) to pursue collection of these guarantees against third parties is expressly preserved.

Prior to the Petition Date, certain of the PSA Guarantors paid the sum of $1,269,000 to The Leland Hirsch Family Partnership, L.P. and Mazzei Holding, LLC (together, "**Hirsch and Mazzei**") on account of their guaranty of Hirsch and Mazzei's PSA Deposit. Subsequently (but also prior to the Petition Date), the Prepetition Lender agreed to indemnify certain losses incurred by PSA Guarantors arising in connection with the PSAs up to a limit of $5,171,050. Accordingly, in connection with the consummation of the Plan, the Prepetition Lender will reimburse those PSA Guarantors in the amount of $1,269,000 for payments made to Hirsch and Mazzei on account of their PSA and as covered by the Prepetition Lender's indemnity obligation.

### 3.    *PSA Creditor Lawsuits*

Prior to the commencement of this Chapter 11 Case, the Debtors were involved in various lawsuits. The lawsuits are disclosed in the Statement of Financial Affairs. No judgments have been rendered against the Debtors, nor have the Debtors incurred any liability pursuant to any of these actions.

On March 17, 2010, one of the PSA Creditors, Royal Butterfly, initiated a lawsuit, styled *Royal Butterfly v. Barnes Bay Development Ltd, Kor Hotel Management, LLC, Kor Realty Group, LLC and Bradford Korzen*, No. 10-CV-1366 (BSJ) (MHD), in the United States District Court for the Southern District of New York (the "**Royal Butterfly Lawsuit**"). In the Royal Butterfly Lawsuit, Royal Butterfly seeks to terminate its PSA and recover the full amount of its $1,999,000 deposit from Barnes Bay and, under alter ego theories, the other defendants.

On November 4, 2010, another PSA Creditor, Gary Black and Florence Black, initiated a lawsuit, styled *Gary Black and Florence Black v. Barnes Bay Development Ltd, Kor Hotel Management, LLC, Kor Realty Group, LLC and Bradford Korzen*, No. 10-CV-8359 (PGG), in the United States District Court for the Southern District of New York (the "**Black Lawsuit**"). In the Black Lawsuit, the plaintiffs similarly seek to terminate its PSA and recover the full amount of its $1,231,900 deposit from Barnes Bay and, under alter ego theories, the other defendants.

Other similar lawsuits have been filed by PSA Creditors in both the United States and Anguilla (collectively, the "**PSA Creditor Lawsuits**"). Attached as Schedule 1 hereto is a list of other PSA Creditors that have filed similar lawsuits, including five PSA Creditors who obtained Consent Judgments. As described in Section III.B.6(b), during the Chapter 11 Case, the Debtors have filed applications seeking to stay each of the PSA Creditor Lawsuits currently pending in Anguilla, and have negotiated consent orders with the corresponding PSA Creditors staying almost all of them. Additionally, Barnes Bay had entered into settlements or standstill agreements with certain other PSA Creditors who brought or threatened litigation against Barnes Bay in the courts of Anguilla.

### 4. *Prepetition Agreements*

In the weeks leading up to the Petition Date, the Debtors, the Prepetition Lender and certain other parties negotiated certain agreements intended to set forth the principal terms upon which the parties would proceed with a consensual restructuring of the Debtors in chapter 11. Those agreements included (i) a Term Sheet by and between the Debtors and the Prepetition Lender, (ii) a Commitment Letter, executed March 16, 2011 between the Debtors and the Prepetition Lender and setting forth terms for a proposed $5,000,000 DIP Facility, (iii) an Indemnity Agreement, executed March 16, 2011 by the Prepetition Lender in favor of the PSA Guarantors, (iv) an Amended and Restated Guaranty, executed March 16, 2011 by Bradford J. Korzen in favor of the Prepetition Lender, and (v) a Guaranty, executed March 16, 2011 by the Prepetition Lender in favor of Viceroy International Holdings, Ltd. and VHA. The foregoing documents are attached to the Disclosure Statement as Appendix 2.

## III. THE CHAPTER 11 CASE

### ~~K~~A. Continuation of Business; Stay of Litigation

On March 17, 2011, the Debtors commenced their Chapter 11 Case. Since the Petition Date, the Debtors have continued to operate as Debtors in Possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code. The Debtors are authorized to operate in the ordinary course of business. Transactions out of the ordinary course of business must receive prior Bankruptcy Court approval. In addition, the Bankruptcy Court has supervised the Debtors' employment of attorneys, accountants and other professionals.

An immediate effect of the commencement of the Chapter 11 Cases was the imposition of the automatic stay under § 362. With limited exceptions, the automatic stay enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtors and litigation against the Debtors. This injunction remains in effect unless modified or lifted by order of the Bankruptcy Court.

### ~~L~~B. Significant Events During the Chapter 11 Case

#### 1. *First Day Motions.*

On the Petition Date, the Debtors submitted numerous so-called "***First Day Motions***" seeking various relief in the first few weeks of the Chapter 11 Case. Among the more notable First Day Motions, the Debtors filed motions seeking authority: (i) to pay certain prepetition wages, salaries, commissions, reimbursable expenses and benefits and authorize certain banks to honor prepetition checks; (ii) to maintain the Debtors' existing Cash management system, bank accounts, checks and business forms; (iii) to pay certain prepetition Claims of "critical vendors"; (iv) to establish procedures for the interim compensation and reimbursement of expenses for Professionals; (v) to conduct a public auction and sale of substantially all the Debtors' assets pursuant to certain bidding procedures; (vi) to continue selling Residential Properties in the ordinary course of business; and (vii) to use Cash collateral, incur certain postpetition indebtedness and grant adequate protection to the DIP Lender.

Some of the First Day Motions are summarized below:

(a)     *Retention of Professionals.*

As of the commencement of the Chapter 11 Case, the Debtors retained Akin Gump Strauss Hauer & Feld LLP as lead bankruptcy counsel and Richards Layton & Finger, P.A. as their local Delaware counsel.  The Debtors also sought to retain certain Anguillan professionals, including Keithley Lake & Associates as local Anguillan counsel, Anguillan Credit Management Limited as auctioneer and Cushman & Wakefield Inc. as appraiser.  The Debtors have also engaged Kurtzman Carson Consultants LLC to serve as Claims and noticing agent in the Chapter 11 Case.

(b)     *Prepetition Wage and Benefits.*

The Bankruptcy Court approved an order authorizing the Debtors to pay certain prepetition wages, salaries and commissions to their approximately 657 direct employees, 7 indirect employees and 8 independent contractors, and to continue reimbursing those employees and independent contractors and employees for certain reimbursable business expenses and employee benefits.  The Debtors believe such relief was necessary to avoid serious disruption to their business at a critical juncture in their reorganization.  Payments made pursuant to this order will reduce the amount of Allowed Priority Claims and Allowed General Unsecured Claims.

(c)     *DIP Financing and Use of Cash Collateral.*

On March 21, 2011, the Bankruptcy Court approved an order authorizing the Debtors to use Cash collateral pursuant to § 363 and to obtain postpetition financing in the form of a $5,000,000 DIP Facility pursuant to §364(c) and (d) on an interim basis, pending a final hearing scheduled for April 12, 2011.  The DIP Lender is SOF-VIII-Hotel II Anguilla, LLC, which is also the Debtors' Prepetition Lender.  On an interim basis, the Debtors were authorized to borrow $2,500,000 under the DIP Facility, with an additional $2,500,000 to be made available once the DIP Facility is approved on a final basis.

Subsequently, the Debtors determined their postpetition financing needs had increased based on a variety of factors, including increased Professionals' fees and an increase in the estimated duration of the Chapter 11 Case.  ~~negotiations~~Negotiations between the Debtors and the DIP Lender—with input from the Committee—resulted in terms for a $12,500,000 DIP Facility, which was presented to the Court for approval on June 14, 2011.

As modified, the DIP Facility provides the Debtors with a total of $12,500,000 in postpetition secured financing.  The DIP Facility will mature on the earliest to occur of: (i) September 30, 2011, (ii) the Effective Date, (iii) the confirmation date of any plan of reorganization confirmed over the objection of the DIP Lender, (iv) the date of the appointment of a trustee or examiner in the Chapter 11 Case, (v) the date of the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code, (vi) at the sole and absolute discretion of Administrative Agent, upon the occurrence of an event of default DIP Facility, and (vii) upon payment in full of all obligations under the date of payment in full in Cash in Dollars of all DIP Obligations under the Loan Documents.

Pursuant to the DIP Facility, the DIP Lender has been granted, as adequate protection for the DIP Facility, (i) an Allowed Administrative Expense with priority over virtually all other Claims and Administrative Expenses in the Chapter 11 Case, including Administrative Expenses (subject to certain carve-outs) and (ii) first priority Liens on substantially all the Debtors' assets *pari passu* with the liens securing the Prepetition Lender's Claims under the Prepetition Facility (subject to certain carve-outs and exclusions).

Approval of the DIP Facility has enabled the Debtors to ensure the continued ability to fund the costs of administration in the Chapter 11 Case, including payments to vendors for goods and services provided to the Debtors during the course of the Chapter 11 Case.

(d)     *Critical Vendors.*

The Bankruptcy Court approved an order authorizing the Debtors to set aside up to $600,000 to pay amounts toward the prepetition Claims of certain of their key vendors and service providers that meet certain criteria ("***Critical Vendors***"). The Critical Vendors are suppliers of goods and services for whom the Debtors (i) do not have alternative suppliers available at comparable cost or quality, (ii) with whom the Debtors do not have enforceable contracts sufficient to provide for continued supply through the duration of the Chapter 11 Case, and (iii) without whose continued trade the Debtors' operations could be disrupted. Moreover, many of the Critical Vendors are local "on-island" vendors, against whom it could be difficult for the Debtors to otherwise compel performance of outstanding contractual obligations.

Subsequent due diligence revealed several additional categories of Critical Vendor, including the Government of Anguilla and the local Anguillian electric company. Based on further evaluation, the Debtors determined that the total claims of these Critical Vendors (including the $600,000 originally authorized) was approximately $3,200,000. Accordingly, the Debtors filed a second motion seeking to increase the total amount they are authorized to pay Critical Vendors to ensure the continued provision of their respective goods and services. This second motion was presented to the Bankruptcy Court on June 14, 2011.

(e)     *Continued Sale of Residential Units*

The Bankruptcy Court approved an order (the "***Ordinary Course Sales Order***") authorizing the Debtors to continue engaging in the sale of the residential properties (*e.g.*, villas, townhomes) associated with the Property without seeking further court approval. In addition, the Debtors received authority to transfer title free and clear of all liens and encumbrances in connection with such sales, and to remit the proceeds from such sales to repay the Prepetition Secured Claims in accordance with the terms of the Prepetition Facility. Finally, the Debtors were authorized to continue to employ certain customer incentive programs consistent with past practices.

Pursuant to the Ordinary Course Sales Order, the Debtors may enter into new PSAs with certain PSA Creditors who had signed PSAs prior to the Petition Date**,** and also with certain new PSA Creditors that may close after the Effective Date. The PSA Creditors' obligation to close on the purchase of the corresponding residential properties under these postpetition PSAs may be conditioned upon the occurrence of the Effective Date of the Debtors' Plan. In the event the

Effective Date does not occur, then (i) certain of these postpetition PSAs may become null and void, and (ii) with respect to those PSA Creditors who initially executed PSAs prior to the Petition Date, those purchasers would retain all of their rights and remedies that would have been available to them prior to their execution of a postpetition PSA under their originally executed PSAs.

For those PSA Creditors who would prefer to finance the remainder of the purchase price, the Debtors have arranged market financing with Scotia Bank.

The Committee filed a motion seeking reconsideration of the Ordinary Course Sales Order on April 20, 2011 (the "*Reconsideration Motion*").  The Reconsideration Motion is being withdrawn contemporaneously with the filing of the Plan and this Disclosure Statement.

On May 2, 2011, the Committee filed a Complaint for Declaratory and Injunctive Relief (the "*Committee Complaint*") and a *Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining Defendants from Closing on Sales of Units to Deposit Creditors* (the "*Motion for TRO*") seeking to, among other things, prevent the Debtors from closing on the sale of Residence Properties.  On  May 11, 2011, the Court entered an *Order Denying Request for Temporary Restraining Order* (the "*TRO Order*").  On May 25, 2011, the Committee filed a Notice of Appeal of the TRO Order (the "*Notice of Appeal*").  By way of stipulation, the Debtors and the Committee have agreed to extend the Debtors' deadline to file an answer to the Committee Complaint and the Committee's deadline to file a statement of issues on appeal and the designation of the record pursuant to Bankruptcy Rule 8006 to July 1, 2011.  The Committee will dismiss the Committee Complaint and withdraw the Notice of Appeal contemporaneously with the filing of the Plan and the Disclosure Statement.  Accordingly, the Debtors and the Committee anticipate that the Debtors will be able to move forward with the execution of new PSAs and the sale of Residence Properties consistent with the terms of the Ordinary Course Sales Order through the balance of the Chapter 11 Case.

## 2. *Bid Procedures Order; Stay Relief.*

Also on the Petition Date, the Debtors filed a motion seeking approval of certain procedures by which they propose to conduct a public auction and sale of the Property and certain related assets and seeking additional relief relating to the proposed sale, including the proposed assumption and assignment of executory contracts and unexpired leases to the prevailing bidder.  The Debtors and the Committee agreed upon a form of order limiting the scope of the relief sought in the initial proposed order.  The Bankruptcy Court entered this revised order approving the proposed auction and sale procedures on May 19, 2011.

At the hearing on the Debtors' motion seeking approval of the Bid Procedures Order, four PSA Creditors—RJR Viceroy Ltd., Mark Frederickson, Grant Gibson and Kim Evans— orally sought relief from the automatic stay pursuant to § 362(d) to permit them to pursue certain alleged rights and interests in the Residence Properties.  These Creditors take the position that the proposed sale of the Property cannot satisfy the requirements of, or be approved pursuant to, § 363.  The Debtors and the Committee dispute this position, and believe that the proposed sale complies with both Anguillian law and the Bankruptcy Code.

On May 24, 2011, the Bankruptcy Court entered an order granting them relief from the automatic stay "to pursue whatever rights they believe they have in their respective units in the Anguillian court."  On May 31, 2011, the Debtors filed a motion seeking to alter or amend the May 24 order in order to more properly limit the scope of relief to permit the enumerated PSA Creditors to seek a determination of their rights, if any, in the Residence Properties, and not to otherwise seek to enforce such rights or collect on any judgment obtained.  Shortly thereafter, on June 10, 2011, RJR Viceroy, Ltd., Mark Frederickson and Grant Gibson filed a *Statement of Claim* (analogous to a petition) in the Anguillian court seeking certain declarations as to the nature of their interests, if any, in certain Residential Properties, as well as a request for injunctive relief preserving the *status quo* and "inhibiting any dealings" with the same Resdiential Properties.

Following a hearing on June 14, 2011, the Bankruptcy Court granted the Debtors' motion in full and amended the May 24, 2011 order to grant the enumerated Creditors relief from the automatic stay only "for the limited purpose of seeking a declaratory judgment in Anguilla as to the validity, priority and extent of their interests, if any, in the respective units."  Thereafter, the objecting parties amended their *Statement of Claim* in the Anguillian court to remove the requests for injunctive relief.

### 3.    Appointment of Committee.

On March 31, 2011, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors composed of the following members, together with the corresponding Class in which each member's Claim falls: (i) Exclusive Resorts Real Estate Holding II, LLC (Class 6—PSA Claim (Tier 1)), (ii) World Class Pools (Class 5—General Unsecured Claim), (iii) Joel Greenberg and Mary Gringlas (Class 6—PSA Claim (Tier 1)), (iv) Carillion Construction (West Indies) Ltd. (formerly Class 5—General Unsecured Claim)[5] and (v) Jacob Stepan (Class 8—PSA Claim (Tier 3)).  Subsequently, the Committee invited two additional unsecured creditors to participate on the Committee as nonvoting *ex officio* members. The ex officio members are (i) Adam Zoia Class 8—PSA Claim (Tier 3) and (ii) Sue Sheain and Richard Afrookteh (Class 8—PSA Claim (Tier 3)).

Section 1103 authorizes any official committee (*e.g.*, the Committee) to employ professionals.  Following entry of an order by the Bankruptcy Court, the Committee retained Brown Rudnick LLP and Womble Carlyle Sandridge & Rice, PLLC as counsel for the Committee and FTI Consulting, Inc. as financial advisors to the Committee.  The Committee has also retained C. R. Hodge & Associates as foreign counsel to the Committee.

### 4.    Chief Restructuring Officer.

Shortly prior to the Petition Date, the Debtors designated Deborah Branch as their Chief Restructuring Officer.  Ms. Branch is also the Chief Financial Officer of Kor Realty Group, an affiliated entity, and was involved during the construction of the Property as well.

---

[5] Pursuant to an order entered by the Bankruptcy Court on June 14, 2011, the Debtors were authorized to assume their contract with Carillion Construction.  Once the cure payment is made in connection with the assumption of that contract (which is expected to occur by early July 2011), Carillion will cease to be a member of the Committee.

On April 12, 2011, the Debtors filed a motion seeking authority to retain Zolfo Cooper Management, LLC and Zolfo Cooper (BVI) Limited (together, "*Zolfo Cooper*") to provide certain interim management services, including the appointment of Kevin Nystrom to replace Ms. Branch as Chief Restructuring Officer. Mr. Nystrom has extensive experience in the development of reorganization plans, creditor negotiations, business plan preparation and long-term forecasting, developing and implementing cost reduction programs and financial management of public and privately held companies. He recently served as Chief Operating Officer of Hawaiian Telecom and Chief Restructuring Officer of American Home Mortgage.

### 5. Trustee Motion

One day after the Debtors sought authority to retain Zolfo Cooper only a few days after the appointment of Mr. Nystrom as Chief Restructuring Officer, the Committee filed a motion (the "*Trustee Motion*") seeking the appointment of a chapter 11 trustee pursuant to § 1104. Each of the Debtors and the Prepetition Lender filed detailed objections to the Trustee Motion, and the Bankruptcy Court conducted contested evidentiary hearings on the matter on May 6, 2011 and May 13, 2011. On May 13, 2011, at the request of the Debtors, the Committee and the Prepetition Lender, the Bankruptcy Court adjourned the hearings on the Trustee Motion to permit the parties to engage in settlement negotiations. The Plan filed contemporaneously herewith is the result of those discussions.

### 6. Certain Prepetition Litigation

In addition to the PSA Creditor Lawsuits described in Section II.B.3. above, the Debtors are involved in certain other litigation that was pending on the Petition Date.

#### (a) Garnishment Proceeding

On February 1, 2011, RJR Viceroy Ltd. ("*RJR*"), a PSA Creditor, filed an application (the "*Garnishment Action*") in the Eastern Caribbean Supreme Court in the High Court of Justice, Anguilla Circuit (the "*Anguillian Court*") for the equivalent of a writ of garnishment against Barnes Bay in connection with RJR's ongoing effort to recover the deposit it had previously paid under a PSA. On March 16, 2011, just before the Petition Date, the Anguillian Court entered a *Provisional Attachment of Debt Order* (the "*Attachment Order*") against Barnes Bay and certain banks in Anguilla where Barnes Bay maintains accounts. The Attachment Order was served on Barnes Bay and the various garnishee banks on the Petition Date. As a result, the garnishee banks placed an immediate freeze on the Debtors' on-island bank accounts, which severely hampered the Debtors' ability to move funds and pay local vendors and employees in violation of the automatic stay pursuant to §§ 362(a)(1), (3) and (6). On March 23, 2011, RJR filed a notice with the Anguillian Court withdrawing the Attachment Order, which was subsequently granted.

#### (b) Extension of Automatic Stay (Anguilla)

In part as a response to the events surrounding the Garnishment Action, on March 25, 2011 the Debtors filed applications in the other PSA Creditor Lawsuits pending in the Anguillian Court for entry of an order in each action staying all further proceedings pending the completion of the Chapter 11 Cases. As of the date hereof, consent orders staying the PSA Creditor

Lawsuits pending in Anguilla were entered in approximately 11 of the lawsuits. In the balance of the PSA Creditor Lawsuits, hearings on the Debtors' applications for a stay of proceedings in some of the PSA Creditor Lawsuits is set for hearing July 11, 2011.

### 7.    *341 Meeting.*

A formal meeting of creditors pursuant to § 341 took place on April 25, 2011 in Wilmington, Delaware.

### 8.    *Claims Process and Bar Date.*

The Debtors filed their *Schedules of Assets and Liabilities* and *Statements of Financial Affairs* on April 5, 2011. In that vein, the Debtors filed a motion on March 28, 2011 seeking to establish certain deadlines for the filing of proofs of Claim, including requests for payment of Administrative Expenses arising under § 503(b)(9).

The Debtors will review all Claims filed and develop and analyze a database of all Claims asserted against them. Each proof of Claim and proof of Interest will be analyzed to determine whether to object to the allowance of such Claims or Interests.

The Claims asserted against the Debtors may be materially in excess of the total amount of Allowed Claims estimated by the Debtors in connection with the development of the Plan because, among other things, certain Claims: (i) are filed in duplicate; (ii) consist of amendments to previously filed Claims; (iii) assert Claims in excess of the amount actually owed; (iv) do not allege an obligation of the Debtors or have been erroneously asserted against the Debtors; (v) assert contingent Claims against the Debtors; (vi) were filed after the Bar Date or (vii) include postpetition interest and other disallowable charges. The Debtors intend to file objections to, among others, those Claims falling into the foregoing categories.

### 9.    *Operation of the Debtors.*

The Debtors are operating substantially in accordance with their budget, which was approved by the DIP Lender, and anticipate that they will continue to meet all of their obligations incurred during the course of the Chapter 11 Case.

## IV.    THE PLAN

### A.    Overall Structure of the Plan

A summary description of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Interests is set out below. This summary is qualified in its entirety by the Plan, and in the event of any discrepancy between this summary and the terms of the Plan, the Plan will control.

The Plan constitutes a chapter 11 plan of liquidation for each of the Debtors. Except for Administrative Claims, and Priority Tax Claims, all Claims against and Interests in a particular category of Debtors are placed in Classes for each category of the Debtors described below. In accordance with § 1123(a)(1), the Debtors have not classified Administrative Claims or Priority

Tax Claims, as described below.  Further, given that only Barnes Bay has Creditors in Impaired Classes that are entitled to vote on this Plan, Creditors of all the Debtors will be consolidated in Classes set forth below; *provided*, *however*, that such consolidation shall be for purposes of voting and distribution only.

**B.      Administrative and Priority Tax Claims Against All of the Debtors**

As provided in § 1123(a)(1), Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under this Plan.  Rather, all such Claims shall be treated separately as unclassified Claims in accordance with the terms set forth in Article III of the Plan.

### *1.      Administrative Claims*

#### *(a)      General.*

The Responsible Person shall pay each Holder of an Allowed Administrative Claim against any Debtor (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim.  All Administrative Claims against the Debtors which are not due and payable on or before the Effective Date and are not Assumed Liabilities shall be paid in the ordinary course of business when due in the ordinary course and shall be provided for in the Administrative Budget.  Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim against any Debtor may be paid on such other date or dates and upon such other terms as may be agreed upon by such Holder and the Responsible Person.  Allowed Administrative Claims, including any unpaid portion of the DIP Claims in the event the DIP Lender or the Prepetition Lender is not the Buyer, must be paid in full or fully reserved for in Cash pending allowance by the Bankruptcy Court before any Distribution may be made to any other Holder of an Allowed Claim.

#### *(b)      Statutory Fees*

All outstanding fees payable to the Office of the United States Trustee under 28 U.S.C. §1930 that have not been paid as of the Effective Date shall be paid by the Responsible Person no later than thirty (30) days after the Effective Date or when due in the ordinary course.

#### *(c)      Bar Date for Administrative Claims*

Each Holder of an Administrative Claim other than the DIP Lender must file an Administrative Expense Request requesting payment of such Administrative Claim with the Bankruptcy Court by no later than the Administrative Expense Request Deadline for all Administrative Claims that are not subject to the Bar Date Order; *provided*, *however*, that any such Administrative Expense Request need not be filed with a hearing date.  Nothing herein extends a Bar Date established in the Bar Date Order.

*(d)    Professional Fee Claims*

The Responsible Person shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from each of the Debtors' Estates pursuant to §§ 327, 330 and 503(b)(2)-(b)(6), in Cash, in the amount awarded to such Professionals by the interim fee application order or by Final Order of the Bankruptcy Court, as soon as practicable after the Effective Date in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases or in accordance with any trial Order issued by the Bankruptcy Court, but in any event within five (5) Business Days of the Bankruptcy Court's approval of such fees and expenses following the Effective Date.

The Plan Supplement shall include an estimate of fees and expenses for Professionals, including all retainers, holdbacks, fees and expenses accrued through the Effective Date and any reductions in fees and expenses agreed upon by the respective Professionals. The Administrative Budget shall set forth the estimated fees and expenses to be incurred by Professionals from the Effective Date through the close of the Chapter 11 Cases, which post-Effective Date fees and expenses shall be paid without further order of the Court.

Any final application for allowance of a Professional Fee Claim for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, Lender and Responsible Person at the addresses listed in Section 11.15 of the Plan and on the Office of the United States Trustee so that it is received no later than thirty (30) days after the Effective Date, unless otherwise extended by agreement of the Claimant and the Responsible Person, or such Professional Fee Claim shall be forever barred and shall not be enforceable against the Debtors and their Estates, and their successors and assigns. Allowed Professional Fee Claims must be paid in full or reserved in full in Cash pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Claims.

In connection with the negotiation of the terms of the Plan, and the negotiation of the treatment of General Unsecured Creditors and PSA Creditors thereunder, the Committee's principal bankruptcy counsel, Brown Rudnick LLP, agreed to reduce its fees earned in these Cases by 12.5%. Similarly, the Committee's financial advisor, FTI Consulting, Inc., agreed to a 10% reduction in its fees earned in these Cases.

**2.    Priority Tax Claims**

The Responsible Person shall pay, at the Responsible Person's discretion, each Holder of an Allowed Priority Tax Claim against any Debtor in full in Cash within ten (10) days after the later to occur of (i) the Effective Date, and (ii) the date such Claim becomes an Allowed Claim. All Allowed Priority Tax Claims against the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. The Responsible Person can prepay any Allowed Priority Tax Claim at any time after the Effective Date without any penalty or charge.

Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Claims. Any Claim for

any such penalty, or demand for any such penalty, will be deemed disallowed by confirmation of the Plan.

## C. Classification and Treatment of Claims and Interests Against Debtors

The following table designates the classes of Claims against, and Interests in, the Debtors, and specifies which of those classes are (i) Impaired or not Impaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with § 1126, or (iii) deemed to reject the Plan.

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 1: DIP Claims | Not Impaired | No |
| Class 2: Prepetition Lender Claims | Not Impaired | No |
| Class 3: Other Secured Claims | Impaired | Yes |
| Class 4: Priority Claims | Not Impaired | No |
| Class 5: General Unsecured Claims | Impaired | Yes |
| Class 6: PSA Claims (Tier 1) | Impaired | Yes |
| Class 7: PSA Claims (Tier 2) | Impaired | Yes |
| Class 8: PSA Claims (Tier 3) | Impaired | Yes |
| Class 9: Prepetition Lender Deficiency Claims | Impaired | Yes |
| Class 10: Intercompany Indemnity Claims | Impaired | No |
| Class 11: Interest and Interest Related Claims | Impaired | No |

## D. Treatment Of Claims And Interests

Holders of Claims and Interests are divided into Classes and treated as follows:

### 1. Class 1 - DIP Claims

(a) Classification

Class 1 consists of all Allowed DIP Claims for each of the Debtors.

(b) Treatment

If the Prepetition Lender and the DIP Lender are the Buyer, on the Effective Date the Responsible Person shall, at the exclusive election and direction of the DIP Lender, either (i) convert the DIP Claims to a debt of Newco, or (ii) discharge the DIP Claims in whole or in part. If the Prepetition Lender and the DIP Lender are not the Buyer, the Responsible Person shall pay the Holders of all Allowed DIP Claims in full in Cash on the Effective Date. Upon final and indefeasible payment and satisfaction in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations shall be terminated and of no further force or effect. All DIP Claims are deemed Allowed under the Plan consistent with all terms of the DIP Facility and related documents.

*(c)      Voting*

Class 1 is not Impaired.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to § 1126(f).  Therefore, holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

### 2.      Class 2 - Prepetition Lender Claims

*(a)      Classification*

Class 2 consists of all Allowed Prepetition Lender Claims, less the pro rata value of the Prepetition Collateral that secured the DIP Claims.

*(b)      Treatment*

On the Effective Date, the Prepetition Lender shall receive the following treatment in full and complete satisfaction of its Allowed Prepetition Lender Claims:

(i)      if the Buyer is the Prepetition Lender, the Prepetition Lender may, at its sole discretion, either waive or convert into the debt of Newco any or all of the remaining Prepetition Lender Claims; or

(ii)      if the Buyer is not the Prepetition Lender, the Prepetition Lender shall receive the net proceeds of the Purchase Price up to the lesser of (A) the Allowed amount of the Prepetition Lender Claims and (B) 100% of such net proceeds.

Upon final and indefeasible payment or satisfaction in full of all Prepetition Lender Claims as provided above, all Liens and security interests granted to secure such obligations shall be terminated and of no further force or effect. All Prepetition Lender Claims are deemed Allowed under the Plan consistent with the Prepetition Facility and related documents.

*(c)      Voting*

Class 2 is not Impaired.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to § 1126(f).  Therefore, holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

### 3.      Class 3 - Other Secured Claims

*(a)      Classification*

Class 3 consists of all Other Secured Claims for each of the Debtors.

*(b)      Treatment*

The Responsible Person, at its election, shall either (i) pay each Holder of an Allowed Other Secured Claim, in full, in Cash, with interest, as soon as practicable, but not later than thirty (30) days, after the Effective Date, or (ii) return to such Holder the property securing such

Allowed Other Secured Claim as the indubitable equivalent of such Holder's interest in such property.

        *(c)*     *Voting*

Class 3 is Impaired. Therefore, Holders of Allowed Class 3 Claims, if any, are entitled to vote to accept or reject the Plan.

### *4.*     *Class 4 – Priority Claims*

        *(a)*     *Classification*

Class 4 consists of all Allowed Priority Claims for each of the Debtors.

        *(b)*     *Treatment*

The Responsible Person shall pay each Holder of an Allowed Class 4 Claim, Allowed in relative order of priority pursuant to § 507, in full, in Cash, without interest, as soon as practicable but not later than thirty (30) days after the Effective Date.

        *(c)*     *Voting*

Class 4 is not Impaired. Holders of Claims in Class 4 are conclusively deemed to have accepted this Plan pursuant to § 1126(f). Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

### *5.*     *Class 5 - General Unsecured Claims*

        *(a)*     *Classification*

Class 6 consists of all General Unsecured Claims.

        *(b)*     *Treatment*

In full and final satisfaction of Allowed Class 5 Claims, the Responsible Person shall pay the Holders of all Allowed Class 5 Claims in full in Cash, without interest, within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim. No Distribution shall be paid on account of any General Unsecured Claim held by an Affiliate or an insider (as defined in § 101(31)) of the Debtors.

        *(c)*     *Voting*

Class 5 is Impaired. Therefore, Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

### 6.      Class 6 - PSA Claims (Tier 1)

#### (a)      Classification

Class 6 Claims consist solely of all PSA Claims (Tier 1).  These represent the Claims of certain PSA Creditors ~~arising~~ from certain PSAs that ~~are alleged to have been~~were expressly and unconditionally terminated prior to the Petition Date pursuant to the terms of such PSAs requiring that the closing (or conditions to close) on the purchase of the corresponding unit was to occur by a date certain without regard to force majeure, causes beyond Barnes Bay's control or any other reason.  The Holders of PSA Claims (Tier 1) are identified on Exhibit A (Schedule 1) to the Plan.  Apppendix 3 to the Disclosure Statement contains the operative termination provisions from these PSA Creditors' PSAs.  For the avoidance of doubt, on the Effective Date, all PSAs shall be deemed rejected or terminated, as applicable, and of no further force or effect.

#### (b)      Treatment

For purposes of this Section 4.6(b) of the Plan, each PSA Claim (Tier 1) shall be conclusively deemed Allowed up to the full amount listed in the Debtors' Schedules; any amount claimed above the amount listed in the Schedules shall be subject to the procedures described in Section 8.6(b) of the Plan.  Each Holder of an Allowed PSA Claim (Tier 1) shall receive in full and complete satisfaction of its Allowed  PSA Claim (Tier 1) a PSA Claim (Tier 1) Distribution, payable in Cash within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim.  Any Holder of an Allowed PSA Claim (Tier 1) that accepts a PSA Claim (Tier 1) Distribution shall retain all Guaranty Claims notwithstanding the releases described in Section 9.7 of the Plan, and the injunction described in Section 9.4 of the Plan.

In lieu of the foregoing treatment, any Holder of an Allowed PSA Claim (Tier 1) may affirmatively elect the Purchase Option or the Enforcement Option, in either case subject to the terms and conditions set forth in Section 4.12 of the Plan, including the waiver of any right to receive a Distribution under Section 4.6(b) of the Plan or otherwise to seek payment of such Claim from the Debtors or their Estates except to the extent such Holder is determined to be the Holder of an Allowed Class 3 Other Secured Claim.  If all Holders of PSA Claims (Tier 1) elected to receive the Distribution provided in Section 4.6(b) of the Plan in lieu of the Purchase Option or the Enforcement Option, the total Cash Distribution to Holders of Allowed Class 6 Claims would be approximately $5,744,250.

#### (c)      Voting

Class 6 is Impaired.  Therefore, Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

### 7.      Class 7 - PSA Claims (Tier 2)

#### (a)      Classification

Class 7 Claims consist solely of all PSA Claims (Tier 2).  These represent the Claims of PSA Creditors arising from prepetition litigation relating to a PSA that either (i) resulted in the

entry of a consent judgment or out-of-court settlement or (ii) was subjected to a standstill prior to the Petition Date.  The Holders of PSA Claims (Tier 2) are identified on Exhibit A (Schedule 2) to the Plan.  For the avoidance of doubt, on the Effective Date, all PSAs shall be deemed rejected or terminated, as applicable, and of no further force or effect.

      *(b)*    *Treatment*

For purposes of this Section 4.7(b) of the Plan, each PSA Claim (Tier 2) shall be conclusively deemed Allowed up to the full amount listed in the Debtors' Schedules; any amount claimed above the amount listed in the Schedules shall be subject to the procedures described in Section 8.6(b) of the Plan.  Each Holder of an Allowed PSA Claim (Tier 2) shall receive in full and complete satisfaction of its Allowed  PSA Claim (Tier 2) a PSA Claim (Tier 2) Distribution, payable in Cash within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim.  Any Holder of an Allowed PSA Claim (Tier 2) that accepts a PSA Claim (Tier 2) Distribution shall retain all Guaranty Claims notwithstanding the releases described in Section 9.7 of the Plan, and the injunction described in Section 9.4 of the Plan.

In lieu of the foregoing treatment, any Holder of an Allowed PSA Claim (Tier 2) may affirmatively elect either the Purchase Option or the Enforcement Option, in either case subject to the terms and conditions set forth in Section 4.12 of the Plan, including the waiver of any right to receive a Distribution under Section 4.7(b) of the Plan or otherwise to seek payment of such Claim from the Debtors or their Estates except to the extent such Holder is determined to be the Holder of an Allowed Class 3 Other Secured Claim.  If all Holders of PSA Claims (Tier 2) elected to receive the Distribution provided in Section 4.7(b) of the Plan in lieu of the Purchase Option or the Enforcement Option, the total Cash Distribution to Holders of Allowed Class 7 Claims would be approximately $1,878,600.

      *(c)*    *Voting*

Class 7 is Impaired.  Therefore, Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

      ***8.***    ***Class 8 - PSA Claims (Tier 3)***

      *(a)*    *Classification*

Class 8 Claims consist solely of all PSA Claims (Tier 3).  These represent the Claims of PSA Creditors other than those properly categorized as PSA Claims (Tier 1) or PSA Claims (Tier 2).  The Holders of PSA Claims (Tier 3) are identified on Exhibit A (Schedule 3) to the Plan.  For the avoidance of doubt, on the Effective Date, all PSAs shall be deemed rejected or terminated, as applicable, and of no further force or effect.

      *(b)*    *Treatment*

For purposes of this Section 4.8(b) of the Plan, each PSA Claim (Tier 3) shall be conclusively deemed Allowed up to the full amount listed in the Debtors' Schedules; any amount claimed above the amount listed in the Schedules shall be subject to the procedures described in

Section 8.6(b) of the Plan.  Each Holder of an Allowed PSA Claim (Tier 3) shall receive in full and complete satisfaction of its Allowed  PSA Claim (Tier 3) a PSA Claim (Tier 3) Distribution, payable in Cash within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim.  Any Holder of an Allowed PSA Claim (Tier 3) that accepts a PSA Claim (Tier 3) Distribution shall retain all Guaranty Claims notwithstanding the releases described in Section 9.7 of the Plan, and the injunction described in Section 9.4 of the Plan.

In lieu of the foregoing treatment, any Holder of an Allowed PSA Claim (Tier 3) may affirmatively elect either the Purchase Option or the Enforcement Option, in either case subject to the terms and conditions set forth in Section 4.12 of the Plan, including the waiver of any right to receive a Distribution under Section 4.8(b) of the Plan or otherwise to seek payment of such Claim from the Debtors or their Estates except to the extent such Holder is determined to be the Holder of an Allowed Class 3 Other Secured Claim.  If all Holders of PSA Claims (Tier 3) elected to receive the Distribution provided in Section 4.8(b) of the Plan in lieu of the Purchase Option or the Enforcement Option, the total Cash Distribution to Holders of Allowed Class 8 Claims would be approximately $5,071,787.

       (c)     *Voting*

Class 8 is Impaired.  Therefore, Holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

### 9.    Class 9 – Prepetition Lender Deficiency Claims

       (a)     *Classification*

Class 9 consists of the Prepetition Lender Deficiency Claims, if any, against all the Debtors.

       (b)     *Treatment*

On the occurrence of the Effective Date, in full and final satisfaction of Allowed Class 9 Claims, Holders of Class 9 Claims shall be deemed to have waived any right to a Distribution on account of such Claims.

       (c)     *Voting*

Class 9 is Impaired.  Therefore, Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

### 10.    Class 10 – Intercompany Indemnity Claims

       (a)     *Classification*

Class 10 consists of all Intercompany Indemnity Claims.

*(b)     Treatment*

Intercompany Indemnity Claims in Class 10 shall be waived, released and forever discharged.  No Distribution shall be paid under the Plan on account of any Allowed Intercompany Indemnity Claim.

*(c)     Voting*

Holders of Intercompany Indemnity Claims in Class 10 are conclusively deemed to reject the Plan pursuant to § 1126(g).  Therefore, Holders of Allowed Intercompany Indemnity Claims in Class 8 are not entitled to vote to accept or reject this Plan.

### 11.     *Class 11 – Interests and Interest Related Claims*

*(a)     Classification*

Class 11 consists of all Interests and Interest Related Claims against any of the Debtors.

*(b)     Treatment*

No Distribution shall be paid under the Plan on account of any Interest or Allowed Interest Related Claim.  On the Effective Date, all Interests in any of the Debtors shall be deemed canceled, null and void, and of no force and effect.

*(c)     Voting*

Holders of Interests and Interest Related Claims in Class 11 are conclusively deemed to reject the Plan pursuant to § 1126(g).  Therefore, Holders of Interests and Allowed Interest Related Claims in Class 11 are not entitled to vote to accept or reject this Plan.

## E.     **Election of Alternative Treatments by PSA Creditors**

Any Holder of a PSA Claim in Class 6, Class 7 or Class 8 may elect, in lieu of receiving a PSA Claim Distribution, to exercise either the Purchase Option or the Enforcement Option.

### 1.     *Purchase Option*

A PSA Creditor electing to purchase a Residence Property in lieu of receiving a PSA Claim Distribution may elect to purchase a Residence Property on the following terms and conditions:

*(a)     Same Unit.*  The PSA Creditor shall execute a new PSA for the purchase of the Residence Property identified in such PSA Creditor's prepetition PSA.  The purchase price for such Residence Property shall be based on the purchase price offered by Barnes Bay to such PSA Creditor in the corresponding Nystrom Letter or otherwise, and shall reflect a credit equal to 100% of the face amount of such PSA Creditor's Scheduled PSA Claim.

*(b)     Trade Up.*  The PSA Creditor shall execute a new PSA for the purchase of an available Residence Property of higher value than the Residence Property identified in such

PSA Creditor's prepetition PSA. The purchase price for such Residence Property shall reflect a credit equal to 110% of the face amount of such PSA Creditor's Scheduled PSA Claim.

(c) *Trade Down.* The PSA Creditor shall execute a new PSA for the purchase of an available Residence Property of lesser value than the Residence Property identified in such PSA Creditor's prepetition PSA. The purchase price for such Residence Property shall reflect a credit equal to 100% of the face amount of such PSA Creditor's Scheduled PSA Claim.; *provided, however,* that the Debtors may reject any sale under this "Trade Down" purchase option where the purchase price would result in a net cash payment (*i.e.,* purchase price less credit for deposit) to the Buyer at closing equal to less than $750 per square foot.

(d) *Multiple Residence Properties.* In the event that a PSA Creditor has entered into a PSA for two Residence Properties, then such PSA Creditor shall have the option to execute a new PSA for the purchase of either or both Residence Properties. If the PSA Creditor elects to enter into a new PSA to purchase the larger (on a square footage basis) of the two Residence Properties, then the purchase price for such Residence Property shall reflect a credit equal to 100% of the face amount of such PSA Creditor's Scheduled PSA Claim; *provided, however,* that the purchase price shall be negotiated by and between the Lender or Buyer, as applicable, and the applicable PSA Creditor. If the PSA Creditor elects to enter into a new PSA to purchase the smaller (on a square footage basis) of the two Residence Properties, then the purchase price for such Residence Property shall reflect a credit equal to 100% of the deposit paid by such PSA Creditor on account of the smaller Residence Property and 50% of the deposit paid by such PSA Creditor on account of the larger Residence Property, and the purchase price shall be negotiated by and between the Lender or Buyer, as applicable, and the applicable PSA Creditor.

Each PSA Creditor shall have the exclusive, nontransferable right to purchase the Residence Property identified in such PSA Creditor's prepetition PSA by making a timely election as proscribed in Section 4.12 of the Plan and executing a new PSA for the purchase of such Residence Property, and such Residence Property shall not be deemed "available" to other PSA Creditors for purposes of options (ii) and (iii) above unless such PSA Creditor fails to make such election (at which point such right of first refusal shall expire and the Residence Property shall become "available" for purposes hereof). If more than one PSA Creditor has placed a deposit on the same Residence Property, then the exclusive right to purchase such Residence Property shall belong to the PSA Creditor that was first in time to place a deposit on such Residence Property. **Any PSA Creditor that elects the Purchase Option shall be deemed to have irrevocably waived, released and discharged any and all Guaranty Claims.**

The Debtors have set a purchase price for each Residence Property taking into account a series of factors, including (i) size (including number of bedrooms), (ii) location (including floor), (iii) view, (iv) proximity to pools, restaurants, gym, spa and other amenities, (v) décor, (vi) original contract purchase price in relation to other prices, (vii) upgrades or downgrades from the original commitment, (viii) consideration of potential resale value, (ix) usage, if any, of the Residence Property since its completion, including any usage by the PSA Creditor. The Debtors consider the purchase price for each Residence Property to be confidential, proprietary information that will be disclosed only to the purchaser of a given Residence Property. The purchase price for each Residence Property purchased pursuant to a PSA Creditor's exercise of

the Purchase Option shall be communicated to such PSA Creditor confidentially, and shall not be disclosed to any other party, except that the Debtors may file a complete listing of purchase prices for individual Residence Properties under seal as part of the Plan Supplement.

In addition, each PSA Creditor that elects the Purchase Option shall have the exclusive right to enter into the Rental Program Agreement pursuant to which the PSA Creditor will be entitled to receive the HOA Fees Guaranty. Further, each PSA Creditor that elects the Purchase Option shall be entitled to receive the waiver of tax levy and applicable alien land holder license fees pursuant to the MOU. The Debtors and the Buyer, as applicable, each agree that they will not sell any available Residence Property for a price per square foot that is less than five percent (5%) lower than the lowest price per square foot for any comparable unit sold pursuant to the Purchase Option under the Plan. This restriction shall be effective for a period of six (6) months commencing on the Effective Date. A "comparable unit" shall be determined based on size, location and view.

Any PSA Creditor that elects the Purchase Option must execute a new PSA for the purchase of a Residence Property on or prior to August 1, 2011 and the closing for such sale must occur on or prior to September 19, 2011, in each case unless otherwise agreed to in writing by the Debtors or, on or after the Effective Date, the Buyer. If the Buyer is not the Prepetition Lender, any PSA Creditor that has executed a new PSA after the Petition Date but prior to the date of the Public Sale shall have the right, within five (5) Business Days after the Public Sale, to rescind such election. Upon such rescission, the new PSA shall become null and void, the PSA Creditor's prepetition PSA shall be fully reinstated, releases given in any addendum or related agreement executed after the Petition Date shall be of no further force or effect, and such PSA Creditor shall receive the applicable PSA Claim Distribution in full and final satisfaction of such PSA Creditor's PSA Claim.

Nothing contained herein shall prohibit a PSA Creditor from executing a new PSA for the purchase of a Residence Property prior to the Effective Date, provided that such transaction is otherwise in compliance with the applicable orders of the Bankruptcy Court. Any such PSA that has not been fully consummated and resulted in a transfer of title to the purchaser prior to the Effective Date shall be assumed by the Debtors and assigned to the Buyer pursuant to Article VII of the Plan.

## 2. *Enforcement Option.*

A PSA Creditor electing to pursue the Enforcement Option may, notwithstanding any other term of the Plan (including the provisions of Article IX of the Plan), commence or continue one or more PSA Enforcement Actions. A PSA Creditor that is determined by a court of competent jurisdiction to hold a valid, binding and enforceable Lien on a Residential Property that is not junior to the Liens of the Prepetition Lender shall be treated as the Holder of an Allowed Class 3 Other Secured Claim.

The releases set forth in Section 9.7 of the Plan and the injunction set forth in Section 9.4 of the Plan shall not apply to any PSA Creditor who elects the Enforcement Option.

### 3. *Form and Manner of Election.*

Any PSA Creditor wishing to elect either the Purchase Option or the Enforcement Option must affirmatively elect such treatment either (i) on the Ballot by which it votes to accept or reject the Plan or (ii) in a writing signed by the PSA Creditor and received by the Debtors on or prior to the Voting Deadline. Once such an election is made and, if applicable, received by the Debtors, such election shall be irrevocable and binding on any successor in interest with respect to such PSA Claim, but shall not preclude the Debtor or other Persons from objecting to such Claim on any applicable ground.

The election by a PSA Creditor of either the Purchase Option or the Enforcement Option shall be deemed to constitute a waiver by such PSA Creditor of any right to seek receive a Distribution under the Plan or otherwise to seek payment of such Claim from the Debtors or their Estates.

Any PSA Creditor that that fails to timely elect either the Purchase Option or the Enforcement Option shall be conclusively deemed to have waived all rights to exercise either the Purchase Option or the Enforcement Option, including any right to commence a PSA Enforcement Action against any Person.

Any PSA Creditor that has previously commenced a PSA Enforcement Action but does not wish to elect the Enforcement Option may instead receive a Distribution under Section 4.6(b), 4.7(b) or 4.8(b), as applicable, of the Plan or elect the Purchase Option by withdrawing such PSA Enforcement Action with prejudice and notifying Debtors' counsel and the Committee's counsel of such withdrawal prior to the Voting Deadline.

A PSA Creditor that believes its Claim has been improperly classified in Class 6, 7 or 8 may challenge such classification by filing with the Bankruptcy Court and serving an appropriate motion on or before July 22, 2011 at 5:00 p.m. prevailing Eastern Time. Any such motions will be heard by the Bankruptcy Court on August 4, 2011 at 9:30 a.m. prevailing Eastern Time. Any PSA Creditor that does not timely file a motion as set forth in this paragraph 12 shall be barred from thereafter challenging the classification of such PSA Creditor's PSA Claim.

## V. MEANS FOR IMPLEMENTATION

### A. Implementation of Plan

Prior to the Effective Date, the Debtors shall continue to operate their businesses subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. The Plan contemplates and is predicated upon the sale of the Property and Acquired Assets, the transfer of the Property and Acquired Assets to Buyer on the Effective Date, the dissolution of the Debtors and the liquidation of the Estates.

### B. The Asset Sale

The Buyer shall be the Person identified at the Public Sale and approved by the Court as having submitted the highest and otherwise best bid for the Property and the Acquired Assets at the Public Sale pursuant to the Bid Procedures Order and the Terms and Conditions of Sale,

which includes the assumption of those Executory Contracts set forth on the Assumed Contracts Schedule, any new PSAs executed after the Petition Date but not yet closed as of the Effective Date and the postpetition operating liabilities of the Debtors as Assumed Liabilities. The sale of the Property and Acquired Assets shall be consummated on the Effective Date pursuant to the Plan as contemplated by §§ 363 and 1123(a)(5)(D).

In the event the Prepetition Lender is the Buyer, Newco will either amend and assume the existing Property Management Agreement (as modified) with VHA, or enter into a new agreement for the management of the property with VHA that will become effective on the Effective Date. The terms of the proposed modifications to the existing Property Management Agreement (or new agreement, as the case may be) are set forth on Exhibit C to the Term Sheet appended to this Disclosure Statement as Appendix 2.

## C.     Funding of the Plan

All Cash consideration necessary for the payment of Distributions under the Plan and the funding of the Administrative Budget will be derived from (i) Cash on hand on the Effective Date, (ii) Cash proceeds received by the Debtors from the DIP Lender, the Prepetition Lender or from the sale of the Property and Acquired Assets to the Buyer, and (iii) to the extent the foregoing are insufficient to fund all payments and Distributions to be made pursuant to the Plan, the Buyer shall provide sufficient Cash to cover such shortfall, which Cash shall be in addition to the purchase price paid by the Buyer in connection with the Public Sale. Any such contributions of Cash by the Buyer to fund Distributions under the Plan shall be deemed to have been "gifted" by the Buyer directly to the recipients of such Distributions.

To the extent not otherwise provided for herein or ordered by the Court, the Responsible Person shall estimate appropriate reserves of Cash to be set aside (or secured in the form of an appropriate credit facility from the Buyer) in order to pay or reserve for Disputed Claims, accrued expenses and for the payment of prospective expenses and liabilities of the Estates after the Effective Date. Without limitation, these reserves shall include funds for the Professional Fee Claims, Administrative Claims, Priority Tax Claims, Priority Claims, Disputed Claims and all amounts due pursuant to 28 U.S.C. §1930.

Notwithstanding any contrary provision contained herein, the Responsible Person shall not be obligated to physically segregate and maintain separate accounts for reserves or for the Distribution Fund. Separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable the Responsible Person to determine reserves and amounts to be paid to parties in interest.

## D.     Other Issues

Entry of the Confirmation Order shall constitute the approval, pursuant to §§ 105(a), 1123(a)(5)(B) or 1123(a)(5)(C), effective as of the Effective Date, of the transfer of the Property and Acquired Assets and certain of the Debtors' liabilities to the Buyer pursuant to the Terms and Conditions of Sale. The Buyer shall be entitled to the protections afforded pursuant to §363(m).

Notwithstanding the reorganization provided for in the Plan, each and every Debtor shall remain severally responsible for the payment of quarterly fees pursuant to 28 U.S.C. §1930 to the Office of the United States Trustee until such time as a particular case is closed pursuant to a Final Decree or other order of the Bankruptcy Court, dismissed, or converted to Cash under another chapter of the Bankruptcy Code.

**E.      Causes of Action**

All Causes of Action, including all Avoidance Actions, shall be transferred to and vest fully in the Responsible Person.  Pursuant to § 1123, the Responsible Person shall be authorized to commence all Causes of Action on behalf of all of the Debtors or their Estates (except for any Cause of Action that may be released pursuant to this Plan).  The authorization shall be approved without limitation, notwithstanding any other applicable law that could restrict any such transfer or authorization, all of which shall be determined by the Bankruptcy Court in the Confirmation Order to be void as against public policy.  Net proceeds, if any, recovered on account of any Cause of Action after the payment of any expenses incurred in connection with the prosecution of such Cause of Action or the recovery of such proceeds shall be distributed by the Responsible Person to the Lender.

On the Effective Date, the Responsible Person shall be substituted as the party in interest instead of the Debtors or the Committee for all Causes of Action.  The Responsible Person shall succeed, on the Effective Date, in all respects to all of the rights, privileges and immunities of the Debtors, including without limitation, the attorney-client privileges and any other evidentiary privileges of the Debtors.

Nothing in this Plan or the Confirmation Order shall limit, impair or otherwise restrict the rights of the Responsible Person to bring any Claim or Cause of Action, except for those actions otherwise released pursuant to this Plan, against any Person for any reason whatsoever, including the failure of this Plan to identify or describe any such potential Claim or Cause of Action with specificity.  No Person may rely on the absence of a specific reference in the Plan or Disclosure Statement to any Cause of Action against them as an indication that the Debtors, the Responsible Person or the Buyer will not pursue any and all available Causes of Action against them.  Except as otherwise specifically released pursuant to the Confirmation Order, it is the Responsible Person's intent not to waive any Cause of Action.

Except to the extent a Cause of Action or Avoidance Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or pursuant to a Bankruptcy Court order, the Responsible Person expressly reserves all Causes of Action for later adjudication.  Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Causes of Action or Avoidance Actions upon, after, or as a consequence of the Confirmation Order.  In accordance with § 1123(b)(3), all Causes of Action and Avoidance Actions that a Debtor may hold against a Person shall vest in the Responsible Person pursuant to the terms of this Plan.

**NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE RESPONSIBLE PERSON SHALL NOT COMMENCE ANY CAUSE OF ACTION**

**AGAINST THE DIP LENDER, THE PREPETITION LENDER, ANY PSA CREDITOR OR ANY OTHER HOLDER OF AN ALLOWED CLAIM OR INTEREST OTHER THAN ANY PSA CREDITOR THAT ELECTS TO EXERCISE THE ENFORCEMENT OPTION PURSUANT TO SECTION 4.12 OF THE PLAN, AGAINST WHOM ALL CAUSES OF ACTION ARE EXPRESSLY PRESERVED.**

**F.      Appointment and Term of the Responsible Person**

The initial Responsible Person shall be Kevin Nystrom.  To the extent that the Responsible Person becomes incapacitated or is otherwise unable or unwilling to assume and carry out his duties under the Plan, a Responsible Person shall be selected by mutual agreement of the Prepetition Lender and the Committee or, if after the Effective Date, by the Buyer.  The terms of the Responsible Person's employment, including the compensation of the Responsible Person and the appointment of any successor to the Responsible Person, will be set forth in a separate agreement to be filed as part of the Plan Supplement.

**G.      Duties of the Responsible Person**

In addition to the duties as set forth elsewhere in the Plan, the Responsible Person shall have the following duties:

1.      to investigate and, if necessary and appropriate, to prosecute, enforce (or not prosecute or enforce), or to compromise, release or settle any Causes of Action on behalf of the Estates;

2.      to implement the Administrative Budget and establish such accounts as may be necessary or appropriate for the maintenance of the Administrative Budget and the Distribution Fund.

3.      to file any and all reports, pleadings and other documents necessary to carry out the provisions of the Plan;

4.      to make any and all Distributions required or permitted to be made under the Plan;

5.      to make and file tax returns and final tax returns for any of the Debtors;

6.      to request the entry of a Final Decree;

7.      to take any and all actions, including any action set forth in Section 6.13 of the Plan, necessary to dissolve and cancel the existence of each of the Debtors in the State of Delaware and in any other jurisdiction in which any Debtor is organized or qualified to do business;

8.      to determine reserve amounts for Post-Confirmation Expenses and Disputed Claims; and

9.      to take any and all other actions necessary or appropriate to implement the Plan and the liquidation of the Debtors in accordance with applicable law, provided, that nothing herein shall permit the Responsible Person to terminate or cancel the Debtors' director and officer liability insurance coverage relating to the period following the Petition Date; and *provided, further* that, the Responsible Person shall not renew or extend such insurance coverage, or other new or substitute coverage.

In connection with the execution of his duties under the Plan, the Responsible Person shall be authorized:

1.      to execute such documents and to take such other actions as are necessary to effectuate the Plan and perform his duties as responsible person of and for the Estates;

2.      to open, close and manage bank accounts, and to enter into business transactions within or without the ordinary course of business;

3.      to authorize, renew, extend and benefit from any of the Debtors' insurance policies and rights of indemnification;

4.      to retain and pay professionals (including any of the Debtors' or the Committee's former Professionals) or other Persons to assist the Responsible Person in the liquidation of the Estates, without prior Bankruptcy Court approval, and to designate another Person to be the Responsible Person as set forth in Section 8.2 of the Plan;

5.      to incur any reasonable and necessary expenses (up to the amounts set forth in the Administrative Budget) in the performance of his duties as responsible person of and for the Estates;

6.      to object to the allowance of, and settle, any Disputed Claim;

7.      to settle any Cause of Action without notice or a hearing where the Cause of Action has an alleged estimated value of $50,000 or less or, after notice to any party affected by the settlement, and a hearing to seek an order of the Bankruptcy Court approving the compromise, release or settlement of any Cause of Action that has an alleged estimated value of greater than $50,000; and

8.      to employ such other procedures, not inconsistent with the Plan, necessary for the Responsible Person to perform his duties hereunder.

The Responsible Person shall be deemed the Estates' representative in accordance with the provisions of the Bankruptcy Code, including, without limitation, § 1123 and shall have all powers, authority and responsibilities specified in the Plan, including, without limitation, the powers of a trustee under §§ 108, 704, and 1106 and Rule 2004 of the Bankruptcy Rules (including, without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges), to the extent not inconsistent with the Plan.

**H.      Omitted**

**I.      Discharge of Debtors' Professionals**

On the Effective Date, the Debtors' Professionals and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to § 503(b) for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order.  The Professionals retained by the Debtors shall not be entitled to compensation and reimbursement of expenses for services rendered to or on behalf of the Debtors after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.  For the avoidance of doubt, nothing contained herein shall prohibit the Debtors or the Responsible Person from engaging any of the Debtors' Professionals for the purpose of rendering services to the Debtors or the Responsible Person, as applicable, on and after the Effective Date, and any such fees and expenses incurred in connection with such post-Effective Date services may be paid by the Debtors or Responsible Person, as applicable, without further order of the Bankruptcy Court.

**J.      Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims and expense reimbursement requests for members of the Committee; (iii) requests for compensation and reimbursement of expenses pursuant to § 503(b) for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.  The Professionals retained by the Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Committee after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

**K.      Employee Matters**

Upon the Effective Date, the terms and conditions of employment of all existing management and employees at the Property shall remain unchanged.  To the extent not earlier terminated in accordance with their terms or assumed by the Buyer, all employee programs, including but not limited to any retirement plans or agreements and health benefits and disability

plans are deemed terminated as of the Effective Date in accordance with their terms with no further action required by the Debtors or the Responsible Person, and to the extent any of such employee programs constitute distinct executory contracts with individual employees or otherwise, such contracts are deemed rejected unless otherwise listed on the Assumed Contracts Schedule. The Responsible Person is authorized to take any actions to permit the termination of such programs and discharge all benefit liabilities to participants and beneficiaries of such programs. The transactions contemplated by the Terms and Conditions of Sale shall not require notice or give rise to any Claim under the Worker Adjustment and Retraining Notification Act or other comparable applicable law.

## L.      Corporate and Limited Liability Company Action

On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company action of the Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors, members or shareholders, as applicable, and execution of all documentation incident to the Plan, notwithstanding any otherwise applicable non-bankruptcy law or the Organization Documents of the Debtors, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, members or shareholders, as applicable, of the Debtors. To the extent necessary, the Responsible Person shall be bested with authority to execute any document necessary to effectuate such action.

## M.      Dissolution of the Debtors

As soon as practical after the Effective Date, the Responsible Person shall file any documents necessary and proper pursuant to applicable law to dissolve the Debtors and the Debtors shall dissolve and cease to exist.

## N.      Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day.

## VI.      TREATMENT OF EXECUTORY CONTRACTS

## A.      Rejection of Remaining Executory Contracts

On the Effective Date, except for any Executory Contract that (i) previously expired or terminated by its own terms, (ii) was previously assumed or rejected by an order of the Bankruptcy Court pursuant to § 365, (iii) is assumed pursuant to the Plan or (iv) is the subject of a pending motion to assume or assume and assign as of the Confirmation Date, shall be deemed rejected pursuant to §§ 365 and 1123, effective as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to §§ 365 and 1123 as of the Effective Date.

## B.    Assumption and Cure of Executory Contracts

The Assumed Contracts Schedule, which will be filed as part of the Plan Supplement, shall identify Executory Contracts to be assumed and assigned to the Buyer pursuant to the Terms and Conditions of Sale and the Plan.  The Debtors reserve the right to amend the Assumed Contracts Schedule at any time up to three (3) Business Days before the Confirmation Hearing to delete any Executory Contract listed therein or, with the consent of the affected counterparty, to add any Executory Contract to the Assumed Contracts Schedule.  The Debtors will provide notice of any amendment to the Assumed Contracts Schedule to the parties to the Executory Contracts added or removed, to the Prepetition Lender, the Buyer and the Committee.  The Assumed Contracts Schedule shall include a designation of the Cure Amount, if any, proposed by the Debtors to be paid in connection with the assumption and assignment of each Executory Contract listed therein.

On the Effective Date, each Executory Contract that is identified in the Assumed Contracts Schedule shall be deemed assumed in accordance with the provisions and requirements of §§ 365 and 1123, and all defaults, if any, shall be deemed cured by the payment of the Cure Amount, if any, corresponding to such Executory Contract.

Except as provided elsewhere in the Plan, any Person objecting to the proposed assumption or assignment of an Executory Contract, including on the basis of any objection to (i) the amount of the proposed Cure Amount, if any, to be paid in connection with such assumption and assignment, (ii) ability of the Buyer to provide "adequate assurance of future performance" of such Executory Contract (within the meaning of § 365), or (iii) any other matter pertaining to the assumption or assignment of such Executory Contract, shall file an serve such objection on or before the deadline for the filing of objections to Confirmation of the Plan.  To the extent any such objections are filed, the hearing on such objections shall be scheduled for the same date as the Confirmation Hearing.  Failure to timely file an objection to the proposed assumption and assignment of an Executory Contract, including any proposed Cure Amount associated therewith, shall constitute consent to the assumption and assignment of such Executory Contract, including the Cure Amount, if any, payable in connection therewith, and an acknowledgment that such assumption and assignment satisfies all requirements of §§ 365(b), (c) and (f).

If any Person files an objection to the proposed assumption or assignment of an Executory Contract, the Debtors reserve the right to delete such contract or lease from the Assumed Contracts Schedule and declare such contract or lease to be rejected pursuant to Section 7.1 hereof.

## C.    Cure of Defaults of Assumed Executory Contracts

All Cure Amounts to be paid in connection with the Executory Contracts to be assumed and assigned pursuant to the Plan shall be paid by the Buyer not more than ten (10) days after the occurrence of the Effective Date.

## D.    Effect of Assumption and Assignment

Each Executory Contract assumed or assumed and assigned pursuant to Article VII of the Plan (or pursuant to Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Buyer in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment.  To the extent applicable, all Executory Contracts assumed during the Chapter 11 Cases, including those assumed pursuant to Article VII of the Plan, (i) shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract (ii) shall not constitute a breach of any anti-alienation provision thereof, and (iii) any required consent regarding assignment of any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

This Plan shall not affect any Executory Contract that was assumed, rejected or assumed and assigned pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Hearing.

## E.    Rejection Damages Bar Date

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Voting and Claims Agent at the following applicable address:

> Barnes Bay Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245

and a copy served on counsel for the Buyer, the Debtors, counsel for the Committee and the Responsible Person, within thirty (30) days from the entry of the Confirmation Order, or such Claim shall be forever barred and shall not be entitled to a Distribution or be enforceable against the Debtors, their Estates, the Buyer or any of their successors and their assigns.  Any Claim arising from the rejection of an Executory Contract, other than a PSA Claim arising from the rejection or termination of a PSA shall be treated as a Class 5 General Unsecured Claim. Nothing in this Plan extends or modifies the Bar Date, except as specifically provided herein.

## F.    Insurance Policies

To the extent any or all of the insurance policies set forth on Exhibit B to this Plan are considered to be Executory Contracts, then notwithstanding anything contained in this Plan to the contrary, this Plan shall constitute a motion to assume, or assume and assign to the Buyer, the insurance policies set forth on the Assumed Contracts Schedule as indicated thereon.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute an order authorizing such assumption or assumption and assignment pursuant to § 365 effective as of the Effective Date.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final

Order or agreed to by the parties thereto prior to the Effective Date, no Cure Amount shall be required to be paid in connection with the assumption or assumption and assignment of any insurance policy identified on the Assumed Contracts Schedule. To the extent the Bankruptcy Court determines otherwise with respect to any insurance policy, the Debtors reserve the right to reject any such insurance policy.

For the avoidance of doubt, certain insurance policies that are not Executory Contracts (including any insurance policy (i) that is not an Executory Contract, (ii) that may have expired prior to the Petition Date, (iii) that was in existence on the Petition Date, or (iv) that was entered into by the Debtors after the Petition Date) shall be retained by the Debtors or assigned to the Buyer as indicated on Exhibit B to the Plan. To the extent that pending Claims existing as of the Effective Date that are covered by such insurance policies, the proceeds from such insurance policies shall be used to reduce the amount of any such Claims asserted against the Debtors. The corresponding insurers may succeed to such Claims by way of subrogation, but only to the extent, priority and class of the underlying Claim itself, subject to any and all defenses, counterclaims and Causes of Action; provided, however, that in order to commence or continue any action or other proceeding of any kind against or to recover from the Debtors or the Debtors' insurance policies, a Person must first seek and obtain from the Bankruptcy Court relief from the automatic stay (11 U.S.C. § 362(a)) or the injunctive provisions of Section 9.4 of the Plan, as applicable.

**G.     PSAs**

To the extent any PSA is determined to be an Executory Contract, such PSA shall be deemed rejected by the Debtors, and any claim for rejection damages shall be filed, in accordance with Sections 7.1 and 7.5 of the Plan.

## VII.     DISTRIBUTIONS

**A.     General Provisions Concerning Distributions**

At the written request of the Responsible Person, any creditor holding multiple Allowed Claims shall provide the Responsible Person a single address to which any Distributions shall be sent.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day.

The Debtors and the Responsible Person may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Allowed Claim, any Claims or Causes of Action of any nature whatsoever that the Debtors or the Responsible Person may have asserted against the Claimant, but neither the failure to do so nor the allowance of any Disputed Claim hereunder shall constitute a waiver or release by the Debtors or the Responsible Person of any such Claim or Cause of Action.

To the extent applicable, Distributions shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the

consideration exceeds the principal amount of the Claim, to interest and such other amounts comprising a part of the Claim.

**B.      Disbursing Agent**

Unless otherwise designated by the Responsible Person, the Responsible Person shall be the Disbursing Agent, and the Disbursing Agent shall make all distributions under the Plan.

**C.      Time and Manner of Distributions**

Distributions of Cash to Holders of Allowed Claims in Classes 5, 6, 7 and 8 shall be made solely from the Distribution Fund.

The Responsible Person shall make all Distributions under the Plan on account of Allowed Claims within ten (10) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim, except as otherwise ordered by the Bankruptcy Court. Amounts withheld may be placed in an interest-bearing account, which interest shall be used by the Responsible Person to fund ongoing expenses and costs relating to such reserves, including taxes in respect of Disputed Claims, if any.

At the option of the Responsible Person, any Distributions under this Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan. Cash will be issued to Holders entitled to receive a Distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

**D.      Delivery of Distributions**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (i) at the addresses set forth on the Proofs of Claim filed by such Holder (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors, the Responsible Person or the Voting and Claims Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Responsible Person after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Responsible Person has not received a written notice of a change of address.

**E.      Undeliverable Distributions**

If a distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of a Claim shall be made unless and until the Responsible Person is notified of the then-current address of such Holder, at which time (subject to the terms of the last sentence of this Section V.E.) all missed distributions shall be made to such Holder without interest. Amounts in respect of undeliverable distributions shall be returned to the Responsible Person until such distributions are Claimed. All funds or other undeliverable distributions returned to the Responsible Person in respect of any Claim and not Claimed within four (4) months of return shall be forfeited and remain with and vest in the Distribution Fund for distribution to other Holders of Allowed Claims. Any unclaimed funds, which aggregate less

than $10,000, held in Distribution Fund at the time the Final Decree is entered may be donated to a charity selected by the Responsible Person without further order of the Court.

## F.  Procedures for Treating Disputed Claims

### 1.  *Reservation of Rights to Object to Claims*

Unless a Claim is expressly described as an Allowed Claim pursuant to or under this Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, the Responsible Person (on behalf of the Estates) reserves all objections to the allowance and payment of any Claim or Interest, including any objection to the validity or amount of any such Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

### 2.  *Objections to Claims*

Prior to the Effective Date, the Debtors or any other party that filed such Claim objection shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Responsible Person will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making Distributions, if any, with respect to all Claims subject to the other provisions of the Plan.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court (including the partial deemed allowance of PSA Claims pursuant to Sections 4.6(b), 4.7(b) and 4.8(b) of the Plan, as applicable), any objections to Claims by the Responsible Person will be filed and served not later than 180 days after the Effective Date, provided that the Responsible Person may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of his business judgment.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.  The Responsible Person shall be substituted for the Debtors with respect to any objections pending as of the Effective Date.

## G.  Filing of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if the Debtors or Responsible Person effects service in accordance with Bankruptcy Rule 3007.

## H.  Determination of Claims

Except as otherwise agreed by the Responsible Person, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has become a Final Order) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Responsible Person on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such

liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in Section 8.6 of the Plan shall constitute or be deemed a waiver of any Claim, right or Cause of Action that the Debtors or the Responsible Person may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. §157.

## I. Procedures for Treating and Resolving Disputed and Contingent Claims

### 1. No Distributions Pending Allowance

No payment or Distribution will be made with respect to any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, determined by a Final Order, and the Disputed Claim has become an Allowed Claim. Any Proofs of Claim filed with all of the dollar amounts listed as contingent, unknown or otherwise containing unliquidated amounts shall be deemed to be a Disputed Claim and shall be treated as such for distribution purposes in accordance with the terms of Section 8.7 of the Plan.

### 2. Claim Estimation

The Debtors and the Responsible Person, as applicable, may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to § 502(c).

## J. Setoffs and Recoupment

The Responsible Person may, pursuant to §§ 502(d), 553 and 558 or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims or Causes of Action of any nature whatsoever, excluding Avoidance Actions, the Debtors or their Estates may have against the Holder of such Claim; *provided*, *however*, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors of any setoff or recoupment the Debtors may have against the Holder of such Claim, nor of any other Claim or Cause of Action.

## K. Allowance and Disallowance of Claims

Allowance and disallowance of Claims shall be in all respects subject to the provisions of § 502, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

## L. Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against the Debtors, the Buyer, the Responsible Person or the Estates; and such promissory notes, share

certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

**M.     No Interest on Claims**

Unless otherwise specifically provided for in this Plan, the Confirmation Order or a post-petition agreement in writing between the Debtors and a Holder of a Claim that has been approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to receive any Distribution on account of interest accruing on or after the Petition Date, nor shall any interest accrue on and after the Effective Date on account of any Disputed Claim that subsequently becomes Allowed and paid under the terms of the Plan after the Effective Date.

**N.     Withholding Taxes**

The Responsible Person shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan.  As a condition to making any distribution under the Plan, the Responsible Person may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the Responsible Person may deem necessary to comply with applicable tax reporting and withholding laws.

**O.     Reports**

From the Effective Date, until a Final Decree is entered, the Responsible Person shall submit quarterly reports to the United States Trustee setting forth all receipts and disbursements as required by the United States Trustee guidelines.

## VIII.   EFFECT OF CONFIRMATION

**A.     Vesting of Assets**

On the Effective Date, pursuant to §§ 1141(b) and (c), the Property and Acquired Assets shall be released from the custody and jurisdiction of the Bankruptcy Court and shall vest in the Buyer free and clear of all Claims, Liens (excluding Liens that run with the land shall continue to encumber and benefit the Property, including the land use and condominium regime currently in place), encumbrances, charges and other interests, including, without limitation, any Tax Liens or Claims, except as provided in the Plan.  From and after the Effective Date, the Buyer may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.  On the Effective Date, all other property of the Estates not vesting in the Buyer, including all Causes of Action, shall vest in the Responsible Person, free and clear of all Claims, Liens, encumbrances, charges and other interests, including any Tax Liens or Claims, except as provided in the Plan.

**B. Binding Effect**

On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

**C. Discharge of Claims and Termination of Interests**

Except as provided in the Plan, the rights afforded in and the payments and Distributions to be made under the Plan shall terminate all Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors, or their assets or properties to the fullest extent permitted by § 1141. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests shall be precluded and enjoined from asserting against the Buyer, the Responsible Person or the Estates, their successors or assignees or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

**D. Injunction**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, including Sections 4.12(b) and 9.7 of the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree or order against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (d) effecting, directly or indirectly, any setoff or recoupment of any kind against any obligation due to any Protected Party or any property of any Protected Party with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in Section 9.4 of the Plan shall prohibit the Holder of a Claim or Interest with respect to which a Proof of Claim was timely filed from litigating its right to seek to have such Claim or Interest declared an Allowed Claim or Interest and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Claim or Interest of any of the obligations of the Debtors or the Responsible Person under the Plan.

### E. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under § 105 or 362, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the entry of the Final Decree.

### F. Exculpation and Releases

None of the Protected Parties shall have or incur any liability for, and each Protected Party is released under the Plan from, any Claim, Cause of Action, including Avoidance Actions, liability to any other Protected Party, to any Holder of a Claim or an Interest only in capacity as such, for any act or omission taken in connection with, arising from or relating to the Chapter 11 Cases, the formulation, negotiation and/or pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan and/or the property to be distributed under the Plan, except for the gross negligence, willful misconduct or fraud of any Protected Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Protected Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such Claim, cause of action or liability. Without limiting the generality of the foregoing, each Protected Party shall be entitled to and granted the protections and benefits of § 1125(e).

Each party to which this section applies shall be deemed to have granted the releases set forth in Section VII.F of the Plan notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, which would limit the effect of such releases to those Claims or Causes of Action, including Avoidance Actions, actually known or suspected to exist at the time of execution of the release.

Notwithstanding anything set forth above or elsewhere in the Plan, nothing in the Plan discharges, releases, precludes, or enjoins: (i) any environmental liability to any governmental unit that is not a Claim; (ii) any environmental Claim of any governmental unit arising on or after the Confirmation Date; (iii) any environmental liability to any governmental unit that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any environmental liability to the United States on the part of any Person other than the Debtors.

### G. Releases by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Holder of a Claim or an Interest (other than any PSA Creditor that elects the Enforcement Option) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors and the Released Parties from any

and all Claims, Interests, Claims obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims or Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Released Parties, the Chapter 11 Cases, the Plan, the Disclosure Statement, the DIP Loan Agreement, the PSAs (including any Claims relating to alleged errors and/or omissions in the offering materials used to market and sell the Residence Property and any Claims related to alleged non-registration or other alleged non-compliance with applicable laws) or related agreements, instruments or other documents, the DIP Loan Agreement, and other related agreements, other than Claims, Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct as determined by a Final Order; *provided*, *however*, that nothing herein shall be deemed a waiver or release of a Releasing Party's right to receive a Distribution pursuant to the terms of the Plan, nor shall anything herein be deemed a waiver or release of the right of any PSA Creditor to assert Guaranty Claims other than any PSA Creditor that elects the Purchase Option.  For the avoidance of doubt, this Release by Holders of Claims and Interests is not and shall not be deemed a waiver of the Debtors' rights or Claims against the holders of General Unsecured Claims, including to the Debtors' rights to assert setoffs, recoupments or counterclaims, or to object or assert defenses to any General Unsecured Claim, and all such rights and Claims are expressly reserved; *provided*, *however*, the Debtors shall release all claims against any Holder of a PSA Claim that has elected the Purchase Option.

The Debtors' preliminary analysis of potential claims and Causes of Action that would be released pursuant to the foregoing release provision primarily comprise potential Avoidance Actions (including preferential and fraudulent conveyances) and alter ego/veil piercing claims. In proposing the foregoing releases, the Debtors and the Committee considered the fact-intensive nature of such claims, the cost and time potentially associated with the litigation of such claims and the existence of potentially valid defenses to such claims.  Additionally, the Debtors and the Committee considered the fact that the proceeds of any such claims and Causes of Action, including Avoidance Actions, are encumbered by Liens in favor of the DIP Lender.  Moreover, the DIP Lender's Liens on the Property are *pari passu* with Prepetition Lender's Liens on the Property.  Accordingly, the Debtors anticipate that, after giving effect to a liquidation of the Debtors' assets, including the Property (other than under the Plan), the DIP Lender would likely assert a remaining claim of approximately $6,000,000 against the Debtors' Estates that, together with the Carve-Out (as defined in the DIP Facility), would be entitled to proceeds recovered from any Avoidance Actions.  The Debtors believe that any such recoveries on account of Avoidance Actions and other claims released pursuant to Section 9.7 of the Plan would be significantly less than $6,000,000; accordingly, even absent the releases proposed in Section 9.7 of the Plan, the Debtors believe it is highly unlikely that any such proceeds would be available for distribution to other Holders of Allowed Claims.

**H.      Reservation of Causes of Action/Reservation of Rights**

Unless otherwise set forth herein, nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action or Avoidance Actions that the Debtors, the Responsible Person, or the Estates may have or may choose to assert against any Person.

## IX.      CONDITIONS PRECEDENT

**I.      Conditions Precedent to Effective Date**

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

1.      The Confirmation Order shall be in form and substance acceptable to the Debtors, the Buyer, the Prepetition Lender, and the Committee in their absolute discretion;

2.      The Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay of effectiveness; the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under § 1144 shall have been made, or, if made, shall remain pending;

3.      The Buyer shall have consented in all respects to, and agreed to be bound by, the terms of the Plan.

4.      The appointment of the Responsible Person shall have been approved by order of the Bankruptcy Court;

5.      All necessary documents relating to the sale of the Property and Acquired Assets (including, the transfer of ownership of the Property to the Buyer under Anguillan law) shall be executed in form and substance acceptable to the Prepetition Lender, the Debtors, the Buyer and the Committee; and

6.      Prepetition Lender shall have paid to the PSA Guarantors $1,296,000 on account of the Hirsch and Mazzei settlement.

**J.      Revocation, Withdrawal or Non-Consummation of Plan**

If, after the Confirmation Order is entered, each of the conditions precedent to the Effective Date have not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the Debtors, the Buyer, the Prepetition Lender or the Committee, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  A condition precedent to the Effective Date may only be waived by a writing executed by the Debtors, the Buyer and the Committee.  If the Confirmation Order is vacated pursuant to Section VIII.B of the Plan, the Plan shall be null and void in all respects, and nothing contained in the

Plan shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors, (iii) prejudice in any manner the rights of the Debtors in the Chapter 11 Cases, or (iv) constitute a release, indemnification or exculpation by the Debtors, the Estates or any other party pursuant to the Plan.

## X.    ADMINISTRATIVE PROVISIONS

### A.    Retention of Jurisdiction by the Bankruptcy Court

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code.  Pursuant to §§ 105(a) and 1142, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

1.    all matters relating to the assumption or rejection or the assumption and assignment of Executory Contracts, or Claims or disputes relating thereto;

2.    all matters relating to the ownership of a Claim or Interest;

3.    all matters relating to the distribution to holders of Allowed Claims and to the determination of Claims;

4.    any and all matters involving the Responsible Person;

5.    all matters relating to or arising in connection with the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim;

6.    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

7.    all matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

8.    all matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

9.    to consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

10.     all applications for allowance of compensation and reimbursement of Professional Fee Claims under §§ 328, 330, 331, 503(b), 1103 and 1129(a)(4);

11.     to hear and determine all motions or requests for the payment of Claims entitled to priority under § 507(a)(2), including compensation and reimbursement of expenses of parties entitled thereto;

12.     all Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets for the Responsible Person or the Buyer as applicable pursuant to the terms of the Plan, as successor-in-interest to any of the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

13.     all matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146;

14.     any other matter not inconsistent with the Bankruptcy Code;

15.     all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

16.     to enter the Final Decree closing the Chapter 11 Cases; and

17.     to enforce all orders previously entered by the Bankruptcy Court.

## B.     Payment of Statutory Fees

All fees through the Effective Date pursuant to 28 U.S.C. §1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided to the Debtors prior to the Effective Date.  All fees invoiced after the Effective Date pursuant to 28 U.S.C. §1930 shall be paid by the Responsible Person from the Distribution Fund.

## C.     Headings

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

## D.     Binding Effect of Plan

Except as otherwise provided in §§ 1141(d)(3) on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, the Responsible Person and their respective successors or assigns, whether or not the Claim or Interest of such Holders is Impaired under the Plan and whether or not such Holder has

accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the Responsible Person and any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

## E.     Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors after consultation with the Committee and the Buyer and upon written notice to the Bankruptcy Court, provided that the Effective Date shall occur within 48 hours of the effectiveness of such waiver.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

## F.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, the Responsible Person shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution.  Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## G.     Tax Exemption and Expedited Tax Determination

Pursuant to § 1146, any and all transfers of real or personal property owned by the Debtors shall be free of any and all state and local stamp taxes and similar taxes pursuant to § 1146(a); provided, however, that upon the Effective Date, so long as the Prepetition Lender is the Buyer, Buyer shall pay to the Government of Anguilla those taxes agreed upon pursuant to the Memorandum of Understanding dated September 17, 2010, as amended.  In the event that the Buyer is not the Prepetition Lender, Buyer shall be required to satisfy all tax obligations under Anguillan law or as otherwise agreed to with the Government of Anguilla.

The Debtors and Responsible Person are authorized to request an expedited determination of taxes under § 505(b) for any or all returns filed for, on or behalf of, the Debtors for any or all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

## H.     Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or Anguillan law or unless specifically stated, the

rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors incorporated or organized in Delaware, corporate and limited liability company governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.

**I.     Plan Supplement**

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, the Committee, the Buyer and the Prepetition Lender and shall be filed with the Bankruptcy Court no later than ten (10) days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims or Interests, and provided further that amendment of the Assumed Contract Schedule shall be governed by Section 7.2 of the Plan.  The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full therein.

**J.     Severability**

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively.  Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**K.     Revocation**

The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee or any other Person or to prejudice in any manner the rights of the Debtors, the Committee or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors and/or the Committee.

**L.     Substantial Consummation**

On the Effective Date, for purposes of § 1127(b) and other applicable sections of the Bankruptcy Code, the Plan shall be deemed to be substantially consummated as such term is defined in § 1101.

**M.     Conflict**

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence.  The

terms of the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in the Disclosure Statement.

## N.    Amendments and Modifications

The Debtors, the Buyer, the Prepetition Lender and the Committee jointly may agree to alter, amend or modify the Plan under § 1127(a) at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in § 1101(2)) and Article 11.12 of the Plan, any Debtor, the Committee or the Responsible Person may institute proceedings in the Bankruptcy Court pursuant to § 1127(b) to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to those parties set forth in Bankruptcy Rule 2002, and the solicitation of all Creditors and other parties-in-interest shall not be required. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Interests.

## O.    Notices

Any notices required under the Plan or any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

### *1.    To the Debtors:*

Akin, Gump, Strauss, Hauer & Feld LLC
Attn:  Charles R. Gibbs, Esq.
Attn:  Michael P. Cooley, Esq.
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
Telephone:  212-969-2800
Facsimile:  212-969-4343

With a copy to:

Richards, Layton & Finger, P.A.
Attn:  Paul N. Heath, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801

**2.**     ***To the Prepetition Lender:***

DLA Piper LLP (US)
Attn:  Richard A. Chesley, Esq.
Attn:  Stacey T. Kern, Esq.
203 North LaSalle Street
Suite 1900
Chicago, Illinois  60601-1293

**3.**     ***To the Committee:***

Brown Rudnick LLP
Attn:  Gordon Z. Novod, Esq.
Seven Times Square
New York, New York 10036

With a copy to:

Womble Carlyle Sandridge & Rice, PLLC
Attn:  Steven K. Kortanek, Esq.
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801

## P.     Filing of Additional Documents

On or before substantial consummation of the Plan, and without the need for any further order or authority, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## Q.     Direction to a Party

From and after the Effective Date, the Debtors or the Responsible Person may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

## R.     Successors and Assigns

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

### S.     Waiver of Subrogation

Notwithstanding any provision of the Plan to the contrary, all Holders of Claims shall be deemed to have waived any and all subrogation rights which they may have with respect to the distributions made pursuant to the Plan, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving distributions under the Plan.

## XI.     CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

### A.     Voting Procedures and Requirements

The Debtors are providing copies of this Disclosure Statement, Ballots and, where appropriate, summary Ballots, to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests in the Debtors that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims or Interests that are not Impaired are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

> **If you hold an Impaired Claim against any Debtor, you are entitled to vote on the Plan.  If you hold multiple Impaired Claims against one or more Debtors, you are entitled to cast a vote on account of each such Claim.  Some Creditors may therefore be entitled to cast more than one Ballot.**

Under the Plan, the Claims in Classes 1, 2 and 4 are not Impaired and are therefore deemed to have accepted the Plan.  The Claims in Class 3 and Classes 5 through 9 are Impaired and are therefore entitled to vote to accept or reject the Plan.  Holders of Claims and Interests in Classes 10 and 11 will not receive any Distributions on account of their Claims under the Plan; accordingly, Classes 10 and 11 do not vote and are deemed to have rejected the Plan.

Any holders of Claims that hold Claims in more than one Impaired Class must vote separately for each Class.  Such holders will receive a separate Ballot for all their Claims in each Class and should complete and sign each Ballot separately.  The following voting procedures (the "***Voting Procedures***") have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

1.     With respect to a Claim as to which a proof of Claim has not been timely filed (*i.e.*, was not filed or was filed after the Bar Date set by the Bankruptcy Court for the filing of a

Claim of that type), the voting amount of such Claim (subject to any applicable limitations set forth below) shall be equal to the amount listed, if any, in respect of such Claim in the applicable Debtor's Schedules to the extent such Claim is not listed as contingent, unliquidated, undetermined or disputed. Such Claim shall be placed in the appropriate Class based upon the applicable Debtor's records and the classification scheme set forth in the Plan.

2. With respect to a proof of Claim which, according to the Clerk of the Bankruptcy Court's records, was not timely filed (*i.e.*, was filed after the applicable Bar Date) and is not subject to the provisions of the immediately preceding paragraph, such Claim shall be provisionally disallowed for voting purposes.

3. With respect to a liquidated, non-contingent, undisputed Claim as to which a proof of Claim has been timely filed and as to which an objection has not been filed, the amount and classification of such Claim shall be that specified in such proof of Claim, subject to any applicable limitations set forth below.

4. With respect to a proof of Claim which is the subject of an objection filed by a Debtor, the Claim represented by such proof of Claim shall be provisionally disallowed for voting purposes, except to the extent and in the manner that (i) that Debtor indicates in its objection the extent to which such Claim should be allowed; or (ii) the Bankruptcy Court otherwise orders.

5. A timely filed proof of Claim that is designated as wholly unliquidated or contingent shall be accorded one vote and assigned a value of one dollar for purposes of § 1126(c), unless the Claim is disputed as set forth in the immediately preceding paragraph.

6. With respect to a Claim that has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the amount and classification of such Claim shall be that set by the Bankruptcy Court.

7. With respect to a Claim any portion of which is unliquidated, contingent or disputed, the holder of the Claim shall be entitled to vote that portion of the Claim that is liquidated, non-contingent and undisputed, subject to any limitations set forth herein and unless otherwise ordered by the Bankruptcy Court.

8. Holders of Claims shall not be entitled to vote Claims to the extent such Claims duplicate or have been superseded by other Claims of such holders of Claims.

9. Each Claim shall be entitled to vote only once.

10. Whenever a holder of a Claim submits more than one Ballot voting the same Claim or Interest prior to the deadline for submission of Ballots, the first of such Ballots filed (and only such Ballot) shall be counted in accordance with the Voting Procedures unless either (i) the applicable Debtor consents to the filing and counting of a superseding Ballot, or (ii) the Bankruptcy Court, after notice and a hearing, orders otherwise.

11. The authority of the signatory of each Ballot to complete and execute such Ballot shall be presumed.

12.     A holder of a Claim must vote all of its Claim within a particular Class under the Plan either to accept or reject the Plan and may not split its vote.  Accordingly, a Ballot (or multiple Ballots with respect to separate Claims within a single Class) that partially rejects and partially accepts the Plan or that indicates both a vote for and against the Plan will not be counted.

13.     Any Ballot which is executed and returned, but does not indicate an acceptance or rejection of the applicable Plan, shall be deemed to be an acceptance of the Plan.

14.     Any Ballot that is not signed will not be counted.

15.     For the purpose of voting on the Plan, the Debtors will be deemed to be in constructive receipt of any Ballot timely delivered to any address designated for the receipt of Ballots cast in connection with the Plan.

16.     Any Ballot received by the Debtors after the end of the Voting Period shall not be accepted or used by the Debtors in connection with the Debtors' request for Confirmation of the Plan unless the Debtors, in their sole discretion, consent to the counting of such Ballot or the Bankruptcy Court orders such Ballot to be counted.

17.     All Ballots must be cast using the Ballots distributed to the holders of Claims. Votes cast in any manner other than by using such Ballots will not be counted.

**IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTORS SO DETERMINE OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO BANKRUPTCY RULE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 5:00 P.M. PACIFIC TIME, ON _____, 2011 AT THE FOLLOWING ADDRESS:**

Barnes Bay Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to counsel for the Debtors at the foregoing address. Please follow the directions contained on the Ballot carefully.

The process of soliciting acceptance of the Plan must be fair and open without outside influence in the form of representations, inducements or duress of any kind.  To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined disclosure requirements and Voting Procedures, please contact counsel for the Debtors.

**B.      Acceptance.**

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions hereinafter discussed below.  Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are not Impaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests of Impaired Classes.

The Bankruptcy Code defines acceptance of a Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject a Plan, are counted.

**C.      Confirmation of the Plan.**

In order to confirm the Plan, § 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (a) that the Plan has classified Claims and Interests in a permissible manner; (b) that the contents of the Plan comply with the technical requirements of the Bankruptcy Code; (c) that the Debtors have proposed the Plan in good faith; and (d) that the Debtors have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 Case.  The Debtors and the Committee believe that all of these conditions have been or will be met.

The Bankruptcy Code requires that, unless the "cramdown" provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes.  Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted.  In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims of the Debtors were to accept the Plan by the requisite number of votes, the Bankruptcy Court would be required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests before it can confirm the Plan.

*1.      The Best Interests Test.*

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must, pursuant to § 1129(a)(7), independently determine that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan.  This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' Chapter 11 Cases were converted to a Chapter 7 liquidation case and the Debtors' assets were liquidated by a Chapter 7 trustee (the "*Liquidation Value*"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 reorganization case. In addition, the dividend to holders of General Unsecured Claims in a Chapter 7 proceeding would be materially affected by the outcome of any litigation instituted by a Chapter 7 trustee. For further information on the Debtors' liquidation analysis, see Appendix 1 hereto. Based on the Liquidation Values discussed more fully in Appendix 1 hereto, the Debtors and the Committee believe that the Plan provides substantially greater recoveries to Creditors than they would receive in a Chapter 7 liquidation and, therefore, satisfies § 1129(a)(7).

### 2. Feasibility.

Even if the Plan is accepted by each Class of Claims voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the "best interests" test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. Based on the funds proposed to be available for distribution under the Plan, the Debtors and the Committee believe that the Debtors will be able to make all payments required to be made pursuant to the Plan.

## D. Non-Acceptance and Cramdown.

Pursuant to § 1129(b), the Bankruptcy Court may confirm a Plan despite the non-acceptance of the Plan by an Impaired Class. This procedure is commonly referred to as a "cramdown". Section 1129(b) provides that upon request of the proponent of the Plan, the Bankruptcy Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (c) at least one Impaired Class has accepted the Plan (without counting acceptances by insiders) and (d) the Plan satisfies the requirements set forth in § 1129(a) other than § 1129(a)(8). In general, § 1129(b) permits Confirmation notwithstanding non-acceptance by an Impaired Class if that Class and all more junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under a Plan.

### 1. The Plan Is Fair and Equitable.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of Secured Claims, Unsecured Claims and Interests. As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class.

(a)     *Secured Claims.*

With respect to a Class of Secured Claims that does not accept a Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) the holders of such Secured Claims will retain the liens securing such Claims and will receive on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in such property, or (ii) the holders of such Claims will realize the indubitable equivalent of such Claims under the Plan.

(b)     *General Unsecured Claims.*

With respect to a Class of General Unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) each holder of a General Unsecured Claim of the dissenting Class receives or retains under the Plan property of a value equal to the Allowed amount of its General Unsecured Claim or (ii) the holders of Claims or Interests that are junior to the Claims of the holders of such General Unsecured Claims will not receive or retain any property under the Plan.

(c)     *Interests.*

With respect to a Class of Interests that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that (i) each holder of an Interest of the dissenting Class receives or retains on account of such Interest property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such Interest or (ii) the holders of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan.  The Debtors and the Committee believe the Plan is fair and equitable with respect to each Class.

## 2.     *No Unfair Discrimination.*

A Chapter 11 Plan "does not discriminate unfairly" with respect to a nonaccepting Class if the value of the Cash and/or securities to be distributed to the nonaccepting Class is equal or otherwise fair when compared to the value of Distributions to other Classes whose legal rights are the same as those of the nonaccepting Class.  Since all similarly situated holders of Claims or Interests are classified together and all Claims or Interests in a given Class are treated identically, the Debtors and the Committee believe the Plan does not unfairly discriminate against any Class.

## E.     Confirmation Hearing

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "***Confirmation Hearing***").  Section 1128(b) provides that any party in interest may object to Confirmation of the Plan.  Notice of the Confirmation Hearing will be provided to all holders of Claims and Interests and other parties in interest (the "***Confirmation Notice***").  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.  Objections to Confirmation of a Plan must be made in writing, specifying in detail the name and address of the person or Entity objecting, the grounds

for the objection, and the nature and amount of the Claim or Interest held by the objector. Objections must be filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to Confirmation of a Plan. Objections to Confirmation of a Plan are governed by Bankruptcy Rule 9014 and the local rules of the Bankruptcy Court.

## XII. RISK FACTORS

**Holders of Claims should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), prior to voting to accept or reject the Plan.**

### A. Bankruptcy Risks

#### 1. *Objection to Classifications*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors and the Committee believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court or other parties in interest will reach the same conclusion. **The Prepetition Lender's and the DIP Lenders' support of the Plan and willingness to voluntarily fund certain amounts under the Plan is conditioned, in part, on the classification of PSA Claims as provided in Sections 4.6, 4.7 and 4.8 and Exhibit A of the Plan. In the event the Bankruptcy Court determines that one or more PSA Claims should be classified differently than as provided under the Plan, the Prepetition Lender and the DIP Lender likely will not fund, resulting in potential liquidation of the Chapter 11 Cases.**

#### 2. *Risk of Nonconfirmation of the Plan.*

Even if all Classes of Claims or Interests that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 sets forth the requirements for confirmation and requires, among other things, that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of Distributions to dissenting Creditors and Interest holders not be less than the value of distributions such Creditors and Interest holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Debtors and the Committee believe that the Plan satisfies all the requirements for Confirmation under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for Confirmation of the Plan has been satisfied.

#### 3. *Nonoccurrence of Effective Date of the Plan.*

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not go effective on the Effective Date. The Plan set forth conditions to the occurrence

of the Effective Date of the Plan which may not be satisfied by the Effective Date. The Debtors and the Committee believe that they will satisfy all requirements for consummation required under the Plan. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

### 4. Potential Effect of Bankruptcy on Certain Relationships.

The effect, if any, which the commencement of the Chapter 11 Cases may have upon the Debtors operations cannot be accurately predicted or quantified. If, however, Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could adversely affect the Debtor's relationship with its purchasers, suppliers, employees and customers, resulting in a material adverse impact on the operations of the Debtor. Moreover, even an expedited Chapter 11 Cases could have a detrimental impact on such operations due to the possibility that the Chapter 11 Cases could create a negative image of the Debtors.

### 5. The Status and Priority of ~~certain~~Certain Claims May Be Disputed.

The Debtors reserve the right to object to the amount, or the secured or priority status, of any Claim or Interest. The estimates set forth in the Disclosure Statement cannot be relied on by any Person whose Claim or Interest is subject to an objection. Any such Holder of a Claim or Interest may not receive its specified share of the estimated Distributions described in the Disclosure Statement. Moreover, notwithstanding any language in any Holder's proof of claim, the holder of a contingent or unliquidated Claim shall not be entitled to receive or recover any amount in excess of the amount stated in such Holder's proof of claim, if any, or if the proof of Claim provides no monetary value of such holders' Claim on the Distribution Record Date, then the amount the Debtors elect to withhold on account of such Claim.

## B. Business Risks

### 1. Risks and Uncertainties Associated with the Chapter 11 Cases.

Although the Debtors believe that the Chapter 11 Cases, commenced in order to implement the orderly liquidation of the Debtors through a sale of the Property in accordance with § 363 and applicable Anguillan law, will not be materially disruptive to their business operations, the Debtors cannot be certain that this will be the case. The Plan is designed to minimize the length of the bankruptcy proceeding, however, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, for the duration of the Chapter 11 Cases, the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to maintain contracts that are critical to their operations;

- the Debtors' ability to obtain Creditor, Interest holder and Bankruptcy Court approval for, and then to consummate, the Plan and emerge from bankruptcy.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' restructuring.

These risks and uncertainties could affect the Debtors' business in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' operations and financial condition. In addition, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition and results of operations.

### 2. *Risks and Uncertainties Associated with Current Economic Conditions*

The United States has experienced an economic downturn and spending by consumers has dropped, including in the luxury hospitality industry. If this downturn and decrease in spending continues, the Debtors' business could be adversely affected.

## XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and holders of Claims and Interests that are individual citizens or residents of the United States or corporations that are created or organized in or under the laws of the United States or any political subdivision thereof. The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service ("***IRS***") as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address the federal income tax consequences to any holders of Claims or Interests that will either be satisfied in full under the Plan or will receive no recovery under the Plan. Finally, this summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, small business investment companies, persons that hold Claims or Interests as part of a straddle or conversion transaction and tax-exempt organizations).

Due to the complexity of the transactions described herein and in the Plan, the lack of applicable legal precedent and the possibility of changes in law, differences in the nature of the Claims, differences in the Claimants' methods of accounting (including Claimants within the same class) and the potential for disputes as to legal and factual matters, the tax consequences described herein are subject to significant uncertainties. No rulings or determinations by the IRS have been obtained or sought by the Debtors with respect to the Plan and no opinion of counsel has been obtained with respect to the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN.**

### C.  Federal Income Tax Consequences to Creditors.

The federal income tax consequences of the Plan to a Creditor will depend upon several factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim; (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (iv) whether the Creditor has taken a bad debt deduction or worthless security deduction with respect to his Claim; and (v) whether the Creditor receives Distributions under the Plan in more than one taxable year. **CREDITORS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT OF THEIR RESPECTIVE CLAIMS UNDER THE PLAN.**

### D.  Federal Income Tax Consequences to Interest holders.

Holders of Class 11 Interests and related Claims will receive no Distribution under the Plan and each such holder should recognize a capital loss to the extent of such holder's tax basis in the Interests held. Such capital loss should be long-term capital loss if the Interest was held by the holder for more than one year. **INTEREST HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT OF THEIR INTERESTS UNDER THE PLAN.**

### E.  Federal Income Tax Consequences to Debtors.

Generally, a taxpayer recognizes cancellation of indebtedness ("***COD***") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied,

over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of Cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a Debtor if the discharge occurs in a Title 11 case or the discharge occurs when the Debtor is insolvent (except with respect to certain discharged intercompany debt that is treated as both income and an offsetting loss to the group). Rather the Debtor generally must, after determining its tax for the taxable year of discharge, reduce its net operating losses ("NOL(s)") and any capital loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income by this exception.

Because the Debtors (other than Summit) are single member limited liability companies and (in the case of Summit) a limited partnership, they each will pass through any COD income and tax attribute adjustment. Accordingly, there will be no tax effect to the Debtors as a result of the Plan.

## F.      Withholding and Reporting.

The Debtors will withhold all amounts required by law to be withheld from payments to Claimants and holders of Interests and with respect to payments on the Reorganization Securities. In addition, such holders may be required to provide certain tax information to the Debtors as a condition of receiving Distributions under the Plan.

## G.      Importance of Obtaining Professional Tax Assistance.

The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional.  The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain.  Such consequences may also vary based upon the individual circumstances of each holder of a Claim or Interest.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY RESPECTS, UNCERTAIN.  THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND, AS SUCH, DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR OR HOLDER OF INTERESTS IN THE DEBTORS.  ALL CREDITORS AND HOLDERS OF INTERESTS IN THE DEBTORS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX

CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.

## XIV.   MISCELLANEOUS PROVISIONS

### A.   Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### B.   Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a), as determined by the Bankruptcy Court at a hearing pursuant to § 1128, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### C.   Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### D.   Successors and Assigns

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each entity.

## XV.   RECOMMENDATION AND CONCLUSION

The Debtors and the Committee recommend the Plan because it provides for greater distributions to the holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the holders of Claims and Interests.  **Accordingly, the Debtors and the Committee recommend that holders of Claims and Interests entitled to vote on the Plan support confirmation and vote to accept the Plan.**

Dated: June 28, 2011
Wilmington, Delaware

Respectfully submitted,

BARNES BAY DEVELOPMENT, LTD.
KOR DUO INVESTMENT PARTNERS II, LP
KOR DUO II, LLC

By: _____/s/ Kevin Nystrom_____
Name:___Kevin Nystrom_____
Title:____Chief Restructuring Officer____

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By: _____/s/ Sarah Bako_____
Exclusive Resorts Real Estate Holding II, LLC
Committee Co-Chair
By: _____Sarah Bayko_____

Prepared by:

Paul Heath (No. 3704)
Chun I. Jang (No. 4790)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: 302.651.7700
Facsimile 302.651.7701

-and-

Charles R. Gibbs (admitted *pro hac vice*)
Michael P. Cooley (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: 214.969.2800
Facsimile: 214.969.4343

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## Schedule 1

## Resident Purchaser Lawsuits

George Kalogridis

Armond Ferri

Francesco Facchini

Tom/Laura Durbin

WO Viceroy 1 Ltd

Thomas/Sharon Lydon

Elliot Eichner & David Sonnenblick

Sandra Taylor

Lee Zoeller

Stephen Paluzek

Jonathan Simon

Mark Frederickson

Martha/Kevin King

RJR Viceroy

Grant Gibson

Grant Gibson/Kim Evans

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**Appendix 1**

**Liquidation Analysis**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**Appendix 2**

**Prepetition Agreements**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**Appendix 3**

**PSA Claims (Tier 1)**
**Sample Termination Provisions**

*Joel Greenberg and Marcy Gringlas*

*"The last sentence in Section 4(a) of the Agreement is hereby modified to read as follows: As of the date of this Agreement, Seller intends that the Closing shall occur on or about May, 2007, subject to delays beyond the reasonable control of Seller, but in no event beyond December 31, 2008."* Modification Addendum dated as of May 21, 2005, ¶ 1 (emphasis in original).

*RJR Viceroy*

*"Completion of Construction: Notwithstanding the terms and conditions of the Agreement, in the event that the conditions to Closing, as set forth in the Agreement in this Addendum, have not occurred on or before December 31, 2008 (regardless of the reason for the delay), Purchaser shall be entitled to terminate the Agreement and receive a full refund of the Deposit(s)."* Addendum, ¶ 2.

*Lee Zoeller*

*"Seller agrees that Purchaser shall not be obligated to complete Closing unless the Unit is available for rent within 90 days of the Closing Date. Subject to the foregoing, Seller further agrees that in the event Seller is not in a position to complete the Closing no later than February 28, 2008, Purchaser may, at Purchaser's option rescind and cancel the Agreement. In case of either of the foregoing, all previously deposited funds shall be refunded to the Purchaser, and no party shall have any further obligation to the other."* Closing and Upgrade Option Addendum to Purchase and Sale Agreement dated as of May 21, 2005.

*Exclusive Resorts*

*"Closing Delay Date. In the event any of the conditions precedent to Buyer's obligations set forth in this Agreement are not satisfied or waived in writing by Buyer on or before the Scheduled Closing Date [i.e., December 10, 2007], then Buyer may, at its option, delay the Closing Date for up to a total of thirty (30) days to permit such condition precedent to be satisfied, and if such condition precedent is not so satisfied by the Closing Date as extended, Buyer will be entitled to terminate and have recourse to its remedies as herein provided. No additional extension of the Closing Date will be required of either party unless both Buyer and Seller agree in writing."* Section 11.2 of Exclusive Resorts' Purchase Agreement dated as of September 28, 2005.

| Summary Report: Litera Change-Pro ML WIX 6.5.0.303 Document Comparison done on 7/5/2011 2:40:35 PM | |
|---|---|
| **Style Name:** Default Style | |
| **Original Filename:** | |
| **Original DMS:** iw://EASTDMS/WEST/200901362/10 | |
| **Modified Filename:** | |
| **Modified DMS:** iw://EASTDMS/WEST/200901362/11 | |
| **Changes:** | |
| Add | 81 |
| ~~Delete~~ | 39 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 120 |