**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Barnes Bay Development Ltd., et al., | ) | Case No. 11-10792 (PJW) |
| | ) | |
| | ) | |
| Debtors. | ) | |

## MEMORANDUM OPINION

Donald J. Detweiler
James C. Carignan
John H. Schanne, II
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

Counsel for W.O. Viceroy I
Ltd. and Co-counsel for
Jonathan Simon

and

Susan Seflin
WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP
11400 W. Olympic Blvd.
9th Floor
Los Angeles, CA 90064

Co-Counsel for Jonathan
Simon

Paul Heath
RICHARDS, LAYTON & FINGER,
P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

and

Charles R. Gibbs
Michael P. Cooley
Keefe Bernstein
AKIN GUMP STRAUSS HAUER &
FELD LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201

Counsel for Debtors and
Debtors in Possession

Steven K. Kortanek
Matthew P. Ward
WOMBLE CARLYLE SANDRIDGE &
RICE, PLLC
222 Delaware Avenue
Suite 1501
Wilmington, DE 19801

and

Edward S. Weisfelner
Gordon Z. Novod
Andrew Dash
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

and

James W. Stoll
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111

Counsel for the Official
Committee of Unsecured
Creditors

Stuart M. Brown
Cynthia Moh
DLA PIPER LLP (US)
919 N. Market Street
15th Floor
Wilmington, DE 19801

and

Richard A. Chesley
DLA PIPER LLP (US)
203 North LaSalle Street
19th Floor
Chicago, IL 60601

Counsel for SOF-VIII-Hotel II
Anguilla Holdings, LLC

Dated: August 15, 2011

**WALSH, J**

This opinion is with respect to the motion for reclassification of the claims submitted by creditors Jonathan Simon ("Simon") and W.O. Viceroy I Ltd. ("Viceroy"). (Doc. # 531). For the reasons described below, I will deny the motion.

## Background

Barnes Bay Development Ltd.("Barnes Bay"), Kor Duo Investment Partners II, LP, and Kor Duo II, LLC (collectively "the Debtors") filed bankruptcy petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 <u>et seq.</u>, on March 17, 2011. At the time the petitions were filed, Debtors owned the Viceroy Anguilla Resort and Residences in Anguilla, British West Indies ("the Property"), and were engaged in the sale of residential properties associated with the Property.

The Debtors filed an original plan (the Joint Chapter 11 Plan of Liquidation ("the Original Plan")) on April 1, 2011. The plan drew a distinction between unsecured creditors whose claims arose from deposits paid pursuant to purchase and sale agreements ("PSAs") for private residences at The Viceroy Anguilla Resorts and Residences ("PSA Creditors") sold by Barnes Bay, and those arising from more generalized unsecured claims. (Joint Omnibus Response, at 4, ¶ 8.) After objections to the treatment of the PSA Creditors, negotiations among the Debtors, the Creditors' Committee ("the Committee"), and the pre-petition secured lender SOF-VIII-Hotel II

4

Anguilla Holdings, LLC ("Starwood") resulted in the First Amended Joint Chapter 11 Plan of Liquidation ("the First Amended Plan"), filed on April 18, 2011. (Joint Omnibus Response, at 5, ¶ 9.) Objections to the treatment of unsecured creditors, particularly the PSA Creditors, continued after the proposal of the First Amended Plan, resulting in the filing of the Second Amended Joint Chapter 11 Plan of Liquidation ("the Second Amended Plan" or "the Plan") on June 13, 2011. (Doc. # 378.)  The Second Amended Plan is a joint plan proposed by the Debtors and the Committee.  The Plan was submitted to the Court in near-final form on June 28, 2011 (Doc. # 442), and was approved by the Court for solicitation of votes pursuant to the Solicitation Order. (Doc. # 471.)

As in the Original Plan, the Second Amended Plan separates the unsecured claims based on whether or not they arose from PSAs.  A "General Unsecured Claim" is defined as "any Claim that is not a Secured Claim, Administrative Claim, Priority Claim, Priority Tax Claim, PSA Claim, Intercompany Indemnity Claim or Interest Related Claim." (Second Amended Plan, at 7.)  The PSA Claims are defined as "any Claim arising from the rejection or termination of a PSA . . . ." (Second Amended Plan, at 11.)

According to the Debtors, the Committee and Starwood, the reason for this separation was the desire to pay in full the on-island vendors, local utility providers, and the Government of Anguilla in order to "ensure the continued success of the Viceroy

Anguilla." (Joint Omnibus Response, at 7, ¶ 13.)   The Debtors
believed that these creditors were vital to continuing operations
at the Viceroy Anguilla; in contrast, according to the Debtors,
"while the successful sale of Residential Properties is ultimately
critical to the overall financial success of the resort, the
continued, successful operation of the resort does not depend on
any particular residential sale." (Joint Omnibus Response, at 7, ¶
14.) As distributions under the Plan are to be financed by what the
Debtors and the Committee call a finite "gift" from Starwood, the
Debtors chose to put the critical vendors into a separate class of
General Unsecured Creditors (Class 5) that would have priority over
the PSA Creditors' claims (Classes 6 through 8).

Unlike the Original Plan, the Second Amended Plan further
divides the category of PSA Creditors into three separate tiers.
The first priority tier, Tier 1, is defined as follows:

> PSA Claim (Tier 1) shall mean Claims arising from certain
> PSAs that were expressly and unconditionally terminated
> prior to the Petition Date pursuant to the terms of such
> PSAs requiring that the closing (or conditions to close)
> on the purchase of the corresponding unit was to occur by
> a date certain without regard to force majeure, causes
> beyond Barnes Bay's control or any other reason.

(Second Amended Plan, at 11.)   Tier 2 Claims are those

> arising from pending or threatened prepetition litigation
> relating to a PSA that either (i) resulted in the entry
> of a Consent Judgment or out-of-court settlement agreed
> to by Barnes Bay and the corresponding PSA Creditor, or
> (ii) was subjected to a standstill agreement executed by
> Barnes Bay and such PSA Creditor prior to the Petition
> Date.

(Id.)  Finally, Tier 3 Claims are those PSA Claims that do not fall into Tiers 1 or 2. (Id.)

Debtors submit that the rationale for the classification of the PSA Claims into three tiers is Starwood's assessment of its potential exposure from each class of PSA Creditors.  Tier 1 PSA Creditors, whose sales contracts gave the purchaser the unconditional right to terminate upon Barnes Bay's failure to deliver the property by a certain date, were perceived as having the "strongest arguments to support the alleged prepetition termination of their PSAs as well as potential claims against Starwood or certain parties that Starwood had previously indemnified . . . ." (Joint Omnibus Response, at 10, ¶ 22.) As a result, the Tier 1 Claims are given the option to receive a distribution of 50%.  Those creditors whose PSAs did not contain the unconditional right to terminate and who entered into settlement or standstill agreements with the Debtors after attempts to terminate were assigned to Tier 2/Class 7;these claims were perceived as less certain than the Tier 1 Claims. Tier 2 Creditors have the option to accept a distribution of 25%. All other PSA Creditors, whose contracts did not provide for unconditional termination and whose litigation efforts (if any) against the Debtors did not result in a standstill or settlement, can collect 15% of their claim.  These claims are deemed Tier 3/Class 8.

Simon and Viceroy filed this motion pursuant to Federal Rule of Bankruptcy Procedure 3013. (Doc. # 531). Both movants object to the classification of their respective claims as Tier 2 Claims, alleging instead that their claims should be classified as Class 6/Tier 1 Claims or Class 5/General Unsecured Claims. On August 4, 2011, a hearing was held on the motion and the Joint Omnibus Response to Rule 3013 Motions and Rule 3018 Motions filed by the Debtors, the Committee and Starwood (Doc. # 574, "the Joint Omnibus Response" or "the Response").  Following the hearing, counsel for Simon and Viceroy submitted a Post-Trial Memorandum. (Doc. # 604.) Debtors, the Committee and Starwood followed suit with a Joint Rule 3013 Brief submitted in response to Simon and Viceroy's post-trial memo. (Doc. # 624.)  Simon and Viceroy accordingly filed a Reply to the Joint Rule 3013 Brief. (Doc.f # 646.)

## Discussion

### Simon Claims & Arguments

Simon asserts two claims arising from two separate purchase and sale agreements. Simon entered into two PSAs for the purchase of two residential units, one for the price of $1,150,000 and the other for the price of $1,775,000, on May 21, 2005. (Movants' Exs. A & B.)  Pursuant to these PSAs, Simon paid $207,000 in deposit for the purchase of one unit, and a $319,500 deposit for the second unit. (Motion, at 5.)

Under section 4(a) of the PSAs, closing on the units was
to occur "on or about May, 2007, subject to delays beyond the
reasonable control of Seller." (Movants' Exs. A & B, § 4(a).)
Section 4(b) further provides for the extension of the closing date
beyond May 2007

> for delays which are outside of Seller's reasonable
> control, such as acts of God, inclement weather, labor or
> material shortages, . . . .  If Seller elects to extend
> Closing for any reason set forth in the proviso to the
> preceding sentence, Seller shall endeavor to provide
> Purchaser with notice of that election within ten (10)
> business days of the event giving rise to the extension
> right, together with a reasonably detailed explanation of
> the basis for such extension.

(Id. § 4(b).)  Simon and Barnes Bay signed two addenda to the PSAs,
also dated May 21, 2005. (Movants' Exs. C & D.)   The addenda
extended the outside date of completion to December 31, 2008.
Additionally, both addenda modified section 15(b) of the original
PSAs to read, in relevant part:

> Except for a failure to substantially complete the Unit
> and the Minimum Service Components on or before the later
> of the anticipated Closing date or two (2) years from the
> date hereof (the "Outside Date"), if Seller shall commit
> a material default under this Agreement before Closing
> which is not cured within fifteen (15) days after notice
> thereof is given by Purchaser to Seller, specifying the
> nature of such alleged default, then Purchaser's sole and
> exclusive remedy shall be termination of this Agreement
> by giving notice thereof to Seller prior to Seller curing
> such default, whereupon the Deposit(s) shall be returned
> to Purchaser . . . .  All other rights and remedies at
> law or in equity are hereby expressly waived, except that
> if  Seller's  default  consists  of  its  failure  to
> substantially complete the Property before the Outside
> Date or December 31, 2008, whichever is later (subject to
> delays caused by Purchaser or on account of causes due to
> force majeure or beyond Seller's control), Purchaser may

> either terminate this Agreement by giving notice thereof
> to Seller prior to Seller curing such default or maintain
> an action for specific performance.

(Movants' Exs. C & D, § 4.)  Neither addendum changed section 4 of the original PSA.

Barnes Bay failed to deliver the completed units by the revised closing date.  Simon then sent two letters to Barnes Bay notifying them that he was terminating the PSAs.  The first letter, dated March 27, 2009, alleges that Barnes Bay was in "material default of the Agreements for, among other reasons, failure to substantially complete the Units . . . ." (Movant's Ex. F.)  The second letter, dated September 8, 2009, asserts Simon's right to terminate in the event that Barnes Bay did not deliver the units on time.  Like the first letter, it alleges that Barnes Bay had materially breached the PSAs. (Movant's Ex. E.)  The second letter also invokes section 4(b) of the PSAs and states that Barnes Bay failed to give the notice required to extend the delivery date; consequently, according to the letter, Barnes Bay materially breached the PSAs[1], and Simon was entitled to terminate the contracts and receive a refund of his deposits.

Barnes Bay did not return Simon's deposits, and so Simon filed a claim against Barnes Bay in the Caribbean Supreme Court in

---

[1]It is not entirely clear from the second letter whether Simon is alleging that the failure to notify constitutes a material breach in and of itself, or whether such failure to notify simply means that the date to complete was not effectively extended.

the High Court of Justice (Anguilla Circuit) ("the Anguillan Court") on September 18, 2009. (Movants' Ex. G.) Simon's complaint sought the return of his deposits due to the failure of Barnes Bay to substantially complete and deliver the units by December 31, 2008; it further asserts that "between May 2007 and December 31st, 2008, no act of God or force majeur [sic] event occurred that could or would account for the Defendant's failure to substantially complete the Units." (Id. ¶ 18.)

On or around May 14, 2010, Simon and Barnes Bay entered into a Standstill Agreement. (Movants' Ex. S.) The agreement, which established a Standstill Period "beginning with the mutual execution of this Standstill Agreement and continuing until the date that is six (6) months after the date hereof," provided that both parties would cease taking further steps with regard to the pending litigation. Pursuant to the Standstill Agreement, a Consent Order staying the proceedings was entered in the Anguillan Court on May 27, 2010. (Movants' Ex. T.)

In light of the foregoing facts, Simon argues in the motion that the claim arising from his PSA should be treated as a Class 6/Tier 1 Claim, or in the alternative, as a Class 5 General Unsecured Claim under the Plan. Simon alleges that (i) the Debtors failed to deliver the completed units to him in accordance with the PSAs and Addenda; (ii) that the Debtors were in material default of the PSAs; and (iii) that his letters to Barnes Bay "effected an

unconditional and express termination" the PSAs. (Post-Trial Memorandum, at 13.)  More specifically, Simon alleges that Barnes Bay did not seek to extend the closing/delivery date pursuant to the notice provisions in the PSAs; as a result, "the Debtor failed to cure the defaults, and Mr. Simon was entitled to terminate his PSAs" under both the material default provisions and the substantial completion provisions of amended section 15(b) of the PSAs. (Id.)

Simon also argues that the provisions of his PSAs are "indistinguishable" from the termination provisions of other PSA Creditors whose claims are specifically identified in the Disclosure Statement as Tier 1 Claims. (Id. at 14.)  Accordingly, he believes that his claims should also be classified as Tier 1 Claims.

In the alternative, Simon argues that his claims should be classified as Class 5 General Unsecured Claims.  Simon alleges that in the event that the Court does not find that his PSAs were terminated pre-petition, his PSAs will nonetheless be rejected by Debtors, as the Plan provides that "all PSAs shall be deemed rejected or terminated . . . ." (Plan, § 7.7.) Citing section 502(g) of the Bankruptcy Code[2], Simon argues that the rejection of

---

[2] Section 502(g)(1) provides that "a claim arising from the rejection ... of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed ... the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(g)(1).

his PSAs would entitle him to a general unsecured claim for rejection damages.   Further, Simon argues that these general unsecured claims would be "legally indistinguishable from the Class 5 General Unsecured Claims," and accordingly, his claims should be reclassified as Class 5 Claims. (Post-Trial Memorandum, at 19.)

Viceroy Claims & Arguments

On May 21, 2005, Viceroy entered into a PSA for the sale of one residential unit at a price of $1,995,000. (Movants' Ex. I) Like the Simon PSAs, Viceroy's PSA called for an original closing date of May 2007.  By an Addendum also dated May 21, 2005, the closing date was amended to December 31, 2008. (Movants' Ex. I; Debtor's Ex. 7.)  The original PSA and the Addendum contained the same sections 4 and 15(b) as the Simon PSAs and Addenda.

Barnes Bay did not deliver the completed units by December 31, 2008. As a result, on January 13, 2009, Viceroy sent a letter to Barnes Bay stating that Barnes Bay was in default of the PSA and that Viceroy was consequently terminating the agreement. (Movants' Ex. J.)  Barnes Bay did not return Viceroy's deposit, as demanded in the letter.  On July 31, 2009, Viceroy filed a complaint against Barnes Bay in the Anguillan Court, seeking the return of its deposit for the unit. (Motion, at 6.[3])

_____

[3] Movants' motion cites to Ex. K as the complaint, but no Exhibit K was submitted to the Court.

On August 15, 2009, Viceroy registered a caution against its unit in Anguilla. (Motion, at 6.)

Viceroy and Barnes Bay subsequently entered into a Settlement, Release and Consent Agreement ("the Settlement Agreement"), dated October 13, 2009. (Movants' Ex. L.) That agreement was made in contemplation of "any and all disputes, claims and controversies arising between the parties relating to (i) the Purchase Agreement; and (ii) any and all sums alleged to be accrued, due or owing to [Viceroy] pursuant to the Purchase Agreement, including . . . the Deposit . . . ." (Id. § 2.5.) The Settlement Agreement states that Barnes Bay had identified a potential third-party purchaser ("the Third Party Purchaser") for Viceroy's unit. As a condition precedent to "this Agreement and each and every provision, right and obligation contained herein," the deposit from the sale to the Third Party Purchaser was to be paid into an escrow account, and upon closing of the sale, the escrow agent was to pay to Viceroy an amount equal to Viceroy's deposit on the unit. (Movants' Ex. L, § § 3.2, 3.3.) The Settlement Agreement further provides that "in the event that the closing under the Third Party Agreement does not occur, then this Agreement shall be null and void and neither party shall have any further obligation to the other. . . . [I]n the event that this Agreement terminates pursuant to this Section 3.5, . . . (iii) the

Purchase Agreement shall not be terminated." (Movants' Ex. L, § 3.5.)

Sometime in November 2010, Viceroy and Barnes Bay executed an Amendment to the Agreement, which extends the date to close on the third-party purchase to February 28, 2011, and further provides that if "(i) the Third Party Purchase Agreement is terminated or (ii) the Third Party Purchase Agreement extension is not delivered as specified herein, Purchaser shall have the right to immediately terminate the Settlement Agreement and the Settlement Agreement . . . shall be of no further force or effect as of the effective date of said termination." (Ex. M, § 1.4.) As of the date of this motion, Barnes Bay had not closed on the third party purchase. (Post-Trial Memorandum, at 17.)  There is nothing in the record that shows whether Viceroy exercised its right to terminate the Settlement Agreement.

From these facts, Viceroy asserts first that its claim should be classified as a Tier 1 PSA /Class 6 Claim. In support of this assertion, Viceroy makes the following allegations: (i) Barnes Bay defaulted by failing to deliver the units by the closing date; (ii) Viceroy effected an "unconditional and express" termination of its PSA after the failure to deliver; (iii) the Settlement Agreement between Viceroy and Barnes Bay further evidenced Viceroy's termination of its PSA because the Agreement was meant to supersede all prior agreements between the parties, including the

PSA; (iv) the Settlement Agreement accordingly "nullifies" the PSA; and (v) since the PSA was terminated, Viceroy is entitled to at least a Tier 1 Claim. (Post-Trial Memorandum, at 17-18.)

In the alternative, Viceroy argues that its claim should be treated as a Class 5 General Unsecured Claim, and offers the following assertions in support of that argument: (i) the Debtors breached the Settlement Agreement, which entitles Viceroy to a general unsecured claim under section 502(g); (ii) Debtors intend to terminate or reject the Settlement Agreement, entitling Viceroy to a general unsecured claim under section 502(g); (iii) the Plan defines PSA Claims to be those "arising from the rejection or termination of a PSA"; and (iv), since the PSA Claim was superseded by the Settlement Agreement, Viceroy no longer holds a PSA Claim, as defined by the Plan, and thus its claim must be considered a Class 5 General Unsecured Claim. (Post-Trial Memorandum, at 18.)

Plan Proponents's Response

In response to the motion from Simon and Viceroy, as well as motions filed by other PSA Creditors, the Debtors, the Committee and Starwood filed a Joint Omnibus Response to address the reclassification issue.  (The Debtors, the Committee and Starwood will hereinafter be referred to as "Plan Proponents".)  Plan Proponents argue that Simon's and Viceroy's claims are properly classified as Tier 2/Class 7 Claims.

With regard to the classification of the claims as Tier
1 Claims, Plan Proponents point to the definition of Tier 1 Claims
found in the Plan.  They point out that the PSAs of those PSA
Creditors classified as Tier 1 Creditors provide "an unqualified
right to terminate the PSA based on the Debtors' failure to close
on the sale of the corresponding Residence Property on or before
the specified date." (Response, at 15, ¶ 32.) In contrast, the PSAs
executed by Simon and Viceroy do not contain such language; rather,
their PSAs provide that the deadline is subject to delays caused by
force majeure or circumstances beyond Barnes Bay's control.  Plan
Proponents also allege that Debtors "suffered substantial delays in
the construction of the Property due to a variety of factors,
including two hurricanes and various labor strikes. . . .
Accordingly, the Debtors take the position that the purported
terminations of the Tier 2 and Tier 3 PSAs "may have been
preemptive in nature, and not necessarily permitted under the terms
of the respective PSAs." (Id. at 16, ¶ 35.)

With regard to the arguments that Simon's and Viceroy's
claims should be classified as Class 5 General Unsecured Claims,
Plan Proponents again assert that the movants' claims are properly
classified.  Plan Proponents argue that while "each of the movants
holds an unsecured claim against the Debtors' estates . . . they
clearly do not (nor are they intended to) fall within the
definition of a General Unsecured Claim." (Response, at 12, ¶ 26.)

Plan Proponents assert that "[p]lan proponents typically enjoy broad discretion in classifying claims"; accordingly, the Debtors defined Class 5 General Unsecured Claims to expressly exclude PSA Claims. (Id. at 12-13, ¶ ¶ 27-28.)  Plan Proponents further assert that "separate classification of substantially similar unsecured claims is permissible so long as there is a reasonable basis for doing so and the decision to separately classify is not motivated solely for the purpose of gerrymandering." (Id. at 13, ¶ 28, citations omitted.) Lastly, Plan Proponents urge that any arguments that the PSA Claims and General Unsecured Claims should be treated as a single class is a separate issue relating to the "fundamental propriety of the Plan classification scheme" and thus should be determined at the confirmation hearing. (Response, at 14, ¶ 29.)

        More generally, Plan Proponents stress the rationale underlying the classification of claims as outlined in the Plan. As noted above, Plan Proponents allege that the classification system was the result of Starwood's assessment of its exposure with respect to each type of creditor.  The General Unsecured Creditors were those deemed most necessary to the continued success of the Viceroy Resort, and the PSA claimants were classified based on the perceived strength of their arguments that they were entitled to the return of their deposits.

<u>Simon's Claims as Tier 1 Claims</u>

Simon's submitted PSA Claims have been classified by Debtors as Class 7/Tier 2 PSA Claims. Simon argues that his claims should be in Tier 1 because he "expressly and unconditionally" terminated the agreements after Barnes Bay materially defaulted by failing to deliver the completed properties by the closing date.

In posing this argument, Simon fails to recognize that the Plan's narrow definition of the Tier 1 category turns solely on whether the PSAs give the purchaser an unqualified right to terminate.  As the Plan provides, only those purchasers whose PSAs lack conditional language have claims entitled to Tier 1 status:

> PSA Claim (Tier 1) shall mean Claims arising from certain PSAs that were expressly and unconditionally terminated prior to the Petition Date pursuant to the terms of **such PSAs requiring that the closing (or conditions to close) on the purchase of the corresponding unit was to occur by a date certain without regard to force majeure, causes beyond Barnes Bay's control or any other reason**.

(Plan, at 11, emphasis added.) The classification, then, turns not on whether the PSAs were expressly and unconditionally terminated, but on whether they included language requiring the closing to occur by a set date, without regard to any possible excuse for Barnes Bay.

Simon's PSAs clearly contain conditional language in amended section 15(b) and in section 4 (which was not changed by the Addenda) of the original PSAs  Section 4(a) provides that "Seller intends that the Closing shall occur on or about May 2007,

**subject to delays beyond the reasonable control of Seller.**" (Movants' Exs. A & B, emphasis added.) The amended section 15(b) allows the purchaser to terminate or seek specific performance "if Seller's default consists of its failure to substantially complete the Property before the Outside Date or December 31, 2008, whichever is later (**subject to delays caused by Purchaser or on account of causes due to force majeure or beyond Seller's control)** . . . ." (Movants' Exs. C & D, emphasis added.)   Simply put, Simon's PSAs do not grant him an unqualified right to terminate, because the December 31, 2008 deadline is expressly subject to delay for events outside Barnes Bay's control. Thus, Simon's claims are not entitled to Tier 1 status. It is irrelevant whether Simon's attempts to "expressly and unconditionally" terminate the PSAs were successful because his claim does not fit the plain-language definition of a Tier 1 Claim.


Viceroy's Claim as a Tier 1 Claim

        Likewise, Viceroy's claim is not entitled to Tier 1 status.  Viceroy's PSA contained the same conditional language in sections 4 and 15(b). Accordingly, any claim arising from its termination would not fit the Plan's definition of a Tier 1 Claim. Whether the PSA was effectively terminated makes no difference. The fact that Viceroy entered into a Settlement Agreement is equally irrelevant.  The Settlement Agreement does not change the

language of the original PSA, and that language is the only determinant of Tier 1 status. Thus, Viceroy has no Tier 1 Claim.

The rationale underlying the separation of the PSA Claims into tiers is based on Starwood's assessment.  Tier 1 Creditors were those seen as having the strongest argument that they were entitled to their deposits, as their contracts expressly gave them an unqualified right to terminate upon non-delivery.  Those contracts containing conditional language were less certain claims, since the contracts gave Barnes Bay a possible excuse for delay due to causes outside its control.  Whether Starwood's assessment of the strength/weakness of the various PSA Creditors' positions is rational will be an issue addressed at the confirmation hearing.

Simon's and Viceroy's Claims as General Unsecured Claims

In addition to arguing that their claims should be treated as Tier 1 Claims, movants Simon and Viceroy allege in the alternative that their claims should be classified as General Unsecured Claims and placed into Class 5. In making this argument, Movants urge the Court to consider whether a claim arising from the post-petition rejection of an executory contract can be properly classified as anything other than a "general unsecured claim." Essentially, they are asking the Court to determine whether the Debtors' separation of general unsecured claims into four separate classes is inappropriate.  Such an inquiry should not be determined

at a Rule 3013 hearing; rather, it is an issue best reserved for the confirmation hearing.

From the plain language of the Plan, then, it is clear that Simon's and Viceroy's claims are properly classified as PSA Claims, and do not fit the definition of General Unsecured Claims. The Plan defines General Unsecured Claims to expressly exclude PSA Claims; PSA Claims are those "arising from the rejection or termination of a PSA."

Simon alleges that he terminated his PSAs or, in the alternative, that his PSAs will be rejected under the Plan; in either case, his resulting claim clearly arises from the rejection or termination of his PSAs. As a result, his claim is properly classified as a PSA Claim.

Viceroy argues that its claim is no longer a PSA Claim since its PSA was nullified by the Settlement Agreement. The Settlement Agreement was made to resolve the dispute over whether Viceroy had a right to terminate its PSA; thus, any claim from the rejection or termination of the Settlement Agreement can be said to arise from the termination or rejection of a PSA. Viceroy's claim is a PSA Claim and not a General Unsecured Claim.

## Conclusion

For the reasons stated above, Simon's and Viceroy's motion to reclassify is denied.