## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Barnes Bay Development Ltd., *et al.*, | : | Case No. 11-10792 (PJW) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | **Hearing Date: August 24, 2011 at 2:00 p.m.** |
| | : | **Related to Docket Nos. 378, 442 & 467** |
| | : | |
| | : | |

## OBJECTION OF GARY TILKIN, GLOBAL FUTURES AND FOREX, LTD., SANDRA E. TAYLOR AND 22 BOND STREET TO CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION

Gary Tilkin, Global Futures and Forex, Ltd., Sandra E. Taylor and 22 Bond Street

(collectively, the "Objecting Creditors") by and through their undersigned counsel, Potter

Anderson & Corroon LLP, submit this objection (the "Objection") to confirmation of the Second

Amended Joint Plan of Liquidation [D.I. 378] (as subsequently modified, the "Plan").[1]  In

support of the Objection, the Creditors respectfully state as follows:

### INTRODUCTION

*Under the Bankruptcy Code you're either a secured creditor or you're an unsecured creditor, period, full stop. Certain unsecured creditors get to move to the front of the line because they hold priority claims afforded a priority in the Bankruptcy Code. The fact that your claim is unsecured because it arose out of a rejection of a PSA claim, arose out of a rejection of an executory contract, or if it's unsecured because you effectively terminated the claim before the* bankruptcy, it doesn't matter.

August 4, 2011 Hearing Transcript[2] ("8/4/11 Tr."), at 95:9–17 (comments of Debtors' counsel) (attached as Exhibit A to the Declaration of R. Stephen McNeill in Support of Objection of Gary Tilkin, Global Futures and Forex, Ltd., Sandra E. Taylor and 22 Bond Street to Confirmation of the Second Amended Joint Plan of Liquidation (the "McNeill Declaration"))

---

[1]    Capitalized terms not defined herein shall have the meanings provided to them in the Plan.

[2]    At the August 4, 2011 hearing on the motions of certain creditors pursuant to Rule 3013 to reclassify their claims (the "August 4, 2011 3013 Hearing").

That is a simple and true summary of one of the fundamental principles of the Bankruptcy Code. Unfortunately, the Debtors, the Committee and Starwood pay no heed to the principle. Instead, their Plan divides unsecured creditors into four classes with recoveries that range from 100 cents for General Unsecured Creditors to 15, 25 and 50 cent recoveries for holders of PSA Claims[3] ("PSA Claimants"). The justifications for discriminating among unsecured creditors are arbitrary and capricious. Indeed, the boundaries are so lacking in merit that after multiple hearings before this Court, thousands and thousands of pages of documents and multiple depositions, neither the Debtor, the Committee nor Starwood will take responsibility for the structure of the tier system among PSA Claimants:

The Committee, at the August 4, 2011 3013 Hearing:

> Starwood perceived the differences between exposure the tier 1 guys if they didn't get satisfied and they wanted to sue, tier 2 guys if they didn't get satisfied and they wanted to sue and tier 3 guys who if they didn't get satisfied and wanted to sue, and they made settlement offers accordingly. 8/4/11 Tr. at 28:6–10.

> * * *

> The issue for classification purposes was ... what are any of the [PSA Claimants] ultimately going to cost you, Starwood, if we don't settle. Where are you going to be exposed? Who's got the better lawsuit either against you, Starwood, or against one your indemnitees? That's the evidence you'll hear on classification. *Id.* at 33:11–17.

> * * *

> [T]he controlling issue is Starwood's perception of its exposure. That's what justified the classifications, whether [the movants at the August 4, 2011 3013 Hearing] like it or not.

The Debtors at the August 9, 2011 Deposition of the Debtors' Federal Rule of Civil Procedure ("FRCP") 30(b)(6) Designee:

> Q. Do you have any knowledge as to how the definitions for the tiers were formulated?
> A. Generally this was a proposal from the unsecured creditors committee.

---

[3]    While this Objection uses the nomenclature set forth in Plan, as discussed *infra*, all creditors in Classes 5, 6, 7 and 8 hold general unsecured claims against the estate.

Deposition of Debtor by its Fed. R. of Evid. 30(b)(6) designee, Chief Restructuring Officer Kevin Nystrom, August 9, 2011 (the "Debtors' Deposition") at 47:17–21 (attached to the McNeill Declaration as Exhibit B).

- - -

Q. Do you have any understanding from your dealings with the unsecured creditors committee how that concept came up?
A. No.
Q. This was not something that the debtors requested?
A. Correct.
Q. It was not something Starwood requested?
A. Right, Starwood has to speak for themselves, I don't know.
Q. To your knowledge?
A. To my knowledge, no.

Debtors' Deposition at 48:4–16.

Starwood at the August 10, 2011 Deposition of Starwood's FRCP 30(b)(6) Designee

Q. Whose suggestion was it to set up the tier structure?
A. The initial suggestion came from the Committee.
Q. Was it any particular Committee member or group of Committee members or was it through Committee counsel?
A. Counsel.

Deposition of SOF-VIII-Hotel II Anguilla Holdings, LLC by its Fed. R. of Evid. 30(b)(6) designee, James Raved, August 10, 2011 (the "Starwood Deposition") at 31:24 to 32:5 (attached to the McNeill Declaration as Exhibit C).

The Committee at the August 12, 2011 Deposition of the Committee's 30(b)(6) Designee

Q. And who came up with the tier system?
MR. DASH: Object to the form.
A. I don't know the genesis of it, but I know that I was informed that --
MR. DASH: The witness is cautioned not to disclose any information received from counsel to the Committee.
A. Okay. I learned of it in connection with the settlement between debtors Starwood and counsel for the Committee.

Deposition of the Committee by its Fed. R. of Evid. 30(b)(6) designee, Adam Wegner of Exclusive Resorts, Co-Chair of the Committee, August 12, 2011 (the "Wegner Deposition") at 84:9–24 (attached to the McNeill Declaration as Exhibit D).

- - -

Q. So somebody provided you with the amended the plan, it had the tier structure in place?
A. Described it to me initially.

3

Q. And do you know if it was the debtors that came up with that?

*Id.* at 85:21 to 86:2.

- - -

MR. DASH: Object to the form.

A. I don't know who first, what individual or group first proposed a tier structure. I learned of it in connection with the debtors Starwood and Committee all agreeing on an approach.

*Id.* at 86:8–15.

It is not surprising that all parties are unwilling to take responsibility for a plan classification and distribution scheme that blatantly discriminates among identically situated creditors.

This Plan is not a gift plan. It is a plan designed to accomplish two goals: (i) transfer the development to Starwood; and (ii) allow Starwood to purchase a settlement and release of claims against itself and the many insiders and affiliates of the Debtors that Starwood chose to indemnify. Neither objective is impermissible *per se* under the Bankruptcy Code. In pursuing those goals, however, the Debtors, the Committee and Starwood are required to abide by the principles, language and policies of the Bankruptcy Code.

The primary failure of this Plan is that the proceeds from Starwood's settlement are not shared equally among unsecured creditors. Instead, the Committee, Starwood and the Debtors chose to reward some creditors at the expense of others. Most distressing is that Committee members benefitted most from the settlement, far more than the vast majority of their fellow general unsecured creditors whose interests the Committee was charged with a duty to protect. As Starwood noted during the negotiations:



E-mail from James Raved of Starwood to Adam Wegner, Executive VP of Exclusive Resorts and co-chair of the Committee, May 3, 2011 (attached to the McNeill Declaration as Exhibit E).

There is no legally cognizable difference among the claims of the PSA Claimants. They are all general unsecured creditors who are owed a refund of their deposits under the PSA Agreement—whether those contracts terminated automatically, were terminated by a PSA Creditor pursuant to the terms of their agreement, or are terminated by the Debtors' rejection of the PSA Agreement. The Debtors scheduled each of those claims as unsecured claims for the deposit amount on their Schedule F. There is no notation on Schedule F that some of PSA Claims are less unsecured than others—the novel proposition incorporated into the Plan.

Given the manufactured distinctions among PSA claims and the disparate recoveries, it is not surprising that Tier 3 PSA Claimants electing the distribution option have overwhelmingly voted to reject the Plan and have filed objections to it. But, there is an easy fix. Under the Plan, $12,694,636.80 (the "PSA Pot") is currently allocated to PSA Claimants as follows:

- Estimated Tier 1 claims of $11,488,500 with a 50% distribution yields a total distribution of $5,744,250 (Disclosure Statement in Support of Second Amended Joint Chapter 11 Plan of Liquidation (the "Disclosure Statement") at 4).

- Estimated Tier 2 claims of $7,514,400 with a 25% distribution yields a total distribution of $1,878,600 (Disclosure Statement at 4).

PAC 1022855v.5

- Estimated Tier 3 claims of $33,811,912 with a 15% distribution yields a total distribution of $5,071,786.80 (Disclosure Statement at 4)

The simple math is that if the PSA Pot were shared *pari passu* (i.e. if the Plan were fair and equitable and did not discriminate among PSA Claimants) each PSA Claimant would receive a 24 cent recovery. Under this scenario, only the four Tier 1 PSA Claimants would see a dramatic decrease in their recoveries from the current Plan.[4]

The disparate and discriminatory treatment among creditors with claims of equal priority and validity cannot pass muster under the scrutiny of the plan confirmation process. The PSA tier system does not satisfy the fair and equitable standard or the good faith standard. This Plan is unconfirmable under sections 1123(b)(3)(A), 1129(a)(3), 1129(a)(4) and 1129(b)(2) of the Bankruptcy Code.

## BACKGROUND

### The Objecting Creditors Claims

The Objecting Creditors' claims arise from certain purchase and sale agreements with the Debtors for units on the Viceroy Anguilla Resort and Residences (the "Property"). The Objecting Creditors, along with other nearly identically situated creditors are generally referred to by the Debtors as PSA Creditors in the Plan.

On November 30, 2005, Mr. Tilkin entered into that certain Purchase and Sale Agreement with the Debtors wherein he agreed to purchase Villa No. 1 located on the Property for the purchase price of $6,450,000. That same day he paid a deposit of $1,290,000 toward

---

[4]     The math further serves to highlight the inequities in the Plan. The *pari passu* distribution is essentially neutral as to the Tier 2 PSA Claimants who would receive a 24 cent distribution in a *pro rata* plan rather than the current 25 cents (or $75,000 in the aggregate). Thus, only the four Tier 1 PSA Claimants benefit from this tier system at the expense of the 58 Tier 3 PSA Claimants.

Villa No. 1.  Subsequently, he paid a second deposit of $1,290,000 toward Villa No. 1.  Mr. Tilkin is listed in the Debtors' amended schedules as holding an unsecured non-priority claim in the amount of $2,577,400.

On February 27, 2006, Mr. Tilkin entered into a second purchase agreement, wherein he agreed to purchase Unit G102 for $2,362,500.  Mr. Tilkin paid a deposit of $472,500 toward Unit G102.

Subsequently, Mr. Tilkin decided to "upgrade" and, on behalf of Global Futures & Forex, Ltd. ("GFF"), entered into that certain Purchase and Sale Agreement with the Debtors wherein he agreed to purchase Penthouse H located on the Property for the purchase price of $4,160,609.30.  Mr. Tilkin was permitted to apply his deposit toward Unit G102 toward his total deposit of $832,121.86 toward Penthouse H.  GFF is listed in the Debtors' amended schedules as holding an unsecured non-priority claim in the amount of $832,122.

On May 27, 2006, Ms. Taylor entered into that certain Purchase and Sale Agreement with the Debtors whereby she agreed to purchase Unit K101 for the purchase price of $2,175,000.  That same day, Ms. Taylor entered into that certain Purchase and Sale Agreement with the Debtors wherein she agreed to purchase Unit K102 for the purchase price of $1,050,000.  Ms. Taylor paid a deposit of $391,500 toward the purchase of Unit K101 and $189,900 toward the Purchase of K102.  She is listed in the Debtors' amended schedules as holding two unsecured non-priority claims in the amount of $388,900 and $186,400.13.

In February 2010, Mark Faist, on behalf of 22 Bond Street, LLC ("22 Bond Street"), entered into that certain Purchase and Sale Agreement with the Debtors wherein he agreed to purchase Unit K203 located on the Property for the purchase price of $2,500,000.  22 Bond Street paid a deposit of $500,500 toward the purchase of Unit K203.  22 Bond Street is listed on

7

the Debtors' amended schedules as holding a unsecured non-priority claim in the amount of $500,500.

Like most, if not all, PSA Creditors in this case, the Debtors breached the Objecting Creditors' PSAs by failing to timely deliver their respective units. Each of the Objecting Creditors' sent termination notices to the Debtors prior to the Petition Date. [5] Further, 22 Bond Street filed a Caution against Unit K 203 under Anguillan law on January 25, 2011, and Ms. Taylor filed a Statement of Claim against the Debtors in the Eastern Caribbean Supreme Court in the High Court of Justice (Anguilla Circuit) on February 10, 2011. [6] Notwithstanding their express and unconditional pre-petition terminations, each of the Objecting Creditors' claims are classified in Class 8 (Tier 3 PSA Claims) pursuant to the Plan.

The History of the Debtors' Cases

On March 17, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The principal operating company of the Debtors' Property was and continues to be Debtor Barnes Bay Development Ltd. ("Barnes Bay"). Barnes Bay is wholly owned by Debtor Kor Duo Investment Partners II, LP ("KDIP"). Debtor Kor Duo II, LLC ("Kor Duo"), the general partner of KDIP, is managed by its managing member, Bradford Korzen (together with KDIP, Kor Duo, and affiliates, the "Korzen Entities"). Lubert-Adler Partners and various of its affiliates

---

[5]    Letter from Duke Keller Jr., on behalf of 22 Bond Street and Mark Faist Terminating Purchase and Sale Agreement (Dec. 23, 2010) (attached to the McNeill Declaration as Exhibit F); Letter from Sandra Taylor to Brad Korzen Terminating Purchase and Sale Agreement (Oct. 12, 2010) (attached to the McNeill Declaration as Exhibit G); Letter from Robert Cooper, on behalf of Gary Tilkin, to Phillip Day Terminating Purchase and Sale Agreements (Aug. 27, 2010) (attached to the McNeill Declaration as Exhibit H).

[6]    Caution in Favor of Mark Faist, Anguilla Registered Land Act (Jan. 25, 2011) (attached to the McNeill Declaration as Exhibit I); Taylor v. Barnes Bay Dev. Ltd., Claim No. AXA HCV 2011/00 (E. Carib. Sup. Ct. Feb. 10, 2011) (attached to the McNeill Declaration as Exhibit J).

(collectively, "Lubert-Adler") are limited partners of Kor Duo and guarantors of approximately $6.4 million of purchase deposits in connections with assorted PSAs.

The day before the Petition Date, Mr. Korzen personally guaranteed payment of any losses incurred by SOF-VIII-Hotel-II Anguilla Holdings, LLC ("Starwood") for specified acts during a five-year period. On the same day, Starwood entered into the Indemnification Relating to Barnes Bay Development, Ltd. Restructuring (the "Indemnity Obligations") for the benefit of the Korzen Entities, Lubert-Adler, and the Viceroy Entities (the "Indemnified Insiders"), pursuant to which Starwood agreed to indemnify and hold harmless the Indemnified Insiders from and against: (i) any losses in connection with the guarantees they gave of repayment of the PSA deposits (the "Guaranty Claims") in an amount not to exceed $5,171,050; and (ii) certain other losses arising in connection with those PSA's in an amount not to exceed $41 million.

On March 31, 2011, the Office of the United States Trustee formed the official committee of unsecured creditors (the "Committee").[7] Almost immediately following its formation, the Committee noticed depositions of the Debtors and their officers, including Mr. Korzen. The Committee also noticed depositions of Starwood and Dean Adler (one of the principals of Lubert-Adler).

After only taking the deposition of Mr. Korzen, the Committee filed the Motion of the Official Committee of Unsecured Creditors to appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2) [D.I. 108] (the "Trustee Motion") asserting that "the Debtors are hopelessly conflicted and quite obviously have been bought off to do Starwood's

---

[7]    The Committee was comprised of the following members: Exclusive Resorts Real Estate Holding II, LLC ("Exclusive Resorts"); World Class Pools; Joel Greenberg and Mary Gringlas; Carillion Construction (West Indies) Ltd.; and Jacob Stepan. Exclusive Resorts and Mr. Stepan were selected as Committee co-chairs. World Class Pools resigned from the Committee after the settlement and payment of its claim.

bidding." *Id.* at ¶ 1. The Court held one day of testimony on May 6, 2011 and then adjourned further testimony until May 13 2011.

Rather than continuing to litigate the Debtors' gross conflicts of interest, the Committee chose to settle with Starwood and the Debtors and became a co-proponent of the Plan. In doing so, the Committee created its own disabling conflicts. The Committee proposed a discriminatory plan structure that disproportionately benefitted the majority of Committee members at the expense of the vast majority of unsecured claims:

- General Unsecured Creditors (i.e. trade creditors) (2 of the 5 Committee members)—100 cents;

- Tier 1 PSA Claimants (4 creditors totaling $11.5 million in claims, including 2 more of the 5 Committee members)—50 cents;

- Tier 2 PSA Claimants (11 creditors totaling $7.5 million in claims)—25 cents; and

- Tier 3 PSA Claimants (58 creditors totaling $34 million in claims)—15 cents.

The settlement incorporated into the Plan creates arbitrary distinctions among PSA Claimants, all of whom possess the same claim with the same legal rights—an unsecured claim for return of deposit monies. Tier 1 PSA Claimants allegedly possess contracts that automatically terminated pre-petition. Tier 2 PSA Claimants commenced litigation in Anguilla which resulted only in standstill agreement with the debtors, not any judgment or lien rights. Tier 3 PSA Claimants are all others, including claimants who terminated their contracts and/or commenced litigation in Anguilla.

## OBJECTION

The Plan cannot be confirmed because it is the product of a tainted settlement process that rewards those creditors with a seat at the table at the expense of those creditors who were not. Moreover, the Plan fails to satisfy the requirements of section 1129(a) of the Bankruptcy Code, which provides that "the court shall confirm a plan only if all the following requirements are met . . . ." 11 U.S.C. § 1129(a).

As Plan Proponents, the Debtors and Committee bear the burden of establishing by a preponderance of the evidence that the Plan complies with each of the confirmation requirements of section 1129(a) of the Bankruptcy Code. *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003). Further, the Bankruptcy Court has an independent duty to determine whether a plan proponent has met its evidentiary burden under section 1129(a) of the Bankruptcy Code prior to entering a confirmation order. *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003).

Despite the Plan Proponents' recent allegations to the contrary, the Plan is not the result of a gift by Starwood. Rather, it is the result of an improper settlement between the Plan Proponents and Starwood, which cannot be confirmed because it (i) does not comply with the applicable provisions of the Bankruptcy Code, in violation of section 1129(a)(1), (ii) was not proposed in good faith, in violation of section 1129(a)(3) of the Bankruptcy Code, and (iii) contains nonconsensual releases of non-debtor third parties without satisfying the requirements for such releases under this Court's precedent. Moreover, in a cramdown situation such as the one here, the Plan cannot be confirmed because it discriminates unfairly among similarly situated creditors and is not fair and equitable in violation of section 1129(b)(1) of the Bankruptcy Code.

PAC 1022855v.5

I.      **The Settlement is Not Fair or Equitable and Cannot be Approved Under Section 1123(b)(3)(A) of the Bankruptcy Code**

This Plan is not a gift Plan.  This Plan is a settlement among Starwood, the Committee and the Debtors.[8]  Their assertions to the contrary are at odds with the Plan documents and the testimony of the parties.  Starwood's contribution to this Plan is a settlement payment.  In exchange for its settlement payment, Starwood is receiving consideration.  Starwood is purchasing releases of Starwood and affiliates of the Debtors which Starwood agreed to indemnify or to whom it has otherwise guaranteed payment of certain obligations.[9]  *See* Plan § 9.7 (granting releases to, among others, the Indemnified Insiders).  Starwood also is purchasing a release by the Committee of not only the litigation the Committee had commenced, but that the Committee was threatening to bring.

> The Committee is 100% behind this plan and to the extent the plan is not confirmed, obviously the Committee has reserved its rights, as your honor is aware, in the DIP order to go ahead, and, you know, bring appropriate action whether it be for re-characterization and cross-subordination and even a numbers of remedies against the lender.  But for all intents and purposes, your Honor, the Committee has voted to support the <u>settlement</u> with the lender . . . .

---

[8]      To the extent the Court finds that the distributions under the Plan were a gift from Starwood instead of consideration for the release of potential estate causes of action against Starwood and the Indemnified Insiders, such a gift is improper because it violates section 1129 of the Bankruptcy Code.  In light of the Third Circuit's holding in *In re Armstrong World Indus.*, 432 F.3d 507 (3d Cir. 2005) and the Second Circuit's recent pronouncement in *Dish Network Corp. v. DBSD North America Inc.* (*In re DBSD North America, Inc.*) 634 F.3d 79 (2d Cir. 2011), a gift that contemplates a distribution under a Plan is invalid if the Plan does not comport with the requirements of section 1129 of the Bankruptcy Code.  For additional arguments on why any purported gift from Starwood would be improper in this context, the Objecting Creditors refer the Court to the Objection to Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 626] (the "Tier 3 Objection"), at ¶¶ 45–55, which the Objecting Creditors adopt and expressly incorporate herein.

[9]      The Objecting Creditors understand that the Plan Proponents intend to modify the release provisions and re-solicit votes on the Plan.  The Objecting Creditors reserve all rights to argue at the confirmation hearing that the modified release and exculpation provisions are inappropriate for any reason, including those set forth by other objectors.  *See, e.g.*, The United States Trustee's Objection to the Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 621], at ¶¶ 13–23; Mark Frederickson, Elliot Eichner, David Sonnenblick, Grant Gibson and Kim Evans' Objection to Confirmation of the Debtors and Committee's Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 629] (the "Tier 2 Objection"), at ¶¶ 81–84.

June 30, 2011 Hearing Transcript at 28:24 to 29:6 (comments of Committee counsel) (emphasis added) (attached to the McNeill Declaration as Exhibit K).

The Committee testified that Starwood's contribution to the Plan and the tier system used to distribute that contribution was the result of a settlement. Wegner Deposition at 84–85. Accordingly, the Plan classification system "first arose sometime during the period in which the Plan was initially created and then was refined as part of a Plan that Debtors hoped would be accepted by the requisite number of voting parties. Hence it is a settlement." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 834 (Bankr. D. Del. 2008). The consequence of the tier system being a part of a settlement embodied in a plan is that the settlement must pass muster under the fair and equitable standard pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). The standards for approving settlements set forth in a plan are the same as the standards for approving settlements pursuant to Bankruptcy Rule 9019. *See Nutritional Sourcing*, 398 B.R. at 832; *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 167 (Bankr. D. Del. 2008). Accordingly, when evaluating the settlement, the Court must determine that the proposed compromise it contains is "fair and equitable." *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003).

> To determine whether a settlement is fair and equitable, Third Circuit courts consider four factors: '(1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors.

*Nutritional Sourcing*, 398 B.R. at 832 (quoting *In re New Century TRS Holdings*, 390 B.R. at 167). While these four factors establish the baseline for the analysis, "Third Circuit courts have

13

made clear that 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise' should be considered as well."[10] *Id.* at 833 (quoting *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (Bankr. D. Del. 1998)).    Importantly, when evaluating settlements under the fair and equitable standard, courts "look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle." *In re Nutraquest*, 434 F.3d 639, 645 (3d Cir. 2006).

This Court's prior decision in *In re Nutritional Sourcing Corporation* is particularly instructive in analyzing the settlement. In *Nutritional Sourcing*, this Court was presented with a dispute concerning the definition of "trade creditor" as used in the Debtors' plan. Although the Court acknowledged that two of the three applicable factors favored the approval of the settlement and the plan, the Court ultimately denied approval of the settlement.    One of the creditors objecting to the plan asserted that "the definition was *created* to unfairly redistribute value away from creditors who were rightfully entitled to it in an attempt to forge consensus for

---

[10]    Some of those factors include:

> (1) The balance between the likelihood of plaintiff's or defendant's success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.
> (2) The prospect of complex and protracted litigation if the settlement is not approved.
> (3) The proportion of the class members who do not object or who affirmatively support the proposed settlement.
> (4) The competency and experience of counsel who support the settlement.
> (5) The relative benefits to be received by individuals or groups within the class.
> (6) The nature and breadth of releases to be obtained by the directors and officers as a result of a settlement.
> (7) The extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud or collusion.

*In re Exide Techs.*, 303 B.R. 48, 67–68 (Bankr. D. Del. 2003) (quoting *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988)).    As demonstrated in greater detail below, these factors, especially factors (3), (5) and (6), also weigh against approval of the Settlement.

14

the plan among the major constituencies in this case." *Nutritional Sourcing.* 398 B.R. at 834 (emphasis in original).

This Court examined the alignment of interests of the parties taking part in the negotiations and concluded that six of the nine members had interests in reaching the definition of "trade creditor" that favored their own recoveries. *Id.* at 835. The parties "obviously had a motive in arriving at a narrow definition of 'trade creditor.'" *Id.* This Court determined that despite the official committee of unsecured creditors' fiduciary duties, "the composition of the Committee was such that the vast majority of the creditors on that Committee held interests aligned against the 'non-goods' trade creditors." *Id.* at 836. Ultimately, the Court denied approval of the settlement and confirmation because "those parties whose rights were severely adversely impacted were not afforded meaningful participation in the negotiations." *Id.* at 837. Because the "preeminent interests of creditors" is the paramount consideration in evaluating the fairness and equity of a proposed settlement, a "proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense." *Nutritional Sourcing*, 398 B.R. at 837 (quoting *In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997)).

This case presents the exact same scenario. The parties to the negotiations were Starwood, the Debtors and the Committee. The settlement provided that general unsecured creditors would receive 100 cent recoveries and tiered recoveries for PSA Claimants. The settlement employed highly technical, completely arbitrary, definitions designed solely justify favoring some unsecured creditors at the expense of the rest. Tier 3 Claimants, who hold the majority of unsecured debt, were adversely impacted.[11]    Starwood had no incentive to increase

---

[11]    Indeed, while Class 8 is larger in amount than Classes 5, 6 and 7 combined, only one of the five Committee Members was from that Class. Presumably, this was due to the fact that, much like in *Nutritional Sourcing*, none of the parties-in-interest were contemplating these highly technical distinctions among PSA Claimants when the

(continued...)

recoveries for Tier 3 Claimants.[12]    The Debtors' conflict between management's personal

interests and its duties to creditors has already been called into question by the Committee.  *See*

*generally* Trustee Motion (explaining in detail why the Debtors are "hopelessly conflicted" and

detailing how they "quite obviously have been bought off to do Starwood's bidding.").    One

Committee member expressly challenged the Debtors' conflicts in testimony before this Court.

> Q.    As a result of your involvement in this entire process from
> the time that you first entered into the purchase agreement through
> your time as a member of the Committee, do you have confidence
> that the Debtor is looking out for the best interest of the unsecured
> creditrs?
> A.    No.  I believe—this comes from not my experience as a
> lawyer, from my experience as a businessperson—that it's very
> difficult to serve two masters.  And my understanding is that as
> part of this bankruptcy proceeding the various people I just named
> from Mr. Adler, Brad Korzen personally, Citigroup, the developer,
> that everyone is being given releases, and that was agreed to by the
> debtor.    And given that the amount of the claims—I also
> understand that Brad signed personally on the loan to Citigroup,
> and that's also being released.  I feel that if you—that there's no
> way, given the amounts of conflicts that presented to Brad and
> others that they could possibly be representing the interests of the
> creditors.  When you're facing one hundred—multi-hundred—
> potentially one hundred million dollar personal claims and you
> can—which would throw your entire personal estate into
> bankruptcy, how could he possibly put that interest behind or look
> out for my interest when that's weighing so heavily on him?  I
> think it's very important that there be someone independent, an
> independent party, to explore all the claims and to decide whether
> those releases were proper.  It's a monumental conflict of interest
> that I would never put myself in, and I would never allow anyone

---

Committee was being formed.  *See Nutritional Sourcing*, 398 B.R. at 836 n.15 (indicating, as is the case here, that the negotiated definition was derived during the negotiations leading to the filing of the Plan).  Nonetheless, as a result of the classification system first proposed by the Committee and ultimately approved as a key component of the settlement, "the composition of the Committee was such that the vast majority of the creditors on that Committee held interests aligned against" the Tier 3 PSA Claimants.  *Id.* at 836.

[12]    In fact, Starwood likely envisioned a lower recovery for the vast majority of PSA Claimants as a benefit. PSA Claimants were given the choice of taking a small distribution for the deposit or getting full credit for the deposit if they chose to close on their unit.  The smaller the recovery for PSA creditors, the better the chance they might close on their unit instead.

> who worked for me to put themselves in. I mean, judges recuse
> themselves all the time.

May 6, 2011 Hearing Transcript (the "Trustee Motion Transcript"), Ex. G at 39:12 to 40:14
(Committee member Joel Greenberg testifying in support of the Trustee Motion) (attached to the
McNeill Declaration as Exhibit L).

Now it appears that the Committee, and several of its members, including Mr. Greenberg,
suffer from the same disabling conflict of interests that they accused the Debtors' management of
having. Four of the five Committee members were in the position of evaluating a settlement that
proposed dramatically better treatment for their own claims than the majority of other unsecured
claims. That is precisely the conflict Mr. Greenberg testified about.

Of the five Committee members, four benefitted disproportionately under the settlement.
Two members were general unsecured creditors that received 100 cent recoveries. Two more
were Tier 1 PSA Claimants that received 50 cent recoveries. Only one Committee member was
in the 15 cent Tier 3.[13] None was in the 25 cent Tier 2. The recoveries under the Plan placed the
members of the Committee in a clear conflict. They were asked to support a settlement that
greatly enhanced their own recoveries while the vast majority of creditors to whom the
Committee and its members owed a fiduciary duty received far less. The contemporaneous
emails of one Committee member, Exclusive Resorts, demonstrate that it was focused not only
the overall treatment of creditors, but ensuring that it obtained the recovery it desired. Exclusive
Resorts was clearly focused on their own recoveries in this case and thus, as Committee
members, supported a settlement that achieved a better result for themselves than the vast
majority of PSA Claimants. *See* E-mail from Steve Case of Exclusive Resorts to Barry
Sternlicht of Starwood (April 11, 2011) (attached to the McNeill Declaration as Exhibit M) and

---

[13]     Notably that Tier 3 creditor, Jacob Stepan, also filed an objection the Plan on the basis that the tier system
unfairly discriminated among PSA Claimants. *See* Tier 3 Objection n. 2.

E-mail from Adam Wegner of Exclusive Resorts to Sara Bayko of Exclusive Resorts (August 9, 2011) (attached to the McNeill Declaration as Exhibit N).   As the results show, Exclusive Resorts was successful in getting its recovery, but neglected to get a similar recovery for the majority of PSA Claimants.

It is questionable whether Committee members were even aware of the negotiation of the tier system, as the Committee's 30(b)(6) designee testified that he only "learned of it in connection with the settlement between debtors Starwood and **counsel for the Committee.**" Wegner Deposition at 84–85 (emphasis added); *See also* Deposition of Joel Greenberg, August 11, 2011 (the "Greenberg Deposition") at 78:22 to 79:17 (illustrating that Mr. Greenberg, as a member of the Committee, was unaware of the tier system's origins) (attached to the McNeill Declaration as Exhibit O).   The cumulative testimony of Starwood, the Debtors and the Committee makes it clear that the tier system was created by counsel for the Committee.   Most troubling is that from the viewpoint of Starwood during the negotiations, Committee counsel was primarily focused on enhancing the recovery of just one Committee member—Joel Greenberg.



James Raved of Starwood to Adam Wegner of Exclusive Resorts and co-chair of the Committee (May 3, 2011) (attached to the McNeill Declaration as Exhibit E).

Tier 3 and Tier 2 creditors, who comprise more than $41 million in claims and two-thirds of all unsecured debt lacked a voice or meaningful representation during the settlement negotiations.   That cannot reasonably be disputed.   As with the creditors in *Nutritional Sourcing*, they became aware that they were disadvantaged only after the settlement was

PAC 1022855v.5

fully negotiated and incorporated into the Plan. They stand to receive 15 or 25 cents on their unsecured claims while other creditors receive 50 or 100 cents on claims of the same nature and priority. That is not a fair and equitable settlement for Tier 3 Claimants.[14]  On that basis alone, the settlement must be rejected and confirmation of the Plan must be denied.

A.    **The Classification System Resulting From the Settlement Violates Sections 1129(a)(1) and 1122 of the Bankruptcy Code and Is Not in the Paramount Interest of Creditors**

The Plan inexplicably separates Class 5 General Unsecured Claims from the three classes of PSA Claims, and treats them significantly differently. Moreover, the Plan divides the PSA Claims into three distinct "Tiers": Class 6 PSA Tier 1 Claims, half of whom are Committee members, Class 7 PSA Tier 2 Claims, who had no members on the Committee and Class 8 PSA Tier 3 claims, which despite being larger (at least by amount) than Classes 5, 6 and 7 combined, only had one representative on the Committee. There is no meaningful legal difference among the claims in classes 5 through 8; all are general unsecured claims with no entitlement to priority of payment. Even more unfair is that all PSA Claimants have the exact same unsecured claim— return of their deposit.

In *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Par. Assocs.,* the United States Court of Appeals for the Third Circuit stated that "it seems clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." 987 F.2d 154, 158 (3d Cir. 1993). Instead, "the classification of the claims or interests must be reasonable." *Id.* (quoting *In re Jersey City Medical Ctr.,* 817 F.2d 1055, 1061 (3d Cir. 1987). Requiring the classification scheme to be reasonable prevents the plan proponent from

---

[14]    Indeed, the Court need look no further than voting results for the two Classes that receive the least under the settlement; both Class 7 and Class 8 have overwhelmingly voted to reject the Plan and the settlement embodied within it.

"construct[ing] a classification scheme designed to secure approval by an arbitrarily designed class of impaired claims even though the overwhelming sentiment of the impaired creditors was that the proposed reorganization would not serve any legitimate purpose." *Route 37*, 987 F.2d at 158.

In this Plan there are 4 classes of unsecured creditors:

- General Unsecured Creditors – presumably comprised mostly of trade creditors;

- Tier 1—PSA Claimants who have "drop dead" dates in the PSA Agreements.[15] However these PSA Claimants only hold unsecured claims as of the Petition Date for return of their deposits;

- Tier 2—PSA Claimants who commenced litigation for the return of their deposits and that litigation resulted in a standstill agreement with the Debtors. While most or all of these creditors would likely argue that the facts of litigation speak to their efforts at terminating the contracts, even if the contracts weren't terminated pre-petition, they are deemed rejected under the Plan. Either way, these PSA Claimants only hold unsecured claims as of the Petition Date for the return of their deposits.

- Tier 3—All other PSA Claimants. Some of these PSA Claimants, like 22 Bond Street and Ms. Taylor, terminated their contracts pre-petition. For those who did not, their contracts are deemed rejected under the Plan. Some of these PSA

---

[15]    To the extent the Debtors did not claim force majeure with respect to a PSA Creditor's agreement, the presence of a force majeure clause is irrelevant. If a closing date under a PSA contract with a force majeure clause came and went without force majeure being invoked, the contract terminated of its own terms; just like the Tier 1 contracts. For Tilkin and GFF, the Debtors never claimed force majeure. The same holds true for any other condition or out that the Debtors might have been able to invoke. If they weren't invoked before a closing date, then the conditions were waived and the contracts terminated of their own accord.

Claimants, like 22 Bond Street and Ms. Taylor, also commenced litigation in Anguilla. Regardless of those differences, they hold unsecured claims as of the Petition Date for the return of their deposits.

All PSA creditors have the same claim—for the return of their deposit. It is simply a contract claim that arises whether the contract is deemed breached through rejection; or if the contract was breached through non-performance; or if the contract terminated automatically; or if the PSA Claimant terminated the contract. They are all contract claims for the return of a deposit under the exact same type of contract—a PSA.

The Plan's purported distinction between the three Tiers of PSA claims is a distinction without a difference. The boundary lines defining Classes 6, 7 and 8 are overly technical and completely arbitrary.[16] All PSA Claimants will be former counterparties to rejected or terminated PSAs related to units at the Property who are seeking the return of their deposits. Accordingly, the PSA Claims are essentially indistinguishable and there cannot be a rational basis for their separate classification.

Similarly, any effort to classify claims on the basis of Starwood's assessment of its financial exposure to certain of the PSA Claimants does not provide the Plan Proponents with a legitimate business purpose for separate classification. Classifying creditors based on litigation exposure of third parties is not a legitimate business purpose for the Debtors. This Plan is a distribution by the Debtors and the Committee of proceeds received by the estate. The Objecting

---

[16]     At the Confirmation Hearing, the Objecting Creditors intend to demonstrate that the PSAs listed in Tier 1 could not expressly and unconditionally terminate pre-Petition based on language in their respective PSAs that provided for delays attributable to the purchasers. Indeed, pre-petition, the Debtors took the position that Exclusive Resort's contract contained force majeure language that allowed them to extend the closing date. *See* Letter from Mark L. Nelson, Esquire to David W. Isbell, Esquire & Mark Brantley, Esquire (Jan. 15, 2009) (attached to the McNeill Declaration as Exhibit P).

21

Parties are not aware of any authority that allows an estate to distribute estate proceeds on account of litigation risks to non-debtor third parties.

Moreover, the assertion that the tier system is a function of Starwood's risk assessment of third party claims is a fallacy. The end result of the extensive discovery taken by the Objecting Parties was that no party was willing to accept responsibility for the conception and rationale of the tier system. Both Starwood and the Debtors' representatives testified that the tier system was conceived and proposed by the Committee. See Debtors' Deposition at 47:17 to 48:2, 51:14–21, 152:24 to 153:5; Starwood Deposition at 31:24 to 32:5; Email from James Raved to Edward Weisfelner, April 30, 2011 (attached to the McNeill Declaration as Exhibit Q). The Committee's representative testified he did not become aware of a tier system until informed of the settlement. Wegner Deposition at 84:9-24; 85:21 to 86:2; 86:8–15; *see also* Greenberg Deposition at 78:22 to 79:17. Based on the discovery taken, it appears the litigation risk assessment that justifies the tier system is the creation of Committee counsel.

**B.    The Classification System Results in Disparate Treatment of Similarly Situated Creditors, Which Violates Sections 1129(a)(1) and 1123(a)(4) and 1129(b)(1)**

Section 1123(a)(4) provides that, absent a creditor's consent to less favorable treatment, a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C. § 1123(a)(4). The rejection of the Plan by Class 8 (and Class 7) creates a "cramdown" scenario, which places the burden on the Plan Proponents to prove that the Plan complies with section 1129(b) of the Bankruptcy Code. *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003). In a cramdown, the Court may only confirm "if the plan does not discriminate unfairly and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. 1129(b)(1). When essentially

22

indistinguishable claims receive wildly disparate treatment, a plan cannot be confirmed. *See In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009). Where similar creditors receive "a materially lower percentage of recovery", a presumption of unfair discrimination arises. *See In re Armstrong World Indus.*, 348 B.R. 111, 121 (D. Del. 2006). This Plan's treatment of Tier 3 creditors fails both sections 1123(a)(4) and 1129(b)(1) of the Bankruptcy Code.

As discussed above, all PSA Claimants possess the exact same claim—a return of a deposit under a PSA Agreement. Regardless of how each PSA Claim came to be, they are all unsecured claims. Differences in contract language or the initiation of litigation efforts that did not result in a lien are immaterial. All of the claims are unsecured deposit claims. It is egregiously discriminatory and unfair for the four Tier 1 PSA Claimants—who merely have unsecured claims for terminated contracts—to receive a recovery more than three times greater than Tier 3 PSA Creditors—who also have the same unsecured claims for terminated or rejected contracts.[17]

## II.     The Plan Violates Section 1129(a)(3) of the Bankruptcy Code Because It Has Not Been Proposed in Good Faith

As demonstrated by the discussion of the tainted settlement above, the Plan was not proposed in good faith. Section 1129(a)(3) provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan is proposed in good faith where the plan "(1) the plan fosters a

---

[17]     The Plan does offer the Purchase Option and the Enforcement Option to each of the PSA Classes. The Plan Proponents contend that electing either option renders a PSA creditor unimpaired. The failure to elect one of these options cannot be viewed as a PSA Creditor's consent to less favorable treatment. The Objecting Creditors do not consent to any distribution that is less favorable than the distribution received by any other PSA Creditor. Instead, it begs the question whether PSA Claimants electing the Purchase Option or the Enforcement Option, as unimpaired creditors, should even be considered in analyzing the votes or treatment of PSA Claimants electing the Distribution Option.

result consistent with the Code's objectives; (2) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) (citations omitted).

The Plan was not proposed in good faith because it was the product of a settlement process riddled with conflicts. From the relationship between Starwood and the Indemnified Insiders, to the conflicted nature of Debtors management and other insiders resulting from the releases they are receiving under the Plan, to the Committee's proposal to establish a tier system that benefits Committee members at the expense of other the vast majority of unsecured claims, the parties in this case are hopelessly conflicted. Such a Plan cannot be countenanced by this Court.

From the outset, the Debtors and Starwood recognized that many of the PSA Claimants had the sophistication and the financial wherewithal to "create mischief" for their Plan. *See* Starwood Deposition at 35:2. Those who had, or might, create such mischief were singled out for special treatment. It did not hurt that some of those mischievous creditors sat on the Committee, the official negotiating body for unsecured creditors. *See id.* at 35:6 to 37:21.

The Committee initially opposed the Debtors' efforts from the outset. Exclusive Resorts filed a pleading complaining of the Debtors' efforts to segregate PSA Claims from General Unsecured Claims.[18]    After the Committee proposed a tiered distribution structure for PSA

---

[18]    Objection of Exclusive Resorts Real Estate Holdings II, LLC to the Disclosure Statement in Support of Joint Chapter 11 Plan of Liquidation and Motion Seeking Approval of Disclosure Statement and Solicitation Procedures [D.I. 247].

24

Claims, whereby Exclusive Resorts got the percentage recovery it wanted in the case,[19] it became supportive not only of segregating PSA Claims from General Unsecured Claims, but also of unequal treatment of PSA Claims. Committee member Joel Greenberg testified to this Court that looking out for personal financial interests posed an enormous conflict with fiduciary duties owed to unsecured creditors. Trustee Motion Transcript at 39:12 to 40:14. That enormous conflict disappeared when it involved Mr. Greenberg's recovery versus the majority of unsecured creditors. By engineering a settlement that benefitted a certain few at the expense of the many, the Debtors and Starwood bought the support of the Committee for the plan process. The result is a plan that benefits Starwood, the Debtor's management and affiliates and a select few creditors with the ability to bind the Committee. This Plan has not been proposed in good faith.

## **RESERVATION OF RIGHTS**

The Objecting Creditors expressly join in, and adopt as their own, the objections of other parties in interest to the extent that such objections are not inconsistent with those mentioned herein.

---

[19]   *See* August 9, 2011, attached to the McNeill Declaration as Exhibit J ███████████
███████████████████████████████

PAC 1022855v.5

## CONCLUSION

For the reasons set forth above, the Objecting Creditors respectfully submit that approval

of the settlement and confirmation of the Plan should be denied.

Dated:  August 16, 2011
       Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

David J. Baldwin (DE Bar No. 1010)
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  dbaldwin@potteranderson.com
       jryan@potteranderson.com
       rmcneill@potteranderson.com

*Attorneys for Gary Tilkin, Global Futures and*
*Forex, Ltd., Sandra E. Taylor and 22 Bond Street*

PAC 1022855v.5